## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------------  x
                                                                 :
In re:                                                           :     Chapter 11
                                                                 :
REMINGTON OUTDOOR COMPANY, INC., et                              :     Case No. 18-10684 (__)
al.,¹                                                            :
                                                                 :
                                                                 :
                              Debtors.                           :     (Joint Administration Requested)
---------------------------------------------------------------  x
```

## DECLARATION OF STEPHEN P. JACKSON, JR.
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY
## PLEADINGS OF REMINGTON OUTDOOR COMPANY, INC.
## AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

I, Stephen P. Jackson, Jr., hereby declare under penalty of perjury:

1.    I am the Chief Financial Officer of each of the above-captioned debtors and debtors in possession (each, a "Debtor" and, collectively, the "Debtors"). I have served as Chief Financial Officer of Remington Outdoor Company, Inc. since August 15, 2015.

2.    I have over 12 years of experience in the firearms manufacturing industry. Before joining the Debtors, from October 2013 to August 2015, I was the Chief Financial Officer and Executive Vice President at Driven Brands, Inc. From 2003 to 2013, I worked for Remington Arms Company, serving various roles, including Chief Strategy and Accounting Officer, Chief Financial Officer, Treasurer, Corporate Secretary, and Vice President of Finance. From 1990 to 2003, I worked for PricewaterhouseCoopers LLP, where I served in various positions, including Partner in Middle Market Advisory Services, as well as Senior Manager, Manager, Senior

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The principal offices of Debtor Remington Outdoor Company Inc., the top-level holding company, are located at 870 Remington Drive, Madison, NC 27025.

Associate and Associate in the Audit Practice. I hold a Bachelor of Science in Accounting from Nichols College and am a Certified Public Accountant in the State of North Carolina.

3.      On March 25, 2018 (the "Petition Date"), each of the Debtors filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"). The Debtors commenced these cases in order to implement a comprehensive balance sheet restructuring pursuant to the Debtors' joint prepackaged plan of reorganization (the "Plan"), which the Debtors are filing concurrently with the chapter 11 petitions. As discussed in further detail below, the Plan contemplates that, except for the Term Loan Claims (as defined in the Plan), the Third Lien Notes Claims (as defined in the Plan), and certain settled intercompany claims, all claims against the Debtors, including all general unsecured claims, will either be paid in full or otherwise rendered unimpaired.

4.      The Debtors have requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings")[2] in order to minimize certain of the potential adverse effects of the commencement of these chapter 11 cases and to maximize the value of their estates while they seek confirmation of the Plan. I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions for relief and the First Day Pleadings.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and other personnel, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the First Day Pleadings.

condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.      I am familiar with the contents of each First Day Pleading (including the exhibits to such motions) and believe the relief sought in each First Day Pleading will allow for an orderly transition of the Debtors into these chapter 11 cases and is critical to maintaining operational stability and preserving the value of the estates as the Debtors seek confirmation of their Plan.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and their stakeholders.

7.      Parts I and II of this Declaration provide an overview of the Debtors' businesses, organizational structure, and capital structure.  Part III provides an overview of the circumstances leading to the commencement of these chapter 11 cases.  Part IV discusses the bases for relief sought in the First Day Pleadings.

I.     **Description of the Debtors**

   A.     **The Debtors' Businesses**

8.      Headquartered in Madison, North Carolina, the Debtors are one of America's oldest and largest manufacturers of firearms, ammunition and related products for commercial, military, and law enforcement customers throughout the world.  The Debtors hold a diverse portfolio of category-defining brands, including Remington, Marlin, Bushmaster, Barnes Bullets, Advanced Armament Corp., and DPMS, among others.

9.      Since 2008, the Debtors have held leading market positions in the United States in a variety of firearms and ammunition categories, including certain sales to the military and law enforcement agencies.  The Debtors have several key strengths that provide them with a significant competitive advantage in the firearm and ammunition markets, including, among

other things, (i) category defining brands, (ii) a broad product portfolio, (iii) multiple distribution channels designed to reach diverse end markets, and (iv) a differentiated, customer-focused management, sales, and marketing approach. In addition, the Debtors are one of only two major U.S. companies that manufacture both firearms and ammunition, which provides them with a unique servicing edge, supports their market leading positions, and adds a recurring revenue component to sales.

10.    The Debtors currently manufacture their products in seven different facilities located across the United States with an aggregate 2.5 million square feet of manufacturing space, enabling them to deliver products throughout the United States and globally to approximately 52 countries. The majority of the Debtors' revenue is derived from two key firearms facilities in Ilion, New York and Huntsville, Alabama and a primary ammunition plant in Lonoke, Arkansas. The Debtors' principal customers are various mass market retail chains (e.g., Wal-Mart and Dick's Sporting Goods) and specialty retail stores (e.g., Bass Pro Shops and Cabela's) and wholesale distributors (e.g., Sports South). As of the Petition Date, the Debtors employed approximately 2,700 full-time employees, with an additional work force of temporary employees engaged during peak production schedules at certain of their manufacturing facilities.

**B.    Corporate History**

11.    Formed in 2007, Debtor Remington Outdoor Company, Inc. ("ROC") is a holding company that is currently majority owned by R2 Holdings, LLC ("R2H"). ROC was previously known as Freedom Group, Inc. ("FGI"), which was formed principally for the purpose of acquiring Remington Arms Company, LLC[3] ("RAC"). On December 12, 2007, through a series of transactions, Bushmaster Firearms International, LLC and RAC became wholly owned subsidiaries of FGI.

---

[3]    Formerly known as Remington Arms Company, Inc.

### C.    Organizational Structure

12.    Debtors ROC, FGI Holding Company, LLC ("FGI Holding"), and FGI Operating Company, LLC ("FGI Opco") principally serve as holding companies.  ROC owns 100% of the equity interests in FGI Holding, which in turn owns 100% of the equity interests in FGI Opco.

13.    FGI Opco owns 100% of the equity interests in Debtors RAC, Barnes Bullets, LLC ("Barnes"), RA Brands, L.L.C. ("RA Brands"), FGI Finance, Inc. ("FGI Finance"), and Outdoor Services, LLC.  RAC, in turn, owns 100% of the equity interests in Debtors Remington Arms Distribution Company, LLC ("RAD"), TMRI, Inc. ("TMRI"), Huntsville Holdings LLC, 32E Productions, LLC and Great Outdoors Holdco, LLC.  A chart showing the Debtors' organizational structure as of the Petition Date is attached hereto as **Exhibit A**.

14.    Debtors RAC, Barnes, TMRI, and RAD are the principal operating companies within the Debtors' corporate enterprise and the owner of the Debtors' principal manufacturing plants.  Brief descriptions of certain of the operating entities' functions are outlined below:

- Remington Arms Company, LLC – manufacturer of firearms, ammunition, and related products;

- Barnes Bullets, LLC – manufacturer of ammunition and ammunition components;

- RA Brands, L.L.C. – owns the Debtors' core brand trademarks and charges a royalty to other Debtors for use of those brands;

- TRMI, Inc. – manufacturer of barrel components with certain Debtors as primary customers;

- FGI Finance, Inc. – inactive entity that is the co-issuer of the Third Lien Notes (described below) with FGI Operating Company, LLC;

- Remington Arms Distribution Company, LLC – distributes Remington products to retail chains/dealers.

15.    Debtors Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC and Outdoor Services, LLC are inactive shell entities that do not have any material assets or liabilities.

16.    The Debtors' principal offices and main corporate headquarters are located at 870 Remington Drive, Madison, North Carolina 27025.  In addition, certain corporate administrative functions are handled in offices adjacent to the Debtors' Huntsville, Alabama plant.

## II.    Prepetition Capital Structure[4]

17.    The Debtors have incurred and/or issued debt through five primary debt facilities, consisting of (i) an asset-based lending ("ABL") facility, (ii) a term loan facility, (iii) third lien notes, (iv) an intercompany note purchase agreement, and (v) a secured promissory note.[5]  A summary of these debt facilities is provided below.[6]

### A.    ABL Facility

18.    Debtors FGI Opco, RAC, Barnes, and RAD[7] are the borrowers under an asset-based revolving credit facility (the "ABL Facility"), in an original amount of $225 million,[8] which is memorialized pursuant to that certain Loan and Security Agreement, dated as of April 19, 2012 (as amended, modified, supplemented or restated from time to time, the "ABL Facility Loan Agreement"), by and among FGI Holding, FGI Opco and certain of FGI Opco's

---

[4]    The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

[5]    Prior to the Petition Date, ROC advanced funds to its subsidiaries pursuant to the ROC Financing (defined below), which is described in greater detail in Part III of this Declaration.

[6]    A chart that further illustrates the outstanding amounts under the debt facilities and the applicable guarantors, borrowers, and issuers under the debt facilities is attached as **Exhibit C**.

[7]    RAD was not a borrower on the closing date, but was added as a borrower by way of joinder subsequently.

[8]    Pursuant to certain amendments entered into prior to the Petition Date, the maximum availability under the ABL Facility has fluctuated from time to time.  As of the Petition Date, the facility size is $193 million.

subsidiaries including Barnes and RAC, Bank of America, N.A., as Administrative Agent (the "ABL Agent") and co-collateral agent with Wells Fargo Bank, National Association ("Wells"), and the lenders from time to time party thereto (the "ABL Facility Lenders"). The maturity date for the ABL Facility is June 27, 2019, provided that, if the Term Loan Facility (as defined below) is not refinanced by January 18, 2019, the ABL Facility will mature on such date.

19.     Debtors FGI Holding, RA Brands, TMRI[9] and FGI Finance are guarantors of the ABL Facility (together with Debtors FGI Opco, Barnes and RAC, the "ABL Loan Parties"). Debtor ROC is not a borrower under or guarantor of the ABL Facility. As is typical in a ABL and term loan structure, the ABL Loan Parties' obligations under the ABL Facility are secured by (i) first priority liens on certain of the ABL Loan Parties' collateral, including but not limited to accounts receivable, intellectual property, inventory, and proceeds thereof and (ii) a second priority lien on substantially all other assets of the ABL Loan Parties.

20.     As of the Petition Date, the aggregate outstanding principal balance under the ABL Facility was approximately $114,500,000, plus any accrued and unpaid fees, expenses, and other amounts due and owing pursuant to the terms of the ABL Facility Loan Agreement and related loan documents.

21.     As discussed below, and as set forth in the commitment letter attached as Exhibit 1 to the Plan, the ABL Facility Lenders have agreed to provide the Debtors with postpetition financing during the chapter 11 cases in the form of a debtor-in-possession superpriority senior secured asset-based revolving credit facility of up to $193 million in the aggregate (including a $15 million letter of credit subfacility and a $25 million swingline subfacility), which the

---

[9]     Debtor TMRI was not a guarantor on the closing date, but was added as a guarantor by way of joinder subsequently.

Debtors intend to use to fund their working capital needs and satisfy certain prepetition obligations under the ABL Facility during the chapter 11 cases.

### B.    Term Loan Facility

22.    Debtor FGI Opco is the borrower under that certain Term Loan Agreement, dated as of April 19, 2012 (as amended, modified, supplemented or restated from time to time, the "Term Loan Agreement")[10] by and between Debtors FGI Holding, FGI Opco and certain of FGI Opco's subsidiaries, Ankura Trust Company, LLC, as successor agent[11] (the "Term Loan Agent"), and the lenders from time to time party thereto (the "Term Loan Lenders").

23.    Debtors FGI Holding, RAC, RA Brands, TMRI, RAD, Barnes, and FGI Finance are guarantors under the Term Loan Facility (together with Debtor FGI Opco, the "Term Loan Parties").[12] Debtor ROC is not a guarantor under the Term Loan Facility.  As is typical in a ABL and term loan structure, the Term Loan Parties' obligations under the Term Loan Facility are secured by (i) second priority liens, junior to the ABL Facility liens, on certain of the Term Loan Parties' collateral, including but not limited to accounts payable, inventory, and proceeds thereof and (ii) first priority liens on substantially all of the Term Loan Parties' other assets.  The maturity date for the Term Loan Facility is April 19, 2019.

24.    On February 12, 2018, Debtors ROC, FGI Holding, and FGI OpCo, the other Term Loan Parties and the Term Loan Agent, entered into an incremental amendment to Term Loan Agreement (the "Term Loan Amendment"), pursuant to which Debtor ROC agreed to loan

---

[10]    The credit facility memorialized by the Term Loan Agreement and the various related agreements and documents is referred to herein as the "Term Loan Facility."

[11]    Ankura Trust Company, LLC was not the administrative agent on the closing date, but succeeded Bank of America as administrative agent subsequently.

[12]    RAD and TMRI were not guarantors on the closing date, but were added as guarantors by way of joinder subsequently.

an aggregate of up to $45 million to Debtor FGI OpCo for general corporate and working capital purposes and to pay fees and expenses related to the foregoing.

25.     As of the Petition Date, the aggregate outstanding principal balance under the Term Loan Facility was approximately $550,475,000.

26.     Debtor ROC and certain of the Debtors' lenders have agreed to provide the Debtors with postpetition financing during the chapter 11 cases in the form of a superpriority debtor-in-possession credit facility of up to $145 million in the aggregate, which the Debtors intend to use to fund their costs during the chapter 11 cases and for working capital needs.

**C.     Senior Third Lien Notes**

27.     Debtors FGI Opco and FGI Finance are issuers of those certain 7.875% Senior Secured Notes due 2020 (the "Third Lien Notes")[13] pursuant to that certain Indenture, dated as of April 19, 2012, by and among, Debtors FGI Opco and FGI Finance, and Wilmington Trust, National Association, as indenture trustee.  Debtors ROC, FGI Holding, RAC, RA Brands, Barnes, TMRI, and RAD[14] are guarantors of the Third Lien Notes.  The Third Lien Notes are secured by third priority liens and security interests (junior to the respective liens and security interests of the ABL Agent and the Term Loan Agent) on substantially all of the assets of the issuers and guarantors of Debtors RAC, RA Brands, Barnes, TMRI, and RAD.

28.     In addition, in connection with the execution of the RSA (as defined below), on February 12, 2018, Debtors ROC, FGI Holding, OpCo, FGI Finance, RAC, Barnes, RAD, RA Brands and TMRI entered into a letter agreement (the "Letter Agreement") with a majority of the Third Lien Noteholders (the "Consenting Third Lien Noteholders").  Pursuant to the Letter

---

[13]   The holders of the Third Lien Notes are referred to herein as the "Third Lien Noteholders".

[14]   Debtors TMRI and RAD were not Guarantors on the closing date, but were added as Guarantors by way of joinder subsequently.

Agreement, the Consenting Third Lien Creditors consented to Debtors ROC's, FGI OpCo, and FGI Holding entering into the Term Loan Amendment and the consummation of the transactions contemplated thereby (including, but not limited to, the provision of the ROC Financing (as defined below)).  Additionally, pursuant to the Letter Agreement, Debtor ROC granted the Third Lien Notes Indenture Trustee, for the benefit of the Third Lien Noteholders, a security interest in and lien on substantially all of ROC's assets, including ROC's bank accounts and cash.  On February 12, 2018, the Third Lien Notes Indenture Trustee filed a UCC-1 financing statement identifying all assets of ROC as collateral.

29.     The Third Lien Notes mature on May 1, 2020.  As of the Petition Date, the aggregate outstanding principal amount of the Third Lien Notes was approximately $226,012,000.[15]

30.     Debtors FGI Holding, OpCo, RAC, RA Brands, Barnes, FGI Finance, TMRI, and RAD, the ABL Agent, the Term Loan Agent, and the Third Lien Notes Indenture Trustee are party to that certain Intercreditor Agreement dated as of April 19, 2012 that, among other thing, sets forth the relationship in terms of claims, priority, rights and remedies between and among the parties.  As of the date of this Declaration, I am unaware of any equity holder of Debtor ROC that holds any Third Lien Notes.

**D.     Intercompany Note Purchase Agreement / ROC Financing**

31.     On May 11, 2017, Debtors FGI Opco and ROC entered into that certain Note Purchase Agreement ("Intercompany NPA").  Pursuant to the Intercompany NPA, FGI Opco agreed to issue, and ROC agreed to purchase, up to $100 million of senior unsecured notes to ROC up to and through July 19, 2019 for the purposes of obtaining additional cash to fund FGI

---

[15]    In late 2017, the Debtor FGI Holding repurchased approximately $24 million of the then-outstanding Third Lien Notes and, prior to the Petition Date, cancelled all of the repurchased Third Lien Notes.

Opco's and its various subsidiaries' working capital needs. As of the Petition Date, $20 million in notes are outstanding under Intercompany NPA.

32.     Furthermore, pursuant to the Term Loan Amendment discussed above, in connection with the Debtors' entry into the RSA, Debtor ROC made a series of advances totaling approximately $45 million from its cash on hand to its subsidiary Debtor FGI Opco for the purpose of funding the operating Debtors' working capital needs. Additional details regarding this prepetition financing are set forth in Section III.B below.

### E.     Huntsville Secured Note

33.     In February 2014, Debtor RAC obtained a $12.5 million loan from the City of Huntsville, Alabama (the "City of Huntsville") in order to improve its manufacturing facility there. The loan is evidenced by a promissory note executed by Debtor RAC in favor of the City of Huntsville (the "Huntsville Note") and secured by a first priority mortgage on the Debtors' firearm facilities in Huntsville. The Promissory Note has an eleven-year term with annual amortization payments due each year beginning on the second anniversary of the issuance equal to 10% of the original principal balance, provided that if RAC meets certain employment goals for the year preceding the principal and interest payment dates, the annual principal and related interest for that payment period will be forgiven. As of the Petition Date, the aggregate outstanding balance under the Huntsville Note was approximately $12.5 million; provided however, that the Debtors' obligations payable in connection with the Huntsville Note may increase to the extent Debtor RAC has not satisfied the criteria for the year ended December 31, 2017 and has not received from the City of Huntsville a waiver or reduction of any such additional obligations.

### F.    Other Liabilities

34.    As of the Petition Date, the Debtors have approximately $55 million in outstanding claims owed to its various vendors, suppliers, and service providers, including claims reflected in the Debtors' current accounts payable or otherwise accrued and/or attributable to the period prior to the Petition Date.  Additionally, the Debtors are party to various litigation matters, including products liability actions.  The claims associated with such litigation matters are disputed, contingent, and/or unliquidated as of the Petition Date.

### G.    ROC Common Stock

35.    Debtor ROC has approximately 351,000 shares of common stock (including restricted stock units) issued and outstanding.  As of December 31, 2017, approximately 93.5% of ROC's outstanding common stock is held by R2H.  The balance of ROC's common stock is held primarily by certain past and present directors, officers, and employees of the Debtors acquired primarily pursuant to various prepetition stock-based incentive plans.  In addition, certain past and present directors, officers and employees hold options to purchase, in the aggregate, less than 10% of ROC's common stock.

## III.    Commencement of the Chapter 11 Cases

### A.    Key Events Leading to Chapter 11

36.    Despite the historical strength of the Debtors' various brands, the Debtors have experienced a significant decline in sales and revenues in the approximately one-year period preceding the Petition Date.  As a result, the Debtors have faced increasing difficulty in meeting certain benchmarks in order to maintain borrowing capacity under their ABL Facility.  Although the Debtors negotiated for minor relief with respect to the borrowing capacity, the overall business and industry environments continue to cause significant financial hardship to the Debtors.

37.    More specifically, throughout 2016, the Debtors were increasing production rates based on inputs from its key markets to meet expected demand for its products in 2017. Those demands, however, ultimately did not materialize. Due to the resulting elevated level of their inventory, the Debtors initiated certain production reductions, as well as various cost cutting measures and liquidity management initiatives. At the same time, however, the firearms and ammunition markets experienced significant competitive market pricing pressures from the higher inventory levels industry-wide and the accelerating reduction in demand. Based on the foregoing, the Debtors' financial performance began experiencing significant year-over-year deterioration since the beginning of 2017.

38.    Furthermore, the Debtors' early 2017 plans and historical seasonality needs required additional working capital, and thus the Debtor increased its borrowings under the ABL Facility. At that time, the Debtors expected that the additional borrowings would be repaid from the collection of receivables on sales of the Debtors' inventory. Those expectations, however, did not materialize, and the Debtors therefore were left with continued high inventory balances, an increased debt load, and a continuing market environment experiencing significant pressures on pricing, in large part due to the Debtors' principal competitors engaging in unusually heavy discounting and promotions to reduce their own excess inventory.

39.    To address these issues, in late 2017, the Debtors embarked on a number of different initiatives, both from an operational and financial perspective to improve sales and obtain relief and flexibility under its various debt instruments. With respect to its operations, the Debtors broadened and restructured their sales force and reorganized their marketing organization, which in turn helped expand their customer base. The Debtors also reset their pricing strategy in the hopes that it would avoid the need to engage in additional discounting. In

addition, the Debtors entered into a number of amendments of the ABL Facility which were principally designed to increase borrowing capacity under the ABL Facility to facilitate smoother operational reductions in their production facilities.

40.    Despite these efforts, the Debtors' financial performance continued to deteriorate, owing in large part to higher costs. At the conclusion of 2017, the Debtors had realized approximately $603.4 million in sales and an adjusted EBITDA of $33.6 million. In comparison, in 2015 and 2016, the Debtors had achieved approximately $808.9 million and $865.1 million in sales and $64 million and $119.8 million in adjusted EBITDA, respectively.

**B.    Negotiation and Entry into RSA**

41.    Given the continued strain the decreasing revenues were placing on their liquidity, in early 2018, the Debtors, together with various holders of the Debtors' funded debt obligations, began exploring even broader solutions to the Debtors' financial problems. Among the options discussed by the parties were (i) a recapitalization of the Debtors through a traditional chapter 11 plan of reorganization and (ii) a potential sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. At the same time, the Debtors considered various financing alternatives to address their immediate working capital needs, including obtaining additional access under their ABL Facility, financing from the Term Lenders and/or the Third Lien Noteholders, or advances from Debtor ROC to its operating subsidiaries.

42.    Based on extensive, good faith efforts of the Debtors and certain of the Term Lenders and Third Lien Noteholders, the parties ultimately were able to negotiate a comprehensive restructuring (the "Restructuring") that not only would address the Debtors' overleveraged balance sheet and a global settlement of various intercompany claims, but also leaves general unsecured claims unimpaired and provides a path to the short-term and long-term

financing that will allow the Debtors to operate their businesses successfully. The terms and conditions of the Restructuring were set forth in that certain Restructuring Support Agreement, dated as of February 11, 2018 (as amended, modified, supplemented or restated from time to time in accordance with the terms thereof, the "RSA") executed by the Debtors party thereto and a majority in principal amount of each of the Term Lenders and the Third Lien Noteholders.[16] A true and correct copy of the RSA (redacted for certain confidential information) is attached hereto as Exhibit B.

43.　　Pursuant to the terms of the RSA, each creditor signing the RSA agreed, among other things, to:

- Support and take all commercially reasonable actions necessary or reasonably requested by Remington to facilitate entry of the DIP Orders, the Disclosure Statement Order, and the Confirmation Order (each as defined in the RSA);

- Support the Restructuring and vote in favor of the Plan, provided that the obligations of the applicable creditors have not been terminated in accordance with the terms of the RSA, and not withdraw or revoke its vote with respect to the Plan; and

- Not take any action materially inconsistent with the transactions expressly contemplated by the RSA, or that would materially delay or obstruct the consummation of the Restructuring, including, without limitation, commencing, or joining in commencing, any litigation or involuntary case for relief under the Bankruptcy Code against the Debtors.

44.　　Pursuant to the terms of the RSA, and in consideration of the Term Lenders' and Third Lien Noteholders' obligations thereunder, the Debtors agreed, among other things, to:

- Support and, subject to all necessary Court approvals, consummate the Restructuring and all transactions contemplated under the RSA;

- Negotiate in good faith all definitive documentation contemplated by the RSA and use best efforts to obtain all necessary regulatory and/or third-party approvals;

---

[16]　The following summary of the Restructuring is qualified in its entirety by reference to the RSA and Plan. In the event of any conflict between the RSA or Plan, on the one hand, and the following summary, on the other hand, the terms of the RSA or Plan, as applicable, shall control.

- Operate in the ordinary course consistent with industry practice and the operations contemplated pursuant to the Debtors' business plan; and

- Complete the Restructuring and all transactions contemplated thereby in accordance with certain milestones (discussed further below).

45.    The RSA includes two principal components.  First, it addressed the Debtors' immediate liquidity needs by allowing the operating subsidiaries to borrow up to $45 million from Debtor ROC in order to satisfy the subsidiaries' various obligations, including the claims of other Debtors' various vendors and suppliers (the "ROC Financing").  Debtor ROC provided the funds for the ROC Financing from its existing cash on hand.

46.    The primary purpose of the ROC Financing was to provide a bridge that would allow the Debtors to operate until the commencement of these chapter 11 cases, as well as provide additional liquidity postpetition.  As of the Petition Date, Debtor ROC had advanced the full $45 million available under the ROC Financing, which amounts will be fully converted and rolled up into a postpetition DIP facility (the "ROC DIP Facility").

47.    The RSA also contemplates that, upon the commencement of these chapter 11 cases, a subset of the Term Lenders and the Third Lien Noteholders would provide up to an additional $100 million in postpetition financing to the Debtors in order to fund the administration of these chapter 11 cases and other working capital needs (the "Term DIP Facility").  The Term DIP Facility is described in greater detail below.  Collectively, the total postpetition financing will be $338 million consisting of a $193 million ABL DIP Facility (defined and discussed below), the $100 million Term DIP Facility, and the $45 million ROC DIP Facility (the Term DIP Facility and the ROC DIP Facility together, the "Term/ROC DIP Facility", and the Term/ROC DIP Facility together with the ABL DIP Facility, the "DIP Facilities").

48.     In addition to the financing aspects, the RSA sets forth the terms and conditions for the comprehensive Restructuring of the Debtors' balance sheet and the path to resolve certain prepetition intercompany and third party claims, all of which would be implemented through the Plan. The principal terms of the Restructuring, which are set forth in greater detail in the RSA and the Plan, are summarized below:

- On the effective date of the Plan (the "Effective Date"), Debtor ROC will receive and immediately distribute to the Third Lien Noteholders, in full and final satisfaction of the $45 million ROC DIP Facility and the settlement of any intercompany claims of ROC against its subsidiaries, 17.5% of the new common units of the applicable reorganized parent entity, plus cash in an amount equal to all accrued and unpaid postpetition interest on the ROC DIP Facility (collectively, the "ROC DIP Distribution");

- On the Effective Date, the $100 million Term DIP Facility claims will be replaced with obligations under a new $100 million exit term loan facility made available to the reorganized Debtors (the "New Term Loan Facility");

- On the Effective Date, the claims under the ABL DIP Facility and the ABL Facility will be repaid in full in cash, unless each holder of such claims agrees to an alternative treatment, which may include participation in an exit asset-based lending facility[17];

- On the Effective Date, the Term Loan Lenders will receive: (i) 82.5% of the applicable reorganized parent entity, (ii) subject to the terms of the Plan, (a) certain interests in the Litigation Trust (as defined below), or (b) any amounts allocated for distribution to the Term Loan Lenders under a Litigation Settlement (as defined below), and (iii) to the extent not previously paid to the Term Loan Lenders in accordance with Interim DIP Order, Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018;

- On the Effective Date, the Third Lien Noteholders will receive: (i) the ROC DIP Distribution; (ii) a cash distribution of $39.3 million from Debtor ROC, provided that such cash distribution (a) will be reduced by certain fees and expenses incurred by the ad hoc group of certain holders of the Third Lien Notes and (b) will be increased by $5.0 million if the

---

[17]   As discussed below, the ABL Lenders have executed a commitment letter agreeing to the conversion of the ABL DIP Facility into the ABL Exit Facility, subject to the terms and conditions of such commitment letter.

Litigation Trust is not established (the "<u>Third Lien Noteholder Cash Distribution</u>"); (iii) new warrants to acquire the new common units of the applicable reorganized parent entity; and (iv) subject to the terms of the Plan (a) certain interests in the Litigation Trust (as defined below), or (b) any amounts allocated for distribution to the Third Lien Noteholders under a Litigation Settlement (as defined below);

- Certain intercompany claims among Debtors ROC, FGI Holding and FGI Opco will be settled, released and waived subject to the terms and conditions of the Plan;

- All other claims against the Debtors, including all general unsecured claims, will either be paid in full in cash in the ordinary course after the Effective Date or otherwise be unimpaired; *provided* that any allowed general unsecured claim against Debtor ROC shall be assumed by Debtor FGI Opco in accordance with the Plan; and

- Existing equity interests in Debtor ROC would be canceled on the Effective Date.

In light of the foregoing, the Plan contemplates that only two impaired classes of claims would be entitled to vote on the Plan: the Term Loan Claims and the Third Lien Notes Claims.

49. In addition to the ROC Financing, prior to the Petition Date, the Debtors and the ABL Facility Lenders also entered into a number of amendments to the ABL Facility to support the Debtors' ongoing business operations during the immediate prepetition period. Furthermore, in connection with the commencement of the Chapter 11 Cases, the Debtors expect to immediately enter into a replacement superpriority senior secured debtor-in-possession asset-based revolving credit facility (the "<u>ABL DIP Facility</u>"), the proceeds of which will be used to pay in full all outstanding obligations under the ABL Facility. In this regard, the ABL Facility Lenders have each executed a commitment letter by which each ABL Facility Lender agrees to participate in the ABL DIP Facility, as well as an exit asset-based lending facility in the aggregate principal amount of $193 million (the "<u>ABL Exit Facility</u>"), upon and subject to the terms and conditions set forth in the commitment letter and in the term sheet attached thereto.

50.    In addition, on the effective date of the Plan, in connection with the various restructuring transactions, the Debtors will enter into a $55 million senior secured first in, last out asset based term loan facility to be provided by certain of the lenders under the Term DIP Facility (the "New FILO Term Loan Facility"). Together, the ABL Exit Facility, the New Term Loan Facility, and the New FILO Term Loan Facility will finance the Debtors' post-chapter 11 cash and operational needs and support the unimpairment of general unsecured creditors as set forth in the Plan.

51.    The RSA and Plan also provide that, on the Effective Date, a litigation trust (the "Litigation Trust") will be established and will acquire any claims or causes of action held by the Debtors' estates as of the Effective Date, as well as any claims held by any of the Term Lenders and Third Lien Noteholders voting to accept the Plan. The Litigation Trust will be funded with $5.0 million in cash in order to investigate and, potentially, prosecute the claims and causes of action.

52.    As set more specifically in the Plan, the first $5.0 million of recoveries obtained by the Litigation Trust will be paid to the Third Lien Noteholders. Any recoveries after the initial $5.0 million will be distributed 50% to the Term Lenders and 50% to the Third Lien Noteholders. Notwithstanding the foregoing, the holders of Third Lien Notes (on account of the Litigation Trust interests they would receive under the Plan) shall receive all recovery amounts from any claims transferred to the Litigation Trust that (i) are exclusively related to amounts transferred within the applicable statute of limitations from Debtor ROC to any transferee, or (ii) belong solely to Debtor ROC or any of its stakeholders, in each case subject to the terms, conditions and limitations of the Plan.

53.    The RSA also provides certain milestones that the Debtors must satisfy in connection with the Restructuring:

- Commence solicitation of the Plan by March 22, 2018;

- Commence the chapter 11 cases by March 25, 2018;

- File the Plan, the Disclosure Statement (as defined below), and the motion to approve the Disclosure Statement by March 26, 2018;

- Entry of the interim DIP order within three (3) days of the Petition Date;

- Entry of the final DIP order within thirty-five (35) days of the Petition Date;

- Entry of the Confirmation Order within fifty (50) days of the Petition Date; and

- Occurrence of the Effective Date within (15) days after entry of the Confirmation Order.

54.    The Debtors have satisfied the first three of the milestones.  Prior to the Petition Date, the Debtors commenced solicitation of the Plan to holders of Term Loan Claims and Third Lien Notes Claims and have set a voting deadline of April 26, 2018.  In addition, concurrently with the filing of the chapter 11 petitions, the Debtors are filing the Plan, along with the accompanying disclosure statement for the plan (the "Disclosure Statement").  In keeping with the milestones, the Debtors are also seeking interim approval of the DIP Financing (defined below) and are filing a motion requesting that the Court schedule a combined hearing to consider approval of the Disclosure Statement and confirmation of Plan on or around May 3, 2018.

55.    The Debtors believe that the Restructuring as set forth in the Plan represents the best outcome for the Debtors, the estates and all of their stakeholders.  The Plan limits the impairment of third party claims only to the Term Loan and Third Lien Notes classes and certain settled intercompany claims.  Importantly, the Plan provides that all general unsecured claims against the Debtors will be paid in full in cash in the normal course or otherwise be rendered

unimpaired. Thus, the Plan will have little to no impact on most creditors of the Debtors and in fact will better position the Debtors to satisfy those creditors' claims as they come due.

## IV.   First Day Pleadings

56.   Concurrently with its chapter 11 petitions, the Debtors are filing the following First Day Pleadings:

a.   Debtors' Motion for Entry of Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief ("Joint Administration Motion");

b.   Debtors' Motion for Entry of Order Authorizing Debtors to File (I) Consolidated List of Creditors and (II) Consolidated List of Top Thirty Creditors ("Creditor Matrix Motion");

c.   Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent ("Prime Clerk Application");

d.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Charge Card Programs and Pay Obligations and Fees, (D) Maintain Existing Business Forms, and (E) Continue Performing and Granting Administrative Priority for Intercompany Transactions, (II) Granting the Debtors an Extension to Comply With the Requirements of Section 345(b), and (III) Scheduling a Final Hearing ("Cash Management Motion");

e.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, and Other Compensation, and Employee Benefits, and (B) Continue Existing Employee Benefit Plans and Programs, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing ("Employee Wages Motion");

f.   Debtors' Motion for Entry of an Order (I) Authorizing Debtors to (A) Continue Debtors' Insurance Programs, (B) Pay Certain Obligations in Respect Thereof Postpetition, and (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing ("Insurance Motion");

g.   Debtors' Motion for Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services,

(III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Scheduling a Final Hearing ("Utilities Motion");

h. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Remit and Pay Certain Prepetition Taxes, Governmental Assessments, and Fees, (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing, and (III) Scheduling a Final Hearing ("Taxes Motion");

i. Debtors' Motion for Entry of Order (I) Authorizing Debtors to (A) Maintain Certain Customer and Consumer Programs and (B) Honor or Pay Certain Prepetition Obligations Related Thereto, and (II) Authorizing Banks and Financial Institutions to Pay All Checks and Electronic Payment Requests Relating to the Foregoing ("Customer and Consumer Programs Motion");

j. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims in the Ordinary Course, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests related thereto, (III) Requiring Creditors to Maintain Customary Terms as a Condition to Payment, and (IV) Scheduling a Final Hearing ("Payable Claims Motion"); and

k. Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Authorizing Postpetition Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (VI) Granting Related Relief With Respect to ABL DIP and Exit Facilities Commitment Letter ("DIP Motion"); and

l. Debtors' Motion for Entry of (I) Order (A) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of Plan, (B) Approving Form and Manner of Notice of Combined Hearing and Commencement of Chapter 11 Cases, (C) Establishing Procedures for Objecting to Disclosure Statement or Plan, and (D) Conditionally Waiving Requirement to File Statements and Schedules and (II) Order (A) Approving Prepetition Solicitation Procedures, (B) Approving Adequacy of Disclosure Statement and (C) Confirming Plan (the "Scheduling Motion").

57.    As noted above, the relief sought in the various First Day Pleadings would allow the Debtors to, among other things, (i) obtain certain operational relief and establish various administrative procedures to promote a seamless transition into bankruptcy and (ii) obtain debtor-in-possession financing and use cash collateral in order to fund the Debtors' business operations and the administration of these chapter 11 cases.

58.    I have reviewed each of the First Day Pleadings or had their contents explained to me, and I believe the Debtors would suffer immediate and irreparable harm absent the ability to continue their business operations as sought in the First Day Pleadings. In my opinion, approval of the relief sought in the First Day Pleadings will be critical to maintaining the stability of the Debtors business operations, preserving value, and allowing the Debtors to focus their efforts on the Plan confirmation process.

59.    Several of the First Day Pleadings request authority to pay certain prepetition claims. I am told by the Debtors' advisors that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have limited their request for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

60.    Below is a brief discussion of the Debtors' operational First Day Pleadings and an explanation of why, in my belief, such motions are critical to the successful prosecution of these chapter 11 cases. More fulsome descriptions of the facts regarding the Debtors' operations, and the bases for the relief requested in the operational motions, can be found in each relevant First Day Pleading.

**Cash Management Motion**

61.    In the ordinary course of business, the Debtors utilize an integrated and centralized cash management system (the "Cash Management System") to collect, manage, and disburse funds used in their operations. The Cash Management System is essential to the

efficient execution and achievement of the Debtors' business objectives, and to maximizing the value of their estates. As of the Petition Date, the Debtors maintained 28 bank accounts (collectively, the "Bank Accounts") at several banks (each, a "Bank" and, collectively, the "Banks") in the United States. The Debtors primarily operate their Cash Management System through 14 active bank accounts maintained at Bank of America. Money is transferred between the Bank Accounts, and payments to creditors are made from Bank Accounts, in a variety of manners, including checks, drafts, wire transfers, and automated clearinghouse ("ACH") transfers. Additional detail regarding the Cash Management System, including a detailed diagram of the system, is provided in the Cash Management Motion.

62.    Pursuant to the Cash Management Motion, the Debtors request authority to continue operating their Cash Management System, to honor and pay associated Bank Fees, to continue and pay all obligations under the Debtors' purchase card system, maintain existing business forms, and to continue performing Intercompany Transactions in the ordinary course of business. The Debtors also request a 45-day extension to comply with the investment requirements of section 345(b) of the Bankruptcy Code. I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid significant interruptions to the operation of the Debtors' businesses. I believe that authorizing the Debtors to, among other things, continue operating their Cash Management System, maintain existing business forms, honor and pay the Bank Fees, honor and pay obligations with respect to the Company's P-cards, and continue Intercompany Transactions is essential to the Debtors' operational stability and restructuring efforts. The Debtors maintain a relatively complex Cash Management System, and some of the Debtors' most critical operations, including payroll, are funded via Intercompany Transactions. In my opinion, continued use of the Cash Management System will

facilitate the Debtors' chapter 11 cases by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of postpetition obligations. Moreover, I believe that allowing the Debtors to continue Intercompany Transactions, as well as to continue performing certain other status quo cash management operations, such as maintaining current business forms, will assure that the Debtors' businesses will be uninterrupted by the commencement of this bankruptcy, thereby ensuring the efficient administration of these chapter 11 cases, and maximizing the value of the Debtors' estates.

### Employee Wages Motion

63.    As of the Petition Date, the Debtors employ approximately 2,700 employees, consisting of approximately 591 full-time salaried and 2,109 full-time hourly employees (collectively, the "Employees").    Of the 2,109 full-time hourly employees, 735 are union Employees and 1,374 are non-union Employees.    The Employees are spread across eight locations, spanning from New York to Utah.

64.    The Employees perform a wide variety of functions critical to the administration of these Chapter 11 Cases and the Debtors' operations generally.    In many instances, the Employees include personnel who are intimately familiar with the Debtors' businesses, processes, and systems, or who have developed relationships with counterparties that are essential to the Debtors' business.    To that end, and as discussed in greater detail in the Employee Wages Motion, in the ordinary course of business, the Debtors pay and incur a number of obligations related to the Employees, including, among other things, wages and salaries and business expense reimbursements.

65.    Pursuant to the Employee Wages Motion, the Debtors request authority to pay prepetition Employee Obligations to their employees and to continue existing Employee Benefit Programs for their current Employees in the normal course.  I believe the relief requested in the Employee Wages Motion is necessary and appropriate in order to avoid any unnecessary disruptions to the Debtors' operations and any resulting deterioration in the value of the Debtors' estates.  I believe paying prepetition employee wages, benefits, and certain other compensation, as well as continuing existing employee benefits for the Debtors' staff, is necessary to ensure the Debtors' seamless transition into bankruptcy and the operational stability needed as the Debtors promptly seek confirmation of the prepackage Plan.  In the absence of paying prepetition wages and benefits and continuing existing employee benefits, I believe the Debtors would face severe threats to the successful operation of their businesses, including employee attrition and turnover, loss of goodwill, and loss of morale, thereby unnecessarily impairing the Debtors' ability to continue operations and reducing the value of the Debtors' estates.  Therefore, I believe that such authorization is necessary to keep the Debtors' existing workforce intact in order to maximize the value of the bankruptcy estates for the benefit of all parties in interest in these chapter 11 cases.

**Insurance Motion**

66.    In the ordinary course of business, the Debtors maintain 15 insurance programs, with many of those programs encompassing multiple policies. These programs provide insurance coverage for, among other things, the Debtors' property and machinery, general liability, automobile, worker's compensation, umbrella coverage, and directors and officers (each, an "Insurance Program" and, collectively, the "Insurance Programs").  In addition, in the ordinary course of business, the Debtors finance, through premium financing agreements (the "PFAs"),

the payment of their premiums on certain Insurance Programs. The Debtors' Insurance

Programs and PFAs, along with a description of the insurance brokers' fees that the Debtors pay

in the normal course, are described in further detail in the Insurance Motion.

67.     Pursuant to the Insurance Motion, the Debtors request authority to maintain and

continue to honor certain Insurance Policies, and pay Insurance Obligations, whether such

obligations relate to the period prior to or after the commencement of these chapter 11 cases, in

the ordinary course of business. I believe that the relief requested in the Insurance Motion is

necessary and appropriate because continuation of the Debtors' Insurance Programs and payment

of the Debtors' Insurance Obligations are imperative to the Debtors' continued operation and

preserving the value of the Debtors' estates. It is essential for the Debtors to carry insurance in

their day-to-day operations, or they run the risk of, among other harms, incurring financial

responsibility and legal liability for potential occurrences not covered by insurance. Moreover,

in many cases, coverage provided by the Debtors' Insurance Policies is required by the

regulations, laws, and contracts that govern the Debtors' commercial activities. Accordingly,

maintaining the Debtors' Insurance Programs, and paying their Insurance Obligations, ensures

that the value of the Debtors' estate is maximized for the benefit of all stakeholders.

**Utilities Motion**

68.     In connection with the operation of their business, certain of the Debtors obtain

electricity, telephone, water, gas, internet, waste disposal, and other similar services

(collectively, the "Utility Services") from a number of utility companies (collectively, the

"Utility Companies"), as identified in the Utilities Motion. I believe the continued and

uninterrupted provision of Utility Services during the postpetition period is necessary to allow a

smooth operation of the Debtors' business and ensure stability in the production of the Debtors' various products.

69.    Pursuant to the Utilities Motion, the Debtors request that the Court determine adequate assurance of payment for future utility services, establish procedures for determining adequate assurance of payment, and prohibit Utility Companies from altering, refusing, or discontinuing utility services.  I believe the relief requested in the Utilities Motion is necessary and appropriate because it will ensure that there is a process to address any utility provider that may make a demand to the Debtors for adequate assurance or otherwise threaten to alter, refuse, or discontinue utility service, thereby ensuring that any disruptions to the Debtors' business operations are minimized.  I am informed and believe that the proposed adequate assurance procedures are consistent with procedures that are typically approved in chapter 11 cases in this district.

**Taxes Motion**

70.    In the ordinary course of business, the Debtors incur federal excise taxes, sales and use taxes, real estate taxes, personal property taxes, and other taxes, fees, and charges, each as more particularly described in the Taxes Motion (collectively, the "Taxes and Fees"). The Debtors remit the Taxes and Fees to various federal, state, and local governments and agencies, including taxing and licensing authorities (collectively, the "Governmental Authorities").

71.    Pursuant to the Taxes Motion, the Debtors request authority to pay certain prepetition taxes, governmental assessments, and fees as those obligations become due in the normal course.  I believe that the relief requested in the Taxes Motion is necessary and appropriate because the Debtors' failure to pay prepetition Taxes and Fees could materially and adversely impact their business operations and impair the value of the Debtors' estates.

Specifically, if the Debtors were to delay paying prepetition Taxes and Fees, there is a risk that Governmental Authorities would assess penalty fees on the past due amounts, thereby increasing the size of the Debtors' financial liability, or that Governmental Authorities would pursue claims against the Debtors' officers and directors, thereby distracting them from the operation of their businesses, the administration of these chapter 11 cases, and the Debtors' pursuit of confirmation of the Plan. Therefore, I believe that the ability to pay prepetition Taxes and Fees will greatly assist the Debtors in maximizing the value of their estates for the benefit of all stakeholders.

**Customer and Consumer Programs Motion**

72.    In order to develop and sustain positive reputations in the marketplace for their products and maximize the loyalty of, and goodwill with, their customers, the Debtors historically have engaged in certain practices and programs designed to provide certain incentives and services to the Debtors' various customers as well as the consumer end users of the Debtors' products (collectively, the "Customer and Consumer Programs"). The Customer and Consumer Programs principally consist of four categories of programs or services: customer rebates; show special promotions; and a consumer warranty program. The specific Customer and Consumer Programs are described in greater detail in the Customer and Consumer Programs Motion.

73.    Pursuant to the Customer and Consumer Programs Motion, the Debtors request authority to continue the Customer and Consumer Programs and to honor and pay certain prepetition obligations related to the Customer and Consumer Programs. I believe that the relief requested in the Customer and Consumer Programs Motion is necessary and appropriate to preserve the value of the Debtors' estates. I believe the ability to continue the Customer and Consumer Programs and honor and pay the related in the ordinary course is critical to ensuring

the continued operation of the Debtors' business. The Debtors operate in a highly competitive sector and much of the success and viability of the Debtors' business is dependent upon the loyalty and confidence of their customers and the end users of the Debtors' products. Any failure to maintain the Customer and Consumer Programs or pay the Customer and Consumer Obligations could result in the Debtors' losing support from their loyal customers and consumers and could tarnish the Debtors' reputation in the marketplace. I believe that if the Debtors failed to honor the Customer and Consumer Programs or pay the related obligations in the ordinary course and without interruption, they would almost certainly suffer an irreparable loss of customer support and confidence and sales would dwindle to the ultimate detriment of the Debtors' estates and all stakeholders.

**Payable Claims Motion**

74.    In the ordinary course of its business, the Debtors incur numerous obligations to various creditors that provide the Debtors with a variety of resources and services that are necessary for the continued operation of the Debtors' firearms and ammunition business. The Debtors estimate that, as of the Petition Date, they owe a total of approximately $55 million on account of liquidated, noncontingent, and undisputed prepetition claims (the "Payable Claims") of third-party creditors who will be treated as unimpaired for purposes of the Plan, including, without limitation, trade vendors, suppliers, common carriers, and service providers (the "Prepetition Creditors").[18]  Of the $55 million of Payable Claims, the Debtors estimate that approximately $48 million will come due within the first 30 days of the chapter 11 cases. The goods provided by the Prepetition Creditors include raw materials and parts specific to the Debtors' various products, such as brass, lead, propellant, steel, plastic, resin, wood, stocks, as

---

[18]   For the avoidance of doubt, the scope of this Motion and the relief requested herein does not apply to any prepetition claim for which the Debtors seek authority to pay pursuant to a separate "first-day" motion filed by the Debtors; such claims shall not be considered "Payable Claims" for purposes of this Motion.

well as other materials relating to components, stamping, injection molds, safety systems, machining, projectiles, and packaging and finishing. The Prepetition Creditors also provide the Debtors with a variety of services in the ordinary course of business including, but not limited to, machining, shipping, warehousing, logistics, equipment maintenance and repairs, property maintenance and repairs, and other basic necessities for the operation of the Debtors' business.

75.     Pursuant to the Payable Claims Motion, the Debtors request authority, in their sole discretion, to pay the Payable Claims in the ordinary course of the Debtors' business. I believe the relief requested in the Payable Claims Motion is necessary in order to minimize disruption to the Debtors' operations and to ensure uninterrupted operations and to allow for a seamless transition through these chapter 11 cases, for the benefit of all parties in interest. Moreover, as described above, because of the broad consensus that was reached under the RSA and the support for the Plan, I am optimistic that the Plan will be confirmed within approximately fifty days of the Petition Date. Because the Payable Claims are unimpaired under the Plan, the relief requested in the Payable Claims Motion would merely expedite the treatment and distribution to the Prepetition Creditors that they would otherwise be entitled to receive upon consummation of the Plan. Given the strong likelihood that holders of the Payable Claims will be paid in full anyway, I believe the mere timing difference is warranted in order to avoid the risk of deteriorating relationships with suppliers, vendors and others.

**DIP Motion**

76.     In the DIP Motion, the Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders") approving the Debtors' entry into the DIP Facilities. The combination of the Term/ROC DIP Facility and the ABL DIP Facility—documented in separate credit agreements

31

but approved in a single order and working in tandem—will effectively replicate the Debtors'
existing capital structure. The DIP Term Facility, provided by a combination of certain
prepetition Term Loan Lenders and holders of Third Lien Notes, will make an additional $100
million available (in addition to the $45 million already advanced by Debtor ROC under the
ROC Financing) to address, in accordance with the terms of an approved budget, the Debtors'
immediate cash needs. The ABL DIP Facility, in turn, will provide the Debtors with up to an
additional $193 in liquidity, to (i) support letters of credit necessary to facilitate the Debtors'
ongoing business operations, (ii) supplement the cash otherwise available to the Debtors by
allowing the Debtors to engage in periodic collection pay downs and re-borrowings of funds; and
(iii) in certain limited circumstances, permit the Debtors to obtain incremental advances secured
by the Debtors' accounts and inventory.

77.     Furthermore, the ABL DIP Facility will roll into the ABL Exit Facility (on terms
more favorable to the Debtors than any other facility it has identified to date) to finance the
Debtors' post-chapter 11 cash and operational needs. Together, the liquidity provided by the
ABL Exit Facility, along with the New Term Loan Facility and the New FILO Exit Facility, will
support the Debtors' ability to pay their trade creditors in the ordinary course during the
pendency of these Chapter 11 Cases as well as the unimpairment of general unsecured claims as
contemplated by the Plan. Accordingly, I believe that entry into the DIP Facilities is in the best
interests of the Debtors' estates and the various stakeholders.

**Scheduling Motion**

78.     As discussed above, the Debtors intend to effectuate the Restructuring through the
prepackaged Plan. Furthermore, pursuant to the RSA, the Debtors are bound by certain
milestones, including but not limited to deadlines to commence solicitation of the Plan, obtain

entry of a confirmation order and to consummate the Restructuring. In light of those milestones and the prepackaged nature of these cases, pursuant to the Scheduling Motion, the Debtors are seeking a combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing"). The Debtors will also seek approval of the prepetition and postpetition solicitation of the Plan at the Combined Hearing. The Debtors believe the relief requested in the Scheduling Motion is appropriate in that it will best position to satisfy the RSA milestones, thereby maximizing the Debtors ability to consummate the Restructuring for the benefit of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 25, 2018

Stephen P. Jackson, Jr.
Chief Financial Officer
Remington Outdoor Company, Inc.