## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x
:
In re:                                    :    Chapter 11
:
REMINGTON OUTDOOR COMPANY, INC., *et*     :    Case No. 18- *10684* (__)
*al.*,[1]                                 :
:    (Joint Administration Requested)
:
Debtors.           :
------------------------------------------------------- x

## JOINT PREPACKAGED CHAPTER 11 PLAN OF REMINGTON OUTDOOR COMPANY, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

### March 22, 2018

**MILBANK, TWEED, HADLEY & McCLOY LLP**

Gregory A. Bray (*pro hac vice pending*)
Thomas R. Kreller (*pro hac vice pending*)
Haig M. Maghakian (*pro hac vice pending*)
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (No. 2436)
Timothy P. Cairns (No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705

*Proposed Counsel to Remington Outdoor Company, Inc.*
*and Its Affiliated Debtors and Debtors in Possession*

**LOWENSTEIN SANDLER LLP**
Robert G. Minion (*pro hac vice pending*)
Paul Kizel (*pro hac vice pending*)
1251 Avenue of the Americas
New York, New York 10020

*Proposed Conflicts Counsel to Remington Outdoor Company, Inc.*

---

[1]       The anticipated debtors in these chapter 11 cases, along with the last four digits of each anticipated debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings, LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The principal offices of Remington Outdoor Company Inc., the top-level holding company, are located at 870 Remington Drive, Madison, NC 27025.

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ................................................................. 1

    A.    Defined Terms .................................................................................. 1
    B.    Rules of Interpretation ................................................................... 18
    C.    Computation of Time ..................................................................... 19
    D.    Governing Law ............................................................................... 19
    E.    Reference to Monetary Figures ..................................................... 19

ARTICLE II ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED CLAIMS ................................................................................... 19

    A.    General Administrative Expenses.................................................. 19
    B.    Restructuring Expenses.................................................................. 20
    C.    Professional Fees ........................................................................... 20
        1.    Final Fee Applications ...................................................... 20
        2.    Professional Fees Escrow Account .................................... 21
        3.    Post-Effective Date Fees and Expenses ............................ 21
    D.    Term DIP Claims ........................................................................... 21
    E.    ROC DIP Claims............................................................................ 22
    F.    ABL DIP Claims............................................................................ 22
    G.    Priority Tax Claims........................................................................ 22

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............................................................................................. 22

    A.    Classification of Claims and Interests........................................... 22
    B.    Treatment of Claims and Interests ................................................ 23
        1.    Class 1 – Priority Non-Tax Claims .................................. 23
        2.    Class 2 – Other Secured Claims ....................................... 24
        3.    Class 3 – ABL Facility Claims ......................................... 24
        4.    Class 4 – Term Loan Claims.............................................. 25
        5.    Class 5 – Third Lien Notes Claims .................................... 25
        6.    Class 6 – General Unsecured Claims................................. 26
        7.    Class 7 – Intercompany Claims ........................................ 27
        8.    Class 8 – Settled Intercompany Claims ............................ 27
        9.    Class 9 – Interests in ROC ................................................ 27
        10.    Class 10 – Intercompany Interests .................................... 27
    C.    Special Provision Governing Unimpaired Claims ........................ 28

ARTICLE IV ACCEPTANCE OR REJECTION OF PLAN..................................... 28

    A.    Voting Classes ............................................................................... 28
    B.    Presumed Acceptance of the Plan.................................................. 28
    C.    Non-Consensual Confirmation ..................................................... 28
    D.    Subordinated Claims...................................................................... 28

ARTICLE V MEANS FOR IMPLEMENTATION OF PLAN ..................................................... 29

    A.    General Settlement of Claims and Interests............................................... 29
    B.    Restructuring Transactions ....................................................................... 29
    C.    Sources of Consideration for Plan Distributions ..................................... 30
        1.    Issuance of New Common Units and New Warrants .................. 30
        2.    Cash.......................................................................................... 30
        3.    New ABL Facility...................................................................... 30
        4.    New Term Loan Facility ........................................................... 31
        5.    New FILO Term Loan Facility .................................................. 32
    D.    Corporate Existence .................................................................................. 32
    E.    Vesting of Assets in Reorganized Remington .......................................... 33
    F.    Cancellation of Loans, Securities, and Agreements ................................ 33
    G.    Corporate and Other Entity Action .......................................................... 34
    H.    New Organizational Documents ............................................................... 34
    I.    Directors and Officers of Reorganized Remington and its Subsidiaries ............. 35
        1.    Reorganized ROC Board .......................................................... 35
        2.    New Subsidiary Boards.............................................................. 36
        3.    Certain Personnel ..................................................................... 36
    J.    Effectuating Documents; Further Transactions ....................................... 36
    K.    Section 1146 Exemption ........................................................................... 36
    L.    Litigation Trust ......................................................................................... 36
    M.    Preservation of Litigation Claims ............................................................ 36
    N.    Management Incentive Plan....................................................................... 37
    O.    Procedures for Treating Disputed Claims and Interests Under the Plan ............. 37
        1.    Disputed Claims and Interests Process ..................................... 37
        2.    No Distributions Pending Allowance ....................................... 38
        3.    Distributions after Allowance .................................................. 38

ARTICLE VI THE LITIGATION TRUST ......................................................................... 38

    A.    Establishment of Litigation Trust ............................................................ 38
    B.    Vesting of Assets ...................................................................................... 39
    C.    The Litigation Trustee............................................................................... 40
        1.    Appointment ............................................................................. 40
        2.    Powers....................................................................................... 41
        3.    Litigation; Responsibilities of Litigation Trustee .................... 41
        4.    Employment of Professionals ................................................... 42
        5.    Value of Litigation Trust Assets ............................................... 42
    D.    Litigation Trust Advisory Board............................................................... 42
        1.    Appointment ............................................................................. 42
        2.    Authority and Responsibilities.................................................. 43
    E.    Expense Reserve and Litigation Trust Expenses ..................................... 43
    F.    Compensation of the Litigation Trustee ................................................... 44
    G.    Litigation Trust Interests........................................................................... 44
    H.    Distributions by Litigation Trustee .......................................................... 44
    I.    Termination................................................................................................ 46

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
            LEASES ................................................................................................ 46

A.    Assumption of Executory Contracts and Unexpired Leases.................. 46
B.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ........ 47
C.    Insurance Policies ................................................................................. 48
D.    Employment Agreements....................................................................... 48
E.    Modifications, Amendments, Supplements, Restatements, or Other
      Agreements ........................................................................................... 48
F.    Reservation of Rights............................................................................ 48
G.    Non-Occurrence of Effective Date ....................................................... 48
H.    Contracts and Leases Entered into after Petition Date.......................... 49
I.    Rejection Damages Claims .................................................................... 49

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ................................ 49

A.    Timing and Calculation of Amounts to Be Distributed ........................ 49
B.    Application of Distributions ................................................................. 49
C.    Disbursing Agent .................................................................................. 49
D.    Rights and Powers of Disbursing Agent............................................... 50
      1.    Powers of the Disbursing Agent ................................................ 50
      2.    Incurred Expenses...................................................................... 50
E.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ........... 50
      1.    Delivery of Distributions to Term Loan Agent and Third Lien
            Notes Indenture Trustee ............................................................ 50
      2.    Delivery of Distributions in General........................................... 51
      3.    Minimum Distributions............................................................. 51
      4.    Undeliverable Distributions and Unclaimed Property ............... 52
F.    Section 1145 Exemption ....................................................................... 52
G.    Compliance with Tax Requirements...................................................... 53
H.    No Postpetition Interest on Claims and Interests.................................. 53
I.    Setoffs and Recoupment ....................................................................... 53
J.    Claims Paid or Payable by Third Parties .............................................. 53
      1.    Claims Paid by Third Parties ..................................................... 53
      2.    Claims Payable by Third Parties................................................ 54
      3.    Applicability of Insurance Policies ........................................... 54

ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
            PROVISIONS ....................................................................................... 54

A.    Compromise and Settlement.................................................................. 54
B.    Discharge of Claims and Termination of Interests ............................... 55
C.    Release of Liens.................................................................................... 55
D.    Releases of Released Parties ................................................................. 56
      1.    Releases by the Remington Entities........................................... 56
      2.    Third-Party Releases by Holders of Claims or Interests............ 57
E.    Exculpation ........................................................................................... 58

iv

F.      Injunction ......................................................................................... 58

ARTICLE X CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ...................... 59

A.      Conditions to Confirmation ............................................................ 59
B.      Conditions to Effective Date........................................................... 60
C.      Waiver of Conditions....................................................................... 61
D.      Effect of Non-Occurrence of Effective Date ................................. 62

ARTICLE XI MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN ................ 62

A.      Modification and Amendments......................................................... 62
B.      Effect of Confirmation on Modifications ....................................... 63
C.      Revocation or Withdrawal of Plan .................................................. 63

ARTICLE XII RETENTION OF JURISDICTION ...................................................... 63

ARTICLE XIII MISCELLANEOUS PROVISIONS .................................................... 65

A.      Immediate Binding Effect................................................................. 65
B.      Additional Documents ...................................................................... 66
C.      Payment of Statutory Fees ............................................................... 66
D.      Reservation of Rights....................................................................... 66
E.      Successors and Assigns..................................................................... 66
F.      Notices .............................................................................................. 66
G.      Term of Injunctions or Stays............................................................ 69
H.      Entire Agreement ............................................................................. 69
I.       Exhibits ............................................................................................. 69
J.       Nonseverability of Plan Provisions.................................................. 69
K.      Votes Solicited in Good Faith.......................................................... 70
L.      Closing of Chapter 11 Cases............................................................ 70
M.      Document Retention ......................................................................... 70
N.      Conflicts............................................................................................ 70

**Introduction**

Remington Outdoor Company, Inc. ("ROC") and its subsidiaries FGI Holding Company, LLC ("FGI Holding"), FGI Operating Company, LLC ("OpCo"), Remington Arms Company, LLC, Barnes Bullets, LLC, TMRI, Inc., RA Brands, L.L.C., FGI Finance, Inc., Remington Arms Distribution Company, LLC, Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC, and Outdoor Services, LLC, as debtors and debtors in possession (each a "Remington Entity" and, collectively, the "Remington Entities"), jointly propose this prepackaged plan of reorganization, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"), for the resolution of certain outstanding Claims against, and Interests in, the Remington Entities, pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended and as in effect on the Confirmation Date or otherwise applicable to the Chapter 11 Cases, the "Bankruptcy Code").

Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A.

Each Remington Entity is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan of reorganization for each Remington Entity. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Remington Entities' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION**
**OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below:

1.    *"ABL DIP Agent"* means Bank of America, N.A., as Administrative Agent under the ABL DIP Facility Loan Agreement.

2.    *"ABL DIP Claims"* means all Claims against any Remington Entity arising on account of the ABL DIP Facility or pursuant to or secured by the ABL DIP Facility Loan Agreement, and which constitute "Obligations," as such term is defined in the ABL DIP Facility Loan Agreement.

3.    *"ABL DIP Facility"* means the superpriority senior secured asset-based revolving credit facility made available by the ABL DIP Facility Lenders to the Remington Entities to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases

pursuant to and subject to the terms and conditions of the ABL DIP Facility Loan Agreement and the DIP Orders.

4.    *"ABL DIP Facility Lenders"* means the financial institutions party from time to time to the ABL DIP Facility Loan Agreement as lenders or issuing banks, in their respective capacities as such.

5.    *"ABL DIP Facility Loan Agreement"* means that certain Superpriority Senior Debtor-In-Possession Asset-Based Loan And Security Agreement by and among OpCo and certain of its subsidiaries, as Borrowers, FGI Holding, the other guarantors, lenders, and issuing banks from time to time party thereto, and the ABL DIP Agent, as amended, modified, or supplemented from time to time, as approved by the DIP Orders.

6.    *"ABL Facility"* means the senior secured asset-based revolving credit facility made available by the ABL Facility Lenders to the Remington Entities to provide financing and otherwise extend credit prior to the filing of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the ABL Facility Loan Agreement.

7.    *"ABL Facility Agent"* means Bank of America, N.A., as Administrative Agent under the ABL Facility Loan Agreement.

8.    *"ABL Facility Claims"* means all Claims against any Remington Entity arising on account of the ABL Facility or pursuant to or secured by the ABL Facility Loan Agreement, and which constitute "Obligations," as such term is defined in the ABL Facility Loan Agreement.

9.    *"ABL Facility Lenders"* means the financial institutions party from time to time to the ABL Facility Loan Agreement as lenders or issuing banks, in their respective capacities as such.

10.    *"ABL Facility Loan Agreement"* means that certain Loan and Security Agreement by and among OpCo and certain of its subsidiaries, as Borrowers, FGI Holding, the other guarantors, lenders, and issuing banks from time to time party thereto, and the ABL Facility Agent, dated as of April 19, 2012, as amended, modified, or supplemented from time to time.

11.    *"ABL Facility Loan Documents"* means the documents that govern the ABL Facility, including the ABL Facility Loan Agreement.

12.    *"ABL Parties"* means, collectively, each of the "Secured Parties" as defined in the ABL Facility Loan Agreement and each of the "Secured Parties" as defined in the ABL DIP Facility Loan Agreement.

13.    *"ABL Payoff Letter"* means that certain postpetition Termination Agreement, by and among OpCo and certain of its subsidiaries, as Borrowers, FGI Holding, the other guarantors, lenders, and issuing banks from time to time party thereto, and the ABL Facility Agent, as amended, modified, or supplemented from time to time, as approved by the DIP Orders.

14.    *"Administrative Expense"* means any cost or expense of administration of the Chapter 11 Cases entitled to priority pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the Remington Entities' businesses; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 330(a) or 331 of the Bankruptcy Code, including the Professional Fees; (c) an administrative expense of the type described in section 503(b)(9) of the Bankruptcy Code; and (d) any and all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code; provided, however, that "Administrative Expense" shall not include any ABL DIP Claim, Term DIP Claim, or ROC DIP Claim.

15.    *"Allowed"* means, with respect to any Claim or Interest, the extent to which such Claim or Interest is not Disputed. An Allowed Claim: (a) includes a previously Disputed Claim to the extent such Disputed Claim becomes allowed; and (b) shall be net of any setoff amount that may be asserted by any Remington Entity against the holder of such Claim, which shall be deemed to have been setoff in accordance with the provisions of the Plan. Notwithstanding anything to the contrary herein, Reorganized Remington shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan.

16.    *"Alternative New Term Loan Facility"* has the meaning specified in Article V.C.4.

17.    *"Article"* refers to an article of the Plan.

18.    *"Avoidance Actions"* means any and all actual or potential claims and Causes of Action to avoid a transfer of property from, or an obligation incurred by, one or more of the Remington Entities, that arise under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code or similar state law.

19.    *"Bankruptcy Code"* has the meaning specified in the Introduction hereto.

20.    *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Chapter 11 Cases.

21.    *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as amended from time to time and as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075 and the general, local, and chamber rules of the Bankruptcy Court.

22.    *"Business Day"* means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or day on which commercial banks in New York are required or authorized by law to remain closed.

23.    *"Cash"* means cash and cash equivalents in U.S. dollars.

24.    *"Cause of Action"* means any action, claim, cause of action, controversy, demand, right, action, remedy, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or

unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date and before the Effective Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, including, but not limited to, Avoidance Actions; (d) any counterclaim or defense, including fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer or similar claim.

25.    *"CEO Director"* means the chief executive officer of Reorganized Remington, as a Director on the Reorganized ROC Board as set forth in Article V.I.

26.    *"Cerberus Entity"* means Cerberus Capital Management L.P., and any entity that is owned, controlled by, or affiliated with Cerberus Capital Management L.P.

27.    *"Chapter 11 Case"* means, with respect to a particular Remington Entity, the case under chapter 11 of the Bankruptcy Code pending for such Remington Entity in the Bankruptcy Court, jointly administered with each other Remington Entity's Chapter 11 Case, and the *"Chapter 11 Cases"* means every Remington Entity's Chapter 11 Case, collectively.

28.    *"claim"* means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, and *"Claim"* means a claim as such term is defined in section 101(5) of the Bankruptcy Code against a Remington Entity.

29.    *"Class"* means a class of Claims or Interests designated in Article III of the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code.

30.    *"COAC"* means Cerberus Operations & Advisory Company, LLC.

31.    *"Combined Hearing"* means the hearing held by the Bankruptcy Court to consider Confirmation and approval of the Disclosure Statement, as such hearing may be continued from time to time.

32.    *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021, subject to all conditions to Confirmation specified in Article X.A having been satisfied or waived in accordance with Article X.C.

33.    *"Confirmation Date"* means the date upon which Confirmation occurs.

34.    *"Confirmation Order"* means the Bankruptcy Court order confirming the Plan pursuant to section 1129 of the Bankruptcy Code that is (i) consistent with the Restructuring Support Agreement and otherwise satisfactory to the Remington Entities and the Requisite Consenting Creditors in their sole and absolute discretion, (ii) in form and substance satisfactory to the ABL DIP Agent, the Term/ROC DIP Agent, the New ABL Agent, the New FILO Term Loan Lenders, and the New ABL Required Lenders in their sole and absolute discretion, and (iii)

to the extent any provision of such order materially affects the New Term Loan Agent, in form and substance acceptable to the New Term Loan Agent.

35.    *"Consenting Creditors"* means the Consenting Term Loan Creditors and Consenting Third Lien Creditors.

36.    *"Consenting Term Loan Creditors"* means each creditor party to the Restructuring Support Agreement that is a holder of, or an investment advisor or an investment manager to a holder or holders of, Term Loan Claims.

37.    *"Consenting Third Lien Creditors"* means each creditor party to the Restructuring Support Agreement that is a holder of, or an investment advisor or an investment manager to a holder or holders of, Third Lien Notes Claims.

38.    *"Consummation"* means the occurrence of the Effective Date.

39.    *"Designated Directors"* means, collectively, the Term Loan Directors and the Third Lien Notes Directors.

40.    *"DIP Orders"* means the Interim DIP Order and Final DIP Order.

41.    *"Direction"* shall mean the prior express written consent, approval, direction, acceptance, authorization, certification, or affirmation, in each case, by a majority in number of the Litigation Trust Advisory Board members.

42.    *"Director"* means a member of the board of directors or board of managers, as applicable, of Reorganized ROC.

43.    *"Disallowed"* means, with respect to a Claim or Interest or portion thereof, that such Claim or Interest or portion thereof has been disallowed by a Final Order.

44.    *"Disbursing Agent"* means one or more of Reorganized Remington and/or any other Entity or Entities selected by the Remington Entities or Reorganized Remington to make or facilitate distributions contemplated under the Plan.

45.    *"Discharge"* has the meaning specified in Article IX.F.

46.    *"Disclosure Statement"* means that certain *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession*, dated March 22, 2018, as it may be amended, supplemented, restated, or modified from time to time, including all exhibits and schedules thereto and references therein, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and as approved by the Bankruptcy Court.

47.    *"Distribution Record Date"* means the Confirmation Date or such later date as agreed to by Reorganized Remington and the Consenting Term Loan Creditors in their sole and absolute discretion; *provided, however,* that the Distribution Record Date shall not apply to publicly-held securities, including, without limitation, the Third Lien Notes. Notwithstanding

any of the foregoing, the Distribution Record Date for purposes of making any determinations with respect to qualification of any holder of a Class 4 Claim or Class 5 Claim as an Electing Term Loan Lender or Electing Third Lien Noteholder, and with respect to receiving any distributions of Litigation Trust Interests under the Plan, shall be made by reference to the Voting Record Date.

48.    "*Disputed*" means with respect to a Claim or Interest, that an objection to such Claim or Interest or portion thereof has been filed on or before (a) the Effective Date or, (b) to the extent proof of such Claim or Interest is filed on or after the Effective Date, any applicable objection deadline.

49.    "*DTC*" means Depository Trust Company.

50.    "*Effective Date*" means the date selected by the Remington Entities, in consultation with the Requisite Consenting Creditors and the ABL DIP Agent and in accordance with the Restructuring Support Agreement, that is the first Business Day after the Confirmation Date, on which date all conditions to the Effective Date specified in Article X.B have been satisfied or waived in accordance with Article X.C.

51.    "*Electing Creditors*" means the Electing Term Loan Lenders and the Electing Third Lien Noteholders.

52.    "*Electing Creditor Causes of Action*" means all Causes of Action related to the Remington Entities held by the Electing Creditors.

53.    "*Electing Term Loan Lender*" means a Term Loan Lender that either (i) votes to approve the Plan or (ii) elects to (a) include its Causes of Action related to the Remington Entities in the Litigation Trust Assets in exchange for its Pro Rata Class 4 Share of the Litigation Trust Class A Interests or (b) otherwise release any such Causes of Action in exchange for its Pro Rata Class 4 Share of the proceeds of any Litigation Settlement.

54.    "*Electing Third Lien Noteholder*" means a Third Lien Noteholder that either (i) votes to approve the Plan or (ii) elects to (a) include its Causes of Action related to the Remington Entities in the Litigation Trust Assets in exchange for its Pro Rata Class 5 Share of the Litigation Trust Class B Interests or (b) otherwise release any such Causes of Action in exchange for its Pro Rata Class 5 Share of the proceeds of any Litigation Settlement.

55.    "*Entity*" means any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

56.    "*Estate*" means, with respect to a particular Remington Entity, the estate created for such Remington Entity upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the "*Estates*" means every Remington Entity's Estate, collectively.

57.    "*Estate Causes of Action*" means all Causes of Action held by the Remington Entities and their Estates (other than any Intercompany Claim or Settled Intercompany Claim).

58.     *"Exculpated Parties"* means any persons entitled to the protections of Section 1125(e) of the Bankruptcy Code.

59.     *"Exculpation"* has the meaning specified in Article IX.F.

60.     *"Executory Contract"* means a contract to which one or more of the Remington Entities are party, other than an Unexpired Lease, which contract is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

61.     *"Existing COAC Agreement"* has the meaning set forth in Article VII.I.3.

62.     *"Existing Employment Agreements"* has the meaning specified in Article VII.D.

63.     *"FGI Holding"* has the meaning specified in the Introduction hereto.

64.     *"Final DIP Order"* means the Bankruptcy Court order authorizing use of cash collateral, the Term/ROC DIP Facility, and the ABL DIP Facility on a final basis.

65.     *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which (a) the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or (b) any appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, petitioned, or moved.

66.     *"General Administrative Expense"* means any Administrative Expense other than Professional Fees.

67.     *"General Unsecured Claim"* means any Unsecured Claim, other than an Intercompany Claim or a Settled Intercompany Claim, against any Remington Entity, including, for the avoidance of doubt, all Claims for rejection damages pursuant to section 365 of the Bankruptcy Code related to an executory contract or unexpired lease to which a Remington Entity was a party.

68.     *"Governmental Unit"* means any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

69.     *"Impaired"* means, with respect to (a) a Class, Claim, or Interest, that such Class, Claim, or Interest is "impaired" within the meaning of section 1124 of the Bankruptcy Code and (b) the holder of a Claim or Interest, that such Claim or Interest is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

70.     *"Independent Directors and Officers"* means any director or officer of the Remington Entities as of and after the Petition Date who is not, as of any date while serving in such capacity, or prior to serving in such capacity, an employee of or affiliated with any Cerberus Entity; *provided, however*, if the Remington Entities are the only Cerberus Entities that

7

a director or officer of the Remington Entities is an employee of or affiliated with (and such director or officer has never served as an employee of and/or been affiliated with any Cerberus owned or controlled entity in the past), then such director or officer will still be considered an Independent Director and/or Officer.

71.    "*Initial Distribution*" shall have the meaning set forth in Article VI.H.

72.    "*Interim DIP Order*" means the Bankruptcy Court order authorizing use of cash collateral, the Term/ROC DIP Facility, and the ABL DIP Facility on an interim basis.

73.    "*Intercompany Claim*" means any Claim held by a Remington Entity against another Remington Entity, but excluding any Settled Intercompany Claim.

74.    "*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Remington Entity, including any share of common or preferred stock, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Remington Entity, and any option, warrant, or right, contractual or otherwise, to purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Remington Entity, whether or not transferable, issued or unissued, authorized, or outstanding.

75.    "*Lien*" means a "lien" as such term is defined in section 101(37) of the Bankruptcy Code.

76.    "*Litigation Claims*" means (i) all Estate Causes of Action, and (ii) all Electing Creditor Causes of Action, in each case, including all Causes of Action against the Unreleased Debtor Parties; provided, however, that any recovery on account of any potential and/or actual claims against the Independent Directors and Officers of the Remington Entities' shall be within and to the extent of the limits of liability and the scope of coverage afforded by the insurance held by the Remington Entities.  For the avoidance of doubt, the Settled Intercompany Claims shall not constitute Litigation Claims.

77.    "*Litigation Settlement*" means a settlement or resolution of the Litigation Claims that occurs prior to the Effective Date and is acceptable to the Remington Entities and the Requisite Consenting Creditors.

78.    "*Litigation Trust Advisory Board*" shall have the meaning ascribed to such term in the Litigation Trust Agreement.

79.    "*Litigation Trust Agreement*" means that certain agreement made by and among Reorganized Remington, the Litigation Trust Beneficiaries and the Litigation Trustee, establishing and delineating the terms and conditions of the Litigation Trust substantially in the form to be filed as part of the Plan Supplement.

80.    "*Litigation Trust Assets*" means the Litigation Claims, the Litigation Trust Fund, and any other assets acquired by the Litigation Trust after the Effective Date or pursuant to the Plan.  For the avoidance of doubt, any Cause of Action settled prior to the Effective Date pursuant to a Litigation Settlement shall not constitute a Litigation Trust Asset.

81.     "*Litigation Trust Beneficiaries*" means the Electing Term Loan Lenders and Electing Third Lien Noteholders.

82.     "*Litigation Trust Expenses*" mean the fees and expenses of the Litigation Trust, including, without limitation, professional fees and expenses incurred in connection with the prosecution of the Litigation Claims.

83.     "*Litigation Trust Fund*" means $5,000,000 in borrowings under the ROC DIP Facility.

84.     "*Litigation Trust Class A Interests*" means the interests, if any, to be issued to the Electing Term Loan Lenders evidencing their interests in the Litigation Trust and the right to receive certain distributions therefrom in accordance with the Litigation Trust Agreement.

85.     "*Litigation Trust Class B Interests*" means the interests, if any, to be issued to the Electing Third Lien Noteholders evidencing their interests in the Litigation Trust and the right to receive certain distributions therefrom in accordance with the Litigation Trust Agreement.

86.     "*Litigation Trust Interests*" means the Litigation Trust Class A Interests and the Litigation Trust Class B Interests.

87.     "*Litigation Trustee*" means that person selected by the Requisite Third Lien Creditors (in consultation with the Requisite Consenting Term Loan Creditors) to act as the trustee of the Litigation Trust or any of his or her or its successors.

88.     "*Management Incentive Plan*" means a customary performance-based incentive plan to be adopted by the Reorganized Parent Board after the Effective Date.

89.     "*Member*" shall mean a member of the Litigation Trust Advisory Board.

90.     "*New ABL Agent*" means Bank of America, N.A., in its capacity as administrative agent under the New ABL Facility Loan Agreement and the other New ABL Facility Documents.

91.     "*New ABL Facility*" means the new $193 million senior secured asset-based revolving credit facility with material terms consisting of those set forth on the commitment letter and term sheet attached as **Exhibit 1** to this Plan, to be made available to Reorganized Remington pursuant to and subject to the terms and conditions of the New ABL Facility Loan Agreement and the other New ABL Facility Documents.

92.     "*New ABL Facility Documents*" means the following documents that will govern the New ABL Facility: (a) the New ABL Facility Loan Agreement and (b) such other financing documents related to the New ABL Facility, including intercreditor agreements, each in form and substance (i) reasonably acceptable to Reorganized Remington, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New ABL Lenders, the New ABL Agent, and the New FILO Term Lenders.

93. "*New ABL Facility Loan Agreement*" means the loan and security agreement, to be dated as of the Effective Date, that will govern the New ABL Facility, in such form filed with the Plan Supplement, which shall be in form and substance (i) reasonably acceptable to Reorganized Remington and the New FILO Term Lenders, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New ABL Lenders, and the New ABL Agent.

94. "*New ABL Lenders*" means the financial institutions party from time to time to the New ABL Facility Loan Agreement as lenders or issuing banks, in their respective capacities as such.

95. "*New ABL Parties*" means the New ABL Agent and the New ABL Lenders.

96. "*New ABL Required Lenders*" has the meaning ascribed to "Required Lenders" in in **Exhibit 1** hereto.

97. "*New Boards*" means the Reorganized ROC Board and New Subsidiary Boards.

98. "*New Common Units*" means the common units in Reorganized ROC to be authorized, issued, or outstanding on and after the Effective Date.

99. "*New FILO Term Loan Agent*" means in respect of the New FILO Term Loan Facility, Ankura Trust Company, LLC, in its capacities as administrative agent and collateral agent under the New FILO Term Loan Facility Documents.

100. "*New FILO Term Loan Agreement*" means the credit agreement that will govern the New FILO Term Loan Facility, in such form filed with the Plan Supplement in form and substance (i) reasonably acceptable to Reorganized Remington and, (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New FILO Term Loan Agent, the New ABL Agent, and New FILO Term Loan Lenders.

101. "*New FILO Term Loan Facility*" means that senior secured first in, last out asset based term loan facility, with last out waterfall priority on ABL priority collateral and first out waterfall priority on Term Loan priority collateral, with material terms consisting of those set forth on the term sheet attached as **Exhibit 4** to this Plan, to be made available to Reorganized Remington pursuant to the New FILO Term Loan Facility Documents.

102. "*New FILO Term Loan Facility Documents*" means the following documents that will govern the New FILO Term Loan Facility, each dated as of the Effective Date: (a) the New FILO Term Loan Agreement, and (b) such other financing documents, including, to the extent necessary and applicable, intercreditor agreements, each in form and substance (i) reasonably acceptable to Reorganized Remington, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New FILO Term Loan Lenders, the New FILO Term Loan Agent, and the New ABL Agent.

103. "*New FILO Term Loan Lenders*" means those means the financial institution(s) party from time to time to the New FILO Term Loan Agreement as lenders, in their respective capacities as such.

10

104. *"New Organizational Documents"* means the new bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, certificates of limited partnership, agreements of limited partnership, or such other organizational documents of Reorganized Remington, which shall be consistent in all respects with the Corporate Governance Term Sheet attached as **Exhibit 2** to this Plan.

105. *"New Term Loan Agent"* means (a) in respect of the RSA Term Loan Facility Ankura Trust Company, LLC, in its capacities as administrative agent and collateral agent under the New Term Loan Facility Documents, or (b) in respect of an Alternative New Term Loan Facility, the administrative agent and collateral agent thereunder.

106. *"New Term Loan Agreement"* means the credit agreement that will govern the New Term Loan Facility, in such form filed with the Plan Supplement in form and substance (i) reasonably acceptable to Reorganized Remington, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New ABL Agent, and the New Term Loan Agent.

107. *"New Term Loan Facility"* means the RSA Term Loan Facility or an Alternative New Term Loan Facility. For the avoidance of doubt, the New Term Loan FILO Facility is an independent facility that is not conditioned upon Reorganized Remington's entry into, and shall under no circumstances be made a part of, the New Term Loan Facility.

108. *"New Term Loan Facility Documents"* means the following documents that will govern the New Term Loan Facility, each dated as of the Effective Date: (a) the New Term Loan Agreement, and (b) such other financing documents related to the New Term Loan Facility, including, to the extent necessary and applicable, intercreditor agreements, each in form and substance (i) reasonably acceptable to Reorganized Remington, and (ii) in their sole and absolute discretion, acceptable to the Requisite Consenting Creditors, the New Term Loan Agent, and the New ABL Agent.

109. *"New Term Loan Lenders"* means the financial institution(s) party from time to time to the New Term Loan Agreement as lenders, in their respective capacities as such.

110. *"New Subsidiary Boards"* means the initial board of directors or managers (as applicable) for Reorganized Remington (other than Reorganized ROC), as appointed pursuant to Article V.I.

111. *"New Warrants"* means four-year warrants for 15% of Reorganized ROC equity at a strike price calculated based on a $700 million enterprise value for Reorganized ROC issued pursuant to the Warrant Agreement.

112. *"Other Secured Claim"* means any Secured Claim against any Remington Entity other than an Administrative Expense, ABL DIP Claim, Term DIP Claim, ROC DIP Claim, Priority Claim, ABL Facility Claim, Term Loan Claim, or Third Lien Notes Claim.

113. *"OpCo"* has the meaning specified in the Introduction hereto.

114. "*OpCo Bridge Payoff Letter*" means that certain postpetition Termination Agreement, by and among OpCo as Borrower, the guarantors and lenders from time to time party thereto, and the Term Loan Agent, as agent, as amended, modified, or supplemented from time to time, as approved by the DIP Orders.

115. "*Petition Date*" means the date on which voluntary petitions commencing the Chapter 11 Cases are filed.

116. "*Plan*" has the meaning specified in the Introduction hereto.

117. "*Plan Supplement*" means the compilation of documents (or forms thereof), schedules, and exhibits to the Plan, as each may be amended, supplemented, or modified from time to time in accordance with the Plan, Restructuring Support Agreement, Bankruptcy Code, and Bankruptcy Rules, to be filed with the Bankruptcy Court in accordance with Article X.A.3, including, as applicable: (a) the New Organizational Documents; (b) a list of the members of the New Boards; (c) the Litigation Trust Agreement, if any; (d) the identity of the Litigation Trustee, if any; (e) the New ABL Facility Loan Agreement; (f) the New Term Loan Agreement; (g) New FILO Term Loan Agreement; (h) the Warrant Agreement, and (i) such other documents as are necessary or advisable to implement the Restructuring Transactions contemplated by the Restructuring Support Agreement and the Plan, each of which shall be consistent in all respects with the Restructuring Support Agreement and, except as otherwise provided herein, reasonably acceptable in form and substance to the Requisite Consenting Creditors, the ABL DIP Agent, and the New FILO Term Loan Lenders (*provided, however*, that to the extent any of the ABL Parties or Term DIP Lenders are materially affected, acceptable to the ABL DIP Agent or the Term ROC DIP Agent, respectively, in their sole and absolute discretion). For the avoidance of doubt, the Remington Entities shall have the right to amend, supplement, or modify the Plan Supplement through the Effective Date in accordance with the Plan, Restructuring Support Agreement, Bankruptcy Code, and Bankruptcy Rules; *provided that* any such amendment or modification shall be reasonably acceptable in form and substance to the Requisite Consenting Creditors, the ABL DIP Agent, and the New FILO Term Loan Lenders (*provided, however*, that to the extent any of the ABL Parties or Term DIP Lenders are materially affected, acceptable to the ABL DIP Agent or the Term/ROC DIP Agent, respectively, in their sole and absolute discretion).

118. "*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

119. "*Priority Non-Tax Claim*" means any Claim against any Remington Entity entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense, ABL DIP Claim, Term DIP Claim, ROC DIP Claim, or Priority Tax Claim.

120. "*Priority Tax Claim*" means any Claim of a Governmental Unit against any Remington Entity entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

121. "*Privileges*" shall have the meaning set forth in Article VI.B.

122.    "*Pro Forma Equity*" means the New Common Units to be issued under the Plan on the Effective Date.

123.    "*Pro Rata*" means, for the holder of an Allowed Claim or Interest in a particular Class, proportional to the ratio of the amount of such Allowed Claim or Interest to the amount of all Allowed Claims or Interests (as applicable) in the same Class.

124.    "*Pro Rata Class 4 Share*" means, for each Electing Term Loan Lender, proportional to the ratio of all Allowed Class 4 Claims of such Electing Term Loan Lender to the amount of all Allowed Class 4 Claims held by all Electing Term Loan Lenders determined in each case by reference to such claims held as of the Voting Record Date.

125.    "*Pro Rata Class 5 Share*" means, for each Electing Third Lien Noteholder, proportional to the ratio of all Allowed Class 5 Claims of such Electing Third Lien Noteholder to the amount of all Allowed Class 5 Claims held by all Electing Third Lien Noteholders determined in each case by reference to such claims held as of the Voting Record Date.

126.    "*Professional*" means any Entity that is, by Bankruptcy Court order: (a) employed for legal, financial advisory, accounting, or other professional services during the Chapter 11 Cases pursuant to section 327 or 1103 of the Bankruptcy Code and to be compensated and reimbursed therefor in accordance with sections 327, 328, 329, 330, 331, and/or 1103 of the Bankruptcy Code; or (b) allowed compensation and reimbursement pursuant to section 503(b)(4) of the Bankruptcy Code; provided, however, that "Professional" shall not include any professional-service Entity that the Remington Entities are authorized to employ, compensate, and reimburse in the ordinary course of its businesses. For the avoidance of doubt, "Professional" does not include any professional-service Entity retained by the ABL Parties, the Term DIP Agent, or the Requisite Consenting Lenders, whose fees shall be reimbursed by the Remington Entities in accordance with the terms and conditions of the Interim DIP Order, the Final DIP Order, or this Plan.

127.    "*Professional Fees*" means the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Professionals, that: (a) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date; (b) have not been denied by the Bankruptcy Court by Final Order; (c) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (d) remain outstanding after applying any retainer that has been provided to such Professional. To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

128.    "*Professional Fees Escrow Account*" means the account established on the Effective Date pursuant to Article II.C.2.

129.    "*Released Claims*" has the meaning specified in Article IX.F.

130.    "*Released Parties*" means to the extent such party has not opted out of being a Releasing Party (as set forth in the definition thereof), all of the following, each in their

13

respective capacities as such: (a) Reorganized Remington, (b) the Term/ROC DIP Agent, (c) the Term DIP Lenders, (d) the Term Loan Agent, (e) the ABL DIP Agent, (f) the ABL DIP Facility Lenders, and each of the "Secured Parties" as defined in the ABL DIP Facility Loan Agreement, (g) the ABL Lenders and each of the "Secured Parties" as defined in the ABL Facility Loan Agreement, (h) the ABL Agent, (i) the Third Lien Notes Indenture Trustee; (j) the Consenting Creditors; (k) the New FILO Term Loan Lenders; (l) to the extent that the applicable foregoing Entity has not opted out of being a Releasing Party, each of the foregoing Entities' respective successors, assigns, current and former shareholders, subsidiaries, directors, officers, funds, affiliates, members, employees, partners, limited partners, general partners, members, management companies, investment managers, investment advisors, investment bankers, financial advisors, restructuring advisors, accountants, managers, agents, representatives, principals, consultants, attorneys, and professional advisors (each in their capacity as such); (m) to the extent that the applicable foregoing Entity has not opted out of being a Releasing Party, each such Entity's, other than Reorganized Remington's and ROC's, predecessors; and (n) with respect to the Remington Entities, each of their investment bankers, financial advisors, restructuring advisors, accountants, consultants, attorneys, and professional advisors. "Released Parties" shall not include any Unreleased Debtor Party or any Entity that "opts out" of being a Releasing Party (as described in the definition therefor); *provided, however,* that for the avoidance of doubt, Reorganized Remington shall be deemed a "Released Party" notwithstanding that Reorganized Remington is not a "Releasing Party."

131.   *"Releasing Parties"* means all of the following, each in their respective capacities as such: (a) the Remington Entities; (b) Released Parties (each in their capacity as such); (c) each present and former holder of a Claim or Interest who either votes to accept the Plan or is conclusively presumed to have accepted the Plan; (d) each present and former holder of a Claim or Interest who is entitled to vote on the Plan and (i) either votes to reject the Plan or abstains from voting to accept or reject the Plan and (ii) does not check the appropriate box on such holder's ballot to indicate such holder opts not to grant the releases provided under the Plan; and (e) each of the foregoing Entities' respective predecessors, successors and assigns, and current and former shareholders, subsidiaries, directors, officers, funds, affiliates, members, employees, partners, limited partners, general partners, management companies, investment managers, managers, investment advisors, investment bankers, financial advisors, restructuring advisors, accountants, managers, agents, representatives, principals, consultants, attorneys, and professional advisors (each in their capacity as such).

132.   *"Reorganized OpCo"* means OpCo or any successor thereto, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

133.   *"Reorganized Remington"* means, collectively, Reorganized ROC and its direct and indirect subsidiaries, or any successors thereto, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

134.   *"Reorganized ROC"* means ROC or any successor thereto, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

135.   *"Reorganized ROC Board"* means the initial board of Directors of Reorganized ROC, as appointed pursuant to Article V.I.

136.    *"Requisite Consenting Creditors"* means, as of any time of determination, a group of creditors that includes the Requisite Term Loan Creditors and Requisite Third Lien Creditors.

137.    *"Requisite Consenting Term Loan Creditors"* means, as of any time of determination, the Consenting Term Loan Creditors holding a majority of the aggregate amount of all Term Loan Claims held at such time by all of the Consenting Term Loan Creditors.

138.    *"Requisite Consenting Third Lien Creditors"* means, as of any time of determination, the Consenting Third Lien Creditors holding a majority of the aggregate amount of all Third Lien Notes Claims held at such time by all of the Consenting Third Lien Creditors.

139.    *"Restructuring"* means the comprehensive restructuring of the existing debt and other obligations of the Remington Entities on the terms and conditions set forth in this Plan and the Restructuring Support Agreement.

140.    *"Restructuring Support Agreement"* means that certain Restructuring Support Agreement, dated as of February 11, 2018, by and among the Remington Entities and the Consenting Creditors, together with all exhibits and schedules thereto, as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms.

141.    *"Restructuring Transactions"* has the meaning set forth in Article V.B.

142.    *"ROC"* has the meaning specified in the Introduction hereto.

143.    *"ROC DIP Claims"* means all Claims against any Remington Entity arising on account of the ROC DIP Facility.

144.    *"ROC DIP Distribution"* means a distribution of 17.5% of the New Common Units of Reorganized ROC, plus Cash in an amount equal to all accrued and unpaid postpetition interest on the ROC DIP Facility.

145.    *"ROC DIP Lender"* means ROC in its capacity as lender under the ROC DIP Facility.

146.    *"ROC DIP Facility"* means the component of the Term/ROC DIP Facility made available by ROC to the Remington Entities to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Term/ROC DIP Credit Agreement and the DIP Orders.

147.    *"RSA Term Loan Facility"* means the new $100 million senior secured term loan facility with material terms consisting of those set forth on the term sheet attached as **Exhibit 3** to this Plan, to be made available to Reorganized Remington pursuant to the New Term Loan Facility Documents, automatically upon the Effective Date unless the Term/ROC DIP Facility is repaid in Cash with the proceeds of an Alternative New Term Loan Facility.

148.    *"Secured Claim"* means any Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or subject to setoff pursuant to section 553 of the

Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

149.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

150.    "*Settled Intercompany Claim*" means, subject to the terms and conditions of Article X.D of the Plan, any Claim held by ROC or FGI Holding against OpCo (excluding, for the avoidance of doubt, the ROC DIP Claim) and any Claim held by OpCo against ROC or FGI Holding. For the avoidance of doubt, this definition includes claims against OpCo related to that certain Note Purchase Agreement dated May 11, 2017, but does not include any claims that ROC or FGI Holding may have against other parties arising out of or related to that certain Note Purchase Agreement dated May 11, 2017, including claims for breach of fiduciary duty against their directors or former directors. Nothing contained in this Plan shall be construed as an admission that the Settled Intercompany Claims has or lacks merit.

151.    "*Term/ROC DIP Agent*" means Ankura Trust Company, LLC or another financial institution satisfactory to the Required Lenders (as defined in the Term/ROC DIP Credit Agreement), in its capacity as administrative agent under the Term/ROC DIP Credit Agreement.

152.    "*Term/ROC DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit and Guaranty Agreement, by and among OpCo, as borrower, the guarantors party thereto, the Term/ROC DIP Agent, the Term DIP Lenders and the ROC DIP Lender, approved by the DIP Orders.

153.    "*Term/ROC DIP Facility*" means the Term DIP Facility and the ROC DIP Facility made available to the Remington Entities to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Term/ROC DIP Credit Agreement and the DIP Orders. The terms and conditions of the Term/ROC DIP Facility are more specifically set forth in the commitment letter and term sheets attached as **Exhibit 5** to the Plan.

154.    "*Term DIP Claims*" means all Claims against any Remington Entity arising on account of the Term/ROC DIP Facility.

155.    "*Term DIP Facility*" means the component of the Term/ROC DIP Facility made available by the Term DIP Lenders to the Remington Entities to provide financing and otherwise extend credit during the pendency of the Chapter 11 Cases pursuant to and subject to the terms and conditions of the Term/ROC DIP Credit Agreement and the DIP Orders.

156.    "*Term DIP Lenders*" means the financial institutions party from time to time to the Term/ROC DIP Credit Agreement as lenders under the Term DIP Facility, solely in their respective capacities as such.

157.    "*Term Loan Agreement*" means the Term Loan Agreement, dated as of April 19, 2012, by and among OpCo as Borrower, the guarantors and lenders from time to time party

thereto, and Bank of America, N.A., as agent, as amended, modified, or supplemented from time to time.

158.    "*Term Loan Agent*" means Ankura Trust Company, LLC as successor administrative agent and collateral agent under the Term Loan Agreement.

159.    "*Term Loan Claims*" means all Claims against any Remington Entity arising on account of the term loan made available to the Remington Entities pursuant to the Term Loan Agreement, and which constitute "Obligations," as such term is defined in the Term Loan Agreement.

160.    "*Term Loan Director*" shall have the meaning set forth in Article V.I.1.

161.    "*Term Loan Lenders*" means the financial institutions party from time to time to the Term Loan Agreement as lenders, solely in their respective capacities as such.

162.    "*Termination Event*" means a Creditor Termination Event (as set forth in Section 6 of the Restructuring Support Agreement) or a Company Termination Event (as set forth in Section 9 of the Restructuring Support Agreement).

163.    "*Third Lien Notes*" shall mean the 7.875% senior secured notes due 2020 issued pursuant to the terms of the Third Lien Notes Indenture.

164.    "*Third Lien Notes Claims*" means all Claims against any Remington Entity arising on account of the Third Lien Notes Indenture, and which constitute "Note Obligations," as such term is defined in the Third Lien Notes Indenture; provided, however, that Third Lien Notes Claims shall not include any Claims arising on account of Treasury Notes, which have been extinguished.

165.    "*Third Lien Notes Director*" shall have the meaning set forth in Article V.I.1

166.    "*Third Lien Notes Indenture*" means that certain Indenture, dated as of April 19, 2012, between OpCo and FGI Finance Inc., as Issuers of the 7.875% Senior Secured Notes due 2020, the guarantors named therein, and Wilmington Trust, National Association, as Trustee and Collateral Agent, as amended, modified, or supplemented from time to time.

167.    "*Third Lien Notes Indenture Trustee*" means Wilmington Trust, National Association, as indenture trustee under the Third Lien Notes Indenture.

168.    "*Third Lien Noteholders*" means the holders of the Third Lien Notes Claims, solely in their capacity as such.

169.    "*Third Lien Noteholder Cash Distribution*" means $39.3 million in Cash at ROC to be distributed to the holders of Allowed Third Lien Notes Claims on the Effective Date, *less* all fees and expenses incurred by Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP, and Perella Weinberg Partners on behalf of the Consenting Third Lien Creditors, *plus* $5.0 million to be distributed on the Effective Date in the event of a Litigation Settlement.

170. *"Treasury Notes"* means Third Lien Notes that are held by (i) ROC, OpCo, or any other direct or indirect subsidiary of ROC, or (ii) any of the Cerberus Entities.

171. *"Warrant Agreement"* means that certain warrant agreement in such form filed as **Exhibit 6** to the Plan, which shall be in form and substance reasonably acceptable to Reorganized Remington and the Requisite Consenting Creditors.

172. *"Unexpired Lease"* means a lease to which one or more of the Remington Entities are party, which lease is subject to assumption or rejection in accordance with section 365 of the Bankruptcy Code.

173. *"Unreleased Debtor Parties"* means the Remington Entities and each of their predecessors, successors (other than Reorganized Remington), assigns, subsidiaries, current and former shareholders, current and former directors, current and former officers, funds, affiliates, members, employees, partners, limited partners, and general partners.

174. *"Unimpaired"* means, with respect to a Class, Claim, Interest, or a holder of a Claim or Interest, that such Class, Claim, Interest, or holder is not Impaired.

175. *"Unsecured Claim"* means any Claim, other than an Administrative Expense, ABL DIP Claim, Term DIP Claim, ROC DIP Claim, Priority Claim, Intercompany Claim, ABL Claim, Term Loan Claim, Third Lien Notes Claim, or Other Secured Claim.

176. *"Voting Record Date"* means March 19, 2018.

B.    *Rules of Interpretation*

For purposes of the Plan and unless otherwise specified herein: (1) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (2) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (3) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (4) all references to articles or Articles are references to the Articles hereof; (5) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, the Plan; (6) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (7) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule or exhibit, as it may thereafter be amended, modified, or supplemented; (8) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (9) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as specifically provided herein; (10) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (11) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed

and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (12) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (13) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise , the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate or entity governance matters relating to the Remington Entities or Reorganized Remington shall be governed by the laws of the state of incorporation or organization of the relevant Remington Entity or Reorganized Remington entity, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II
## ADMINISTRATIVE EXPENSES AND
## OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, ABL DIP Claims, Term DIP Claims, ROC DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *General Administrative Expenses*

Each holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, then in the applicable Remington Entity's ordinary course of business), unless otherwise agreed by the holder of such General Administrative Expense and the applicable Remington Entity.

19

B.     *Restructuring Expenses*

Except as otherwise specifically provided in the Plan, Reorganized OpCo shall, without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash all reasonable and documented accrued and unpaid (i) Creditor Fees and Expenses (as defined in the Restructuring Support Agreement) in accordance with the terms of the Restructuring Support Agreement and the Bankruptcy Code, and (ii) subject to and in accordance with the ABL Loan Facility Agreement, the fees, expenses and other disbursements of the ABL Parties, whether incurred before or after the Petition Date, including without limitation, the reasonable and documented fees and expenses of the ABL Parties' professional advisors.  Reorganized OpCo shall, without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash all reasonable and documented accrued and unpaid fees and expenses of the Term Loan Agent in accordance with that certain Successor Agent Fee Letter, dated March 2, 2018.  Notwithstanding anything to the contrary herein, Cash associated with the Third Lien Noteholder Cash Distribution on the Effective Date shall only be used to satisfy the Third Lien Noteholder Cash Distribution and to fund payment of fees and expenses incurred by Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP, and Perella Weinberg Partners on behalf of the Consenting Third Lien Creditors; *provided that* documentation of such fees and expenses shall be summary in nature and shall not include billing detail.

C.     *Professional Fees*

1.     Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on Reorganized Remington no later than forty-five (45) days after the Effective Date, unless Reorganized Remington agrees otherwise in writing.  Objections to Professional Fees must be filed with the Bankruptcy Court and served on Reorganized Remington and the applicable Professional no later than seventy-five (75) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Professional Fees Escrow Account; *provided, however*, that if the funds in the Professional Fees Escrow Amount are insufficient to pay the full Allowed amounts of the Professional Fees, Reorganized Remington shall promptly pay any remaining Allowed amounts from its Cash on hand.  For the avoidance of doubt, in no circumstance shall ROC funds be contributed to the Professional Fees Escrow Account or used to pay any Professional Fees except as otherwise provided pursuant to the Plan.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Remington Entities are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Remington Entities' businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation.

2.    Professional Fees Escrow Account

On the Effective Date, Reorganized Remington shall establish the Professional Fees Escrow Account in an amount equal to all asserted Claims for Professional Fees outstanding as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by the Remington Entities or Reorganized Remington). Amounts held in the Professional Fees Escrow Account shall not constitute property of Reorganized Remington. The Professional Fees Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Professional Fees Escrow Account following payment to all holders of Claims for Professional Fees under the Plan, any such amounts shall be returned to Reorganized Remington.

Professionals shall estimate their unpaid Claims for Professional Fees incurred in rendering services to the Remington Entities or their Estates before and as of the Effective Date and shall deliver such estimate to counsel for the Remington Entities no later than ten (10) Business Days before the Effective Date; *provided, however,* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of filed Professional Fees Claims. If a Professional does not provide an estimate, the Remington Entities shall estimate the unpaid and unbilled fees and expenses of such Professional in order for such Professional to be entitled to payment from the Professional Fees Escrow Account. The total amount proposed to be allocated to the Professional Fees Escrow Account pursuant to this Section shall be provided to the attorneys for the Remington Entities no later than three (3) Business Days before the Effective Date.

3.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, Reorganized OpCo shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by Reorganized Remington on and after the Effective Date. On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized Remington may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

D.    *Term DIP Claims*

On the Effective Date, each holder of an Allowed Term DIP Claim shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Term DIP Claim, have such Allowed Term DIP Claim replaced with obligations in an amount equal to such Allowed Term DIP Claim under the RSA Term Loan Facility or repaid in full in cash with the proceeds of an Alternative New Term Loan Facility. Pursuant to the Restructuring Support Agreement, each holder of an Allowed Term DIP Claim shall be deemed to have consented to receive such treatment for such Allowed Term DIP Claim. The specific terms and conditions of the New Term Loan Facility will be subject to and may require material modifications depending

on the terms and conditions of the New ABL Facility, the New FILO Term Loan Facility, or such other exit asset-based lending facility that Remington enters into on the Effective Date. For the avoidance of doubt, the obligations under the New FILO Term Loan Facility shall not replace the Allowed Term DIP Claims and no portion of the proceeds of the New FILO Term Loan Facility shall be used in any part to satisfy the Allowed Term DIP Claims.

E.    *ROC DIP Claims*

On the Effective Date, ROC, as the holder of the Allowed ROC DIP Claims, shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed ROC DIP Claims, (i) receive the ROC DIP Distribution, and (ii) be deemed to automatically, and without need for any further action or notice, distribute such ROC DIP Distribution on a Pro Rata basis to the holders of Third Lien Notes Claims, consistent with the distributions described in Article III.B.5.

F.    *ABL DIP Claims*

On the Effective Date, except to the extent such holder has agreed to an alternative treatment (which may include participation in an exit asset-based lending facility), each holder of any Allowed ABL DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, consideration equal to the Allowed amount of such Claim, in Cash, on the Effective Date.

G.    *Priority Tax Claims*

Except to the extent that a holder of a Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim also is secured, such Claim shall, to the extent it is Allowed, be treated as an Allowed Other Secured Claim if such Claim is not otherwise paid or satisfied in full.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF
## CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Claims and Interests, except for Administrative Expenses, ROC DIP Claims, Term DIP Claims, ABL DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to

exist. To the extent that a particular Claim does not qualify within the description of any Class and the Plan otherwise fails to classify such Claim or specify its treatment, then such Claim shall be deemed to be part of Class 6; *provided, however,* that all rights of the holder(s) of such Claim(s), including the right to object to such classification, and the Remington Entities' and Reorganized Remington's rights and defenses thereto, are reserved.

The Plan constitutes a separate chapter 11 plan of reorganization for each Remington Entity. Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|-------|--------------------|--------|----------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | ABL Facility Claims | Unimpaired | Deemed to accept |
| 4 | Term Loan Claims | Impaired | Entitled to vote |
| 5 | Third Lien Notes Claims | Impaired | Entitled to vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to accept |
| 7 | Intercompany Claims | Unimpaired | Deemed to accept |
| 8 | Settled Intercompany Claims | Impaired | Deemed to reject |
| 9 | Interests in ROC | Impaired | Deemed to reject |
| 10 | Intercompany Interests | Unimpaired | Deemed to accept |

B.    *Treatment of Claims and Interests*

    1.    Class 1 – Priority Non-Tax Claims

        a.    *Classification*: Class 1 consists of all Allowed Priority Non-Tax Claims. Although all Priority Non-Tax Claims have been placed in one Class for the purposes of nomenclature, the Priority Non-Tax Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

        b.    *Treatment*: Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 1 Claim shall (i) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the later of the Effective Date and the date such Claim becomes due and payable in the ordinary course of business or (ii) be otherwise rendered Unimpaired.

23

    c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

    a.    *Classification*: Class 2 consists of all Allowed Other Secured Claims. Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, the Other Secured Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

    b.    *Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 2 Claim (i) have its Claim be reinstated or receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the Effective Date or (ii) be otherwise rendered Unimpaired.

    c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.    Class 3 – ABL Facility Claims

    a.    *Classification*: Class 3 consists of all Allowed ABL Facility Claims. Although all ABL Facility Claims have been placed in one Class for the purposes of nomenclature, the ABL Facility Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

    b.    *Allowance*: Except to the extent previously indefeasibly paid during the Chapter 11 Cases, Class 3 Claims are deemed Allowed in the aggregate principal amount of $114,500,000, plus any pre-petition and post-petition interest, fees, expenses, and other amounts due and owing pursuant to or secured by the terms of the ABL Facility Loan Documents as of the Effective Date.

    c.    *Treatment*: Except to the extent each holder has agreed to an alternative treatment (which may include participation in an exit asset based lending facility), each holder of an Allowed Class 3 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, consideration equal to the Allowed amount of such Claim, in Cash, on the Effective Date.

      d.    *Voting*: Class 3 is Unimpaired under the Plan. Therefore, holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

4.    Class 4 – Term Loan Claims

      a.    *Classification*: Class 4 consists of all Allowed Term Loan Claims. Although all Allowed Term Loan Claims have been placed in one Class for the purposes of nomenclature, the Allowed Term Loan Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

      b.    *Allowance*: Class 4 Claims are deemed Allowed in the aggregate principal amount of $550,475,000, plus any interest, fees, and expenses due and owing pursuant to the terms of the Term Loan Agreement as of the Effective Date.

      c.    *Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, its Pro Rata share of (i) 82.5% of the New Common Units, (ii) to the extent such holder is an Electing Term Loan Lender, its Pro Rata Class 4 Shares of either (a) the Litigation Trust Class A Interests, or (b) any amounts allocated for distribution to the Electing Term Loan Lenders under a Litigation Settlement, and (iii) to the extent not previously paid to the Term Loan Lenders in accordance with the terms of the Interim DIP Order, Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018.

      d.    *Voting*: Class 4 is Impaired under the Plan. Therefore, holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 – Third Lien Notes Claims

      a.    *Classification*: Class 5 consists of all Allowed Third Lien Notes Claims. Although all Allowed Third Lien Notes Claims have been placed in one Class for the purposes of nomenclature, the Allowed Third Lien Notes Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

      b.    *Allowance*: Class 5 Claims are deemed Allowed in the aggregate amount of $226,012,000, plus any interest, fees, and expenses due and owing pursuant to the terms of the Third Lien Notes Indenture as of the Effective Date.

c.    *Treatment*:  Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, its Pro Rata share of: (i) the ROC DIP Distribution, (ii) the Third Lien Noteholder Cash Distribution, (iii) the New Warrants, and (iv) to the extent such holder is an Electing Third Lien Noteholder, its Pro Rata Class 5 Shares of either (a) the Litigation Trust Class B Interests, or (b) any amounts allocated for distribution to the Electing Third Lien Noteholders under a Litigation Settlement.  To the extent not previously paid by OpCo to ROC in accordance with the terms of the Interim DIP Order, on the Effective Date, OpCo shall transfer Cash to ROC in an amount equal to $924,375.61 for reimbursement of fees and costs previously paid by ROC between January 30, 2018 and March 16, 2018.

d.    *Voting*:  Class 5 is Impaired under the Plan.  Therefore, holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

6.    Class 6 – General Unsecured Claims

a.    *Classification*: Class 6 consists of all Allowed General Unsecured Claims. Although all General Unsecured Claims have been placed in one Class for the purposes of nomenclature, the General Unsecured Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.    *Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 6 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, as an when such Claim becomes due and payable in the ordinary course of the applicable Remington Entity's business or in accordance with applicable court order (plus any interest accrued after the Petition Date with respect to such Claim as may be required by law to render such Claim Unimpaired, as determined by the Remington Entities or ordered by the Bankruptcy Court), or (ii) such other treatment that renders such holder Unimpaired; *provided, that* any Allowed General Unsecured Claim against ROC shall be assumed by Reorganized OpCo in accordance with the foregoing terms.

c.    *Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Allowed Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

7.  Class 7 – Intercompany Claims

    a.   *Classification*: Class 7 consists of all Allowed Intercompany Claims. Although all Allowed Intercompany Claims have been placed in one Class for the purposes of nomenclature, the Intercompany Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

    b.   *Treatment*: Each holder of an Allowed Class 7 Claim shall (i) have its Claim be paid, reinstated, or cancelled, to the extent determined appropriate by the Remington Entities, or (ii) receive such other treatment that renders such holder Unimpaired.

    c.   *Voting*: Class 7 is Unimpaired under the Plan. Holders of Allowed Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

8.  Class 8 – Settled Intercompany Claims

    a.   *Classification:* Class 8 consists of all Settled Intercompany Claims.

    b.   *Treatment*: No holder of a Class 8 Claim shall receive a distribution under the Plan.

    c.   *Voting*: Class 8 is Impaired under the Plan. Each holder of a Claim in Class 8 shall be deemed to have rejected this Plan and, therefore, is not entitled to vote.

9.  Class 9 – Interests in ROC

    a.   *Classification*: Class 9 consists of all Interests in ROC.

    b.   *Treatment*: No holder of a Class 9 Interest shall receive a distribution under the Plan.

    c.   *Voting*: Class 9 is Impaired under the Plan. Each holder of a Claim in Class 9 shall be deemed to have rejected this Plan and, therefore, is not entitled to vote.

10.  Class 10 – Intercompany Interests

    a.   *Classification*: Class 10 consist of all Allowed Interests in the Remington Entities other than in ROC, separately classified by Remington Entity.

    b.   *Treatment*: Each holder of an Allowed Interest in Class 10 shall (i) have its Interest be reinstated or (ii) receive such other treatment that renders such holder Unimpaired.

      c.      *Voting*: Class 10 is Unimpaired under the Plan. Holders of Allowed Interests in Class 10 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Remington Entities' rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF PLAN

A.    *Voting Classes*

Classes 4 and 5 are Impaired under the Plan; therefore, holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan.

B.    *Presumed Acceptance of the Plan*

Classes 1, 2, 3, 6, 7, and 10 are Unimpaired under the Plan. Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

C.    *Non-Consensual Confirmation*

Class 8 and Class 9 are Impaired and will not receive a distribution under the Plan. Accordingly, Class 8 and Class 9 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Because Class 8 and Class 9 are deemed to reject the Plan, and to the extent that any other Impaired Class rejects the Plan, the Remington Entities will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. The Remington Entities reserve the right to alter, amend, modify, revoke, or withdraw this Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, subject in each instance to the Restructuring Support Agreement.

D.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any

contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, Reorganized Remington reserves the right to re-classify, with the consent of the Requisite Consenting Creditors, any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE V
## MEANS FOR IMPLEMENTATION OF PLAN

A.    *General Settlement of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims in any Class and Interests in accordance with the Plan are intended to be, and shall be, final.

Although the Plan does not provide for substantive consolidation of the Estates, it also does not contemplate individual recoveries on a debtor-by-debtor basis. Rather, it represents a global and integrated series of compromises and settlements of all Allowed Claims and Interests against the Remington Entities, including, but not limited to, the settlement of all Allowed Claims held by the Consenting Creditors. The treatment of the Consenting Creditors' Claims and the ABL Parties' Claims set forth in the Plan supports maximum recoveries for all other creditors, including the unimpairment of holders of Claims in Class 6 (General Unsecured Claims).

B.    *Restructuring Transactions*

On the Confirmation Date, subject to and consistent with the terms of its obligations under the Plan, the New ABL Facility Documents, the New Term Loan Facility Documents, the New FILO Term Loan Facility Documents, and the Restructuring Support Agreement, and subject to the rights of the Consenting Creditors under the Restructuring Support Agreement, the Remington Entities shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate and other Entity restructuring of their businesses, to otherwise simplify the overall corporate and other Entity structure of the Remington Entities, or to reincorporate or reorganize certain of the Remington Entities under the laws of jurisdictions other than the laws under which such Remington Entities currently are incorporated or formed, which restructuring may include one or more mergers, consolidations, dispositions, liquidations or dissolutions, as may be determined by the Remington Entities to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Remington Entities vesting in one or more surviving, resulting or acquiring entities (collectively, the "Restructuring Transactions"). Subject to the terms of this Plan, in each case in which the surviving, resulting or acquiring Entity in any such transaction is a successor to a Remington Entity, such surviving, resulting or

acquiring Entity will perform the obligations of such Remington Entity pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Remington Entity, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Entity, which may provide that another Remington Entity will perform such obligations.

In effecting the Restructuring Transactions, the Remington Entities shall be permitted to: (1) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree; (2) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree; (3) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law; and (4) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. The terms of the Restructuring Transactions shall be structured to preserve favorable tax attributes, if any, of the Remington Entities.

C.    *Sources of Consideration for Plan Distributions*

1.    Issuance of New Common Units and New Warrants

On the Effective Date, Reorganized ROC shall issue the New Common Units and the New Warrants. All of the securities issued pursuant to the Plan shall be duly authorized, validly issued, and fully paid, and non-assessable. Each distribution and issuance referred to in Article VIII shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, ROC, as the holder of the Allowed ROC DIP Claims, shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed ROC DIP Claims, (i) receive the ROC DIP Distribution, and (ii) be deemed to automatically and without need for any further action or notice distribute such ROC DIP Distribution on a Pro Rata basis to the holders of Third Lien Notes Claims, consistent with the distributions described in Article III.B.5.

2.    Cash

Other than the Third Lien Noteholder Cash Distribution, Reorganized OpCo shall fund distributions under the Plan required to be paid in Cash with Cash on hand, including Cash from operations and any Cash received on the Effective Date, and borrowings under the Term/ROC DIP Facility, the ABL DIP Facility, the New ABL Facility, and the New Term Loan Facility, as applicable.

3.    New ABL Facility

On the Effective Date, Reorganized Remington shall enter into the $193 million New ABL Facility. The ABL DIP Lenders will commit to provide an exit facility upon Remington's emergence from bankruptcy, subject to the terms and conditions set forth in its commitment letter and the term sheet attached as **Exhibit 1** to this Plan. The borrowers and guarantors under the New ABL Facility will be the same as the existing ABL Facility, and additionally, ROC will become a guarantor after the Third Lien Noteholder Cash Distribution. The New ABL Facility is expected to contain affirmative and negative covenants that are customary for similar facilities, and will be secured by the same assets as the existing ABL Facility.

Confirmation shall be deemed approval of the New ABL Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New ABL Facility, including the New ABL Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, and the New ABL Agent may mutually agree to be necessary to consummate the New ABL Facility. The terms and conditions of the New ABL Facility are more specifically set forth in the commitment letter attached as **Exhibit 1**.

4.    New Term Loan Facility

As of the Petition Date, the Term DIP Lenders have committed to provide the RSA Term Loan Facility (in an amount equal to the Term DIP Facility Claims outstanding as of the Effective Date), which shall refinance the outstanding Term DIP Facility Claims. In the event that the Debtors' board of directors, in its good faith judgment, determines, prior to the Effective Date, and consistent with the milestone dates set forth in the Restructuring Support Agreement, that one or more alternative commitments for financing (such facility, an "Alternative New Term Loan Facility") with the same or longer maturity and weighted average maturity, the same collateral priority and ranking and the same aggregate principal amount as the RSA Term Loan Facility is available at a lower effective yield (taking into account interest margins, minimum LIBOR rates, original issue discount, upfront fees and other fees, costs and expenses) than the RSA Term Loan Facility or otherwise on terms no less favorable, taken as a whole, to Reorganized Remington than the RSA Term Loan Facility, the Debtors may accept such commitment and consummate the transactions contemplated thereby without any liability in respect of the RSA Term Loan Facility, including any fees, costs or expenses thereunder; *provided that* (i) the Alternative New Term Loan Facility shall not include any commitment replacing, repaying or refinancing the New FILO Term Loan Facility, and (ii) the Debtors' acceptance of any Alternative New Term Loan Facility shall not release the Debtors or Reorganized Remington (after the Effective Date) from liability in respect of the New FILO Term Loan Facility, including any fees, costs or expenses thereunder.

On the Effective Date, Reorganized Remington shall enter into the New Term Loan Facility (in an amount equal to the Term DIP Facility Claims outstanding as of the Effective Date), and the outstanding Term DIP Facility Claims shall be replaced with, or repaid in full in cash with the proceeds of, the obligations under the New Term Loan Facility. Confirmation

shall be deemed approval of the New Term Loan, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain and/or effectuate the New Term Loan Facility without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, the New ABL Agent, the New Term Loan Agent, and the New FILO Term Loan Agent (solely to the extent such modification materially affects the New ABL Agent, the New Term Loan Agent or the New FILO Term Loan Agent, as applicable) may mutually agree to be necessary to consummate the New Term Loan Facility. The specific terms and conditions of the New Term Loan Facility will be subject to and may require material modifications depending on the terms and conditions of the New ABL Facility, the New FILO Term Loan Facility, or such other exit asset-based lending facility that Remington enters into on the Effective Date.

     5.    New FILO Term Loan Facility

On the Effective Date, Reorganized Remington shall enter into the New FILO Term Loan Facility. Confirmation shall be deemed approval of the New FILO Term Loan Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith and subject to the terms of conditions of the New FILO Term Loan Facility Documents) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New FILO Term Loan Facility, including the New FILO Term Loan Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, and the New FILO Term Loan Agent may mutually agree to be necessary to consummate the New FILO Term Loan Facility. For the avoidance of doubt, the Remington Entities shall not solicit alternative commitments for financing in place of the New FILO Term Loan Facility.

D.    *Corporate Existence*

Except as otherwise provided in the Plan, each of Reorganized ROC and its direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Remington Entity is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are

deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law).

E.    *Vesting of Assets in Reorganized Remington*

Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, and any property acquired by the Remington Entities pursuant to the Plan shall vest in Reorganized Remington, free and clear of all Liens, Claims, charges, or other encumbrances; *provided, however,* that (i) each Litigation Claim shall either (a) be treated pursuant to the terms of a Litigation Settlement, or (b) if no such Litigation Settlement occurs with respect to such Litigation Claim, shall be transferred to the Litigation Trust, and (ii) all unsecured claims against ROC as of the Effective Date shall be assumed by Reorganized OpCo on the Effective Date. On and after the Effective Date, except as otherwise provided in the Plan, Reorganized Remington may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or causes of action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

F.    *Cancellation of Loans, Securities, and Agreements*

Except as otherwise provided in the Plan, on the Effective Date: (1) the Term/ROC DIP Credit Agreement, the ABL DIP Facility Loan Agreement, the ABL Facility, the Term Loan Agreement, the Third Lien Notes Indenture, the Interests in ROC, its intercompany notes, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Remington Entities giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, the Remington Entities that are reinstated pursuant to the Plan), shall be deemed cancelled, surrendered, and discharged as to the Remington Entities without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and Reorganized Remington shall not have any continuing obligations thereunder or in any way related thereto; and (2) the obligations of the Remington Entities pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Remington Entities (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Remington Entities that are specifically reinstated pursuant to the Plan) shall be deemed satisfied in full, released, and discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity; provided, however, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions under the Plan, (b) with respect to the ABL Facility, as necessary to enforce the terms of the ABL Payoff Letter, including but not limited to the Surviving Obligations (as defined in the ABL Payoff Letter), and (c) solely with respect to the Term Loan Agreement, as necessary to (i) enforce the rights, Claims and interests of the Term Loan Agent and any predecessor thereof vis-a-vis the Secured Parties (as defined in the Term Loan Agreement) and any parties other than Remington or Reorganized Remington,

(ii) preserve any rights of the Term Loan Agent and any predecessor thereof as against any money or property distributable to holders of Term Loan Claims, including any priority in respect of payment and the right to exercise any charging lien, and (iii) enforce the terms of the OpCo Bridge Payoff Letter, including but not limited to the Surviving Obligations (as defined in the OpCo Bridge Payoff Letter); provided further, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to Reorganized Remington. Except for the foregoing, the Term Loan Agent and its respective agents shall be relieved of all further duties and responsibilities related to the Financing Agreements (as defined in the Term Loan Agreement) and the Plan, except with respect to such other rights of the Term Loan Agent that, pursuant to the Term Loan Agreement, survive the termination of the Financing Agreements. Subsequent to the performance by the Term Loan Agent of its obligations pursuant to the Plan, the Term Loan Agent and its agents shall be relieved of all further duties and responsibilities related to the Financing Agreements.

G.    *Corporate and Other Entity Action*

On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including: (1) appointment of the New Boards pursuant to Article V.I and any other managers, directors, or officers for Reorganized Remington identified in the Plan Supplement; (2) the issuance and distribution of the New Common Units by Reorganized ROC; (3) entry into the New Organizational Documents; (4) entry into the New ABL Facility Documents; (5) entry into the New Term Loan Facility Documents and the New FILO Term Loan Facility Documents; (6) entry into the Warrant Agreement and the issuance and distribution of the New Warrants by Reorganized ROC pursuant thereto; (7) implementation of the Restructuring Transactions; (8) the establishment of the Litigation Trust and the issuance of the Litigation Trust Interests, in each case, if applicable; and (9) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate or other Entity structure of the Remington Entities or Reorganized Remington, and any corporate or other Entity action required by the Remington Entities or Reorganized Remington in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, or officers of the Remington Entities or Reorganized Remington. On or before the Effective Date, the appropriate officers of the Remington Entities or Reorganized Remington, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of Reorganized Remington, including any and all agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.G shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

H.    *New Organizational Documents*

On or immediately prior to the Effective Date or as soon thereafter as is practicable, Reorganized Remington shall, to the extent such New Organizational Documents were included in the Plan Supplement, file their New Organizational Documents (if so required under

applicable state law) with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, Reorganized Remington may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the Plan, the laws of their respective states, provinces, or countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court.

I.     *Directors and Officers of Reorganized Remington and its Subsidiaries*

As of the Effective Date, the terms of the current members of the boards of directors or managers (as applicable) of the Remington Entities shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards, and the officers of each Reorganized Remington entity shall be appointed in accordance with the respective New Organizational Documents. The members of the New Boards will be identified in the Plan Supplement, together with biographical information. If any such director, manager, or officer of Reorganized Remington is an "insider" under the Bankruptcy Code, the Remington Entities also will disclose the nature of any compensation to be paid to such director or officer. Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized Remington.

1.     Reorganized ROC Board

The Reorganized ROC Board shall consist of seven (7) initial Directors appointed as follows on the Effective Date: (i) four (4) Directors appointed by the Requisite Consenting Term Loan Creditors (each, a "Term Loan Director"); (ii) two (2) Directors appointed by the Requisite Consenting Third Lien Creditors (the "Third Lien Notes Director"); and (iii) the CEO Director.

Thereafter, for so long as they own certain amounts of Reorganized ROC equity, certain stockholders of Reorganized ROC will have the right to appoint one or more directors to the Reorganized ROC Board, subject to the terms and conditions of the New Organizational Documents. Except as provided below, in the event that any Designated Director for any reason ceases to serve as a member of the Reorganized ROC Board, the resulting vacancy on the Reorganized ROC Board shall be filled by a person designated by the party who designated such Designated Director. In the event that the CEO Director for any reason ceases to serve as a member of the Reorganized ROC Board (including as a result of ceasing to be Reorganized Remington's chief executive officer), the CEO Director board seat shall remain vacant until Reorganized Remington's chief executive officer is next appointed by the Reorganized ROC Board. Following the loss of any party's right to appoint a Designated Director, such party will cause its Designated Director to promptly resign, and the board seat formerly occupied by such Designated Director will thereafter be subject to a one-year term, with the vacancy resulting from such loss of designation rights initially filled by a vote of the holders of the New Common Units (determined by plurality) at a special meeting called for such purposes and, thereafter, shall be elected annually by the holders of the New Common Units.

2.    New Subsidiary Boards

On the Effective Date, the New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

3.    Certain Personnel

On and after the Effective Date until June 30, 2018, COAC shall continue to make available to Reorganized Remington each of Jim Geisler, John Kwapis, Jason Bixby, and Jed Dunbar, and COAC in accordance with past practice under the prepetition agreement between COAC and ROC (the "Existing COAC Agreement"); *provided, however,* that on and prior to the Effective Date, the Existing COAC Agreement shall be deemed to be amended (the "COAC Amendment") to provide that COAC shall pay for the foregoing personnel without any cost to the Remington Entities or Reorganized Remington.

J.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, Reorganized Remington and the officers and members of the boards of directors thereof are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of Reorganized Remington, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

K.    *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

L.    *Litigation Trust*

Pursuant to Article VI hereof, a Litigation Trust shall be established in the event that Litigation Claims are not settled or otherwise resolved through a Litigation Settlement prior to the Effective Date. For the avoidance of doubt, if a Litigation Settlement occurs, the Litigation Trust will not be established.

M.    *Preservation of Litigation Claims*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VI and Article IX, each Remington Entity shall retain all rights to commence and pursue,

36

as appropriate, any and all Litigation Claims that such Remington Entity or its Estate may hold whether arising before or after the Petition Date, including any actions specifically identified in the Plan Supplement, and such rights to commence, prosecute, settle, or assert as a defense such Litigation Claims shall be preserved notwithstanding the occurrence of the Effective Date. No Litigation Claim belonging to any of the Remington Entities prior to the occurrence of the Effective Date shall be settled without the consent of the Requisite Consenting Creditors. Unless any Litigation Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, each Remington Entity and its Estate expressly reserve any and all Litigation Claims that such Remington Entity or its Estate may hold.

If a Litigation Trust is established, any and all Litigation Claims that constitute Litigation Trust Assets shall be transferred to the Litigation Trust on the Effective Date, and the Litigation Trustee shall be entitled to enforce all rights to commence and pursue any such Litigation Claims at the Direction of the Litigation Trust Advisory Board in accordance with the terms of the Litigation Trust Agreement. If a Litigation Trust is established, the Litigation Trust expressly reserves any and all Litigation Claims that constitute Litigation Trust Assets for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Litigation Claims upon, after, or as a consequence of, the Confirmation or Consummation.

If the Litigation Trust is established, the Litigation Trustee, at the Direction of the Litigation Trust Advisory Board and in accordance with the terms of the Litigation Trust Agreement, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Litigation Claims and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Litigation Claim against it as any indication that Reorganized Remington or the Litigation Trust, as applicable, will not, or may not, pursue any and all available Litigation Claims against it.

N.    *Management Incentive Plan*

Following the Effective Date, the Reorganized ROC Board shall reserve a customary amount of the New Common Units for distribution to certain employees of Reorganized Remington pursuant to the Management Incentive Plan. The terms of the Management Incentive Plan and any awards thereunder shall be determined by the Reorganized ROC Board.

O.    *Procedures for Treating Disputed Claims and Interests Under the Plan*

1.    Disputed Claims and Interests Process

Except as otherwise specified in the Plan or required by an order of the Bankruptcy Court, holders of Claims or Interests need not file proofs of claim or interest with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the

Plan. If a proof of claim or interest is filed, and if Remington or Reorganized Remington dispute any such Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; provided, however, that Remington or Reorganized Remington may elect to object to any proof of claim or interest, and to have the validity or amount of any Claim or Interest adjudicated by, the Bankruptcy Court; provided further, that holders of Claims or Interests may elect to resolve the validity or amount of any Claim or Interest in the Bankruptcy Court. If a holder makes such an election, the Bankruptcy Court shall apply applicable bankruptcy law and the law that would have governed the dispute if the Chapter 11 Cases had not been filed. Notwithstanding anything to the contrary herein, (1) Reorganized Remington shall retain all defenses to Claims and Interests under applicable law and (2) notwithstanding anything to the contrary herein, on the Effective Date, any proof of claim or interest filed by an Entity whose Allowed Claim or Allowed Interest is otherwise addressed, resolved, paid, or satisfied by the Plan shall be automatically expunged without further notice to or action, order, or approval of the Bankruptcy Court. To the extent any holder of a Claim or Interest files a proof of claim or interest with the Bankruptcy Court, any objections to any such proof of claim or interest must be filed by no later than (i) ninety (90) days after the Effective Date if such proof of claim or interest is filed prior to the Effective Date or (ii) ninety (90) days after the date of the filing of such proof of claim or interest if such proof of claim or interest was filed after the Effective Date.

   2.  No Distributions Pending Allowance

   Notwithstanding anything to the contrary herein, if any portion of a Claim or Interest is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes Allowed.

   3.  Distributions after Allowance

   To the extent that a Disputed Claim or Disputed Interest ultimately becomes Allowed, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment finding or deeming any Disputed Claim or Disputed Interest to be Allowed has become a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

## ARTICLE VI
## THE LITIGATION TRUST

A.  *Establishment of Litigation Trust*

   The parties shall execute the Litigation Trust Agreement on or before the Effective Date if no Litigation Settlement has occurred. In the event that a Litigation Settlement does not occur on or before the Effective Date, then on the Effective Date, the Litigation Trust Agreement shall be effective and the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purposes of, among other things, (i) administering the Litigation Trust Assets,

(ii) prosecuting, settling, adjusting, retaining, and enforcing any Litigation Claims, (iii) making any distributions as provided for under the Plan and the Litigation Trust Agreement, and (iv) liquidating the Litigation Trust Assets. Each Electing Term Loan Lender and Electing Third Lien Noteholder has consented to treating its Litigation Claims as Litigation Trust Assets subject to the Litigation Trust Agreement by voting in favor of the Plan or otherwise checking the appropriate box on its ballot to "opt in" to such treatment. Accordingly, pursuant to the Plan, the Litigation Trust Beneficiaries shall be deemed parties to the Litigation Trust Agreement, and the Litigation Trust Agreement shall be binding upon all of the Litigation Trust Beneficiaries, without the need for any Litigation Trust Beneficiary to execute the Litigation Trust Agreement. The Litigation Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and shall take no action inconsistent with such qualification. The Litigation Trust will be initially funded by the Litigation Trust Fund.

For the avoidance of doubt, if a Litigation Settlement occurs, then no Litigation Trust shall be established and the remaining provisions of this Article VI below shall be of no force or effect.

B.    *Vesting of Assets*

On the Effective Date, provided that a Litigation Settlement does not occur, then the Remington Entities and the Litigation Trust Beneficiaries shall be deemed to transfer all of the Litigation Trust Assets (and, in the case of (x) the Remington Entities, the rights and powers of the Remington Entities' Estates applicable to the Litigation Trust Assets in accordance with section 1141 of the Bankruptcy Code, and (y) the Consenting Third Lien Creditors, the Litigation Trust Fund) to the Litigation Trust, including all information necessary to investigate, prosecute, protect, and conserve all Litigation Claims, free and clear of all liens, Claims, encumbrances, and Interests (legal, beneficial, or otherwise) for the benefit of the Litigation Trust Beneficiaries. For the avoidance of doubt, upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the Remington Entities' rights, title, and interest in the Litigation Trust Assets, and the Remington Entities shall have no further interest in or with respect to the Litigation Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. In connection with the vesting and transfer of the Litigation Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral and including, electronic information) relating to the Litigation Trust Assets (collectively, the "Privileges") shall vest in the Litigation Trust. The Remington Entities, Reorganized Remington, the Consenting Creditors, and the Litigation Trustee shall take all necessary actions to effectuate the transfer of such privileges, protections, and immunities. The Litigation Trust's, Litigation Trustee's, and the Litigation Trust Advisory Board's receipt of the Privileges shall be without waiver in recognition of the joint/successorship interest in prosecuting claims on behalf of the applicable stakeholders of the Remington Entities' Estates.

The transfer of the Litigation Trust Assets to the Litigation Trust shall be made for the benefit and on behalf of the Litigation Trust Beneficiaries. The assets comprising the Litigation Trust Assets will be treated for tax purposes as being transferred by the Remington Entities to the

Litigation Trust Beneficiaries pursuant to the Plan in exchange for a portion of their Allowed Claims and then by the Litigation Trust Beneficiaries to the Litigation Trust in exchange for the Litigation Trust Interests in the Litigation Trust. Article VII of the Litigation Trust Agreement ("Tax Matters") is incorporated by reference as if set forth fully herein. The Litigation Trust Beneficiaries shall be treated as the grantors and owners of their respective share of the Litigation Trust Assets. Upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the Remington Entities' rights, title and interest in the Litigation Trust Assets, and the Remington Entities will have no further interest in or with respect to the Litigation Trust.

Except as provided in, and unless expressly released, compromised, or settled in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, the Litigation Trustee, upon the Direction (as defined in the Litigation Trust Agreement) of the Litigation Trust Advisory Board, shall enforce the Litigation Claims, in accordance with sections 1123(a)(5)(A) and 1123(b)(3) of the Bankruptcy Code. For the avoidance of doubt, any Direction of the Litigation Trust Advisory Board to release, compromise, or settle a Litigation Claim must be consistent with the Advisory Board's fiduciary obligations to the Litigation Trust Beneficiaries pursuant to Section 5.3 of the Litigation Trust Agreement. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel, (judicial, equitable, or otherwise), or laches shall apply to the Litigation Trust, the Litigation Trustee, or the Litigation Trust Advisory Board by virtue of or in connection with the confirmation, consummation, or effectiveness of the Plan. No Person or entity may rely on the absence of a specific reference in the Plan to any claim against them as any indication that the Litigation Trustee will not pursue any and all available Litigation Claims against them. Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Litigation Trustee expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation Order.

In accordance with the Litigation Trust Agreement, the Litigation Trustee will prepare and make available to Litigation Trust Beneficiaries, on an annual basis, a written report detailing, among other things, the litigation status of the Litigation Claims, any settlements entered into by the Litigation Trust, the proceeds recovered to date from the Litigation Trust Assets, and the distributions made by the Litigation Trust. Such report shall be posted on a website maintained by the Litigation Trustee. In addition, the Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article VI.B and Section 7.2 of the Litigation Trust Agreement.

C.    *The Litigation Trustee*

      1.    Appointment

The Litigation Trustee shall be selected no later than thirty (30) days after the Effective Date or as soon as practicable thereafter by the Requisite Third Lien Creditors in consultation with the Requisite Consenting Term Loan Creditors. The Litigation Trustee may be named in the Confirmation Order if selected prior to the Combined Hearing, or in the Litigation Trust Agreement if selected prior to the deadline for filing the Plan Supplement. Prior to the appointment of the Litigation Trustee, a majority of the Members may exercise all powers otherwise belonging to the Litigation Trustee, in addition to the powers provided to the Litigation Trust Advisory Board, pursuant to the Litigation Trust Agreement.

2.    Powers

The powers and responsibilities of the Litigation Trustee shall include, but shall not be limited to, those responsibilities vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee shall maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to Litigation Trust Beneficiaries contemplated or effectuated under the Plan. In connection with the administration of the Litigation Trust, the Litigation Trustee shall have all powers necessary to implement the provisions of the Plan relating to the Litigation Trust, within the bounds of the Plan, the Litigation Trust Agreement, and applicable law.

3.    Litigation; Responsibilities of Litigation Trustee

The Litigation Trustee shall, upon the Direction of the Litigation Trust Advisory Board, in an expeditious but orderly manner, and subject to the other provisions of the Plan, the Confirmation Order, and the Litigation Trust Agreement, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions, and not unduly prolong the duration of the Litigation Trust. The Litigation Trust Advisory Board shall take into consideration the Members' fiduciary obligations pursuant to Section 5.3 of the Litigation Trust Agreement and the risks, timing, and costs of potential actions, in exercising its reasonable business judgment to maximize net recoveries to the Litigation Trust Beneficiaries. Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment, or dismissal of any or all claims, rights, or causes of action of the Litigation Claims or otherwise or through the sale or other disposition of the Litigation Trust Assets (in whole or in combination). Consistent with an agreed-upon budget in accordance with Section 3.12(b) of the Litigation Trust Agreement, if any, the Litigation Trustee may incur any reasonable and necessary expenses in connection with liquidating and converting the Litigation Trust Assets to Cash and distribution of the proceeds thereof.

The Litigation Trust Advisory Board shall have the absolute right to provide Direction to the Litigation Trustee to prosecute, pursue, commence, object to, seek to estimate, seek to subordinate, compromise, settle, or take any other action concerning any and all Litigation Claims as it determines in good faith to be in the best interests of the Litigation Trust Beneficiaries, and consistent with (i) the Members' fiduciary obligations to the Litigation Trust Beneficiaries pursuant to Section 5.3 of the Litigation Trust Agreement; and (ii) the purposes of

41

the Litigation Trust; provided, that neither the Litigation Trustee nor the Litigation Trust Advisory Board Members, and their representatives, shall have any liability for any actions or omissions in accordance with the Litigation Trust Agreement or with respect to the Litigation Trust unless arising out of such Person's own fraud, self-dealing, intentional misrepresentation, willful misconduct, breach of the fiduciary duty of loyalty, or gross negligence. The Litigation Trustee may incur any reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash and shall be reimbursed in accordance with the provisions of the Litigation Trust Agreement. Any and all proceeds generated from the Litigation Trust Assets shall be the property of the Litigation Trust.

    4.    Employment of Professionals

The Litigation Trustee may, without further order of the Bankruptcy Court, but subject to the terms of the Litigation Trust Agreement, employ various professionals, including, but not limited to, counsel, experts, consultants, and financial advisors, as needed to assist the Litigation Trustee in fulfilling its obligations under the Plan. Such employment agreements shall be acceptable to the Litigation Trust Advisory Board. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. For the avoidance of doubt, unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court, at the Direction of the Litigation Trust Advisory Board, or the Litigation Trustee, as applicable), professionals retained by the Litigation Trustee shall be compensated solely by the Litigation Trust Fund. Any and all proceeds generated from the Litigation Trust Assets shall be the property of the Litigation Trust.

    5.    Value of Litigation Trust Assets

As soon as reasonably practicable following the Effective Date, but in no event later than sixty (60) days thereafter, the Litigation Trustee shall inform, in writing, the Litigation Trust Advisory Board and the Litigation Trust Beneficiaries of the value of the Litigation Trust Assets, based on the good-faith determination of the Litigation Trustee. The valuation of the Litigation Trust Assets prepared pursuant to this Article VI.C.5 and Section 1.8 of the Litigation Trust Agreement shall be used consistently by all parties (including the Litigation Trust) for all federal income tax purposes. The Litigation Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit.

D.    *Litigation Trust Advisory Board*

    1.    Appointment

On or prior to the Confirmation Date, a three-member Litigation Trust Advisory Board shall be appointed as follows: (i) two Members to be appointed by the holders of Litigation Trust Class B Interests; and (ii) one Member to be appointed by the holders of Litigation Trust Class A Interests. The Litigation Trustee shall not be a Member. Each Member shall designate an alternate representative to attend meetings and participate in other activities of the Litigation Trust Advisory Board when the corresponding Member is unavailable to participate in such

meetings and activities. With the express written consent of a majority in number of the Members, the Litigation Trust Advisory Board may appoint ex officio members. Such ex officio members shall not be entitled to vote.

2.    Authority and Responsibilities

The Litigation Trust Advisory Board shall, as and when requested by the Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or the Litigation Trust Agreement, consult with and advise the Litigation Trustee as to the administration and management of the Litigation Trust in accordance with the Plan, the Confirmation Order, or the Litigation Trust Agreement, and the Litigation Trustee's and the Litigation Trust Advisory Board's fiduciary duties and shall have the other responsibilities and powers as set forth herein. The Litigation Trust Advisory Board shall have the authority and responsibility to provide Direction with respect to the activities of the Litigation Trust and the performance of the Litigation Trustee and shall have the authority to remove the Litigation Trustee in accordance with Section 4.4 of the Litigation Trust Agreement *provided, however*, that the Litigation Trust Advisory Board may not provide Direction to the Litigation Trustee or the Members to act inconsistently with their duties under the Plan, the Confirmation Order, or the Litigation Trust Agreement, or their fiduciary obligations to the Litigation Trust Beneficiaries; *provided, further*, that the Litigation Trust Class A Trust Representative shall not have the authority to provide Direction to the Litigation Trustee with respect to any Litigation Claims to which only holders of Litigation Trust Class B Interests are entitled to proceeds, as set forth in Section 3.5(a) of the Litigation Trust Agreement. Notwithstanding anything to the contrary herein, the Litigation Trust Class A Trust Representative shall receive notice of and a reasonable opportunity to attend all meetings of the Litigation Trust Advisory Board.

The Litigation Trustee shall consult with and provide information to the Litigation Trust Advisory Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, or the Litigation Trust Agreement to enable the Litigation Trust Advisory Board to meet its obligations hereunder.

Notwithstanding any provision of Litigation Trust Agreement to the contrary, the Litigation Trustee shall not be required to (i) obtain the Direction of the Litigation Trust Advisory Board to the extent that the Litigation Trust Advisory Board has not provided Direction to the Litigation Trustee to take any action that the Litigation Trustee, in good faith, reasonably determines, based on the advice of legal counsel, is required to be taken by applicable law; or (ii) follow the Direction of the Litigation Trust Advisory Board to the extent that the Litigation Trust Advisory Board provides Direction to the Litigation Trustee to take action that the Litigation Trustee, in good faith, reasonably determines, based on the advice of legal counsel, is prohibited by applicable law or by the Litigation Trustee's fiduciary obligations.

E.    *Expense Reserve and Litigation Trust Expenses*

The Litigation Trustee shall establish a segregated account, maintained by the Litigation Trustee, to be funded initially by the Litigation Trust Fund and thereafter by such amounts as reasonably estimated from time to time by the Litigation Trustee as being necessary to assure

payment when due of all expenses that the Litigation Trustee anticipates will be incurred in connection with carrying out the provisions of the Plan, the Litigation Trust Agreement, and applicable law, which amounts are to be reserved from distributions to Litigation Trust Beneficiaries.

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses, on or after the Effective Date, shall be paid in accordance with the Litigation Trust Agreement without further order of the Bankruptcy Court. For the avoidance of doubt, (i) the Litigation Trust Assets may not be used to pay professional fees and expenses other than those of the Litigation Trustee and professionals or vendors retained by the Litigation Trustee or his/her counsel, and (ii) the Remington Entities shall not have any obligation, or be required, to pay any of the Litigation Trust Expenses, other than the Litigation Trust Fund.

F.    *Compensation of the Litigation Trustee*

In addition to reimbursement for the Litigation Trust Expenses, the Litigation Trustee shall, upon the Direction of the Litigation Trust Advisory Board without necessity for review or approval by the Bankruptcy Court or any other Person, shall be paid reasonable compensation as provided by the Litigation Trust Agreement. The reasonable costs and expenses incurred by the Litigation Trustee in performing the duties set forth in the Plan shall be paid by the Litigation Trust from the Litigation Trust Fund. All costs, expenses, and obligations incurred by the Litigation Trustee in administering the Plan, or in any manner connected, incidental, or related thereto, including those of attorneys, accountants, and other persons employed to assist in the administration and distribution of the Litigation Trust Assets, shall be a charge against such assets.

G.    *Litigation Trust Interests*

Each Litigation Trust Interest will entitle its holder to distributions from the Litigation Trust in accordance with the terms of the Litigation Trust Agreement. The Litigation Trust Interests will be uncertificated; thus, distributions of Litigation Trust Interests will be accomplished solely by the entry of the names of the holders and their respective Litigation Trust Interests in the books and records of the Litigation Trust. Each holder of a Litigation Trust Interest shall take and hold its uncertificated beneficial interest subject to all of the terms and provisions of the Plan, the Confirmation Order, and the Litigation Trust Agreement.

The Litigation Trust Interests shall not be registered pursuant to the Securities Act of 1933, as amended, or any state securities law and shall be exempt from registration thereunder pursuant to section 1145 of the Bankruptcy Code. The Litigation Trust Interests shall be freely transferable; *provided*, *however*, that the transfer of the Litigation Trust Interests will be prohibited to the extent such transfer would subject the Remington Entities to the registration and reporting requirements of the Securities Act and the Securities Exchange Act of 1934, as amended.

H.    *Distributions by Litigation Trustee*

The Litigation Trustee shall make distributions on account of Litigation Trust Interests in accordance with the terms of the Litigation Trust Agreement. The first $5,000,000 of any

44

aggregate net proceeds of the Litigation Claims shall be allocated on a pro rata basis to the holders of Litigation Trust Class B Interests (the "Initial Distribution"), and any recoveries in excess of $5,000,000 obtained by the Litigation Trust shall be shared equally among the holders of Litigation Trust Class A Interests and holders of the Litigation Trust Class B Interests, if applicable. The Litigation Trustee shall classify and allocate recoveries from Litigation Claims in good faith and consistent with its fiduciary obligations to all Litigation Trust Beneficiaries under Section 3.2 of the Litigation Trust Agreement. Notwithstanding the foregoing, the holders of Litigation Trust Class B Interests shall receive all recovery amounts from any Litigation Claims that (i) are exclusively related to amounts transferred within applicable statutes of limitations from ROC to any transferee, or (ii) belong solely to ROC or any of its stakeholders; *provided, however,* for the avoidance of doubt, that any Litigation Claim based on mismanagement or a fiduciary-duty breach in connection with any potential merger, acquisition or similar change in control transaction of the Remington Entities, or against any third party in connection with the same; or based on mismanagement or a fiduciary-duty breach that had a material adverse effect on the value of any of the non-ROC Remington Entities (excluding claims related to amounts transferred within applicable statutes of limitations from ROC to any transferee, as set forth in (i) above), shall in each case not be deemed to belong solely to ROC.

The identities and entitlements of the Litigation Trust Beneficiaries shall be maintained in a registry of the Litigation Trust, based on the ballots received from holders of Class 4 Claims and Class 5 Claims and using the Voting Record Date (as defined below) as the determinative date for such determination.

The Litigation Trustee shall distribute or cause to be distributed to each Litigation Trust Beneficiary its share of any proceeds of the Litigation Trust Assets semi-annually, or more frequently as otherwise determined upon the Direction of the Litigation Trust Advisory Board, until such time as there are no longer any proceeds to distribute; provided, however, that the Litigation Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation; (ii) to pay or reserve for reasonable administrative expenses (including the costs and expenses of the Litigation Trust and the Litigation Trustee and the fees, costs, and expenses of all professionals retained by the Litigation Trustee, and any taxes imposed on the Litigation Trust or in respect of the assets of the Litigation Trust); and (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Litigation Trust Agreement. All reasonable and documented fees and expenses of the Term Loan Agent or any successor agent designated by the holders of Litigation Trust Class A Interests or the Litigation Trust, as applicable, to receive distributions pursuant to the terms of the Litigation Trust Agreement (including the reasonable and documented fees and expenses of its counsel and agents) incurred in connection with such distributions shall be paid by Reorganized OpCo.

No Cash distributions shall be required to be made to any Litigation Trust Beneficiary in an amount less than $100.00. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions. Notwithstanding the foregoing, all cash shall be distributed in the final distribution of the Litigation Trust.

Notwithstanding the foregoing and the terms of the Litigation Trust Agreement, upon a motion by the Litigation Trustee (filed upon the Direction of the Litigation Trust Advisory Board) asserting reasonable grounds therefor, the Bankruptcy Court shall have the authority to enter an order directing that distributions to be made on account of Litigation Trust Interests issued to the Third Lien Notes Indenture Trustee or the Term Loan Agent instead be made to the beneficial and/or record Third Lien Noteholders and/or Term Loan Lenders. Reasonable grounds shall include, without limitation, an insolvency proceeding relating to the Third Lien Notes Indenture Trustee or Term Loan Agent, or any other circumstance in which the distributions being made on account of Litigation Trust Interests would not or cannot promptly be made to the beneficial Third Lien Noteholders or the Term Loan Lenders.

I.      *Termination*

The Litigation Trust Advisory Board and the Litigation Trust shall be dissolved no later than five years from the Effective Date unless the Litigation Trust Advisory Board determines that a fixed period extension (not to exceed three years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Trust Advisory Board that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

Notwithstanding the foregoing, multiple extensions can be effectuated as long as the Litigation Trust Advisory Board determines that each such extension is necessary at least ninety (90) days prior to the expiration of each extended term; *provided*, *however*, that in no event shall the term of the Litigation Trust extend past ten years from the Effective Date. In the event a Cash balance exists in the Litigation Trust Fund upon termination of the Litigation Trust, (i) if holders of the Litigation Trust Class B Interests have not received, or have only received a portion of, the Initial Distribution contemplated by Article VI.H of the Plan, the difference between $5,000,000 and the portion of the Initial Distribution the holders of Litigation Trust Class B Interests have received shall be distributed to holders of the Litigation Trust Class B Interests, and (ii) any remaining balance shall be shared equally by holders of the Litigation Trust Class A Interests and Litigation Trust Class B Interests.

## ARTICLE VII
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise ordered by the Bankruptcy Court or provided herein, all Executory Contracts and Unexpired Leases of the Remington Entities, including the Existing Employment Agreements, shall be deemed assumed by the applicable Remington Entity counterparty in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, on the Effective Date, all Executory Contracts and Unexpired Leases to which ROC or FGI Holding is a party shall be deemed assumed by Reorganized OpCo; provided, that all federal, state, or local government

licenses, permits, and similar rights or privileges held by ROC shall be deemed assumed on the Effective Date by Reorganized ROC. All indemnification contracts and employment contracts to which one or more Remington Entities is a party shall be rejected to the extent permitted by law unless expressly assumed prior to the Effective Date or pursuant to the terms of this Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, and assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to this Article VII.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in, and be fully enforceable by, Reorganized OpCo in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Remington Entity that is party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of Reorganized OpCo or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of the applicable cure amount, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

C.    *Insurance Policies*

Each of the insurance policies of the Remington Entities, including all director and officer insurance policies in place as of the Petition Date are deemed to be and treated as Executory Contracts under the Plan. On the Effective Date, the Remington Entities shall be deemed to have assumed all insurance policies, including all director and officer insurance policies in place as of the Petition Date.

D.    *Employment Agreements*

On the Effective Date, Reorganized OpCo shall be deemed to have assumed that certain Employment Agreement dated as of August 15, 2015, by and between Remington Outdoor Company, Inc. and Stephen P. Jackson, Jr., and that certain Employment Agreement dated as of October 19, 2017, by and between Remington Outdoor Company, Inc. and Anthony A. Acitelli (collectively, the "Existing Employment Agreements"). The Existing Employment Agreements are the only two employment contracts of which the Remington Entities are aware.

E.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed and, if applicable, assigned to OpCo, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts or Unexpired Leases that have been executed by the Remington Entities during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith; *provided*, that the Remington Entities shall not execute any material modification, amendment, supplement, and/or restatement on or after the Confirmation Date and prior to the Effective Date without the consent of the Requisite Consenting Creditors, which consent shall not be unreasonably withheld, and upon notice to the ABL DIP Agent.

F.    *Reservation of Rights*

Nothing contained in the Plan shall constitute an admission by the Remington Entities that any Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease or that the Remington Entities or Reorganized Remington has any liability thereunder.

G.    *Non-Occurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    *Contracts and Leases Entered into after Petition Date*

Contracts and leases entered into after the Petition Date by any Remington Entity, including any Executory Contracts and Unexpired Leases assumed by a Remington Entity, will be performed by the applicable Remington Entity or Reorganized OpCo, as the case may be, liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

I.    *Rejection Damages Claims*

If the rejection of an executory contract or unexpired lease by the Remington Entities results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be classified and treated in Class 6 (General Unsecured Claims).

## ARTICLE VIII
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class; *provided however*, that holders of Third Lien Notes Claims will receive their distribution (other than any such distributions of Litigation Trust Interests) on, or as soon as practicable after, the Effective Date via customary methods to make distributions through DTC, including via a mandatory exchange upon surrender of the Third Lien Notes Claims. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

B.    *Application of Distributions*

Any distribution made under the Plan on account of an Allowed Claim shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to any portion of such Claim for accrued but unpaid interest.

C.    *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. If the Disbursing Agent is one or more of Reorganized Remington, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized OpCo.

D.    *Rights and Powers of Disbursing Agent*

    1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.    Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent on and after, or in contemplation of, the Effective Date (including taxes) and any reasonable compensation and documented expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by Reorganized OpCo.

E.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.    Delivery of Distributions to Term Loan Agent and Third Lien Notes Indenture Trustee

No later than two (2) Business Days after the Distribution Record Date, the Term Loan Agent shall provide to counsel to the Remington Entities a list of all holders of Term Loan Claims as of such date and such additional information as reasonably requested by counsel to the Remington Entities or the Disbursing Agent required to make distributions under the Plan. The Term Loan Agent may, in its sole discretion, limit the further assignment of Term Loan Claims to allow for the accurate recording of the holders of Term Loan Claims as of the Distribution Record Date with respect to the Term Loan Claims. All distributions of Cash on account of Term Loan Claims shall be deposited with the Term Loan Agent for distribution to holders of Term Loan Claims in accordance with terms of the Plan and the Term Loan Agreement. All distributions other than Cash on account of Term Loan Claims shall be made by the Disbursing Agent directly to holders of Term Loan Claims or such holder's authorized designee in accordance with terms of the Plan and the Term Loan Agreement. All reasonable and documented fees and expenses of the Term Loan Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the Chapter 11 Cases or the implementation of the Plan, including but not limited to as part of this Article VIII.E.1, shall be paid by Reorganized OpCo.

All distributions to holders of Allowed Third Lien Notes Claims shall be governed by the Third Lien Notes Indenture and shall be made to each holder of an Allowed Third Lien Notes Claim, or such holder's authorized designee, for purposes of distributions to be made hereunder. Notwithstanding the foregoing, except as otherwise provided in the Plan or reasonably requested by the Third Lien Notes Indenture Trustee, all distributions to holders of Allowed Third Lien Notes Claims shall be deemed completed when made to the Third Lien Notes Indenture Trustee,

which shall be deemed to be the holder of all Allowed Third Lien Notes Claims for purposes of distributions to be made hereunder. The Third Lien Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Third Lien Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article VIII, the Third Lien Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders. If the Third Lien Notes Indenture Trustee is unable to make, or consents to Reorganized Remington or the Disbursing Agent making, such distributions, Reorganized Remington or the Disbursing Agent, as applicable, with such Third Lien Notes Indenture Trustee's cooperation, shall make such distributions to the extent reasonably practicable to do so. As to any holder of an Allowed Third Lien Notes Claims that is held in the name of, or by a nominee of, DTC, Reorganized Remington, or the Disbursing Agent, as applicable, shall seek the cooperation of DTC so that such distribution shall be made through the facilities of DTC on or as soon as practicable on or after the Effective Date. All reasonable and documented fees and expenses of the Third Lien Notes Indenture Trustee incurred after the Effective Date as part of this Article VIII.E.1 shall be paid by Reorganized OpCo.

2.      Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date (provided that the foregoing shall not apply to publicly held securities, including, without limitation, the Third Lien Notes), at the address for each such holder as indicated on the Remington Entities' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of Reorganized Remington. Notwithstanding any of the foregoing, and for the avoidance of doubt, the Distribution Record Date for purposes of making any determinations with respect to qualification of any holder of a Class 4 Claim or Class 5 Claim as an Electing Term Loan Lender, Electing Third Lien Noteholder, or a Litigation Trust Beneficiary, and with respect to receiving any distributions of Litigation Trust Interests under the Plan, shall be made by reference to the Voting Record Date.

3.      Minimum Distributions

No fractional New Common Units, New Warrants, or Litigation Trust Interests shall be distributed, and no Cash shall be distributed with respect to such fractional amounts. When any distribution pursuant to the Plan would otherwise result in the issuance of a number of New Common Units, New Warrants, or Litigation Trust Interests that is not a whole number, the actual distribution of New Common Units New Warrants, or Litigation Trust Interests, as applicable, shall be rounded as follows: (a) fractions of greater than one-half (½)shall be rounded to the next higher whole number, and (b) fractions of one-half (½) or less shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized New Common Units, New Warrants, or Litigation Trust Interests, as applicable, to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding. DTC is considered a single holder for rounding and distribution purposes and no additional cash or securities will be distributed to DTC on account of rounding at the DTC participant or beneficial holder level.

4.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date; provided further, that the Remington Entities or Reorganized Remington, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to Reorganized Remington automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred; provided, that all distributions of (i) the ROC DIP Distribution, (ii) the Third Lien Noteholder Cash Distribution, (iii) New Warrants, (iv) Cash, and (v) New Common Units that are unclaimed by a holder of Allowed Class 4 Claims or Allowed Class 5 Claims, as applicable, shall be distributed on a Pro Rata basis to the holders of Allowed Class 4 Claims or Allowed Class 5 Claims, as applicable, whose distributions of the preceding items (i)-(v) on the Effective Date were not returned as undeliverable; provided further, that no unclaimed distributions on account of an Allowed Class 4 Claim shall be distributed to the holders of Allowed Class 5 Claims, and no unclaimed distributions on account of an Allowed Class 5 Claim shall be distributed to the holders of Allowed Class 4 Claims; provided further, that if a Litigation Trust is established pursuant to Article VI of the Plan, each Electing Term Loan Lender whose distributions of the preceding items (i)-(v) were not returned as undeliverable shall receive their Pro Rata Class 4 Share of all unclaimed distributions of Litigation Trust Class A Interests, and each Electing Third Lien Noteholder whose distributions of the preceding items (i)-(v) were not returned as undeliverable shall receive their Pro Rata Class 5 Share of all unclaimed distributions of Litigation Trust Class B Interests.

F.    *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the issuance and distribution of the New Common Units, the New Warrants (and the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests as contemplated by the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration thereunder. In addition, under section 1145 of the Bankruptcy Code, the New Common Units, the New Warrants (and the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments and subject to any restrictions in the New Organizational Documents, the Warrant Agreement, and the Litigation Trust Agreement, as applicable. Notwithstanding anything to the contrary herein, the transfer of the New Common Units, the New Warrants, and the Litigation Trust Interests will be prohibited to the extent such transfer would subject the

Remington Entities to the registration and reporting requirements of the Securities Act and the Securities Exchange Act of 1934, as amended.

G.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, Reorganized Remington shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, Reorganized Remington and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. Reorganized Remington reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

H.    *No Postpetition Interest on Claims and Interests*

Unless otherwise specifically provided for in the Restructuring Support Agreement, Plan, Confirmation Order, or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

I.    *Setoffs and Recoupment*

The Remington Entities and Reorganized Remington are authorized to set off against or recoup from any Claims (to the extent not released pursuant to the Plan) of any nature whatsoever that the Remington Entities or Reorganized Remington may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Remington Entities or Reorganized Remington of any such claim they may have against the holder of such Claim.

J.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Remington Entities or Reorganized Remington, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Remington Entity or Reorganized Remington entity. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Remington Entity or Reorganized Remington entity on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Remington Entity or Reorganized Remington entity, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the

amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Remington Entity annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid. Notwithstanding the foregoing, if a Litigation Trust is established, nothing in this Section VIII(J) shall apply to any treatment or recoveries on account of being a Litigation Trust Beneficiary.

2.      Claims Payable by Third Parties

To the extent that one or more of the Remington Entities' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Remington Entities or any Entity, including the Litigation Trustee, may hold against any other Entity under any insurance policies, including against insurers or any insured, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE IX
## SETTLEMENT, RELEASE, INJUNCTION,
## AND RELATED PROVISIONS

A.      *Compromise and Settlement*

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Remington Entities, their Estates, and all holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9019. In addition, the allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Remington Entities and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan. The Confirmation Order shall authorize and approve the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto. Nothing in this Article IX.A shall compromise or settle, in any way whatsoever, any Causes of Action that the Remington Entities or Reorganized Remington, as applicable, may have against any Entity that is not a Released Party.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, but subject in all respects to Article VI, after the Effective Date, except with respect to the Litigation Trust Assets, Reorganized Remington may, in its sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in the Remington Entities (if any), and (2) claims (including Causes of Action) against other Entities.

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Plan Supplement), the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by Reorganized Remington), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Remington Entities or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose prior to the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), (h), or (i) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests as set forth above subject to the occurrence of the Effective Date. The discharge of all Claims and Interests as set forth above shall not apply to any Litigation Claim unless such Litigation Claim is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Litigation Settlement, or a Bankruptcy Court order. Notwithstanding the foregoing or anything to the contrary in the Plan or in the Confirmation Order, (a) each Administrative Expense and any Claim or Interest arising prior to the Effective Date in Classes 1, 2, 3, 6, 7, or 10 (including Claims for rejection damages pursuant to section 365 of the Bankruptcy Code) of the Plan shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan, and (b) Remington and Reorganized Remington shall retain all defenses, counterclaims, rights to setoff, and rights to recoupment, if any, as to the foregoing Claims.

C.    *Release of Liens*

**Except as otherwise expressly provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the New ABL Facility Documents, New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the New ABL Facility Documents, New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other**

security interests shall revert to Reorganized Remington and each of their successors and assigns.

D.    *Releases of Released Parties*

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article IX.D and shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by this Article IX.D; (3) in the best interests of the Remington Entities and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity (including the Remington Entities) asserting any claim or Cause of Action released pursuant to this Article IX.D.

1.    Releases by the Remington Entities

Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Released Parties to facilitate the reorganization of the Remington Entities and the implementation of the restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, the Remington Entities, and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions and Settled Intercompany Claims), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Remington Entity, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereinafter arising, in law, equity, or otherwise, that the Remington Entities, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Remington Entity), based on or relating to, or in any manner arising from, in whole or in part, the Remington Entities, the Chapter 11 Cases, the ABL DIP Claims, the Term DIP Claims, the ROC DIP Claims, the ABL Facility Claims, the Term Loan Claims, the Third Lien Notes Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Remington Entities or Reorganized Remington, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Remington Entity and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New Term Loan Facility, (iii) the New FILO Term Loan Facility, (iv) the New ABL Facility, (v) the Disclosure Statement, (vi) the Restructuring Support Agreement, or (vii) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act

or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence. For the avoidance of doubt, the releases described in this Article IX.D.1 do not release any Litigation Claim asserted or that could be asserted against any Unreleased Debtor Parties or any Independent Directors and Officers. However, such Litigation Claims may be released pursuant to a Litigation Settlement. Any recovery on account of any potential and/or actual claims against the Independent Directors and Officers of the Remington Entities shall be within and to the extent of the limits of liability and the scope of coverage afforded by the insurance held by the Remington Entities.

    2.    Third-Party Releases by Holders of Claims or Interests

Except as otherwise expressly provided in the Plan, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Remington Entity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Remington Entity), based on or relating to, or in any manner arising from, in whole or in part, the Remington Entities, the Chapter 11 Cases, the ABL DIP Claims, the Term DIP Claims, the ROC DIP Claims, the ABL Facility Claims, the Term Loan Claims, the Third Lien Notes Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Remington Entities or Reorganized Remington, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Remington Entity and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New Term Loan Facility, (iii) the New ABL Facility, (iv) the Disclosure Statement, (v) the Restructuring Support Agreement, or (vi) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.  For the avoidance of doubt, the releases described in this Article IX.D.2 do not release any Litigation Claim asserted or that could be asserted against any Unreleased Debtor Parties or any Independent Directors and Officers. However, such Litigation Claims may be released pursuant to a Litigation Settlement. Any recovery on account of any potential and/or actual claims against the Independent Directors and Officers of the Remington Entities shall be within and to the extent of the limits of liability and the scope of coverage afforded by the insurance held by the Remington Entities.

E.    *Exculpation*

Except as otherwise expressly provided in the Plan, and to the extent permitted under Section 1125(e) of the Bankruptcy Code, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claims (including any Cause of Action), whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereinafter arising, in law, equity, or otherwise, related to or arising out of any act taken or omitted to be taken in connection with, or relating to, negotiation of and entry into the Restructuring Support Agreement, the ABL DIP Facility Loan Agreement, the Term/ROC DIP Credit Agreement, the New ABL Facility Documents, the New Term Loan Facility Documents, the New FILO Term Loan Facility Documents, the issuance of the New Common Units and the New Warrants pursuant to this Plan, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the preparation or filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the Restructuring Transactions, and the administration and implementation of the Plan, including the issuance of any securities or the distribution of property under the Plan or any other agreement or any obligation, cause of action, or liability for any such Claim; provided, however, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence; provided further, that in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan; provided, further that the exculpations set forth herein shall not be deemed a release of any claims or Causes of Action that are otherwise expressly preserved by the Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.    *Injunction*

Except as otherwise expressly provided in the Plan and, if applicable, the Litigation Trust Agreement, and except for obligations issued pursuant to the Plan, including with respect to the New ABL Facility, the New Term Loan Facility, and the New FILO Term Loan Facility, all Entities (along with their respective current or former employees, agents, officers, directors, principals, and affiliates) who have held, hold, or may hold claims, Causes of Action, or interests that have been released pursuant to Article IX.D (the "Released Claims") or discharged pursuant to Article IX.B (the "Discharge"), or that are subject to exculpation pursuant to Article IX.E (the "Exculpation"), are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties or the Exculpated Parties: (1) commencing or

continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; (2) enforcing, attaching, collecting, or recovering, by any manner or means any judgment, award, decree or order against the Released Parties or the Exculpated Parties, as applicable, on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Released Parties or the Exculpated Parties, as applicable, or their property or assets on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; and (4) asserting any right of subrogation, setoff, or recoupment of any kind against any obligation due from the Released Parties or the Exculpated Parties, as applicable, or against their property or assets on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation. Pursuant to sections 1142 and 105 of the Bankruptcy Code, from and after the Effective Date, all holders of Claims and Interests and other parties in interest, along with their respective current or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan; **provided, that** if a Litigation Trust is established, this Section F shall not apply to the Litigation Trustee, the Litigation Trust Advisory Board, or any Litigation Trust Beneficiary, each, solely in its capacity as such, and shall not enjoin such parties with respect to the Litigation Trust or any of the Litigation Trust Assets (including the Litigation Claims).

## ARTICLE X
## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

A.    *Conditions to Confirmation*

The following are conditions to Confirmation that shall have been satisfied or waived in accordance with Article X.C:

1.    no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred in accordance with the terms of the Restructuring Support Agreement, and no Termination Event shall have occurred and not been waived;

2.    the Confirmation Order shall approve all provisions, terms, and conditions hereof and be in form and substance (i) acceptable to the Remington Entities, the Requisite Consenting Creditors, the ABL DIP Agent, the New ABL Agent, and New FILO Term Loan Lenders, and the ABL Required Lenders, each in its sole and absolute discretion and (ii) to the extent any provision of such order materially affects the New Term Loan Agent, acceptable to the New Term Loan Agent in its sole and absolute discretion; and

3.    the Plan Supplement shall have been filed at least fourteen (14) days prior to the Combined Hearing, and shall be (i) in form and substance reasonably acceptable

to the Remington Entities and the Requisite Consenting Creditors, and (ii) to the extent ABL Parties are materially affected, in form and substance acceptable to the ABL DIP Agent in its sole and absolute discretion, and any additional documents or amendments to previously-filed documents shall have been filed as amendments to the Plan Supplement prior to Confirmation.

B.    *Conditions to Effective Date*

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article X.C:

1.    no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred in accordance with the terms of the Restructuring Support Agreement, and no Termination Event shall have occurred and not been waived;

2.    the Bankruptcy Court shall have entered the Final DIP Order in such form and substance as is (i) consented to by each of the Remington Entities and to the Requisite Consenting Creditors, (ii) acceptable to the ABL DIP Agent in its sole and absolute discretion, and (iii) and otherwise consistent with the Restructuring Support Agreement;

3.    Confirmation shall have occurred, the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation shall not be subject to any stay, modification or reversal;

4.    all authorizations, consents, regulatory approvals, rulings, or documents required by applicable law to implement and effectuate the Plan, including any approvals required in connection with the transfer, change of control, or assignment of the Remington Entities' permits and licenses, shall have been obtained from any appropriate regulatory agencies and not subject to any appeal;

5.    except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with Consummation shall have been executed, delivered, assumed, or performed, as the case may be, and any conditions contained therein (other than Consummation or notice of Consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement, which are in form and substance (i) reasonably acceptable to the Remington Entities and the Requisite Consenting Creditors, and otherwise consistent with the Restructuring Support Agreement, and (ii) reasonably acceptable to the ABL DIP Agent, Term/ROC DIP Agent, and the New FILO Term Loan Lenders (*provided, however,* that to the extent the ABL Parties, Term DIP Lenders, ROC DIP Lender, or the New FILO Term Loan Lenders are materially affected, acceptable to the ABL DIP Agent, Term/ROC DIP Agent, or the New FILO Term Loan Lenders, respectively, in their sole and absolute discretion);

60

6.      all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the appropriate parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law;

7.      there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

8.      the conditions to the effectiveness of each of the New ABL Facility, the New Term Loan Facility, and the New FILO Term Loan Facility shall have been satisfied or waived in accordance with the terms of the New ABL Facility Documents, the New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents (as applicable) on or prior to the Effective Date;

9.      the Third Lien Noteholder Cash Distribution shall be $39.3 million in Cash at ROC, *less* all fees and expenses incurred by Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP, and Perella Weinberg Partners on behalf of the Consenting Third Lien Creditors, *plus* $5.0 million to be distributed on the Effective Date in the event of a Litigation Settlement;

10.     the Professional Fees Escrow Account shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan;

11.     on the date of the initial extension of credit pursuant to the terms of the Term/ROC DIP Credit Agreement, (a) OpCo shall have paid ROC in Cash an amount equal to $924,375.61 for reimbursement of fees and costs previously paid by ROC between January 30, 2018 and March 16, 2018, and (b) the Term Loan Lenders shall have received Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018; and

12.     the New FILO Term Loan Facility, in the form of the term sheet attached to the Plan as **Exhibit 4**, shall have been consummated in accordance with such term sheet and is otherwise reasonably acceptable to the Requisite Consenting Creditors.

C.      *Waiver of Conditions*

The conditions to Confirmation and the Effective Date set forth in this Article X may be waived only by the Remington Entities with the consent of the Requisite Consenting Creditors and the ABL DIP Agent, which consents may be withheld in their sole and absolute discretion, in whole or in part, without notice, leave, or order of the Bankruptcy Court. Notwithstanding the foregoing, the condition set forth in Article X.B.9 may be waived only by the Requisite Consenting Third Lien Creditors.

D.    *Effect of Non-Occurrence of Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity; (2) prejudice in any manner the rights of the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity, in any respect. For the avoidance of doubt, except as provided in the Restructuring Support Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Restructuring Support Agreement upon non-occurrence of the Effective Date (subject, in all respects, to any consent, termination, or other rights of the Consenting Creditors under the Restructuring Support Agreement) or as otherwise preventing the Restructuring Support Agreement from being effective in accordance with its terms.

## ARTICLE XI
## MODIFICATION, REVOCATION OR
## WITHDRAWAL OF PLAN

A.    *Modification and Amendments*

Except as otherwise specifically provided in the Plan, and subject to the terms of the Restructuring Support Agreement, the Remington Entities reserve the right to modify the Plan, with the consent of the Requisite Consenting Creditors, the Term Loan Agent, the Term/ROC DIP Agent, the ABL DIP Agent, the New FILO Term Lenders, and the New ABL Required Lenders, which consent may be withheld in their sole and absolute discretion, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the terms of the Restructuring Support Agreement, and subject to the consent of the Requisite Consenting Creditors, the ABL DIP Agent, the New FILO Term Lenders, and the New ABL Required Lenders, which consent may be withheld in their sole and absolute discretion, each Remington Entity expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Remington Entity, one or more times, after Confirmation, to the extent necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement, including by structuring the Plan, the Restructuring, and the Restructuring Transaction in a manner that preserves favorable tax attributes. Each Remington Entity may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of Plan*

The Remington Entities reserve the right to revoke or withdraw the Plan with respect to any or all of the Remington Entities prior to the Confirmation Date and to file subsequent plans of reorganization, subject in each instance to the Restructuring Support Agreement.  If the Remington Entities revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:   (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Remington Entity or any other Entity (including the Consenting Creditors and the ABL Parties); or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Remington Entity or any other Entity (including the Consenting Creditors and the ABL Parties).

# ARTICLE XII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest that is not a Litigation Trust Asset, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Remington Entities are party or with respect to which the Remington Entities may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned;

and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.     ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.     adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Remington Entities that may be pending on the Effective Date;

6.     adjudicate, decide, or resolve any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

7.     enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.     enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.     issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article IX, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VIII.J.1;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.     determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    enter an order or final decree concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX, regardless of whether such termination occurred before or after the Effective Date;

22.    hear and determine all disputes that arise out of the formation or initial implementation of the Litigation Trust Agreement or the transfer of the Litigation Trust Assets to the Litigation Trust on the Effective Date;

23.    determine whether a Claim is Allowed or Disallowed;

24.    enforce all orders previously entered by the Bankruptcy Court; and

25.    hear any other matter not inconsistent with the Bankruptcy Code.

*provided*, however, that the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article X.B and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon Consummation, the terms of the Plan shall be immediately effective and

enforceable and deemed binding upon the Remington Entities, Reorganized Remington, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Remington Entities' counterparties to Executory Contracts, Unexpired Leases, and any other prepetition agreements.

B.    *Additional Documents*

On or before the Effective Date, the Remington Entities may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.    The Remington Entities or Reorganized Remington, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by Reorganized OpCo (or the Disbursing Agent on behalf of Reorganized OpCo) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.    None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Remington Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Remington Entity with respect to the holders of Claims or Interests before Consummation.

E.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.    *Notices*

All notices, requests, and demands to or upon the Remington Entities shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Remington Entities, to:

    Remington Outdoor Company, Inc.
    870 Remington Drive
    Madison, NC 27025
    Attn:  Stephen P. Jackson, Jr., Chief Financial Officer (steve.jackson@remington.com)

    and

    Remington Outdoor Company, Inc.
    1816 Remington Circle SW
    Huntsville, Alabama 35824
    Attn: Andrew Logan, Executive Vice President and General Counsel
    (andrew.logan@remington.com)

with copies to:

    Milbank, Tweed, Hadley & McCloy LLP
    2029 Century Park East, 33rd Floor
    Los Angeles, CA 90067
    Attn:  Gregory A. Bray (gbray@milbank.com)
    Attn:  Thomas R. Kreller (tkreller@milbank.com)
    Attn:  Haig M. Maghakian (hmaghakian@milbank.com)

    and

    Pachulski Stang Ziehl & Jones LLP
    919 North Market Street, 17th Floor
    P.O. Box 8705
    Wilmington, DE 19801
    Attn:  Laura Davis Jones (ljones@pszjlaw.com)

If to ROC, to:

    Lowenstein Sandler LLP
    1251 Avenue of the Americas
    New York, New York 10020
    Robert G. Minion (rminion@lowenstein.com)
    Paul Kizel (pkizel@lowenstein.com)

If to the ABL Agent, to:

    Skadden, Arps, Slate, Meagher & Flom LLP
    4 Times Square
    New York, NY 10036

Attn: Paul Leake (paul.leake@skadden.com)
Attn: Shana Elberg (shana.elberg@skadden.com)

and

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
920 N. King Street
Wilmington, DE, 19801
Attn: Jason Liberi (jason.liberi@skadden.com)

If to the Term Loan Lenders:

O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attn: Andrew Parlen (aparlen@omm.com)
Attn: Joseph Zujkowski (jzujkowski@omm.com)

and

Richards, Layton & Finger LLP
920 N King Street, Suite 200
Wilmington, DE 19801
Attn: Mark D. Collins (collins@rlf.com)

If to the Third Lien Noteholders:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attn: Rachel C. Strickland (rstrickland@willkie.com)
Attn: Joseph G. Minias (jminias@willkie.com)

and

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
Attn: Edmon L. Morton (emorton@ycst.com)

After the Effective Date, the Remington Entities shall be authorized to send a notice to Entities specifying that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity (excluding the United States Trustee) must file a renewed request to receive

documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Remington Entities shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the United States Trustee and those Entities who have filed such renewed requests.

G.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into, and are a part of, the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Remington Entities' counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at http://www.ecf.deb.uscourts.gov/ or the website of the Remington Entities' notice and voting agent at http://cases.primeclerk.com/remington. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.    *Nonseverability of Plan Provisions*

Before Confirmation, if any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without consent of the Remington Entities and the Requisite Consenting Creditors; and (3) nonseverable and mutually dependent.

K.  *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Remington Entities shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and, pursuant to section 1125(e) of the Bankruptcy Code, the Remington Entities and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, none of any such parties or individuals or Reorganized Remington will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

L.  *Closing of Chapter 11 Cases*

Reorganized Remington shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.  *Document Retention*

On and after the Effective Date, Reorganized Remington may maintain documents in accordance with its current document retention policy, as may be altered, amended, modified, or supplemented by Reorganized Remington.

N.  *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, Plan Supplement, Restructuring Support Agreement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan (without reference to the Plan Supplement), the Plan (without reference to the Plan Supplement) shall govern and control.  Notwithstanding the foregoing, in the event of a conflict between Article VI of the Plan and the Litigation Trust Agreement, the Litigation Trust Agreement shall control; *provided, however,* that nothing in the Litigation Trust Agreement shall be deemed to expand or modify the scope of the Litigation Trust Assets, including but not limited to the Litigation Claims.

*[Remainder of page intentionally left blank]*

Dated:  March 22, 2018

Respectfully submitted,

REMINGTON OUTDOOR COMPANY,
INC.

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer

FGI HOLDING COMPANY, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer

FGI OPERATING COMPANY, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer

REMINGTON ARMS COMPANY, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer

BARNES BULLETS, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer

TMRI, INC.

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer

RA BRANDS, L.L.C.

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer


FGI FINANCE, INC.

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer


REMINGTON ARMS DISTRIBUTION
COMPANY, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer


HUNTSVILLE HOLDINGS, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer


32E PRODUCTIONS, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer


GREAT OUTDOORS HOLDCO, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer


OUTDOOR SERVICES, LLC

By: _____
    Name: Stephen P. Jackson, Jr.
    Title: Chief Financial Officer

**Exhibit 1 to Plan**

**New ABL Facility Commitment Letter and Term Sheet**

BANK OF AMERICA, N.A.
One Bryant Park
New York, New York 10036

WELLS FARGO BANK,
NATIONAL ASSOCIATION
301 S. College Street
Charlotte, NC 28202

REGIONS BANK
1180 West Peachtree Street
NW
Suite 1000
Atlanta, GA  30309

BRANCH BANKING
AND TRUST
COMPANY
5130 Parkway Plaza
Blvd
Charlotte, NC 28217-
1964

SYNOVUS BANK
800 Shades Creek
Parkway, Suite 326
Birmingham, AL 35209

FIFTH THIRD BANK
222 South Riverside
Plaza
Chicago, IL 60606

DEUTSCHE BANK
AG NEW YORK
BRANCH
60 Wall Street
New York, NY 10005

March 22, 2018

FGI Operating Company, LLC
c/o Remington Outdoor Company, Inc.
870 Remington Drive
P.O. Box 700
Madison, NC 27025
Attention: Stephen P. Jackson, Jr., Chief Financial Officer

$193,000,000 Superpriority Debtor-in-Possession ABL Credit Facility
$193,000,000 Senior Secured Exit ABL Credit Facility
Commitment Letter

Ladies and Gentlemen:

You have advised us that FGI Operating Company, LLC ("*you*" or the "*Administrative Borrower*") and certain of your subsidiaries and affiliates (collectively, the "*Debtors*," and each, a "*Debtor*") are considering filing voluntary petitions for relief (the "*Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"). In connection with the Cases, you have entered into that certain Restructuring Support Agreement, dated as of February 11, 2018 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "*Restructuring Support Agreement*"), with the creditors party thereto. In connection with the Restructuring Support Agreement, (i) you and the other Debtors intend to file with the Bankruptcy Court the Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession, and (ii) you have requested that each of the financial institutions listed on Schedule 1 attached hereto (collectively, the "*Initial ABL Lenders*") commit to provide (A) a $193,000,000 superpriority debtor-in-possession asset-based revolving credit facility (the "*DIP ABL Facility*") to the Debtors upon the entry of the Interim Order (as defined in the DIP ABL Facility Term Sheet (as defined below)) and (B) a $193,000,000 senior secured asset-based revolving credit facility (the "*Exit ABL Facility*," and together with the DIP ABL Facility, the "*ABL Facilities*") to the reorganized Debtors concurrently with the effectiveness of the Reorganization Plan (as defined in the DIP ABL Facility Term Sheet (as defined below)).

Bank of America, N.A. ("**Bank of America**") is pleased to offer to be the sole administrative agent (in such capacity, the "**ABL Administrative Agent**") for each of the ABL Facilities, and each of the Initial ABL Lenders is pleased to offer its commitment (i) to lend up to an amount listed opposite its name on Schedule 1 hereto, which amount in the aggregate shall equal $193,000,000, of the DIP ABL Facility, on a several and not joint basis, upon and subject to the terms and conditions set forth in this letter (this "**Commitment Letter**") and in the Summary of Principal Terms and Conditions (DIP ABL Facility) attached as Exhibit A hereto and incorporated herein by this reference (the "**DIP ABL Facility Term Sheet**"), and (ii) to lend up to an amount listed opposite its name on Schedule 2 hereto, which amount in the aggregate shall equal $193,000,000, of the Exit ABL Facility, on a several and not joint basis, upon and subject to the terms and conditions set forth in this Commitment Letter and in the Summary of Principal Terms and Conditions (Exit ABL Facility) attached as Exhibit B hereto and incorporated herein by this reference (the "**Exit ABL Facility Term Sheet**," and together with the DIP ABL Facility Term Sheet, the "**Term Sheets**"). Bank of America and Wells Fargo Bank, National Association will act as co-collateral agents for each of the ABL Facilities (in such capacities, each a "**Co-Collateral Agent**", and together with the ABL Administrative Agent and the Initial ABL Lenders, the "**Commitment Parties**"). No additional agents, co-agents or arrangers will be appointed and no other titles will be awarded without our prior written approval.

The commitments of the Initial ABL Lenders in respect of the DIP ABL Facility and the undertaking of the applicable Commitment Parties to provide the services described herein in respect of the DIP ABL Facility are subject to the satisfaction of each of the following conditions precedent in a manner acceptable to each of the Commitment Parties: (a) the accuracy and completeness of all representations that you and your affiliates make to the Commitment Parties in respect of the DIP ABL Facility and your compliance with the terms of this Commitment Letter (including the DIP ABL Facility Term Sheet) and the Fee Letter (as hereinafter defined); (b) the negotiation, execution and delivery of definitive documentation for the DIP ABL Facility consistent with the DIP ABL Facility Term Sheet and otherwise satisfactory to each of the Commitment Parties; and (c) the satisfaction of the conditions precedent set forth under the caption "Conditions to Closing" in the DIP ABL Facility Term Sheet.

The commitments of the Initial ABL Lenders in respect of the Exit ABL Facility and the undertaking of the applicable Commitment Parties to provide the services described herein in respect of the Exit ABL Facility are subject to the satisfaction of each of the following conditions precedent in a manner acceptable to each of the Commitment Parties: (a) the accuracy and completeness of all representations that you and your affiliates make to the Commitment Parties in respect of the Exit ABL Facility and your compliance with the terms of this Commitment Letter (including the Exit ABL Facility Term Sheet) and the Fee Letter (as hereinafter defined); (b) prior to and during the syndication of the Exit ABL Facility, there shall be no competing offering, placement or arrangement of any debt securities or bank financing by or on behalf of the Debtors or any of their subsidiaries, other than the Exit Term Facility (as defined in the Exit ABL Facility Term Sheet) and any debt permitted by the Exit ABL Facility Term Sheet under the heading "Other Permitted Debt"; (c) the negotiation, execution and delivery of definitive documentation for the Exit ABL Facility consistent with the Exit ABL Facility Term Sheet and otherwise satisfactory to each of the Commitment Parties; and (d) the satisfaction of the conditions precedent set forth under the caption "Conditions to Closing" in the Exit ABL Facility Term Sheet.

The ABL Administrative Agent intends to commence syndication of the Exit ABL Facility to a group of financial institutions and institutional lenders capable of extending credit on a revolving basis (collectively with the Initial ABL Lenders, the "**Exit ABL Lenders**") promptly upon your acceptance of this Commitment Letter and the Fee Letter, and the commitment of each of the Initial ABL Lenders in respect of the Exit ABL Facility shall be reduced on a pro rata basis as and when corresponding commitments are received from the Exit ABL Lenders; *provided* that, notwithstanding the ABL Administrative Agent's right to syndicate the Exit ABL Facility and receive commitments with respect

thereto, (x) no Initial ABL Lender shall be relieved, released or novated from its obligations hereunder in connection with any syndication, assignment or participation of the Exit ABL Facility, including its commitments in respect thereof, until the Closing Date in respect of the Exit ABL Facility, (y) no assignment or transfer of any Initial ABL Lender's commitments hereunder in respect of the Exit ABL Facility shall become effective until the Closing Date in respect of the Exit ABL Facility and (z) unless you agree in writing, each Initial ABL Lender shall retain exclusive control over all rights and obligations with respect to its commitment in respect of the Exit ABL Facility, including all rights with respect to consents, modifications, waivers and amendments, until the Closing Date in respect of the Exit ABL Facility has occurred. You agree to actively assist the ABL Administrative Agent in achieving a syndication of the Exit ABL Facility that is satisfactory to the ABL Administrative Agent and you. Such assistance shall include your (a) providing and causing your advisors to provide the ABL Administrative Agent upon request with all information reasonably deemed necessary by the ABL Administrative Agent to complete syndication of the Exit ABL Facility, including, but not limited to, information and evaluations prepared by you and your advisors, or on your behalf, relating to the transactions contemplated hereby (including the Projections (as hereinafter defined), the "***Information***"), (b) assisting in the preparation of materials reasonably requested by the ABL Administrative Agent to be used in connection with the syndication of the Exit ABL Facility (collectively with the Term Sheets, the "***Information Materials***"), (c) using your best efforts to ensure that the syndication efforts of the ABL Administrative Agent benefit materially from your existing banking relationships and (d) otherwise using your commercially reasonable efforts to assist the ABL Administrative Agent in its syndication efforts, including by making your officers and advisors available from time to time to attend and make presentations regarding the business and prospects of the Debtors, as appropriate, at one or more meetings of the Exit ABL Lenders.

It is understood and agreed that Bank of America will manage and control all aspects of the syndication of the Exit ABL Facility, including decisions as to the selection of prospective Exit ABL Lenders and decisions as to any titles offered to proposed Exit ABL Lenders, when commitments will be accepted and the final allocations of the commitments among the Exit ABL Lenders. It is understood that no Exit ABL Lender will receive compensation from you in order to obtain its commitment, except on the terms contained herein and in the Exit ABL Facility Term Sheet.

You represent, warrant and covenant that (a) all financial projections concerning the Debtors that have been or are hereafter made available to the Commitment Parties or the Exit ABL Lenders by you or any of your representatives (or on your or their behalf) (the "***Projections***") have been or will be prepared in good faith based upon reasonable assumptions; provided that, with respect to such Projections, it is understood that actual results for the periods covered may differ from the Projections and such differences may be material, and (b) all Information, other than Projections, which has been or is hereafter made available to the Commitment Parties or the Exit ABL Lenders by you or any of your representatives (or on your or their behalf) in connection with any aspect of the transactions contemplated hereby, as and when furnished and when taken as a whole, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading. You agree to furnish us with further and supplemental information from time to time until the date of the initial borrowing under the Exit ABL Facility (the "***Closing Date***" in respect of the Exit ABL Facility) so that the representation, warranty and covenant in the immediately preceding sentence are correct on the Closing Date in respect of the Exit ABL Facility as if the Information were being furnished, and such representation, warranty and covenant were being made, on such date. In issuing this commitment and in arranging and syndicating the Exit ABL Facility, the Commitment Parties are and will be using and relying on the Information without independent verification thereof.

You acknowledge that (a) Bank of America on your behalf will make available Information Materials to the proposed syndicate of Exit ABL Lenders by posting the Information Materials on IntraLinks, SyndTrak or another similar electronic system and (b) certain prospective Exit ABL Lenders (such Exit ABL Lenders, "*Public Lenders*"; all other Exit ABL Lenders, "*Private Lenders*") may have personnel that do not wish to receive material non-public information (within the meaning of the United States federal securities laws, "*MNPI*") with respect to the Debtors or their affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such entities' securities. If requested, you will assist us in preparing an additional version of the Information Materials not containing MNPI (the "*Public Information Materials*") to be distributed to prospective Public Lenders.

Before distribution of any Information Materials (a) to prospective Private Lenders, you shall provide us with a customary letter authorizing the dissemination of the Information Materials and (b) to prospective Public Lenders, you shall provide us with a customary letter authorizing the dissemination of the Public Information Materials and confirming the absence of MNPI therefrom. In addition, at our request, you shall identify Public Information Materials by clearly and conspicuously marking the same as "PUBLIC".

You agree that Bank of America on your behalf may distribute the following documents to all prospective Exit ABL Lenders, unless you advise Bank of America in writing (including by email) within a reasonable time prior to their intended distributions that such material should only be distributed to prospective Exit ABL Lenders: (a) administrative materials for prospective Exit ABL Lenders such as lender meeting invitations and funding and closing memoranda, (b) notifications of changes to the Exit ABL Facility's terms and (c) other materials intended for prospective Exit ABL Lenders after the initial distribution of the Information Materials, including drafts and final versions of definitive documents with respect to the Exit ABL Facility. If you advise us that any of the foregoing items should be distributed only to Private Lenders, then Bank of America will not distribute such materials to Public Lenders without further discussions with you. You agree (whether or not any Information Materials are marked "PUBLIC") that Information Materials made available to prospective Public Lenders in accordance with this Commitment Letter shall not contain MNPI.

By executing this Commitment Letter, you agree to reimburse the Commitment Parties from time to time on demand for all reasonable out-of-pocket fees and expenses (including, but not limited to, (a) the reasonable fees, disbursements and other charges of (i) Skadden, Arps, Slate, Meagher & Flom LLP, as counsel to Bank of America as the ABL Administrative Agent, and of special and local counsel to the ABL Administrative Agent and the Initial ABL Lenders retained by the Commitment Parties or the ABL Administrative Agent, and (ii) FTI Consulting, Inc., as financial advisor to Bank of America as the ABL Administrative Agent, and (b) due diligence expenses (including the fees and expenses of field examinations and appraisals)) incurred in connection with the ABL Facilities, the syndication of the Exit ABL Facility, the preparation of the definitive documentation for the ABL Facilities and the other transactions contemplated hereby. You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with us including, without limitation, fees paid pursuant hereto.

You agree to indemnify and hold harmless the Commitment Parties and each of their affiliates and their respective officers, directors, employees, agents, advisors and other representatives (each, an "*Indemnified Party*") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or

4

preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter or any related transaction or (b) the ABL Facilities and any other financings, or any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems.

This Commitment Letter and the fee letter between you, Bank of America and Merrill Lynch, Pierce, Fenner & Smith Incorporated of even date herewith (the "*Fee Letter*") and the contents hereof and thereof are confidential and, except for disclosure hereof or thereof on a confidential basis to your affiliates and your and your affiliates' respective directors, officers, agents, employees, accountants, attorneys and other professional advisors involved in the Transactions on a "need to know" basis and who are made aware of and have been directed to comply with the provisions of this paragraph (and you agree you are responsible for such persons' compliance with this paragraph), may not be disclosed by you in whole or in part to any person or entity without our prior written consent; *provided, however*, it is understood and agreed that you may disclose (i) this Commitment Letter (including the Term Sheets) but not the Fee Letter after your acceptance of this Commitment Letter and the Fee Letter, in filings with the Securities and Exchange Commission and other applicable regulatory authorities and stock exchanges, and (ii) after providing prior written notice to us and with appropriate redactions as requested by us, this Commitment Letter (including the Term Sheets) and the Fee Letter may be disclosed to the extent required pursuant to applicable law, compulsory legal process or by governmental, judicial and/or regulatory authorities having jurisdiction and self-regulatory bodies with oversight over the Commitment Parties and their respective affiliates or as required in the Cases; provided that you agree to take, or cause to be taken, such actions requested by us to prevent the Fee Letter from becoming publicly available, including, without limitation, the filing of a motion or an ex parte request seeking an order authorizing you or any other Debtor, as applicable, to file the Fee Letter under seal. Each Commitment Party hereby notifies you and each of the other Borrowers and Guarantors that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "*Act*"), it is required to obtain, verify and record information that identifies you, such other Borrowers and Guarantors, which information includes your name and address and the name and address of each other Borrower and Guarantor and other information that will allow such Commitment Party to identify you or such other Borrowers or Guarantors in accordance with the Act.

The Commitment Parties shall use all confidential information provided to it by or on behalf of you hereunder solely for the purpose of providing the services which are the subject of this letter agreement and otherwise in connection with the transactions contemplated hereby and shall treat confidentially all such information; *provided, however*, that nothing herein shall prevent any Commitment Party from disclosing any such information (i) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory

legal process (in which case such Commitment Party agrees to inform you promptly thereof prior to such disclosure to the extent not prohibited by law, rule or regulation), (ii) upon the request or demand of any regulatory authority having jurisdiction over any Commitment Party or any of its affiliates, (iii) to the extent that such information becomes publicly available other than by reason of disclosure in violation of this agreement by any Commitment Party, (iv) to any Commitment Party's affiliates, and its and such affiliates' respective employees, legal counsel, independent auditors and other experts or agents who need to know such information in connection with the transactions contemplated hereby and are informed of the confidential nature of such information, (v) for purposes of establishing a "due diligence" defense, (vi) to the extent that such information is or was received by any Commitment Party from a third party that is not to such Commitment Party's knowledge subject to confidentiality obligations to you, (vii) to the extent that such information is independently developed by any Commitment Party or (viii) to potential Exit ABL Lenders, participants, assignees or potential counterparties to any swap or derivative transaction relating to the Debtors or any of their respective obligations, in each case, who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph or as otherwise reasonably acceptable to you and the Commitment Parties, including as may be agreed in any confidential information memorandum or other marketing material).  This paragraph shall terminate on the first anniversary of the date hereof.

You acknowledge that each of the Commitment Parties or their respective affiliates may be providing financing or other services to parties whose interests may conflict with yours.  Each of the Commitment Parties agrees that it will not furnish confidential information obtained from you to any of its other customers and that it will treat confidential information relating to you and your affiliates with the same degree of care as it treats its own confidential information.  Each of the Commitment Parties further advises you that it will not make available to you confidential information that it has obtained or may obtain from any other customer.  In connection with the services and transactions contemplated hereby, you agree that each Commitment Party is permitted to access, use and share with any of its bank or non-bank affiliates, agents, advisors (legal or otherwise) or representatives any information concerning you or any of your affiliates that is or may come into the possession of such Commitment Party or any of such affiliates.

In connection with all aspects of each transaction contemplated by this Commitment Letter, you acknowledge and agree, and acknowledge your affiliates' understanding, that:  (a) (i) the arranging and other services described herein regarding the ABL Facilities are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Commitment Parties, on the other hand, (ii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; (b) (i) each of the Commitment Parties has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (ii) each of the Commitment Parties does not have any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein; and (c) each of the Commitment Parties and its affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and each of the Commitment Parties has no obligation to disclose any of such interests to you or your affiliates.  To the fullest extent permitted by law, you hereby waive and release any claims that you may have against any of the Commitment Parties with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Commitment Letter.

This Commitment Letter (including the Term Sheets) and the Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York.  Each of you and the Commitment

Parties hereby irrevocably waives any and all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter (including the Term Sheets), the Fee Letter, the transactions contemplated hereby and thereby or the actions of the Commitment Parties in the negotiation, performance or enforcement hereof. Each of the Commitment Parties and you hereby irrevocably and unconditionally submits to the exclusive jurisdiction of (i) any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City and (ii) after the commencement of the Cases and prior to the conclusion thereof, the Bankruptcy Court and any appellate court from such court, in each case in respect of any suit, action or proceeding arising out of or relating to the provisions of this Commitment Letter (including the Term Sheets), the Fee Letter and the transactions contemplated hereby and thereby and irrevocably agrees that all claims in respect of any such suit, action or proceeding shall be heard and determined in any such court. Nothing in this Commitment Letter, the Term Sheets or the Fee Letter shall affect any right that any Commitment Party or any of its affiliates may otherwise have to bring any claim, action or proceeding relating to this Commitment Letter (including the Term Sheets), the Fee Letter and/or the transactions contemplated hereby and thereby in any court of competent jurisdiction to the extent necessary or required as a matter of law to assert such claim, action or proceeding against any assets of the Debtors or any of their subsidiaries or enforce any judgment arising out of any such claim, action or proceeding. Each of the Commitment Parties and you agree that service of any process, summons, notice or document by registered mail addressed to you shall be effective service of process against you for any suit, action or proceeding relating to any such dispute. Each of the Commitment Parties and you waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceedings brought in any such court, and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction you are or may be subject by suit upon judgment. The commitments and undertakings of the Commitment Parties may be terminated by the Commitment Parties if you fail to perform your obligations under this Commitment Letter or the Fee Letter on a timely basis.

The provisions of this paragraph and the immediately preceding seven paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the ABL Facilities shall be executed and delivered, and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of the Commitment Parties hereunder.

This Commitment Letter and the Fee Letter may be executed in counterparts which, taken together, shall constitute an original. Delivery of an executed counterpart of this Commitment Letter or the Fee Letter by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart thereof.

This Commitment Letter (including the Term Sheets) and the Fee Letter embody the entire agreement and understanding among each of the Commitment Parties, you and your affiliates with respect to the ABL Facilities and supersedes all prior agreements and understandings relating to the specific matters hereof. However, please note that the terms and conditions of the commitments of the Commitment Parties and the undertaking of the Commitment Parties hereunder are not limited to those set forth herein or in the Term Sheets. Those matters that are not covered or made clear herein or in the Term Sheets or the Fee Letter are subject to mutual agreement of the parties. No party has been authorized by the Commitment Parties to make any oral or written statements that are inconsistent with this Commitment Letter. This Commitment Letter is not assignable by you without the prior written consent of the Commitment Parties and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties. The parties hereby agree that Bank of America may, without notice to the Borrowers, assign its rights and obligations under this Commitment Letter and the Fee Letter to any other registered broker-dealer wholly-owned by

7

Bank of America Corporation to which all or substantially all of Bank of America Corporation's or any of its subsidiaries' investment banking, commercial lending services or related businesses may be transferred following the date of this Commitment Letter. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by us and you.

This Commitment Letter and all commitments and undertakings of the Commitment Parties hereunder will expire at 5:00 p.m. (Eastern Daylight Time) on March 26, 2018, unless you execute this Commitment Letter and the Fee Letter and return them to the Commitment Parties prior to that time (which may be by facsimile or electronic transmission), whereupon this Commitment Letter (including the Term Sheets) and the Fee Letter (each of which may be signed in one or more counterparts) shall become binding agreements. Thereafter, all commitments and undertakings of the Commitment Parties hereunder will expire on the Scheduled Termination Date (as defined in the DIP ABL Facility Term Sheet), unless definitive documentation for the Exit ABL Facility is executed and delivered prior to such date.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

1105238.06-CHISR02A - MSW

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**BANK OF AMERICA, N.A.**

By: _____

Name: _____ Christopher M. O'Halloran

Title: _____ Senior Vice President

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**

By: _____

Name: _____

Title: _____

[ABL Facilities Commitment Letter]

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

**BANK OF AMERICA, N.A.**

By: _____
Name: _____
Title: _____

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**

By: _____
Name: _Larry Larsen_
Title: _Managing Director_

[ABL Facilities Commitment Letter]

WELLS FARGO BANK, NATIONAL
ASSOCIATION,

By: _____
　　Name:  Mark Bradford
　　Title:   Sr. Vice President

[ABL Facilities Commitment Letter]

**REGIONS BANK**

By:

Name:  Bruce Rhodes
Title:   Managing Director

**BRANCH BANKING AND TRUST COMPANY**

By: _____

Name: Justin K. Higgins
Title: Senior Vice President

**SYNOVUS BANK**

By: _____

Name: Jeffrey Spielberger
Title: Managed Assets Officer

[ABL Facilities Commitment Letter]

**FIFTH THIRD BANK**

By: _____
Name: Kristina M. Miller
Title: Senior Vice President

[ABL Facilities Commitment Letter]

**DEUTSCHE BANK AG NEW YORK BRANCH**

By: _____

Name:  Stephen R. Lapidus
Title:  Director

By: _____

Name:  Maria Guinchard
Title:  Vice President

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE WRITTEN:

**FGI OPERATING COMPANY, LLC**

By: _____
         Name:   Stephen P. Jackson, Jr.
         Title:    Chief Financial Officer

EXHIBIT A

DIP ABL FACILITY TERM SHEET

(See attached.)

Exhibit A

**FGI Operating Company, LLC**
**$193 million Superpriority Debtor-in-Possession ABL Revolver**
**Summary of Principal Terms and Conditions**

Set forth below is a summary of certain key terms for a proposed $193 million DIP ABL Facility (as defined below) to be made available to the Borrowers (as defined below). Capitalized terms not otherwise defined herein shall have the same meanings as specified therefor in the commitment letter (the *"Commitment Letter"*) to which this Summary of Principal Terms and Conditions is attached.

| | |
|---|---|
| **Borrowers:** | (1) FGI Operating Company, LLC, a Delaware limited liability company (*"FGI"* or the *"Administrative Borrower"*), (2) Remington Arms Company, LLC, a Delaware limited liability company (*"RAC"*), (3) Remington Arms Distribution Company, LLC, a Delaware limited liability company (*"RAD"*), and (4) Barnes Bullets, LLC, a Delaware limited liability company (*"Barnes"*, and collectively with the Administrative Borrower, RAC and RAD, the *"Borrowers"* and each individually, a *"Borrower"*), each as a debtor and debtor-in-possession in cases (collectively, the *"Borrowers' Cases"* and each individually, a *"Borrower's Case"*) under chapter 11 of title 11 of the United States Code (the *"Bankruptcy Code"*) to be filed in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*). |
| **DIP ABL Administrative Agent:** | Bank of America, N.A. (the *"DIP ABL Administrative Agent"*). |
| **DIP ABL Co-Collateral Agents:** | Bank of America, N.A. and Wells Fargo Bank, National Association (together with the DIP ABL Administrative Agent, the *"DIP ABL Agents"*). |
| **ABL Lenders:** | The Prepetition ABL Lenders (as defined below) (the *"DIP ABL Lenders"*). |
| **Certain Prepetition Debt Facilities:** | ABL Facility: A senior secured asset-based revolving credit facility (the *"Prepetition ABL Facility"*) made available to the Borrowers pursuant to that certain Loan and Security Agreement, dated April 19, 2012, by and among the Loan Parties, the lenders party thereto (the *"Prepetition ABL Lenders"*), Bank of America, N.A., as administrative agent for the Prepetition ABL Lenders (in such capacity, the *"Prepetition ABL Agent"*) and the other parties thereto, as amended, restated, supplemented or otherwise modified prior to the date hereof (the *"Prepetition ABL Credit Agreement"*). |
| | Term Loan Facility: A senior secured term loan credit facility (the *"Prepetition Term Facility"*) made available to FGI pursuant to that certain Term Loan Agreement, dated April 19, 2012, by and among the Loan Parties, the lenders party thereto (the *"Prepetition* |

*Term Lenders"*), Ankura Trust Company LLC, as successor to Bank of America, N.A., as administrative agent for the Prepetition Term Lenders (in such capacity, the *"Prepetition Term Agent"*) and the other parties thereto, as amended, restated, supplemented or otherwise modified prior to the date hereof (the *"Prepetition Term Credit Agreement"*).

<u>Senior Notes</u>: FGI's 7.875% Senior Secured Notes due 2020 (the *"Prepetition Notes"*) issued under the Indenture, dated as of April 19, 2012, by and among FGI, FGI Finance Inc., the guarantors party thereto and Wilmington Trust, National Association, as trustee and collateral agent (in such capacity, the *"Prepetition Notes Trustee"*), as amended, restated, supplemented or otherwise modified prior to the date hereof (the *"Prepetition Notes Indenture"*).

The Prepetition ABL Facility, the Prepetition Term Facility and the Prepetition Notes are collectively referred to herein as the *"Prepetition Facilities."*

| | |
|---|---|
| **DIP ABL Facility:** | A superpriority senior secured debtor-in-possession asset-based revolving credit facility in an aggregate principal amount of $193 million (such facility, the *"DIP ABL Facility"* and the loans thereunder, the *"DIP ABL Loans"*) to be made available to the Borrowers (subject in all cases to having Excess Availability (as defined below)), which will be available both on the Closing Date (as defined below), as well as at all times thereafter to the extent authorized by the DIP Financing Orders (as defined below) and subject to applicable conditions to borrowing thereunder. |
| **DIP Term Loan Facility:** | A superpriority senior secured term loan facility in an aggregate principal amount of up to $145 million (the *"DIP Term Facility"* and, together with the DIP ABL Facility, the *"DIP Facilities"*), the loans made thereunder to be made available to FGI, $95 million of which will be available on the Closing Date and $50 million of which will be available in one or more additional draws on a date following the entry of the Final Order. |
| **DIP Loan Documents:** | The DIP ABL Facility and the DIP Term Facility will be documented in separate credit agreements and secured pursuant to separate collateral agreements. The DIP Facilities will be subject to a single intercreditor agreement (the *"DIP Intercreditor Agreement"*) in form and substance satisfactory to the DIP ABL Administrative Agent and the DIP ABL Lenders in their sole discretion (entry into which will be authorized by the DIP Financing Orders), which shall establish the priorities among the DIP Facilities with respect to the proceeds of ABL Priority Collateral (as defined below) and Term Priority Collateral (as defined below) and govern the relative rights and certain other intercreditor issues as among the holders of the obligations under the DIP Facilities with respect to ABL Priority Collateral and Term Priority Collateral. The credit agreement for the DIP ABL Facility (the *"DIP ABL Credit* |

2

*Agreement"*) and other definitive documentation with respect to the DIP ABL Facility are referred to as the *"DIP ABL Loan Documents"*.

**Swingline Loans:** Bank of America, N.A. (in such capacity, the *"Swingline Lender"*) may make available to any Borrower a swingline facility under which such Borrower may make short-term borrowings upon same-day notice of up to $25 million. Any such swingline borrowings will reduce Excess Availability under the DIP ABL Facility on a dollar-for-dollar basis.

**Use of Proceeds:** The letters of credit and proceeds of DIP ABL Loans will be used by the Borrowers for operating, working capital and other general corporate purposes of the Borrowers and the Guarantors (as defined below), in each case consistent with and subject to the Approved Budget (as defined below), including, together with a portion of the loans made under the DIP Term Facility, (i) to refinance in full on the Closing Date the indebtedness outstanding under the Prepetition ABL Facility (and to replace or backstop letters of credit outstanding thereunder), and (ii) to pay fees, costs and expenses incurred in connection with the transactions contemplated hereby and other administration costs incurred in connection with the Cases (as defined below).

**Availability:** Borrowings may be made at any time on or after the Closing Date to, but excluding, the business day immediately preceding the Termination Date (as defined below); *provided* that the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the DIP ABL Facility at any time shall not exceed an amount equal to the lesser of (a) the maximum credit under the DIP ABL Facility (the *"Maximum Credit"*) less applicable Reserves and the DIP Availability Block and (b) the Borrowing Base (as defined below) in effect at such time minus the DIP Availability Block (such lesser amount, the *"Line Cap"* and the amount by which the Line Cap at any time exceeds the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the DIP ABL Facility at such time, *"Excess Availability"*). In calculating Excess Availability, up to $10 million in cash located in a blocked account at Bank of America subject to a control agreement shall be added to Excess Availability. Notwithstanding anything to the contrary herein, prior to the funding of the full commitments under the DIP Term Facility, after giving effect to any extensions of credit or issuance (or deemed issuance) of letters of credit under the DIP ABL Facility, the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the DIP ABL Facility shall not exceed such amounts outstanding under the Prepetition ABL Facility on the Closing Date.

*"DIP Availability Block"* shall mean an amount equal to the greater of 7% of the Line Cap and $10 million.

**Borrowing Base:**

The Borrowing Base (the **_"Borrowing Base"_**) at any time shall equal the sum of the following as set forth in the most recently delivered Borrowing Base certificate:

(a)    the sum of:

(i)    eighty-five percent (85%) of the Eligible Accounts, <u>plus</u>

(ii)    the lesser of:

    (A)    the Inventory Loan Limit, or

    (B)    the sum of:

        (1) eighty-five percent (85%) of the Net Recovery Percentage multiplied by the Value of such Eligible Inventory consisting of (I) Finished Goods, (II) Raw Materials and (III) Parts

<u>plus</u>

        (2) eighty-five percent (85%) of the Net Recovery Percentage multiplied by the Value of such Eligible Inventory consisting of Work-In-Process; provided that no more than $10 million of the Borrowing Base shall consist of the amount determined under this clause (2),

<u>minus</u>

(b)    Reserves.

"**_Inventory Loan Limit_**" shall mean, at any time, the amount equal to sixty percent (60%) of the Maximum Credit.

For purposes hereof, capitalized terms used above and not otherwise defined herein have the meanings ascribed to them in the Prepetition ABL Credit Agreement; provided, however, that:

(A) the term "Eligible Accounts" will be modified to (1) increase the cap on availability for Accounts with dated terms of 181 to 270 days after the invoice date that are not past due from $15 million to $30 million in clause (c) thereof, (2) for purposes of calculating cross age receivables only, receivables otherwise considered to be ineligible solely for having terms of 120 days or more are to be assumed as eligible to the extent that such receivables are no more than 30 days past due and (3) base the concentration limits set forth in clause (e) thereof on percentages of gross Accounts owing by such account debtor rather than otherwise Eligible Accounts and change the concentration limits for specific account debtors as follows:

General: 10% (same as existing)
Bass Pro (including Cabela's): 30%
Wal-Mart and Sports South: 30%
Dick's: 20%
Academy Sports: 15%;

4

subject in each case, at the request of the DIP ABL Administrative Agent with respect to the Accounts of any such account debtor, such Accounts being covered by credit insurance reasonably satisfactory to the DIP ABL Administrative Agent; and

(B) the term "Reserves" will be modified to include a reserve for the Post-EoD Carve-Out Amount (as defined below) and any success or transaction fees and other accrued and unpaid Pre-Trigger Date Fees included in the Carve-Out (as defined below) and make other changes customary for debtor-in-possession asset-based revolving credit facilities.

**Interest Rates and Fees:**    As set forth on Schedule I hereto.

**Letters of Credit:**    Up to $15 million of the DIP ABL Facility shall be available to the Borrowers for the purpose of issuing letters of credit, which shall be available for letters of credit for governmental authorities and beneficiaries other than governmental authorities. Letters of credit under the DIP ABL Facility shall be issued by Bank of America, N.A. (with a sublimit of $11 million), Wells Fargo Bank, N.A. (with a sublimit of $4 million) and/or other DIP ABL Lenders reasonably acceptable to the Administrative Borrower and the DIP ABL Administrative Agent who agree to issue letters of credit (each an *"Issuing Bank"*). Each letter of credit shall expire not later than one year after its date of issuance (or such longer period as may be agreed by the issuing lender and the applicable Borrower). The Borrowers shall be required to cash collateralize the outstanding letter of credit exposure under the DIP ABL Facility beginning on the thirtieth day prior to the Scheduled Termination Date in an amount equal to 105% of the face amount of such outstanding letters of credit. The face amount of any outstanding letter of credit (and, without duplication, any unpaid drawing in respect thereof) will reduce Excess Availability under the DIP ABL Facility on a dollar-for-dollar basis. Letters of credit outstanding under the Prepetition ABL Credit Agreement on the Closing Date and issued by an Issuing Bank may, at the Administrative Borrower's option, be rolled into the DIP ABL Facility on the Closing Date.

**Closing Date:**    The date on which the DIP ABL Facility becomes effective and all terms and conditions set forth under "Conditions to Closing" below are satisfied or waived (the *"Closing Date"*).

**Final Maturity:**    The DIP ABL Facility will mature, and lending commitments thereunder will terminate, on the date that is the earliest of: (a) four (4) months after the Closing Date, subject to a one month extension with the consent of each DIP ABL Lender (the *"Scheduled Termination Date"*), (b) 40 days after the Petition Date if the Final Order (as defined below) has not been entered prior to the expiration of such period, (c) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan

5

of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (d) the consummation of a sale of all or substantially all of the assets of the Debtors (as defined below), (e) the acceleration of the DIP ABL Loans and the termination of the commitments with respect to the DIP ABL Facility in accordance with the DIP ABL Loan Documents and (f) the maturity or earlier termination date of the DIP Term Facility (the earliest of such dates, the *"Termination Date"*).

*"Final Order"* means a final non-appealable order of the Bankruptcy Court authorizing the DIP ABL Facility and the DIP Term Facility in form and substance satisfactory to the DIP ABL Administrative Agent in its sole discretion (it being understood and agreed that an order entered by the Bankruptcy Court substantially in the form of the Interim Order, with only such modifications as are satisfactory in form and substance to the Required Lenders in their sole discretion shall, if entered by the Bankruptcy Court, be deemed acceptable to the DIP ABL Administrative Agent).

**Guarantees:** All obligations of the Borrowers (the *"DIP ABL Obligations"*) under the DIP ABL Facility and under any interest rate protection or other swap or hedging arrangements or cash management arrangements entered into with a DIP ABL Lender, the DIP ABL Administrative Agent or any affiliate of a DIP ABL Lender or the DIP ABL Administrative Agent as of the Closing Date or at the time of entering into of such arrangements *("DIP ABL Hedging/Cash Management Arrangements")* shall be unconditionally guaranteed jointly and severally on a senior secured basis (the *"DIP ABL Guarantees"*) by FGI Holding Company, LLC, a Delaware limited liability company *("Holdings")*, all subsidiaries of the Administrative Borrower that currently are or are required to be guarantors under the Prepetition ABL Credit Agreement (subject to any adjustment to such requirements in the DIP ABL Credit Agreement) and under the Prepetition Term Credit Agreement (collectively, the *"Guarantors"*), each of which will be a debtor and a debtor-in-possession in proceedings (together with the Borrowers' Cases, the *"Cases"* and each individually, a *"Case"*) under chapter 11 of the Bankruptcy Code filed contemporaneously and jointly administered with the Borrowers' Cases.

The Borrowers and the Guarantors are referred to herein as *"Loan Parties"* and each, a *"Loan Party"*, or *"Debtors"* and each, a *"Debtor"*.

The date of commencement of the Cases is referred to herein as the *"Petition Date"*.

**Security:** The DIP ABL Obligations, the DIP ABL Guarantees, and the DIP ABL Hedging/Cash Management Arrangements will, subject to the Carve-Out:

(a) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority allowed administrative expense claim status in the Case of such Loan Party (the *"DIP Superpriority Claims"*), which DIP Superpriority Claims in respect of the DIP ABL Facility and the DIP Term Facility shall rank pari passu with each another;

(b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by (A) an automatically perfected first priority security interest in and lien on all of the ABL Priority Collateral of each Loan Party and (B) an automatically perfected second priority security interest and lien on all of the Term Priority Collateral of each Loan Party subject as to priority only to the senior security interest and lien on the Term Priority Collateral of each Loan Party securing the DIP Term Facility; in each case of this clause (b), (i) to the extent such ABL Priority Collateral or Term Priority Collateral, as applicable, is not subject to valid, perfected and non-avoidable liens as of the Petition Date and (ii) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively, *"Avoidance Actions"*) (it being understood that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such lien shall attach on a pari passu basis with the lien securing the DIP Term Facility to any proceeds of Avoidance Actions);

(c) subject to the immediately following clause (d), pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by (A) an automatically perfected junior security interest in and lien on all of the ABL Priority Collateral of each Loan Party and (B) an automatically perfected junior security interest and lien on the Term Priority Collateral of each Loan Party, subject as to priority to the senior security interest and lien on the Term Priority Collateral of each Loan Party securing the DIP Term Facility, in each case of this clause (c), to the extent that such ABL Priority Collateral or Term Priority Collateral, as applicable, is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the existing liens that secure obligations of the applicable Loan Party under or governed by (i) the Prepetition ABL Credit Agreement, (ii) the Prepetition Term Credit Agreement or (iii) the Prepetition Notes Indenture, which existing liens will be primed by the liens described in clause (d) below), subject as to priority to such liens in favor of such third parties; and

(d) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by (A) an automatically perfected first priority priming security interest in and lien on all of the ABL Priority Collateral of

1102316.16-CHISR02A - MSW

each Loan Party and (B) an automatically perfected second priority priming security interest in and lien on all of the Term Priority Collateral of each Loan Party subject as to priority only to the first priority priming security interest and lien on the Term Priority Collateral of each Loan Party securing the DIP Term Facility (such liens and security interests, the "***Priming Liens***"), in each case to the extent that such ABL Priority Collateral or Term Priority Collateral, as applicable, is subject to existing liens that secure the obligations of the applicable Loan Party under (i) the Prepetition ABL Credit Agreement, (ii) the Prepetition Term Credit Agreement or (iii) the Prepetition Notes Indenture (collectively, the "***Primed Liens***").

The Priming Liens (x) shall be senior in all respects to the interests in such property of the Prepetition Term Lenders under the Prepetition Term Credit Agreement and the other "secured parties" referred to therein and of the noteholders under the Prepetition Notes Indenture and the other "secured parties" referred to therein and (y) shall also be senior to any liens granted to provide adequate protection in respect of any of the Primed Liens.

All of the liens described above shall be effective and perfected upon entry of the Interim Order or the Final Order, as applicable.

"***ABL Priority Collateral***" means, with respect to each Loan Party, all of such Loan Party's Collateral consisting of "ABL Priority Collateral" as defined in the DIP Intercreditor Agreement.

"***Term Priority Collateral***" means, with respect to each Loan Party, all of such Loan Party's Collateral consisting of "TL Priority Collateral" as defined in the DIP Intercreditor Agreement.

"***Collateral***" means all owned or hereafter acquired assets and property of the Loan Parties (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to customary exceptions and other exceptions to be agreed.

The following chart summarizes the lien priorities with respect to ABL Priority Collateral and Term Priority Collateral:

| Property constituting ABL Priority Collateral | Property constituting Term Priority Collateral |
| --- | --- |
| Carve-Out | Carve-Out |

8

| | |
|---|---|
| Valid, perfected prepetition liens (other than those securing the Prepetition ABL Facility, the Prepetition TL Facility or the Prepetition Senior Notes) | Valid, perfected prepetition liens (other than those securing the Prepetition ABL Facility, the Prepetition TL Facility or the Prepetition Senior Notes) |
| DIP ABL Facility Liens | DIP TL Facility Liens |
| Prepetition ABL Facility Adequate Protection Liens (until ABL Discharge) | Prepetition TL Facility Adequate Protection Liens |
| Prepetition ABL Facility Liens (until ABL Discharge) | Prepetition TL Facility Liens |
| DIP TL Facility Liens | DIP ABL Facility Liens |
| Prepetition TL Facility Adequate Protection Liens | Prepetition ABL Facility Adequate Protection Liens (until ABL Discharge) |
| Prepetition TL Facility Liens | Prepetition ABL Liens (until ABL Discharge) |
| Prepetition Senior Notes Adequate Protection Liens | Prepetition Senior Notes Adequate Protection Liens |
| Prepetition Senior Notes Liens | Prepetition Senior Notes Liens |

"*ABL Discharge*" shall have the meaning set forth in the Interim Order.

|              |            |
|--------------|------------|
| **Carve-Out:** | The Interim Order shall provide for a customary carve out for the payment of professionals' and U.S. Trustee fees (the "*Carve-Out*"), in an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); and (iii) (a) allowed and unpaid claims for unpaid fees, costs, and expenses (the "*Professional Fees*") incurred by persons or firms retained by the Debtors or the official committee of unsecured creditors in the Cases (the "*Creditors' Committee*"), if any, whose retention is approved by the Bankruptcy Court pursuant to section 327, 328, and 1103 of the Bankruptcy Code (collectively, the "*Professional Persons*"), (b) any claims of the noticing agent retained by the Debtors with approval of the Bankruptcy Court and (c) any success or transaction fees payable to the Debtors' current investment banker, Lazard, subject to the fourth paragraph of this section and solely to the extent (1) such success or transaction fee is earned and payable pursuant to an engagement letter between the Debtors and Lazard that has been approved by the Court, and (2) any such success or transaction fees |

9

are reflected as a reserve in the most recent Borrowing Base Certificate delivered to the DIP ABL Administrative Agent by the Debtors prior to the delivery of a Carve-Out Trigger Notice (as defined below), in all cases, subject to the terms of the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred or earned (A) at any time before delivery of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice less the amount of any prepetition retainers of such Professional Persons not previously applied to fees and expenses (the *"Pre-Trigger Date Fees"*), subject to any limits imposed by the Approved Budget, the Interim Order, the Final Order or otherwise on Professional Fees, including with respect to any Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any prepetition secured parties; and (B) starting on the first day following delivery of a Carve-Out Trigger Notice (as defined below), in an aggregate amount not to exceed $2.5 million less the amount of any prepetition retainers of such Professional Persons not previously applied to fees and expenses (the amount set forth in this clause (iii)(B) being the *"Post-EoD Carve-Out Amount"*); provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds.

For purposes of the foregoing, *"Carve-Out Trigger Notice"* shall mean a written notice delivered by email (or any other means permitted under the DIP ABL Credit Agreement) by the DIP ABL Administrative Agent to the Debtors, the Debtors' lead restructuring counsel, the United States Trustee, and lead counsel for the Creditors' Committee, if any, which notice may be delivered upon the Trigger Date and during the continuation of an Event of Default, stating that the Post-EoD Carve-Out Amount has been invoked. *"Trigger Date"* means the date upon which an Event of Default occurs.

Notwithstanding anything to the contrary in the immediately preceding paragraph, (i) the fact that a Carve-Out Trigger Notice has been delivered shall not be used directly or indirectly to terminate or otherwise alter any rights under a Professional Person's engagement letter, except as to the priority of payments as set forth herein; and (ii) if a success fee has been earned by Lazard after a Carve-Out Trigger Notice has been delivered in accordance with the terms and conditions of an engagement letter between the Debtors and Lazard that has been consented to by the agent and the required lenders under the DIP Term Facility and approved by the Bankruptcy Court, such success fee when due shall be afforded the benefits of the Carve-Out, subject to the next paragraph.

10

Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the secured parties under the DIP Facilities or the Prepetition Facilities, or any representatives of any of the foregoing, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP ABL Loan Documents or the documents evidencing the DIP Term Facility or to the secured parties under the DIP Facilities or the Prepetition Facilities, including, in each case, without limitation, for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the secured parties under DIP Facilities or the Prepetition Facilities; (c) attempts to prevent, hinder or otherwise delay any assertion, enforcement or realization upon any Collateral by the secured parties under the DIP Facilities or the Prepetition Facilities in accordance with the DIP ABL Loan Documents, the documents evidencing the DIP Term Facility, the documents evidencing the Prepetition Facilities and the Final Order other than to seek a determination that an Event of Default has not occurred or is not continuing; (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court; (e) after delivery of a Carve-Out Trigger Notice, any success, completion, back-end or similar fees (other than any success fee payable to Lazard, engaged pursuant to its existing engagement letter with the Debtors, the payment of which shall not reduce the Post-EoD Carve-Out Amount, regardless of whether such success fee is earned prior to or after delivery of a Carve-Out Trigger Notice; provided that such success fee shall be paid solely from Term Priority Collateral and/or the proceeds thereof); and/or (f) anything else prohibited by the DIP ABL Loan Documents, the documents evidencing the DIP Term Facility or the documents evidencing the Prepetition Facilities, as applicable.

For the avoidance of doubt and notwithstanding anything to the contrary herein, in the DIP ABL Loan Documents or in the documents evidencing the DIP Term Facility, the Carve-Out shall be senior to all liens and claims securing the DIP Facilities, any adequate protection liens, if any, and the superpriority claims, and any and all other liens or claims securing the DIP Facilities, it being understood and agreed that, except as otherwise set forth herein, the Carve-Out shall be allocated pro rata among the ABL Priority Collateral and Term Priority Collateral, with such pro rata allocation calculated based upon (i) the aggregate outstanding "Obligations" (as defined in the definitive documentation for the DIP Term Facility) under the DIP Term Facility plus the aggregate outstanding "Obligations" (as defined in the Prepetition Term Credit

Agreement as compared with (ii) the aggregate outstanding "Obligations" (as defined in the DIP ABL Credit Agreement) under the DIP ABL Facility plus the aggregate outstanding "Obligations" (as defined in the Prepetition ABL Credit Agreement), in each case, as of the Trigger Date).

**Adequate Protection:**

Typical and appropriate adequate protection provisions, as set forth in the Interim Order, for the benefit of the secured parties under the Prepetition Facilities to be included, including, without limitation, replacement liens and the payment of expenses and current interest.

**Mandatory Prepayments:**

The Borrowers shall repay the outstanding DIP ABL Loans, subject to the DIP Intercreditor Agreement, in amounts equal to: (i) 100% of the net proceeds of insurance and condemnation recoveries with respect to the ABL Priority Collateral; (ii) 100% of the net proceeds from asset sales of ABL Priority Collateral; (iii) the net proceeds remaining from asset sales of Term Priority Collateral following application thereof in accordance with the DIP Term Facility; (iv) 100% of the net proceeds of any issuance of equity securities or from any capital contribution; (v) 100% of the net proceeds of the issuance or incurrence of debt (other than the DIP Term Facility); and (vi) if at any time the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the DIP ABL Facility exceeds the Line Cap, 100% of such excess; <u>provided</u> that mandatory prepayments under clauses (iii), (iv) and (v) shall be subject to the terms of the DIP Intercreditor Agreement.

**Voluntary Prepayments and Reductions in Commitments:**

Voluntary reductions of the unutilized portion of the DIP ABL Facility commitments and voluntary prepayments of borrowings under the DIP ABL Facility will be permitted at any time without premium or penalty, subject to (i) reimbursement of the DIP ABL Lenders' redeployment costs in the case of a prepayment of Adjusted Eurodollar Rate borrowings other than on the last day of the relevant interest period and subject to breakage costs, if applicable and (ii) prepayment of borrowings as necessary so that the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the DIP ABL Facility does not exceed the Line Cap after giving effect to such commitment reduction.

**Representations and Warranties:**

Substantially consistent with the Prepetition ABL Credit Agreement, as modified (including with respect to baskets, exceptions and qualifications) for a debtor-in-possession credit facility and updated for changes in law and market practice, including, without limitation: corporate existence, power and authority; name, state of organization, chief executive office, collateral locations; financial statements of FGI; priority of liens; title of properties; tax returns;

litigation; compliance with other agreements and applicable laws; environmental compliance; employee benefits; intellectual property; subsidiaries, affiliates, capitalization; labor disputes; material contracts; payable practices; investment company act; margin regulations; accuracy and completeness of information; OFAC; and anti-money laundering laws; subject, in the case of each of the foregoing representations and warranties, to customary qualifications and limitations for materiality.

**Conditions to Closing:**     Customary for transactions of this type, to be set forth in the DIP ABL Credit Agreement, including:

A.  The DIP ABL Loan Documents (including the DIP Intercreditor Agreement) shall have been executed and delivered by each party thereto.

B.  The Petition Date shall have occurred, and each Loan Party shall be a debtor and a debtor-in-possession. The cash management order and all other substantive "first day orders" shall be in form and substance satisfactory to the DIP ABL Administrative Agent in its sole discretion, and all administrative "first day orders" entered at the time of commencement of the Cases shall be satisfactory to the DIP ABL Administrative Agent in its sole discretion.

C.  The DIP ABL Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court in form and substance acceptable to each DIP ABL Lender in its sole discretion, which order shall have been entered not later than three (3) business days following the Petition Date (or such later date as the DIP ABL Administrative Agent may agree), authorizing and approving the making of the loans and the issuance of the letters of credit in the amounts consistent with those set forth in the "DIP ABL Facility" section above, the making of the loans in the amounts consistent with those set forth in the "DIP Term Loan Facility" section above, and the granting of the superpriority claims and liens and other liens referred to above under the heading "Security" (such order, the ***"Interim Order"***, and together with the Final Order, the ***"DIP Financing Orders"***), which Interim Order shall not have been vacated, reversed or stayed in any respect, or, except as expressly permitted by the DIP ABL Loan Documents.

D.  No trustee, responsible officer or examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) shall have been appointed or elected, or any Loan Party shall have applied for, consented to, or acquiesced in, any such

appointment, with respect to the Loan Parties, any of their subsidiaries or their respective properties.

E. All reasonable and documented out-of-pocket costs, fees and expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the DIP ABL Loan Documents or otherwise required to be paid to the DIP ABL Administrative Agent, the DIP ABL Co-Collateral Agents and the DIP ABL Lenders on or before the Closing Date shall have been paid.

F. The DIP ABL Lenders shall have received and be reasonably satisfied with (i) monthly projections for fiscal year 2018, quarterly projections for fiscal year 2019 and annual projections for fiscal year 2020 (the "*Projections*"), (ii) a cash flow forecast for the 13-week period ending after the Closing Date dated as of a date not less than two (2) business days prior to the Closing Date (the "*Initial Budget*") and (iii) a Borrowing Base certificate dated as of the last day of the week ended immediately prior to the Closing Date. The DIP ABL Administrative Agent acknowledges receipt of the Projections and satisfaction with the Projections.

G. After giving effect to the initial drawing and issuance (or deemed issuance) of letters of credit and borrowings under the DIP ABL Facility and borrowings under the DIP Term Facility and use of proceeds thereof, in each case on the Closing Date, the Borrowers shall have Excess Availability of at least $0.

H. The DIP ABL Administrative Agent shall have received customary closing deliverables consistent with the Prepetition ABL Credit Agreement.

I. Since December 31, 2017, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code by the Loan Parties and the commencement of the Cases) that, individually or in the aggregate, (i) has a material adverse effect upon the business, properties, results of operations or financial condition of the Borrowers (taken together) or of all Borrowers and their subsidiaries (taken as a whole); (ii) has or may be reasonably expected to have any material adverse effect whatsoever upon the validity or enforceability of rights, remedies or benefits available to DIP ABL Lenders, the DIP ABL Administrative Agent or the DIP ABL Co-Collateral Agents under, any DIP ABL Loan Document; (iii) has any material adverse effect upon

14

the value of the Collateral taken as a whole, the liens of DIP ABL Administrative Agent with respect to the Collateral or the priority of any such liens; (iv) materially impairs the ability of any Borrower or Guarantor to perform its obligations under any of the DIP ABL Loan Documents, including repayment obligations; or (v) materially impairs the ability of DIP ABL Administrative Agent or any DIP ABL Lender to enforce or collect the obligations or realize upon any of the Collateral in accordance with the DIP ABL Loan Documents and applicable law (such event, condition, circumstance or contingency, a "*Material Adverse Effect*").

J.   There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases or the consequences that would normally result from the commencement and continuation of the Cases) that could reasonably be expected to have a Material Adverse Effect.

K.   Each DIP ABL Lender who has requested the same at least five (5) business days prior to the Closing Date shall have received "know your customer" and similar information at least three (3) days prior to the Closing Date.

L.   The DIP ABL Administrative Agent, for the benefit of the DIP ABL Lenders, shall have the valid and perfected liens on the Collateral of the Loan Parties contemplated by the "*Security*" section above; the Loan Parties shall have delivered uniform commercial code financing statements and shall have executed and delivered intellectual property security agreements, in each case in suitable form for filing.

M.   The Prepetition ABL Credit Agreement shall have been repaid in full, and the DIP ABL Administrative Agent shall have received reasonably satisfactory evidence of each of the foregoing.

N.   The DIP Term Facility shall have become effective substantially concurrently with the DIP ABL Facility, and at least $95 million of initial loans funded thereunder on the Closing Date (up to $45 million of which may consist of loans rolled up from the Prepetition Term Facility).

O.   The DIP ABL Administrative Agent shall be satisfied in its sole discretion with cash dominion arrangements effective with respect to the DIP ABL Facility.

P.   A form of Reorganization Plan (as defined in Exhibit B to the Commitment Letter) shall have been filed in the Cases

with the Bankruptcy Court, which form shall be acceptable to each DIP ABL Lender in its sole discretion.

**Conditions to All Borrowings:**

On the date of each extension of credit or issuance of a letter of credit under the DIP ABL Facility, (a) the representations and warranties shall be accurate in all material respects, (b) no event shall have occurred and no condition shall exist that has or may be reasonably likely to have a Material Adverse Effect, (c) the absence of defaults or events of default at the time of, or after giving effect to such extension of credit or issuance of a letter of credit, (d) such extension of credit or issuance of a letter of credit shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (e) after giving effect to such extension of credit and issuance of a letter of credit, Excess Availability shall be greater than zero, (f) the extension of credit and issuance of a letter of credit shall not result in the aggregate outstandings under the DIP ABL Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable, (g) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect or, except as expressly permitted by the DIP ABL Loan Documents, modified or amended in any manner and (h) prior to the funding of the full commitments under the DIP Term Facility, after giving effect to such extension of credit or issuance of such letter of credit, the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the DIP ABL Facility shall not exceed such amounts outstanding under the Prepetition ABL Facility on the Closing Date.

**Affirmative Covenants:**

Substantially consistent with the Prepetition ABL Credit Agreement, as modified (including with respect to baskets, exceptions and qualifications) for a debtor-in-possession credit facility and updated for changes in law and market practice, including, without limitation: maintenance of existence; new collateral locations; compliance with laws, regulations, etc.; payment of taxes and claims; insurance; financial statements of FGI and other information; weekly rolling 13-week cash flow forecasts and variance reports (as set forth under the caption "Budget Compliance and Reporting" below); license agreements; anti-corruption laws; costs and expenses; further assurances; post-closing requirements; use of proceeds; lender calls; retention of restructuring and financial advisors; milestones; and certain other bankruptcy matters; subject, in the case of each of the foregoing covenants, to limitations for materiality, exceptions and qualifications. Required milestones shall include:

(1) by 11:59 p.m. (prevailing Eastern Time) on March 20, 2018, the Debtors shall have filed the Reorganization Plan, the Disclosure Statement, and the Disclosure Statement Motion, each in form and substance satisfactory to the Required Lenders in their sole discretion;

1102316.16-CHISR02A - MSW

(2) by three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order in form and substance satisfactory to the DIP ABL Administrative Agent in its sole discretion;

(3) by forty (40) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order in form and substance satisfactory to the Required Lenders in their sole discretion;

(4) by fifty-five (55) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably satisfactory to the Required Lenders in their sole discretion; and

(5) by (20) calendar days after entry of the Confirmation Order (the "*Outside Date*"), the effective date of the Reorganization Plan shall have occurred.

**Collateral Reporting and Monitoring Covenants:**

Customary for transactions of this type and such others as the DIP ABL Administrative Agent deems appropriate, including, without limitation: collateral reporting on a regular basis as reasonably required by the DIP ABL Administrative Agent; maintenance of records on accounts; maintenance of records on inventory; maintenance of equipment; designation of a power of attorney; the DIP ABL Administrative Agent's right to cure under contracts affecting collateral; delivery of a Borrowing Base certificate and related borrowing base reporting on a weekly basis (it being understood that information with respect to Dakota Arms and inventory ineligibles shall only be required to be updated on a monthly basis); prompt delivery of any other collateral or financial information requested by the DIP ABL Administrative Agent or any DIP Co-Collateral Agent in their reasonable discretion; and reasonable access to premises. The Borrowers shall deliver, at their sole expense, or reimburse the DIP ABL Administrative Agent for the expenses of, in each case in form and substance satisfactory to the DIP ABL Administrative Agent in its sole discretion, (a) a trademark appraisal, which shall be delivered to the DIP ABL Administrative Agent by March 26, 2018, (b) an inventory appraisal (which the Borrowers shall provide prompt access to and cooperation with the DIP ABL Administrative Agent) and (c) a field exam, which the Borrowers shall provide prompt access for upon reasonable notice from the DIP ABL Administrative Agent. In addition, the Borrowers shall be required to reimburse the expenses of a second field exam and/or inventory appraisal requested by the DIP ABL Administrative Agent or any DIP ABL Co-Collateral Agent if at any time Excess Availability is less than 25% of the Maximum Credit. If an Event of Default exists, there shall be no limit on the number of field examinations and inventory appraisals for which Borrowers shall be obligated to reimburse the DIP ABL Administrative Agent or any DIP ABL Co-Collateral Agent.

17

**Negative Covenants:**

Customary for transactions of this type and such others as DIP ABL Administrative Agent deems appropriate, including, without limitation:

(a)    limitation on sale of assets, consolidation, merger, dissolution and other fundamental changes;

(b)    limitation on encumbrances;

(c)    limitation on incurrence of indebtedness;

(d)    limitation on loans and investments or amendment, modification or repayment of indebtedness or prepetition obligations;

(e)    limitation on dividends and redemptions of capital stock;

(f)    limitation on transactions with affiliates;

(g)    changes in fiscal year;

(h)    changes in business;

(i)    limitation on activities of Holdings;

(j)    limitation on restrictive agreements;

(k)    limitation on amendments of organizational documents; and

(l)    additional bankruptcy matters.

**Budget Compliance and Reporting:**

A cash flow forecast for the 13-week period commencing on the Closing Date, as of a date not less than 3 business days prior to the Closing Date, shall be delivered by the Debtors to the Commitment Parties for approval (once so approved, and subject to any update as may be approved by the Commitment Parties, the "***Approved Budget***"). Beginning on the fifth week, and every fourth week thereafter, the Approved Budget shall be redefined as the last Rolling Budget (defined below) and delivered to the Required Lenders for approval (as approved by the Required Lenders, and subject to any update as may be approved by the Required Lenders). The Debtors shall be required to comply with such Approved Budget, subject to the Permitted Variance (as defined below).

The Debtors shall deliver to the DIP ABL Administrative Agent (a) beginning on the fifth week, and every fourth week thereafter, on each applicable Wednesday, a 13-week cash flow forecast for the current week and the immediately following consecutive 12 weeks (each, a "**Rolling Budget**"), (b) reports of the cash balances and disbursements (including, without limitation, check and wire

18

run reports) of ROC as of the end of the prior business day, in each case, in reasonable detail and (c) other information as may be reasonably requested by the DIP ABL Administrative Agent or DIP ABL Lenders. The DIP ABL Administrative Agent and the DIP ABL Lenders shall also be entitled to receive on a timely basis other customary information and documents, including reasonable approval rights with respect thereto, to be set forth in the definitive DIP ABL Facility documentation.

The Borrowers shall also provide a qualitative and quantitative budget variance report/reconciliation (the **"Budget Variance Report"**) by Wednesday of each week for the most recently ended four-week period included in the previous Approved Budget (each, a **"Testing Period"**) showing line items in comparable form and substance to what has been provided to the DIP ABL Lenders prior to the Closing Date, noting therein all variances, on a line-item basis, from amounts set forth for such week in the relevant Approved Budget, and shall include explanations for all material variances for such week. The Borrowers shall arrange for weekly (unless waived by the DIP ABL Administrative Agent) conference calls beginning the week after the Petition Date with DIP ABL Lenders discussing and analyzing cash flow and related forecast for the prior week, the financial condition, liquidity, and results of operations of each of the Loan Parties, status of the Cases and progress in achieving the milestones set forth in the "*Affirmative Covenants*" section above.

**Cash Dominion:**

All Accounts of the Loan Parties shall be paid directly into blocked accounts under the control of the DIP ABL Administrative Agent. All payments made to such blocked accounts or other funds received and collected by the DIP ABL Administrative Agent or any DIP ABL Lender, whether in respect of the receivables, as proceeds of inventory or other Collateral or otherwise shall be treated as payments to the DIP ABL Administrative Agent and DIP ABL Lenders in respect of the outstanding obligations and therefore shall constitute the property of the DIP ABL Administrative Agent and DIP ABL Lenders to the extent of the then outstanding obligations, and the DIP ABL Administrative Agent may disregard Borrowers' instructions with respect to the blocked accounts and exercise exclusive dominion and control over the blocked accounts and apply funds deposited therein. Notwithstanding the foregoing, the Loan Parties may establish segregated accounts into which proceeds of the loans funded pursuant to the DIP Term Facility and proceeds of Term Priority Collateral are deposited and the DIP ABL Administrative Agent agrees not to issue any instructions or exercise exclusive dominion and control over such accounts.

**Financial Covenants:**

Maximum weekly variance of disbursements, net operating cash flow and cash receipts from budgeted amounts as follows (the "*Permitted Variance*"):

(i) For the first ten weeks of the DIP ABL Facility,

- For the first two weeks of the Approved Budget:

  - total operating disbursements to not exceed by more than twenty percent (20.0%) the aggregate amount budgeted for such Test Period on a cumulative basis.

  - net operating cash flow to be no less than 35% less than the budgeted amount for such Test Period on a cumulative basis.

- For the second two weeks of the Approved Budget:

  - total operating disbursements to not exceed by more than fifteen percent (15.0%) the aggregate amount budgeted for such Test Period on a cumulative basis.

  - net operating cash flow to be no less than 30% less than the budgeted amount for such Test Period on a cumulative basis.

- After the first four weeks of the Approved Budget:

  - total operating disbursements to not exceed by more than twelve and a half percent (12.5%) the aggregate amount budgeted for such Test Period on a cumulative basis.

  - net operating cash flow to be no less than 30% less than the budgeted amount for such Test Period on a cumulative basis.

(ii) For any time after the first 10 weeks of the DIP ABL Facility,

- total operating disbursements to not exceed by more than twelve and a half percent (12.5%) the aggregate amount budgeted for such Test Period on a cumulative basis.

- total receipts to be in an aggregate amount greater than eighty-seven and one-half percent (87.5%) of the receipts budgeted for such Test Period on a cumulative basis.

**Events of Default:**                Substantially consistent with the Prepetition ABL Credit Agreement, as modified (including with respect to baskets, exceptions

and qualifications) for a debtor-in-possession credit facility and updated for changes in law and market practice, including, without limitation:

A.  nonpayment of any obligations when due;

B.  failure to perform affirmative covenants to comply with laws and regulations or pay taxes and claims and certain additional affirmative covenants set forth in the DIP ABL Credit Agreement, after a fifteen-day grace period;

C.  violation of other covenants, terms, conditions or other provisions; incorrectness of representations and warranties in any material respect;

D.  cross default (beyond the applicable cure period) and cross acceleration to material postpetition or unstayed indebtedness in an amount greater than $5 million;

E.  monetary judgments in an amount greater than $2.5 million;

F.  ERISA events in an amount greater than $5 million;

G.  actual or asserted invalidity of guarantees or security documents;

H.  actual or purported revocation or termination or failure to perform by a Guarantor of any terms, covenants, conditions or provisions of any guarantee, endorsement or other agreement; death or dissolution of a Guarantor or a Borrower, or any order entered against any Loan Party decreeing the dissolution of such Loan Party;

I.  indictment by any governmental authority as to which there is a reasonable possibility of adverse determination;

J.  loss, theft, damage or destruction of collateral in excess of $2.5 million not covered by insurance;

K.  default under the DIP Term Facility permitting acceleration of the DIP Term Facility;

L.  change of control;

M.  certain bankruptcy defaults, including:

　　i.  certain bankruptcy orders, including:

　　　　1. the entry of an order dismissing any of the Cases or converting any of the Cases to a

21

case under chapter 7 of the Bankruptcy Code, or any filing by the Borrowers of a motion or other pleading seeking entry of such an order;

2. a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Borrowers' Case, the Borrowers apply for, consent to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Required Lenders in their sole discretion;

3. the entry of an order (i) staying, reversing or vacating the Interim Order or the Final Order or (ii) modifying or amending the Interim Order (after the initial entry thereof) or Final Order other than in the case of clause (ii) in form and substance satisfactory to the Required Lenders in their sole discretion, or the filing by the Borrowers of an application, motion or other pleading seeking entry of such an order;

4. the entry of an order in any of the Cases denying or terminating use of cash collateral by the Loan Parties and the Debtors have not obtained use of cash collateral (consensually or non-consensually);

5. the entry of an order in any of the Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties in excess of an amount to be mutually agreed;

6. the entry of a final non-appealable order in the Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the DIP ABL Lenders or the commencement of other actions by the Loan Parties that challenges the rights and remedies of the DIP ABL Administrative

22

Agent, the DIP ABL Co-Collateral Agents or the DIP ABL Lenders under the DIP ABL Facility in any of the Cases or inconsistent with the DIP ABL Loan Documents (other than the use of cash collateral on a non-consensual basis);

7. without the consent of the DIP ABL Administrative Agent, the entry of an order in any of the Cases seeking authority to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facilities), unless such financing would repay in full in cash all obligations under the DIP ABL Facility upon consummation thereof; or

8. the filing or support of any pleading by any Loan Party (or any direct or indirect parent thereof) seeking, or otherwise consenting to, any of the matters set forth in clauses (1) through (7) above, unless such filing or any pleading is in connection with the enforcement of the DIP ABL Loan Documents against the DIP ABL Administrative Agent or the DIP ABL Lenders;

ii. the making of any material payments in respect of prepetition obligations other than (i) as permitted by the Interim Order or the Final Order, (ii) as permitted by the cash management order or any other substantive order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the DIP ABL Administrative Agent in its sole discretion, (iii) as permitted by any administrative "first day order" or other administrative order entered by the Bankruptcy Court, all of which shall be in form and substance satisfactory to the DIP ABL Administrative Agent in its sole discretion, or (iv) as otherwise agreed to by the DIP ABL Administrative Agent;

iii. the entry of the Final Order shall not have occurred within 40 days after entry of the Interim Order;

iv. an order of the Bankruptcy Court granting, other than in respect of the DIP Facilities (subject, in the case of the DIP Term Facility, to the priority set forth in the DIP Financing Orders) and the Carve-

23

Out or as otherwise permitted under the applicable DIP ABL Loan Documents, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the DIP ABL Administrative Agent and the DIP ABL Lenders under the DIP ABL Facility, or the filing by the Borrowers of a motion or application seeking entry of such an order;

v. other than with respect to the Carve-Out and the liens provided for in the DIP Facilities (subject, in the case of the DIP Term Facility, to the priority set forth in the DIP Financing Orders), the Borrowers shall create or incur, or the Bankruptcy Court enters an order granting, any claim which is pari passu with or senior to any liens under the Prepetition Facilities, the adequate protection liens and adequate protection obligations granted under the DIP Financing Orders;

vi. noncompliance by any Loan Party or any of its subsidiaries with the terms of the Interim Order or the Final Order;

vii. the Loan Parties or any of their subsidiaries (or any direct or indirect parent of any Loan Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the DIP ABL Administrative Agent, the DIP ABL Co-Collateral Agents or any of the DIP ABL Lenders regarding the DIP ABL Facility, unless such suit or other proceeding is in connection with the enforcement of the DIP ABL Loan Documents against any of the DIP ABL Administrative Agent, the DIP ABL Co-Collateral Agents or the DIP ABL Lenders;

viii. a plan of reorganization shall be confirmed in any of the Cases that is not satisfactory to the Required Lenders in their sole discretion, or any order shall be entered which dismisses any of the Cases or approves a 363 sale and which order (i) does not provide for termination of the unused commitments under the DIP Facilities and payment in full in cash of the Loan Parties' obligations under the DIP Facilities, (ii) does not provide for release and exculpatory provisions relating to the DIP ABL Administrative Agent, the DIP ABL Co-Collateral

24

Agents and the DIP ABL Lenders that are satisfactory to the Required Lenders in their sole discretion and (iii) is not otherwise satisfactory to the Required Lenders in their sole discretion, or any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents), shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order; and

ix. a substantial portion of the operations of the Loan Parties are suspended, voluntarily or involuntarily, on a temporary or permanent basis.

The DIP ABL Lenders will have the ability to set off only after the occurrence and during the continuance of an Event of Default.

**Voting:** Amendments and waivers of the DIP ABL Credit Agreement will require the approval of DIP ABL Lenders holding more than 50% of the aggregate amount of the loans and commitments under the DIP ABL Facility or in the event all loans and commitments are held by three or fewer DIP ABL Lenders, such approval shall include the approval of the DIP ABL Administrative Agent in addition to such DIP ABL Lenders (the *"Required Lenders"*), subject to exceptions substantially consistent with the Prepetition ABL Credit Agreement, modified to require (i) 100% lender consent to reduce the amount of the Default Rate or modify the definitions of "Excess Availability" and "Availability Block" (and the other defined terms used in such definitions or any component thereof) if the effect would be to increase the amount available for borrowing by Borrowers or otherwise make more credit available to the Borrowers or (ii) consent of DIP ABL Lenders holding more than 75% of the aggregate amount of the loans and commitments under the DIP ABL Facility to waive the application of Default Rate. Defaulting lenders shall not be included in the calculation of Required Lenders.

**Cost and Yield Protection:** Customary for transactions of this type.

**Assignments and Participations:** The DIP ABL Lenders will be permitted to assign (except to natural persons, Borrowers, Guarantors, affiliates of any Borrower or Guarantor or disqualified institutions) loans and commitments under the DIP ABL Facility with the consent of the DIP ABL Administrative Agent (in each case not to be unreasonably withheld or delayed). Each assignment will be in a minimum amount of $5.0 million or, if less, all of such DIP ABL Lender's remaining loans and commitments of the applicable class. The DIP ABL Administrative Agent shall receive a processing and recordation fee of $3,500 for each assignment. The Borrowers' obligation to assist with DIP ABL Lender assignments will be limited to providing new promissory notes to such DIP ABL Lender assignees.

25

**Expenses, Indemnification
and Releases:**                    Customary for transactions of this type.

**Governing Law and Forum:**       New York and, to the extent applicable, the Bankruptcy Code.

**Counsel to the DIP ABL
Administrative Agent:
:**                                Skadden, Arps, Slate, Meagher & Flom LLP

SCHEDULE I

**Interest Rates:**

The interest rates under the DIP ABL Facility will be as follows:

All swingline loans will be Base Rate loans.

The interest rate margins under the DIP ABL Facility shall be determined by reference to the following grid based on the average Excess Availability under the DIP ABL Facility during the immediately preceding calendar month.

| Excess Availability | Applicable Eurodollar Rate Margin | Applicable Base Rate Margin |
|---|---|---|
| Greater than 66% of the Maximum Credit | 5.25% | 4.25% |
| Less than or equal to 66% of the Maximum Credit and greater than 33% of the Maximum Credit | 5.50% | 4.50% |
| Less than or equal to 33% of the Maximum Credit | 5.75% | 4.75% |

The Administrative Borrower may elect interest periods of 1, 2 or 3 months for Adjusted Eurodollar Rate borrowings.

Base Rate is the higher of (i) the rate of interest publicly announced by the DIP ABL Administrative Agent as its "prime rate," subject to each increase or decrease in such prime rate, effective as of the day any such change occurs, or (ii) the federal funds rate from time to time plus 0.50% and (iii) the one-month Applicable Eurodollar Rate plus 1.0% per annum.

**Letter of Credit Fee:**

A per annum fee equal to the Adjusted Eurodollar Rate Margin in effect at such time, which will accrue on the aggregate face amount of outstanding letters of credit under the DIP ABL Facility, payable monthly in arrears.

Such fees shall be distributed to the DIP ABL Lenders pro rata in accordance with the amount of each such DIP ABL Lender's DIP ABL Facility commitment, with exceptions for defaulting DIP ABL Lenders. In addition, the Borrowers shall pay to each Issuing Bank, for its own account, (a) a fronting fee equal to 0.25% upon the aggregate face amount of outstanding letters of credit, payable on the terms set forth in the DIP ABL Credit Agreement, calculated based upon the actual number of days elapsed over a 360-day year, and (b) customary issuance and administration fees.

**Commitment Fees:**

The Borrowers shall pay a commitment fee of 0.50% per annum on the average daily unused portion of the DIP ABL Facility, calculated based upon the actual number of days elapsed over a 360-day year, payable monthly in arrears.

Such fees shall be distributed to the DIP ABL Lenders (other than the Swingline Lender in its capacity as such) pro rata in accordance with the amount of each such DIP ABL Lender's DIP ABL Facility commitment, with exceptions for defaulting DIP ABL Lenders.

**Closing Fee:**

The Borrowers shall pay a closing fee to the DIP ABL Administrative Agent on behalf of each DIP ABL Lender, in an amount equal to 0.50% of such DIP ABL Lender's DIP ABL Facility commitment on the Closing Date.

**Default Rate:**

Applicable interest rate plus two percent (2%) per annum with respect to the principal amount of all of the loans, letters of credit and other DIP ABL Obligations outstanding upon the existence of any Event of Default (whether or not acceleration or demand for payment has been made), and including, to the extent permitted by applicable law, all past due interest.

1102316.16-CHISR02A - MSW

EXHIBIT B

EXIT ABL FACILITY TERM SHEET

(See attached.)

Exhibit B

### FGI Operating Company, LLC
### $193 million Senior Secured ABL Revolver
### Summary of Principal Terms and Conditions

Set forth below is a summary of certain key terms for a proposed $193 million Exit ABL Facility (as defined below) to be made available to the Borrowers (as defined below). Capitalized terms not otherwise defined herein shall have the same meanings as specified therefor in the commitment letter (the "*Commitment Letter*") to which this Summary of Principal Terms and Conditions is attached.

| | |
|---|---|
| **Borrowers:** | (1) FGI Operating Company, LLC, a Delaware limited liability company (*"FGI"* or the *"Administrative Borrower")*, (2) Remington Arms Company, LLC, a Delaware limited liability company (*"RAC"*), (3) Remington Arms Distribution Company, LLC, a Delaware limited liability company (*"RAD"*), and (4) Barnes Bullets, LLC, a Delaware limited liability company (*"Barnes"*, and collectively with the Administrative Borrower, RAC and RAD, the *"Borrowers"* and each individually, a *"Borrower"*), in each case, as reorganized pursuant to the Reorganization Plan in connection with cases (collectively, the "*Cases*" and each individually, a "*Case*") to be filed by the Loan Parties as debtors and debtors-in-possession under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*") |
| **ABL Administrative Agent:** | Bank of America, N.A. |
| **ABL Co-Collateral Agents:** | Bank of America, N.A. and Wells Fargo Bank, National Association. |
| **ABL Lenders:** | The DIP ABL Lenders (as defined below) and other banks, financial institutions or institutional lenders capable of extending credit on a revolving basis identified by the DIP ABL Lenders (the *"ABL Lenders"*). |
| **Certain Debtor-in-Possession Debt Facilities:** | DIP ABL Facility:  A superpriority senior secured debtor-in-possession asset-based revolving credit facility (the *"DIP ABL Facility"*) to be made available to the Borrowers pursuant to that certain Superpriority Senior Debtor-in-Possession Asset-Based Loan and Security Agreement, by and among the Loan Parties, the lenders party thereto (the *"DIP ABL Lenders"*), Bank of America, N.A., as administrative agent for the DIP ABL Lenders (in such capacity, the *"DIP ABL Agent"*) and the other parties thereto, as amended, restated, supplemented or otherwise modified (the *"DIP ABL Credit Agreement"*). |
| | DIP Term Loan Facility:  A superpriority senior secured debtor-in-possession term loan credit facility (the *"DIP Term Facility"*) to be made available to FGI pursuant to that certain Superpriority |

1

Senior Debtor-in-Possession Term Loan Agreement, by and among the Loan Parties, the lenders party thereto (the *"DIP Term Lenders"*), Ankura Trust Company LLC, as administrative agent for the DIP Term Lenders (in such capacity, the *"DIP Term Agent"*) and the other parties thereto, as amended, restated, supplemented or otherwise modified (the *"DIP Term Credit Agreement"*).

The DIP ABL Facility and the DIP Term Facility are collectively referred to herein as the *"DIP Facilities."*

**Exit ABL Facility:**

A senior secured asset-based revolving credit facility in an aggregate principal amount of $193 million (such facility, the *"Exit ABL Facility"* and the loans thereunder, the *"ABL Loans")* to be made available to the Borrowers (subject in all cases to having Excess Availability (as defined below)), which will be available and subject to applicable conditions to borrowing thereunder.

**Exit Term Loan Facility:**

A senior secured term loan facility in an aggregate principal amount of up to $100 million converted, to the extent not repaid in cash with a similar term loan facility acceptable to the ABL Lenders, from loans funded under the DIP Term Facility (the *"Exit Term Facility"* and, together with the Exit ABL Facility, the *"Exit Facilities"*).

**Exit Loan Documents:**

The Exit ABL Facility and the Exit Term Facility will be documented in separate credit agreements and secured pursuant to separate collateral agreements. The Exit Facilities will be subject to a single intercreditor agreement (the *"ABL/TL Intercreditor Agreement"*) in form and substance satisfactory to the ABL Administrative Agent and the ABL Lenders in their individual respective sole discretion, which shall establish the priorities among the Exit Facilities with respect to the proceeds of ABL Priority Collateral (as defined below) and Term Priority Collateral (as defined below) and govern the relative rights and certain other intercreditor issues as among the holders of the obligations under the Exit Facilities with respect to ABL Priority Collateral and Term Priority Collateral. The credit agreement for the Exit ABL Facility (the *"ABL Credit Agreement"*) and other definitive documentation with respect to the Exit ABL Facility are referred to as the *"ABL Loan Documents"*.

The Exit ABL Facility and the Exit FILO Facility (as defined below) will be documented in separate credit agreements and secured pursuant to separate collateral agreements. The Exit ABL Facility and the Exit FILO Facility will be subject to an intercreditor agreement (the *"ABL/FILO Intercreditor Agreement"*) in form and substance satisfactory to the ABL Administrative Agent and the ABL Lenders in their individual respective sole discretion, which shall (a) establish the priorities among the Exit ABL Facility and the Exit FILO Facility with respect to the proceeds of ABL Priority Collateral (as defined below) and (b) govern the relative

rights and certain other intercreditor issues as among the holders of the obligations under the Exit ABL Facility and the Exit FILO Facility with respect to ABL Priority Collateral.

**Swingline Loans:**

Bank of America, N.A. (in such capacity, the *"Swingline Lender"*) may make available to any Borrower a swingline facility under which such Borrower may make short-term borrowings upon same-day notice of up to $25 million. Any such swingline borrowings will reduce Excess Availability under the Exit ABL Facility on a dollar-for-dollar basis.

**Use of Proceeds:**

The letters of credit and proceeds of ABL Loans will be used by the Borrowers for operating, working capital and other general corporate purposes of the Borrowers and the Guarantors (as defined below), including, (i) to refinance in full on the Closing Date the indebtedness outstanding under the DIP ABL Facility (and to replace or backstop letters of credit outstanding thereunder), and (ii) to pay fees, costs and expenses incurred in connection with the transactions contemplated hereby.

**Availability:**

Borrowings may be made at any time on or after the Closing Date to, but excluding, the business day immediately preceding the Termination Date (as defined below); *provided* that the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the Exit ABL Facility at any time shall not exceed an amount equal to the lesser of (a) the maximum credit under the Exit ABL Facility (the *"Maximum Credit"*) less applicable Reserves and the Base Availability Block and (b) the Borrowing Base (as defined below) in effect at such time minus the Adjusted Base Availability Block (such lesser amount, the *"Line Cap"* and the amount by which the Line Cap at any time exceeds the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the Exit ABL Facility at such time, *"Excess Availability"*). In calculating Excess Availability, up to $10 million in cash located in a blocked account at Bank of America subject to a control agreement shall be added to Excess Availability.

*"Base Availability Block"* shall mean an amount equal to the greater of 10% of the Line Cap and $15 million, *provided, however*, that (a) in 2018, during a 60-day period to be specified in the ABL Credit Agreement and (b) in 2019, 2020 and 2021, during a 135-day period (which 135-day period shall not begin later than August 1 of each such year, and such 135-day period, the *"Reduced Block Period"*) to be designated by the Borrowers by prior written notice delivered to the ABL Administrative Agent no later than April 30 of each such year, the Base Availability Block shall be an amount equal to the greater of 5% of the Line Cap and $10 million.

3

"*Adjusted Base Availability Block*" shall mean an amount equal to 100% of the FILO Amount (as defined below), or if greater, the amounts set forth below:

(a) for the first 12 months of the Exit ABL Facility, the greater of 10% of the Line Cap and $15 million;

(b) for the next 12 months of the Exit ABL Facility, the greater of 12.5% of the Line Cap and $15 million; and

(c) at all times thereafter of the Exit ABL Facility, the greater of 15% of the Line Cap and $15 million.

**Borrowing Base:**

The Borrowing Base (the *"Borrowing Base")* at any time shall equal the sum of the following as set forth in the most recently delivered Borrowing Base certificate:

(a)     the sum of:

(i)     eighty-five percent (85%) of the Eligible Accounts, <u>plus</u>
(ii)    the lesser of:
    (A)     the Inventory Loan Limit, or
    (B)     the sum of:

       (1) eighty-five percent (85%) of the Net Recovery Percentage multiplied by the Value of such Eligible Inventory consisting of (I) Finished Goods, (II) Raw Materials and (III) Parts

<u>plus</u>

       (2) eighty-five percent (85%) of the Net Recovery Percentage multiplied by the Value of such Eligible Inventory consisting of Work-In-Process; provided that no more than $10 million of the Borrowing Base shall consist of the amount determined under this clause (2),

<u>minus</u>

(b)     Reserves.

For purposes hereof, capitalized terms used above and not otherwise defined herein have the meanings ascribed to them in the DIP ABL Credit Agreement; <u>provided</u>, <u>however</u>, that the term "Reserves" will be modified to remove reserves relating specifically to the Cases.

**Interest Rates and Fees:**

As set forth on Schedule I hereto.

**Letters of Credit:**

Up to $20 million of the Exit ABL Facility shall be available to the Borrowers for the purpose of issuing letters of credit, which shall be available for letters of credit for governmental authorities and beneficiaries other than governmental authorities. Letters of credit

under the Exit ABL Facility shall be issued by Bank of America, N.A. (with a sublimit of $16 million), Wells Fargo Bank, N.A. (with a sublimit of $4 million) and/or other ABL Lenders reasonably acceptable to the Administrative Borrower and the ABL Administrative Agent who agree to issue letters of credit (each an *"Issuing Bank")*. Each letter of credit shall expire not later than one year after its date of issuance (or such longer period as may be agreed by the issuing lender and the applicable Borrower). No letter of credit may be issued if such letter of credit has an expiry date later than the Scheduled Termination Date unless such letter of credit is cash collateralized in an amount equal to 105% of the face amount of such letter of credit at the time of issuance. The face amount of any outstanding letter of credit (and, without duplication, any unpaid drawing in respect thereof) will reduce Excess Availability under the Exit ABL Facility on a dollar-for-dollar basis. Letters of credit outstanding under the DIP ABL Credit Agreement on the Closing Date and issued by an Issuing Bank may, at the Administrative Borrower's option, be rolled into the Exit ABL Facility on the Closing Date.

**Closing Date:**     The date on which the Exit ABL Facility becomes effective and all terms and conditions set forth under "Conditions to Closing" below are satisfied or waived (the *"Closing Date")*.

**Final Maturity:**     The Exit ABL Facility will mature, and lending commitments thereunder will terminate, on the date that is the earlier of: (a) thirty-six (36) months after the Closing Date (the *"Scheduled Termination Date")* or (b) the acceleration of the ABL Loans and the termination of the commitments with respect to the Exit ABL Facility in accordance with the ABL Loan Documents (the earlier of such dates, the *"Termination Date")*.

**Guarantees:**     All obligations of the Borrowers (the *"Exit ABL Obligations")* under the Exit ABL Facility and under any interest rate protection or other swap or hedging arrangements or cash management arrangements entered into with a ABL Lender, the ABL Administrative Agent or any affiliate of a ABL Lender or the ABL Administrative Agent as of the Closing Date or at the time of entering into of such arrangements *("Exit ABL Hedging/Cash Management Arrangements")* shall be unconditionally guaranteed jointly and severally on a senior secured basis (the *"Exit ABL Guarantees")* by FGI Holding Company, LLC, a Delaware limited liability company *("Holdings")*, all subsidiaries of the Administrative Borrower that currently are or are required to be guarantors under the DIP ABL Credit Agreement, all subsidiaries of the Administrative Borrower that guarantees the Exit Term Facility and Remington Outdoor Company, Inc. (collectively, the *"Guarantors")*.

The Borrowers and the Guarantors are referred to herein as *"Loan Parties"* and each, a *"Loan Party"*.

**Security:**

The Exit ABL Obligations, the Exit ABL Guarantees, and the Exit ABL Hedging/Cash Management Arrangements will be secured by (a) a perfected first priority security interest and lien on the ABL Priority Collateral of each Loan Party and (b) a perfected second priority security interest and lien on the Term Priority Collateral of each Loan Party subject as to priority only to the senior security interest and lien on the Term Priority Collateral of each Loan Party securing the Exit Term Facility;

*"ABL Priority Collateral"* means, with respect to each Loan Party, all of such Loan Party's Collateral consisting of "ABL Priority Collateral" as defined in the ABL/TL Intercreditor Agreement.

*"Term Priority Collateral"* means, with respect to each Loan Party, all of such Loan Party's Collateral consisting of "TL Priority Collateral" as defined in the ABL/TL Intercreditor Agreement.

*"Collateral"* means all owned or hereafter acquired assets and property of the Loan Parties (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to customary exceptions and other exceptions to be agreed.

**Mandatory Prepayments:**

The Borrowers shall repay the outstanding ABL Loans, subject to the ABL/TL Intercreditor Agreement, in amounts equal to: (i) 100% of the net proceeds of insurance and condemnation recoveries with respect to the ABL Priority Collateral; (ii) 100% of the net proceeds from asset sales of ABL Priority Collateral; (iii) the net proceeds remaining from asset sales of Term Priority Collateral following application thereof in accordance with the Exit Term Facility; (iv) 100% of the net proceeds of any issuance of equity securities or from any capital contribution; (v) 100% of the net proceeds of the issuance or incurrence of debt (other than the Exit Term Facility); and (vi) if at any time the aggregate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the Exit ABL Facility exceeds the Line Cap, 100% of such excess; provided that mandatory prepayments under clauses (iii), (iv) and (v) shall be subject to the terms of the Intercreditor Agreement.

**Voluntary Prepayments and Reductions in Commitments:**

Voluntary reductions of the unutilized portion of the Exit ABL Facility commitments and voluntary prepayments of borrowings under the Exit ABL Facility will be permitted at any time without premium or penalty, subject to (i) reimbursement of the ABL Lenders' redeployment costs in the case of a prepayment of Adjusted Eurodollar Rate borrowings other than on the last day of the relevant interest period and subject to breakage costs, if applicable and (ii) prepayment of borrowings as necessary so that the aggre-

1105220.14-CHISR02A - MSW

gate amount of the loans, unreimbursed letter of credit drawings and letters of credit outstanding under the Exit ABL Facility does not exceed the Line Cap after giving effect to such commitment reduction.

**Representations and Warranties:**

Substantially consistent with the Prepetition ABL Credit Agreement, as modified (including with respect to baskets, exceptions and qualifications) for an exit credit facility and updated for changes in law and market practice, including, without limitation: corporate existence, power and authority; name, state of organization, chief executive office, collateral locations; financial statements of FGI; priority of liens, title of properties; tax returns; litigation; compliance with other agreements and applicable laws; environmental compliance; employee benefits; intellectual property; subsidiaries, affiliates, capitalization and solvency; labor disputes; material contracts; payable practices; investment company act; margin regulations; accuracy and completeness of information; OFAC; and anti-money laundering laws; subject, in the case of each of the foregoing representations and warranties, to customary qualifications and limitations for materiality.

**Conditions to Closing:**

Customary for transactions of this type, to be set forth in the ABL Credit Agreement, including:

A. The ABL Loan Documents (including the ABL/TL Intercreditor Agreement and the ABL/FILO Intercreditor Agreement) shall have been executed and delivered by each party thereto.

B. The ABL Administrative Agent shall have received a copy of, and the Bankruptcy Court shall have entered, the Interim Order and the Final Order (each as defined in Exhibit A to the Commitment Letter), which Interim Order and Final Order shall be in full force and effect and shall not have been vacated, reversed or stayed in any respect or, except as expressly permitted by the DIP ABL Credit Agreement, modified or amended in any manner. The Interim Order and the Final Order shall have authorized and approved (in each case, on a final, non-appealable basis), (i) the ABL Debt Roll-Up and the ABL Discharge (as such terms are defined in the Interim Order) and (ii) the indefeasible payment in full of the fees set forth in the Fee Letter.

For purposes of determining whether the condition precedent set forth above shall have been satisfied, the Interim Order and Final Order shall have been approved and authorized on a final and non-appealable basis if (a) no motion or petition for rehearing or reconsideration of the Interim Order or Final Order is pending and the time for filing any such motion or petition has passed, including any

extensions thereof, (b) the Bankruptcy Court does not *sua sponte* have the Interim Order or Final Order under reconsideration and the time for the Bankruptcy Court to reconsider the Interim Order or Final Order has passed, including any extensions thereof and (c) there is no pending notice of appeal of the Interim Order or the Final Order, and the deadline for filing such notice of appeal has passed, including any extensions thereof; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, as made applicable by Rule 9024 of the Federal Rules of Bankruptcy Procedure, may be filed, shall not cause the Interim Order or the Final Order to not be a Final Order.

C.   The ABL Administrative Agent shall have received a signed copy of an order of the Bankruptcy Court (the "***Confirmation Order***") in form and substance satisfactory to the Required Lenders in their sole discretion, which shall confirm a plan of reorganization for each of the Cases in form and substance acceptable to each DIP ABL Lender in its sole discretion pursuant to clause P of the caption entitled "Conditions to Closing" set forth in Exhibit A of the Commitment Letter, which plan of reorganization shall (i) provide for the termination of the unused commitments under the DIP ABL Facility and the payment in full in cash and full discharge of the Borrowers' and Guarantors' obligations under the DIP ABL Facility at emergence, (ii) contain releases and other exculpatory provisions for the DIP ABL Agent and the DIP ABL Lenders in form and substance satisfactory to the Required Lenders in their sole discretion and (iii) be otherwise in form and substance satisfactory to the Required Lenders in their sole discretion (such plan, the "***Reorganization Plan***") and that the Reorganization Plan shall have been entered after due and proper notice to all parties in interest and shall be in full force and effect, shall not be stayed, and shall have become a Final Confirmation Order.

For purposes of determining whether this condition precedent is satisfied, the Confirmation Order shall be a "***Final Confirmation Order***" if (a) no motion or petition for rehearing or reconsideration of the Confirmation Order is pending and the time for filing any such motion or petition has passed, including any extensions thereof, (b) the Bankruptcy Court does not *sua sponte* have the Confirmation Order under reconsideration and the time for the Bankruptcy Court to reconsider the Confirmation Order has passed, including any extensions thereof and (c) there is no pending notice of appeal of the Confirmation Order, and the deadline for filing such notice of appeal has passed, including any extensions thereof; provided, however, that

the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, as made applicable by Rule 9024 of the Federal Rules of Bankruptcy Procedure, may be filed, shall not cause the Confirmation Order to not be a Final Confirmation Order.

For the avoidance of doubt, nothing in this clause (c) that requires Required Lenders' consent or that anything be satisfactory to the Required Lenders shall, or is intended to, override any provision herein or in the DIP ABL Credit Agreement, that requires the consent of all ABL Lenders with respect to any matter or that anything be satisfactory to all ABL Lenders.

D. Concurrently with the initial funding of the loans under the Exit ABL Facility, all conditions precedent set forth in the Reorganization Plan shall have been satisfied and not waived (other than any conditions precedent that are waived in accordance with the terms of the Reorganization Plan so long as any such waiver does not adversely affect the rights and interest of any or all of the ABL Administrative Agent, the ABL Co-Collateral Agents and the ABL Lenders in their capacities as such (as determined in good faith by the ABL Administrative Agent) unless the ABL Administrative Agent has so consented in writing) and the Reorganization Plan shall have been substantially consummated. All documents and agreements relating to the Reorganization Plan or the consummation thereof (including, without limitation, any supplement to the Reorganization Plan) (collectively, the "*Plan Documents*") shall be in form and substance satisfactory to the ABL Administrative Agent in all respects, and no provision of the Reorganization Plan or any Plan Document shall have been waived, amended, supplemented or otherwise modified in any respect that is adverse to the rights and interest of any or all of the ABL Administrative Agent, the ABL Co-Collateral Agents and the ABL Lenders (as determined in good faith by the ABL Administrative Agent) unless the ABL Administrative Agent has so consented in writing.

E. All reasonable and documented out-of-pocket costs, fees and expenses (including, without limitation, reasonable and documented legal fees and expenses) set forth in the ABL Loan Documents or otherwise required to be paid to the ABL Administrative Agent, the ABL Co-Collateral Agents and the ABL Lenders on or before the Closing Date shall have been paid.

F. The ABL Administrative Agent and each of the ABL Lenders shall have received (i) monthly projections for fiscal year 2018, quarterly projections for fiscal year 2019

and annual projections for fiscal years 2020 and 2021 (the "*Projections*") and (ii) a Borrowing Base certificate dated as of the last day of the week ended immediately prior to the Closing Date. The DIP ABL Administrative Agent and each of the ABL Lenders acknowledge receipt of the Projections.

G. After giving effect to the initial drawing and issuance (or deemed issuance) of letters of credit and borrowings under the Exit ABL Facility and use of proceeds thereof, in each case on the Closing Date, the Borrowers shall have Excess Availability of at least 90% of the projected Excess Availability as of the Closing Date as set forth on the applicable Rolling Budget (as defined in Exhibit A of the Commitment Letter).

H. The ABL Administrative Agent shall have received customary closing deliverables consistent with those delivered in connection with the DIP ABL Credit Agreement.

I. Since the date of the filing of the Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually or in the aggregate, (i) has a material adverse effect upon the business, properties, results of operations or financial condition of the Borrowers (taken together) or of all Borrowers and their subsidiaries (taken as a whole); (ii) has or may be reasonably expected to have any material adverse effect whatsoever upon the validity or enforceability of rights, remedies or benefits available to ABL Lenders, the ABL Administrative Agent or the ABL Co-Collateral Agents under, any ABL Loan Document; (iii) has any material adverse effect upon the value of the Collateral taken as a whole, the liens of Administrative Agent with respect to the Collateral or the priority of any such liens; (iv) materially impairs the ability of any Borrower or Guarantor to perform its obligations under any of the ABL Loan Documents, including repayment obligations; or (v) materially impairs the ability of ABL Administrative Agent or any ABL Lender to enforce or collect the obligations or realize upon any of the Collateral in accordance with the ABL Loan Documents and applicable law (such event, condition, circumstance or contingency, a "*Material Adverse Effect*").

J. There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality that could reasonably be expected to have a Material Adverse Effect.

1105220.14-CHISR02A - MSW

K. Each ABL Lender who has requested the same at least five (5) business days prior to the Closing Date shall have received "know your customer" and similar information at least three (3) days prior to the Closing Date.

L. The ABL Administrative Agent, for the benefit of the ABL Lenders, shall have the valid and perfected liens on the Collateral of the Loan Parties contemplated by the "*Security*" section above; and the Loan Parties shall have delivered uniform commercial code financing statements and shall have executed and delivered intellectual property security agreements, in each case in suitable form for filing, and deposit account control agreements in form and substance satisfactory to the ABL Administrative Agent.

M. The ABL Administrative Agent shall have received endorsements naming the ABL Administrative Agent, on behalf of the ABL Lenders, as loss payee under all insurance policies required to be maintained with respect to the Collateral pursuant to the terms of the ABL Loan Documents.

N. The DIP ABL Credit Facility shall have been repaid in full, all liens securing such facility shall have been terminated, all related agreements material to the interests of the ABL Lenders shall have been terminated, and the ABL Administrative Agent shall have received reasonably satisfactory evidence of each of the foregoing.

O. (i) The Exit Term Facility shall have become effective substantially concurrently with the Exit ABL Facility and shall have fully funded on the closing date of the Exit ABL Facility, if not fully funded prior to such date; (ii) the Loan Parties shall have incurred at least $50 million of "Other Permitted Debt" set forth below; and (iii) the terms of the Exit Term Facility and the "Other Permitted Debt" (as set forth below) are satisfactory to the ABL Administrative Agent in its sole discretion.

P. The ABL Administrative Agent shall be satisfied in its sole discretion with cash dominion arrangements effective with respect to the Exit ABL Facility.

Q. The Loan Parties and their subsidiaries shall have no outstanding indebtedness other than the Exit ABL Facility, the Exit Term Facility and any debt permitted under the heading "Other Permitted Debt" below, unless the ABL Administrative Agent agrees in its sole discretion.

R. No Event of Default (as such term is defined under the DIP ABL Credit Agreement) has occurred and is continuing under the DIP ABL Credit Agreement.

**Conditions to All Borrowings:** On the date of each extension of credit or issuance of a letter of credit under the Exit ABL Facility, (a) the representations and warranties shall be accurate in all material respects, (b) no event shall have occurred and no condition shall exist that has or may be reasonably likely to have a Material Adverse Effect, (c) the absence of defaults or events of default at the time of, or after giving effect to, such extension of credit or issuance of a letter of credit, (d) such extension of credit or issuance of a letter of credit shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently and (e) after giving effect to such extension of credit and issuance of a letter of credit, Excess Availability shall be greater than zero.

**Affirmative Covenants:** Substantially consistent with the Prepetition ABL Credit Agreement, as modified (including with respect to baskets, exceptions and qualifications) for an exit credit facility and updated for changes in law and market practice, including, without limitation: maintenance of existence; new collateral locations; compliance with laws, regulations, etc.; payment of taxes and claims; insurance; financial statements of FGI and other information; license agreements; anti-corruption laws; costs and expenses; further assurances; use of proceeds; and lender calls; subject, in the case of each of the foregoing covenants, to limitations for materiality, exceptions and qualifications.

**Collateral Reporting and Monitoring Covenants:** Customary for transactions of this type and such others as the ABL Administrative Agent deems appropriate, including, without limitation: collateral reporting on a regular basis as required by the ABL Administrative Agent; maintenance of records on accounts; maintenance of records on inventory; maintenance of equipment; designation of a power of attorney; the ABL Administrative Agent's right to cure under contracts affecting collateral; delivery of a Borrowing Base certificate and related borrowing base reporting on a weekly basis (it being understood that information with respect to Dakota Arms and inventory ineligibles shall only be required to be updated on a monthly basis) through 2018 and on a monthly basis thereafter, springing to a weekly basis (i) during the Reduced Block Period or (ii) if Excess Availability is less than 30% of the Maximum Credit at any time during such period; prompt delivery of any other collateral or financial information requested by the ABL Administrative Agent or any ABL Co-Collateral Agent in their reasonable discretion; and reasonable access to premises. The Borrowers shall deliver, at their sole expense, or reimburse the ABL Administrative Agent for the expenses of, in each case in form and substance satisfactory to the ABL Administrative Agent in its sole discretion, one (1) field examination and one (1) inventory appraisal after the Closing Date in 2018 and in each subsequent calendar year. In addition, the Borrowers shall be required to reimburse the expenses of a second field exam

and/or inventory appraisal requested by the ABL Administrative Agent or any ABL Co-Collateral Agent if any time Excess Availability is less than 30% of the Maximum Credit during such calendar year. If an Event of Default exists, there shall be no limit on the number of field examinations and inventory appraisals for which Borrowers shall be obligated to reimburse the ABL Administrative Agent or any ABL Co-Collateral Agent.

**Negative Covenants:**

Substantially consistent with the Prepetition ABL Credit Agreement, as modified (including with respect to baskets, exceptions and qualifications) for an exit credit facility and updated for changes in law and market practice, including, without limitation:

(a)   limitation on sale of assets, consolidation, merger, dissolution and other fundamental changes;

(b)   limitation on encumbrances;

(c)   limitation on incurrence of indebtedness;

(d)   limitation on loans and investments or amendment, modification or repayment of indebtedness or prepetition obligations;

(e)   limitation on dividends and redemptions of capital stock;

(f)   limitation on transactions with affiliates;

(g)   changes in fiscal year;

(h)   changes in business;

(i)   limitation on activities of Holdings and ROC;

(j)   limitation on restrictive agreements; and

(k)   limitation on amendments of organizational documents.

**Other Permitted Debt:**

The ABL Credit Agreement will permit the Loan Parties to incur an additional $55 million as an incremental FILO (the "***FILO Amount***") documented separately from the Exit ABL Facility and subject to the ABL/FILO Intercreditor Agreement (such incremental FILO, the "***Exit FILO Facility***").

**Cash Dominion:**

All Accounts of the Loan Parties shall be paid directly into blocked accounts under the control of the ABL Administrative Agent. All payments made to such blocked accounts or other funds received and collected by the ABL Administrative Agent or any ABL Lender, whether in respect of the receivables, as proceeds of inventory or other Collateral or otherwise shall be treated as payments to the ABL Administrative Agent and ABL Lenders in respect of the out-

standing obligations and therefore shall constitute the property of the ABL Administrative Agent and ABL Lenders to the extent of the then outstanding obligations, and the ABL Administrative Agent may disregard Borrowers' instructions with respect to the blocked accounts and exercise exclusive dominion and control over the blocked accounts and apply funds deposited therein.

**Financial Covenants:**

A. Minimum EBITDA (to be defined in the Exit ABL Credit Agreement) less fixed charges (defined as sum of capital expenditures, cash pension expenses and debt service) with level set to $10 million cushion to plan, tested quarterly through the third fiscal quarter of 2019.

B. For any time after the third fiscal quarter of 2019, a net leverage covenant with level set to 15% cushion to plan LTM EBITDA, tested quarterly.

**Events of Default:**

Substantially consistent with the Prepetition ABL Credit Agreement, as modified for an exit credit facility and updated for changes in law and market practice, including, without limitation:

    A. nonpayment of any obligations when due;

    B. failure to perform affirmative covenants to comply with laws and regulations or pay taxes and claims and certain additional affirmative covenants set forth in the ABL Credit Agreement, after a fifteen-day grace period;

    C. violation of other covenants, terms, conditions or other provisions; incorrectness of representations and warranties in any material respect;

    D. cross default (beyond the applicable cure period) and cross acceleration to material indebtedness in an amount greater than $5 million;

    E. monetary judgments in an amount greater than $2.5 million;

    F. ERISA events in an amount greater than $5 million;

    G. actual or asserted invalidity of guarantees or security documents;

    H. actual or purported revocation or termination or failure to perform by a Guarantor of any terms, covenants, conditions or provisions of any guarantee, endorsement or other agreement; death or dissolution of a Guarantor or a Borrower, or any order entered against any Loan Party decreeing the dissolution of such Loan Party;

14

I.  indictment by any governmental authority as to which there is a reasonable possibility of adverse determination;

J.  loss, theft, damage or destruction of collateral in excess of $2.5 million not covered by insurance;

K.  default under the Exit Term Facility permitting acceleration of the Exit Term Facility;

L.  change of control; and

M.  bankruptcy or other insolvency events of any Borrower or Guarantor.

The ABL Lenders will have the ability to set off only after the occurrence and during the continuance of an Event of Default.

**Voting:**     Amendments and waivers of the ABL Credit Agreement will require the approval of ABL Lenders holding more than 50% of the aggregate amount of the loans and commitments under the Exit ABL Facility or in the event all loans and commitments are held by three or fewer ABL Lenders, such approval shall include the approval of the ABL Administrative Agent in addition to such ABL Lenders (the *"Required Lenders")*, subject to exceptions substantially consistent with the DIP ABL Credit Agreement, modified to require consent of a majority in number of the ABL Lenders in addition to the consent of the Required Lenders to amend, modify or waive any financial covenant (including the applicable levels, the defined terms used therein or any manner of calculation used in connection therewith) if the effect is to loosen or make less restrictive such financial covenant. Defaulting lenders shall not be included in the calculation of Required Lenders.

**Cost and Yield Protection:**     Customary for transactions of this type.

**Assignments and Participations:**     The ABL Lenders will be permitted to assign (except to natural persons, Borrowers, Guarantors, affiliates of any Loan Party or disqualified institutions) loans and commitments under the Exit ABL Facility to other banks, financial institutions or institutional lenders capable of extending credit on a revolving basis with the consent of the ABL Administrative Agent (not to be unreasonably withheld or delayed). Each assignment will be in a minimum amount of $5.0 million or, if less, all of such ABL Lender's remaining loans and commitments of the applicable class. The ABL Administrative Agent shall receive a processing and recordation fee of $3,500 for each assignment. The Borrowers' obligation to assist with ABL Lender assignments will be limited to providing new promissory notes to such ABL Lender assignees.

**Expenses, Indemnification and Releases:**     Customary for transactions of this type.

15

**Governing Law and Forum:**             New York

**Counsel to the ABL**
**Administrative Agent:**                Skadden, Arps, Slate, Meagher & Flom LLP

1105220.14-CHISR02A - MSW

**SCHEDULE I**

**Interest Rates:**    The interest rates under the Exit ABL Facility will be as follows:

All swingline loans will be Base Rate loans.

The interest rate margins for the first 3 months of the Exit ABL Facility shall be determined by reference to the following grid based on the average Excess Availability under the Exit ABL Facility during the immediately preceding calendar month.

| Excess Availability | Applicable Euro-dollar Rate Margin | Applicable Base Rate Margin |
|---|---|---|
| Greater than 66% of the Maximum Credit | 5.25% | 4.25% |
| Less than or equal to 66% of the Maximum Credit and greater than 33% of the Maximum Credit | 5.50% | 4.50% |
| Less than or equal to 33% of the Maximum Credit | 5.75% | 4.75% |

For each succeeding 6 month period of the Exit ABL Facility, the interest rate margins for each applicable tier shall increase by 50 bps relative to the preceding 6 month period, provided that such interest rate margins (without giving effect to any default rate) shall not exceed the rates set forth below:

| Excess Availability | Applicable Euro-dollar Rate Margin | Applicable Base Rate Margin |
|---|---|---|
| Greater than 66% of the Maximum Credit | 7.50% | 6.50% |
| Less than or equal to 66% of the Maximum Credit and greater than 33% of the Maximum Credit | 7.75% | 6.75% |
| Less than or equal to 33% of the Maximum Credit | 8.00% | 7.00% |

The Administrative Borrower may elect interest periods of 1, 2 or 3 months for Adjusted Eurodollar Rate borrowings.

Base Rate is the higher of (i) the rate of interest publicly announced by the ABL Administrative Agent as its "prime rate," subject to each increase or decrease in such prime rate, effective as of the day any such change occurs, or (ii) the federal funds rate from time to time plus 0.50% and (iii) the one-month Applicable Eurodollar Rate plus 1.0% per annum.

**Letter of Credit Fee:**

A per annum fee equal to the Adjusted Eurodollar Rate Margin in effect at such time, which will accrue on the aggregate face amount of outstanding letters of credit under the Exit ABL Facility, payable monthly in arrears.

Such fees shall be distributed to the ABL Lenders pro rata in accordance with the amount of each such ABL Lender's Exit ABL Facility commitment, with exceptions for defaulting ABL Lenders. In addition, the Borrowers shall pay to each Issuing Bank, for its own account, (a) a fronting fee equal to 0.25% upon the aggregate face amount of outstanding letters of credit, payable on the terms set forth in the ABL Credit Agreement, calculated based upon the actual number of days elapsed over a 360-day year, and (b) customary issuance and administration fees.

**Commitment Fees:**

The Borrowers shall pay a commitment fee of 1.00% per annum on the average daily unused portion of the Exit ABL Facility, calculated based upon the actual number of days elapsed over a 360-day year, payable monthly in arrears.

Such fees shall be distributed to the ABL Lenders (other than the Swingline Lender in its capacity as such) pro rata in accordance with the amount of each such ABL Lender's Exit ABL Facility commitment, with exceptions for defaulting ABL Lenders.

**Closing Fee:**

The Borrowers shall pay a closing fee to the ABL Administrative Agent on behalf of each ABL Lender, in an amount equal to 0.50% of such ABL Lender's Exit ABL Facility commitment on the Closing Date.

**Default Rate:**

Applicable interest rate plus two percent (2%) per annum with respect to the principal amount of all of the loans, letters of credit and other Exit ABL Obligations outstanding upon the existence of any Event of Default (whether or not acceleration or demand for payment has been made), and including, to the extent permitted by applicable law, all past due interest.

1105220.14-CHISR02A - MSW

SCHEDULE 1

INITIAL ABL LENDERS' COMMITMENTS IN RESPECT OF DIP ABL FACILITY

| Initial ABL Lender | Commitments |
|---|---|
| Bank of America, N.A. | $43,233,654.88 |
| Wells Fargo Bank, National Association | $43,233,654.88 |
| Regions Bank | $43,233,654.88 |
| Branch Banking and Trust Company | $18,617,363.34 |
| Synovus Bank | $18,617,363.34 |
| Fifth Third Bank | $14,893,890.67 |
| Deutsche Bank AG New York Branch | $11,170,418.01 |
| **Total** | $193,000,000.00 |

SCHEDULE 2

INITIAL ABL LENDERS' COMMITMENTS IN RESPECT OF EXIT ABL FACILITY

| Initial ABL Lender | Commitments |
|---|---|
| Bank of America, N.A. | $43,233,654.88 |
| Wells Fargo Bank, National Association | $43,233,654.88 |
| Regions Bank | $43,233,654.88 |
| Branch Banking and Trust Company | $18,617,363.34 |
| Synovus Bank | $18,617,363.34 |
| Fifth Third Bank | $14,893,890.67 |
| Deutsche Bank AG New York Branch | $11,170,418.01 |
| **Total** | $193,000,000.00 |

**Exhibit 2 to Plan**

**Corporate Governance Term Sheet**

# REMINGTON OUTDOOR COMPANY, INC.

## CORPORATE GOVERNANCE TERM SHEET

This Term Sheet describes the proposed material corporate governance terms of the restructuring of Remington Outdoor Company, Inc. and its subsidiaries. This Term Sheet does not include a description of all terms, conditions and other provisions that are to be contained in the definitive documentation. All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Disclosure Statement.

## GENERAL

| | |
|---|---|
| **Surviving Parent Entity** | Remington Outdoor Company, Inc. (the "Company") |
| **Entity Type** | Corporation |
| **State of Incorporation** | Delaware |
| **Public v. Private** | Private |
| **Organizational Structure** | Subject to due diligence, certain subsidiaries may be formed, dissolved or merged out of existence, as applicable, to streamline the Company's organizational structure. |

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

| | |
|---|---|
| **General** | The Company's Certificate of Incorporation will be amended and restated, as necessary, to include standard provisions for a privately-held, multi-stockholder corporation. Certain specifics are listed below. |
| **Capital Stock** | Authorized classes of stock: common stock, par value $0.01 per share; and preferred stock (blank check), par value $0.01 per share.<br><br>Authorized shares of stock: [TBD] |
| **Supermajority Vote Provisions** | Consent of the holders of at least 66-2/3% of total voting power of the issued and outstanding common stock entitled to vote is required to approve:<br><br>▪ Amendments of Certificate of Incorporation and Bylaws, provided that any amendments affecting a board member's indemnification rights and the director and board observer appointment rights will require the written consent of the applicable stockholder appointing such director or observer, as applicable;<br><br>▪ Change of control transactions (limited to mergers, consolidations, and sales of all or substantially all assets); and<br><br>▪ Liquidation, winding up or dissolution of the Company. |
| **Preemptive Rights** | Each stockholder that, collectively with its affiliates, owns 5% or more of the Company's issued and outstanding common stock will be entitled to customary pro rata preemptive rights (with no right to reallocation for unsubscribed shares) with respect to the first $75 million of equity issuances post-emergence; *provided*, that, the Company may be permitted to issue additional shares to third parties without first offering preemptive rights to the applicable stockholders to the extent such rights are offered promptly following such issuance. |

1

| | Upon a qualified IPO, preemptive rights will terminate. |
|---|---|
| **Stockholder Action by Written Consent** | Not allowed. Stockholder actions must be taken at a duly noticed and called stockholder meeting. |
| **Mandatory Distribution** | Subject to compliance with applicable law and after the satisfaction of all of the Company's liabilities (including any outstanding indebtedness), upon (i) the liquidation, dissolution or winding up of the Company, either voluntary or involuntary, (ii) any change of control of FGI Holding Company, LLC ("HoldCo") or FGI Operating Company, LLC ("OpCo") or (ii) any sale, transfer or license of all or substantially all of the assets of the Company, HoldCo or OpCo to any person, the Company will promptly distribute the net proceeds that it receives from such liquidation, dissolution, winding up, change of control, sale, transfer or license, as applicable, to the stockholders of the Company. |
| **Indemnification and Limitation on Director Liability** | Indemnification and limitation on liability of directors provided to the fullest extent permitted by Delaware law. |
| **Amendments to Certificate of Incorporation** | Only by an affirmative vote of at least 66-2/3% of the total voting power of the issued and outstanding stock entitled to vote. |
| **Waiver of Corporate Opportunities** | Yes. |
| **DGCL §203 Election** | The Company will opt out of DGCL §203. |
| **Exclusive Forum** | The Certificate of Incorporation will include an exclusive forum clause for the Court of Chancery of the State of Delaware. |

*AMENDED AND RESTATED BYLAWS*

| **General** | The Company's Bylaws will be amended and restated, as necessary, to include standard provisions for a privately-held, multi-stockholder corporation. Certain specifics are listed below. |
|---|---|
| **Board of Directors** | The Board of Directors (the "Board") will consist of two or more members, with the size of the board to be determined by resolution of the Board of Directors. |
| | Non-classified board. |
| | Removal of directors ("with cause" or "without cause") by at least 66-2/3% of the total voting power of the issued and outstanding stock entitled to vote; *provided, however,* that directors appointed pursuant to the director appointment rights may be removed (a) by the appointing stockholder at any time and for any reason and (b) only "with cause" in all other instances and appointing stockholder retains right to appoint replacement. |
| | The majority of the directors must be independent. |
| **Stockholder Nominations for Board of Directors** | Stockholders must provide director nominees for consideration by the Company's Nominating and Governance Committee with advanced notice, including specified information for the Company's consideration. |
| | No proxy access. |
| **Committees of the Board of** | *Audit Committee.* Three members, made up of all independent directors, with two |

2

| | |
|---|---|
| **Directors** | initial members appointed by the Consenting Term Loan Creditors and one initial member appointed by the Consenting Third Lien Creditors. |
| | *Compensation Committee.* Three members, made up of a majority of independent directors, with two initial members appointed by the Consenting Term Loan Creditors and one initial member appointed by the Consenting Third Lien Creditors. |
| | *Nominating and Governance Committee.* Three members, made up of a majority of independent directors, with two initial members appointed by the Consenting Term Loan Creditors and one initial member appointed by the Consenting Third Lien Creditors. |
| **Voting** | Directors to be elected by plurality of votes cast. |
| | Except for actions requiring a Supermajority Vote as set forth above, all other matters subject to stockholder vote to be determined by a majority of the total voting power of the issued and outstanding common stock entitled to vote. |
| | Cumulative voting not permitted. |
| **Stockholder Special Meetings** | Stockholder meetings may be called only by the Board of Directors, the Chairman of the Board or holders of more than 50% of the total voting power of the issued and outstanding stock entitled to vote. |
| **Information Rights/Financial Reporting Requirements** | Audited financials, business description and MD&A within 90 days of fiscal year end, unaudited financials and MD&A within 45 days of each fiscal quarter end and abbreviated current reports (triggers generally consistent with Form 8-K but limited to material events and excluding Items 3.02 and 5.07) as needed, in each case posted to a public[1] website. |
| | Commercially reasonable efforts to hold a quarterly public conference call regarding earnings. |

## STOCKHOLDERS AGREEMENT

| | |
|---|---|
| **Board Composition** | Initial Board: Upon emergence, the board will initially consist of seven (7) directors, as follows: |
| | ▪ The Company's CEO (who will not be the Chairman); |
| | ▪ Four (4) directors appointed by the Consenting Term Loan Creditors (one of whom will be the Chairman), three of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act; and |
| | ▪ Two (2) directors appointed by the Consenting Third Lien Creditors, each of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act. |
| | Ongoing Board: As elected by the stockholders; *provided, however,* that: |
| | ▪ the Company's then-CEO at any time will serve as a director; |

---

[1] To be determined whether the website and conference call will be public or provided in password-protected/confidential setting.

- one of the Consenting Term Loan Creditors and its affiliates ("CTLC #1") will have the right to appoint (a) three (3) directors, two of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as CTLC #1 owns less than 50% of the issued and outstanding common stock that CTLC #1 held as of emergence, (b) two (2) directors, each of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as CTLC #1 owns less than 25% of the issued and outstanding common stock that CTLC #1 held as of emergence, and (c) one (1) director, who must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as CTLC #1 owns less than 10% of the issued and outstanding common stock that CTLC #1 held as of emergence;

- another of the Consenting Term Loan Creditors, as a Consenting Term Loan Creditor ("CTLC #2"), will have the right to appoint one (1) director, who must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as CTLC #2 owns less than 50% of the issued and outstanding common stock that CTLC #2 held as of emergence; and

- the Consenting Third Lien Creditors will have the right, by vote of a majority of the issued and outstanding common stock held by the Consenting Third Lien Creditors, to appoint (a) two (2) directors, each of whom must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as the Consenting Third Lien Creditors own less than 50% of the issued and outstanding common stock that the Consenting Third Lien Creditors held as of emergence and (b) one (1) director, who must meet the independence requirements of the NYSE and Rule 10A-3 under the 1934 Act, until such time as the Consenting Third Lien Creditors own less than 25% of the issued and outstanding common stock that the Consenting Third Lien Creditors held as of emergence.

Upon a qualified IPO, director appointment rights will convert to director nomination rights.

| | |
|---|---|
| **Board Observers** | Each of (i) CTLC #1, (ii) CTLC #2, and (iii) the Consenting Third Lien Creditors (as a group) will have the right to appoint one (1) board observer each. Such observer will be entitled to observe meetings of the board and its committees and will receive invitations, and materials relating, to such meetings simultaneously with members of the board or such committees (as applicable); *provided, however*, that the Board may, in its sole discretion, (i) take all reasonable actions to maintain the integrity of attorney-client privileged communications, including, if necessary, limiting or prohibiting any observer's attendance at all or any portion of meetings of the Board and its committees where attorney-client privileged communications will be discussed or (ii) restrict any observer's access to attorney-client privileged communications. Observers may not attend or receive any materials relating to any (i) "executive session" of the Board or its committees or (ii) any meeting where either the Board or its committees has determined, in its sole discretion, that such observer has a conflict of interest.<br><br>The right to appoint a board observer will terminate upon the applicable stockholder no longer having the right to appoint one or more directors to the Board. |
| **Expenses** | The Company will pay the reasonable out-of-pocket expenses (including travel and lodging) incurred by each director and each board observer in connection with attending (i) in-person meetings of the Board and the committees thereof and (ii) |

| | |
|---|---|
| | any other in-person meetings or performing any other activities at the request of the Board. |
| **No Pledges** | Unless approved by the Board of Directors, including at least one director appointed by the Consenting Third Lien Creditors (during such period that the Consenting Third Lien Creditors have the right to appoint one or more directors), the Company, HoldCo, OpCo and any other intermediate entity between OpCo and the Company will not transfer to a third party, pledge or otherwise encumber the capital stock of Holdco, OpCo or any other such intermediate entity between OpCo and the Company. |
| **Transfer Restrictions** | None other than as required by applicable securities law; *provided,* that, other than with respect to rights granted pursuant to the Registration Rights Agreement, transfers will be prohibited to the extent it will cause the Company to become subject to the registration and reporting requirements under the securities laws. <br><br> The Company will appoint a transfer agent. |
| **Drag-Along Rights** | None. |
| **Tag-Along Rights** | For the first 12 months after emergence, each Consenting Third Lien Creditor and each Consenting Term Loan Creditor that, collectively with its respective affiliates, at the relevant time, owns 5% or more of the Company's issued and outstanding common stock will be entitled to customary tag-along rights with respect to any proposed transfer or series of related transfers of 20% or more of the Company's issued and outstanding common stock. |

## OTHER CORPORATE GOVERNANCE MATTERS

| | |
|---|---|
| **Indemnification Matters** | Each director and executive officer will be provided a customary indemnification agreement between the Company and such director or executive officer, as applicable, in form reasonably acceptable to such director. <br><br> The Company will maintain adequate D&O insurance, as determined in the sole discretion of the Board. |
| **Registration Rights Agreement** | Registration rights will be granted only to any stockholder that, collectively with its affiliates, owns 10% or more of the outstanding common stock and any stockholder who, other than solely as a result of holding common stock, is an affiliate of the Company. Registration rights may only be exercised after the date that is three years after emergence. <br><br> Up to three demand registrations, subject to minimum thresholds. <br><br> Up to three S-3 shelf registrations, subject to minimum thresholds. <br><br> Unlimited piggyback rights granted, subject to customary underwriter cutbacks. <br><br> Requesting stockholder selects underwriter, with reasonable consent of the Company. |
| **Poison Pill** | None. |
| **Related Party Transaction Policy** | Yes, including that affiliate transactions must be approved by a majority of the disinterested directors. |

| | |
|---|---|
| **Ownership Aggregation** | The holdings of common stock among affiliates, including two or more accounts managed by the same or affiliated asset managers, will be aggregated for purposes of determining whether a requisite ownership threshold is achieved; *provided*, *however*, that CTLC #2's holdings as a Consenting Term Loan Creditor and as a Consenting Third Lien Creditor will not be aggregated. |

## OTHER MATTERS

| | |
|---|---|
| **Management Incentive Plan**[2] | As part of the Plan, the Company will adopt a new incentive plan covering [TBD]% of the Company's issued and outstanding common stock on fully-diluted basis (after conversion of all convertible securities and exercise of warrant and options). No awards will be granted under the incentive plan on or prior to the Effective Date. The Board will have discretion to grant awards under the incentive plan after the Effective Date. |
| **Employment and Employee Benefits Arrangements**[3] | The Company will assume the existing employment agreement with [TBD] and will assume the existing confidentiality and non-competition agreements (or enter into market-based alternatives) with the other employees.<br><br>[The Company will assume the existing bonus and other incentive (other than existing equity awards), retention, severance, retirement, deferred compensation, health and welfare, and other compensation and benefit plans, programs, policies, agreements and arrangements.] |

[Remainder of page intentionally left blank.]

---

[2] Subject to review of the proposed incentive plan by creditor groups.
[3] Subject to review of the existing agreements by creditor groups.

6

**Exhibit 3 to Plan**

**RSA Term Loan Facility Term Sheet**

CONFIDENTIAL

**$100 Million New Term Loan Facility**
**Summary of Terms and Conditions**

Set forth below is a summary of certain key terms for a proposed $100 million in New Term Loans (as defined below) under a New Term Loan Facility (as defined below) to be made available to Reorganized Remington.  Capitalized terms used herein with definition have the meanings given to such terms in that certain Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession Dated March [__], 2018 (the "**Plan**").  This summary of proposed terms and conditions (the "**Term Sheet**") does not purport to summarize all the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the New Term Loan Facility Documents (as defined below).  The obligation of any New Term Loan Lender to fund any New Term Loans is expressly subject to the negotiation and execution of the New Term Loan Facility Documents.

| | |
|---|---|
| **Borrower:** | FGI Operating Company, LLC, a Delaware limited liability company (the "**Company**"), as reorganized pursuant to the Plan. |
| **Guarantors:** | The obligations of the Company under the New Term Loan Facility and all obligations of the Company, will be guaranteed by FGI Holding Company, LLC, a Delaware limited liability company, as reorganized pursuant to the Plan ("**Holdings**") and all of the Company's direct and indirect domestic wholly owned subsidiaries (excluding immaterial subsidiaries and subject to other exceptions to be agreed upon) (collectively, the "**Guarantors**").  The Company and the Guarantors are referred to herein as "**Loan Parties**" and each, a "**Loan Party**". |
| **Lenders:** | The DIP Term Loan Lenders (as defined below) party to the DIP Term Loan Agreement (as defined below) (excluding ROC) and other banks, financial institutions or institutional lenders identified by the DIP Term Loan Lenders (collectively, the "**New Term Loan Lenders**"). |
| **Certain Debtor-in-Possession Debt Facilities:** | <u>DIP Term Loan Facility</u>:  A superpriority senior secured debtor-in-possession term loan credit facility (the "**DIP Term Loan Facility**") to be made available to FGI Operating Company, LLC pursuant to that certain Superpriority Senior Debtor-in-Possession Term Loan Agreement, by and among the Remington Entities (other than ROC), the lenders party thereto (the "**DIP Term Loan Lenders**"), Ankura Trust Company LLC, as administrative agent for the DIP Term Loan Lenders (in such capacity, the "**DIP Term Loan Agent**") and the other parties thereto, as amended, restated, supplemented or otherwise modified (the "**DIP Term Loan Agreement**"). |
| | <u>DIP ABL Facility</u>:  A superpriority senior secured debtor-in-possession asset-based revolving credit facility (the "**DIP ABL Facility**") to be made available to the Remington Entities (other than ROC) pursuant to that certain Superpriority Senior Debtor-in-Possession Asset-Based Loan and Security Agreement, by and among the Remington Entities (other than ROC), the lenders party thereto (the "**DIP ABL Lenders**"), Bank of America, N.A., as administrative agent for the DIP ABL Lenders (in such capacity, the "**DIP ABL Agent**") and the other parties thereto, as amended, restated, supplemented or otherwise modified (the "**DIP ABL Credit Agreement**"). |

-1-

The DIP ABL Facility and the DIP Term Loan Facility are collectively referred to herein as the "**DIP Facilities**".

| | |
|---|---|
| **Administrative Agent:** | Ankura Trust Company, LLC or another financial institution satisfactory to the Required Lenders (the "**New Term Loan Agent**" and, together with the New Term Loan Lenders, the "**New Term Loan Secured Parties**")). |
| **New Term Loan Facility:** | A senior secured U.S. dollar denominated term loan facility in an aggregate principal amount of up to $100 million (the "**New Term Loan Facility**"; the loans made thereunder, the "**New Term Loans**") to be deemed issued in repayment of $100 million of the DIP Term Loan Facility upon confirmation of the Plan. Amounts borrowed under the New Term Loan Facility that are repaid or prepaid may not be re-borrowed. |
| **Maturity Date:** | The date that is the 4-year anniversary of the Effective Date (the "**Maturity Date**"). |
| **Use of Proceeds:** | The proceeds of the New Term Loans, upon confirmation of the Plan, shall, unless repaid in cash pursuant to the terms of such Plan, automatically replace the outstanding obligations under the DIP Term Loan Facility other than the ROC DIP Facility on the Effective Date. |
| **New Term Loan Facility Documents:** | The New Term Loan Facility will be documented in a credit and guarantee agreement (the "**New Term Loan Agreement**") and shall be secured pursuant to a security agreement. The documents referred to in the preceding sentence are referred to as the "**New Term Loan Facility Documents**". |
| | The New Term Loan Facility Documents shall reflect the terms and provisions set forth in this term sheet and shall otherwise be substantially consistent with the documentation governing the DIP Term Loan Facility; provided that certain provisions, including the representations and warranties, covenants and events of default, shall be modified in a manner appropriate to reflect the emergence of Reorganized Remington from chapter 11 (the definitive documentation for the DIP Term Loan Facility, as modified in the manner set forth above, is referred to herein as the "**Documentation Principles**"). |
| **Interest Rates and Fees:** | As set forth on Annex A attached hereto. |
| **Optional Prepayments:** | Consistent with the DIP Term Loan Agreement, subject to the Documentation Principles. |
| **Mandatory Prepayments:** | Consistent with the DIP Term Loan Agreement, subject to the Documentation Principles. |
| **Prepayment Premium:** | In the event of an optional or a mandatory prepayment of all or any portion of the New Term Loans, (a) a 3.00% prepayment premium shall be paid on the aggregate principal amount of New Term Loans so prepaid at any time on or before the first anniversary of the Effective Date, (b) a 2.00% prepayment premium shall be paid on the aggregate principal amount of the New Term Loans so prepaid at any time |

after the first anniversary of the Effective Date but on or prior to the second anniversary of the Effective Date, (c) a 1.00% prepayment premium shall be paid on the aggregate principal amount of the New Term Loans so prepaid at any time after the second anniversary of the Effective Date but on or prior to the third anniversary of the Effective Date and (d) no prepayment premium shall be paid on the aggregate principal amount of the New Term Loans so prepaid at all times thereafter (the "**Prepayment Premium**"). Notwithstanding anything to the contrary, the Prepayment Premium shall be due whether or not such prepayment under the New Term Loan Facility occurred before or after an event of default has occurred or is continuing, whether there has been an acceleration of loans under the New Term Loan Facility, or before or after the commencement of an insolvency proceeding.

**Security and Priority:**

The obligations of the Loan Parties under the New Term Loan Facility Documents shall at all times be secured by (a) a perfected second priority security interest and lien on the Term Priority Collateral of each Loan Party (i) subject as to priority only to the first priority security interest and lien on the Term Loan Priority Collateral of each Loan Party securing the New FILO Term Loan Facility and (ii) senior as to priority to the third priority security interest and lien on the Term Loan Priority Collateral of each Loan Party securing the New ABL Facility and (b) a perfected third priority security interest and lien on the ABL Priority Collateral of each Loan Party subject as to priority only to (x) the first priority security interest and lien on the ABL Priority Collateral of each Loan Party securing the New ABL Facility and (y) the second priority security interest and lien on the ABL Priority Collateral of each Loan Party securing the New FILO Term Loan Facility.

"**ABL Priority Collateral**" means all accounts receivable, inventory, intellectual property, related books and records and general intangibles, cash and the proceeds thereof, subject to exclusions to be agreed that are customary and to the extent that such Collateral is subject to existing first priority liens that secure the obligations under the New ABL Facility.

"**Collateral**" means all owned or hereafter acquired assets and property of the Loan Parties (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to exclusions to be agreed that are customary for facilities of this type.

"**Term Priority Collateral**" means all Collateral and all other assets pledged pursuant to the New Term Loan Facility Documents to secure the obligations under the New Term Loan Facility (in each case, other than ABL Priority Collateral).

**Conditions Precedent to the Initial Extension of Credit:**

The initial extension of credit (the "**Closing**"; the date on which the Closing occurs, the "**Closing Date**") under the New Term Loan Facility shall be subject to the satisfaction (or waiver) of conditions precedent customary and appropriate to this type of transaction (and the conditions set forth under "*Conditions Precedent to Each Loan*" below).

| | |
|---|---|
| **Conditions Precedent to Each Loan:** | On the funding date of each New Term Loan (each, a "**Credit Event**"), (i) immediately prior to, and after giving effect to, such funding or issuance, there shall exist no default under the New Term Loan Facility Documents, (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding or issuance, (iii) the making of such New Term Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (iv) the Confirmation Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect, and (v) the Effective Date shall have occurred. |
| **Representations and Warranties:** | The New Term Loan Agreement will contain representations and warranties substantially consistent with the DIP Term Loan Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | The New Term Loan Agreement will contain affirmative covenants substantially consistent with the DIP Term Loan Agreement, subject to the Documentation Principles. |
| **Negative Covenants:** | The New Term Loan Agreement will contain negative covenants consistent with the DIP Term Loan Agreement, subject to the Documentation Principles. |
| **Financial Covenants:** | The New Term Loan Agreement will contain the following financial covenants (which, for the avoidance of doubt, shall only be applicable to the Loan Parties and their subsidiaries): |

(i) After the first two years of the New Term Loan Facility, limited to a maximum Consolidated First Lien Net Leverage Ratio (as defined below) of 4.50:1.00.

"**Consolidated First Lien Net Leverage Ratio**" shall mean, with respect to any test period, the ratio of (a) consolidated total debt of the Loan Parties that is secured by first priority liens on all or substantially all of the Collateral, including indebtedness under the New ABL Facility, the New FILO Term Loan Facility and the New Term Loan Facility, less cash of the Loan Parties as of any date of determination to (b) Adjusted EBITDA (to be defined in a manner to be mutually agreed) of the Loan Parties for such test period; provided that for purposes of calculating the Consolidated First Lien Net Leverage Ratio, the total debt under the New ABL Facility will be the average balance of the borrowing under the New ABL Facility for the immediately ending four quarters.

| | |
|---|---|
| **Financial Reporting Requirements:** | The Company shall provide the New Term Loan Agent and the New Term Loan Lenders: |

(i) quarterly unaudited consolidated financial statements within 45 days of quarter-end for the first 3 fiscal quarters of the fiscal year, certified by the Company's chief financial officer, accompanied by a customary management's discussion and analysis; and

(ii) annual audited consolidated financial statements within 90 days of year-end, certified with respect to such consolidated statements by Grant Thornton LLP, or

other independent certified public accountants reasonably acceptable to the Required Lenders, accompanied by a customary management's discussion and analysis (it being agreed that there shall be no requirement to deliver an audit opinion not subject to a "going-concern" qualification).

**Other Reporting Requirements:**   Consistent with the DIP Term Loan Agreement, subject to the Documentation Principles.

**Events of Default:**   The New Term Loan Facility Documents will contain customary indemnification and expense provisions, in each case consistent with the DIP Term Loan Agreement, subject to the Documentation Principles.

**Expenses and Indemnification:**   The New Term Loan Facility Documents will contain customary indemnification and expense provisions, in each case consistent with the DIP Term Loan Agreement, subject to the Documentation Principles.

**Required Lenders:**   New Term Loan Lenders holding greater than 50.0% of the outstanding commitments and/or exposure under the New Term Loan Facility (the "**Required Lenders**"); *provided* that the commitments and/or exposure of any defaulting New Term Loan Lender shall be disregarded in determining the Required Lenders at any time; *provided further* that upon the occurrence of an event of default, the Required Lenders under the applicable New Term Loan Facility shall have the right to enforce remedies with respect to such New Term Loan Facility, subject to certain exceptions.

**Amendments:**   Required Lenders, except for amendments customarily requiring approval by affected Lenders.

**Miscellaneous:**   The New Term Loan Facility Documents will include (i) waivers of consequential damages and jury trial, and (ii) agency, set-off and sharing language, in each case consistent with the New Term Loan Agreement.

**Governing Law and Submission to Exclusive Jurisdiction:**   State of New York.

CONFIDENTIAL

**ANNEX A**

**$100 Million Senior Secured Term Loan Facility**
**Interest Rates And Certain Fees**

**Interest Rates:**   The New Term Loans will bear interest, at the option of the Company, at one of the following rates:

(a) the Applicable Rate (as defined below) <u>plus</u> the Base Rate, payable quarterly in arrears; or

(b) the Applicable Rate <u>plus</u> the Eurodollar Rate as quoted by the Administrative Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of three months (the "**Adjusted Eurodollar Rate**"), payable at the end of the relevant interest period, but in any event, at least quarterly; *provided* that in no event shall the Adjusted Eurodollar Rate be less than 2.00% per annum (the "**Eurodollar Floor**").

"**Applicable Rate**" means (i) 9.0% *per annum*, in the case of Base Rate Loans and (ii) 10.0% *per annum*, in the case of Eurodollar Rate Loans.

"**Base Rate**" means for any day, the higher of (i) the rate of interest publicly announced by The Wall Street Journal as its "prime rate," subject to each increase or decrease in such prime rate, effective as of the day any such change occurs, and (ii) the Federal Funds Effective Rate from time to time <u>plus</u> 0.50%; <u>provided</u> that in no event shall the Base Rate be less than 1.00% plus the Adjusted Eurodollar Rate applicable to three-month Interest Periods on the date of determination of the Base Rate.

Interest shall be payable as follows: (i) on or prior to the first anniversary of the Effective Date, interest accrued at the rate of 3.0% per annum shall be payable in kind and the remainder shall be payable in immediately available funds and (ii) at all times after the first anniversary of the Effective Date, interest accrued at the rate of 1.0% per annum shall be payable in kind and the remainder shall be payable in immediately available funds.  Interest shall be payable on the last day of each interest period (and no less frequently than quarterly) and on the Maturity Date and shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of Base Rate Loans).

**Default Interest:**   During the continuance of an event of default (as defined in the New Term Loan Facility Documents), the New Term Loans will bear interest at an additional 2.00% *per annum*.

**Exhibit 4 to Plan**

**New FILO Term Loan Facility Term Sheet**

CONFIDENTIAL

**$55 Million Senior Secured FILO Term Loan Facility**
**Summary of Terms and Conditions**

Set forth below is a summary of certain key terms for a proposed $55 million in New FILO Term Loans (as defined below) under a New FILO Term Loan Facility (as defined below) to be made available to Reorganized Remington. Capitalized terms used herein with definition have the meanings given to such terms in that certain Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and its Affiliated Debtors and Debtors in Possession Dated March [__], 2018 (the "Plan"). This summary of proposed terms and conditions (the "Term Sheet") does not purport to summarize all the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the New FILO Term Loan Facility Documents (as defined below). The obligation of any New FILO Term Loan Lender to fund any New FILO Term Loans is expressly subject to the negotiation and execution of the New FILO Term Loan Facility Documents.

| | |
|---|---|
| **Borrower:** | FGI Operating Company, LLC, a Delaware limited liability company (the "**Company**"), as reorganized pursuant to the Plan. |
| **Guarantors:** | The obligations of the Company under the New FILO Term Loan Facility will be guaranteed by all of the Company's direct and indirect domestic wholly owned subsidiaries (excluding immaterial subsidiaries and subject to other exceptions to be agreed upon) (collectively, the "**Guarantors**"). The Company and the Guarantors are referred to herein as "**Loan Parties**" and each, a "**Loan Party**". |
| **Lenders:** | ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████ that are Term DIP Lenders (the "**New FILO Term Loan Lenders**"). |
| **Administrative Agent:** | Ankura Trust Company, LLC or another financial institution satisfactory to the Required Lenders (the "**Administrative Agent**" and, together with the New FILO Term Loan Lenders, the "**Secured Parties**"). |
| **Facility:** | An asset-based term loan facility (the "**New FILO Term Loan Facility**") advanced on a "first-in, last-out" basis in an aggregate principal amount of $55,000,000, consisting of (i) $50,000,000 available on the Effective Date and (ii) $5,000,000 available in multiple installments after the Effective Date, subject to the terms and conditions of the New FILO Term Loan Facility Documents and provided that the sum of the principal amount of outstanding New FILO Term Loans plus the aggregate amount of the outstanding loans, unreimbursed letter of credit drawings and outstanding letters of credit available to be drawn under the New ABL Facility (collectively, the "**Total Applicable Borrowings**") shall not at any time exceed the borrowing base under the New ABL Facility Loan Agreement in effect as of the Effective Date (the "**Borrowing Base**"). Amounts borrowed under the New FILO Term Loan Facility that are repaid or prepaid may not be re-borrowed. |
| **Maturity Date:** | The date that is the 3-year anniversary of the Effective Date (the "**Maturity Date**") which, for the avoidance of doubt, shall be the maturity date of the New ABL Facility. |

| | |
|---|---|
| **Use of Proceeds:** | For working capital and general corporate purposes of the Loan Parties and their subsidiaries and to pay fees, costs and expenses incurred in connection with the transactions contemplated hereby (including professional fees). |
| **New FILO Term Loan Facility Documents:** | The New FILO Term Loan Facility will be documented in a credit and guarantee agreement (the "**New FILO Term Loan Agreement**") and shall be secured pursuant to a security agreement. The documents referred to in the preceding sentence are referred to as the "**New FILO Term Loan Facility Documents**". |
| | The New FILO Term Loan Facility Documents shall reflect the terms and provisions set forth in this term sheet and shall otherwise be in form and substance acceptable to the Loan Parties, the New FILO Term Loan Lenders and the Administrative Agent. |
| **Interest Rates and Fees:** | As set forth on Annex A attached hereto. |
| **Optional Prepayments:** | The Company may, upon such prior notice and subject to such minimum increments as are provided for under the New FILO Term Loan Agreement, prepay the New FILO Term Loans in full or in part, subject to payment of accrued interest thereon, applicable breakage costs and the Prepayment Premium. |
| **Mandatory Prepayments:** | The following mandatory prepayments of the Loans shall be required with (a) 100% of the net cash proceeds received from the incurrence of indebtedness not permitted by the New FILO Term Loan Facility Documents, (b) 100% of the net cash proceeds from sales, recoveries or other dispositions (including casualty events) of any Term Priority Collateral (as defined below) (excluding sales of inventory in the ordinary course of business and subject to other exceptions to be agreed) and (c) following the repayment in full of the New ABL Facility, to the extent the Total Applicable Borrowings exceed the Borrowing Base. |
| **Prepayment Premium:** | In the event of an optional or a mandatory prepayment of all or any portion of the New FILO Term Loans, (a) a 2.00% prepayment premium shall be paid on the aggregate principal amount of New FILO Term Loans so prepaid at any time on or before the first anniversary of the Effective Date, (b) a 1.00% prepayment premium shall be paid on the aggregate principal amount of the New FILO Term Loans so prepaid at any time after the first anniversary of the Effective Date but on or prior to the second anniversary of the Effective Date, and (c) no prepayment premium shall be paid on the aggregate principal amount of the New FILO Term Loans so prepaid at all times thereafter (the "**Prepayment Premium**"). Notwithstanding anything to the contrary, the Prepayment Premium shall be due whether or not such prepayment under the New FILO Term Loan Facility occurred before or after an event of default has occurred or is continuing, whether there has been an acceleration of loans under the New FILO Term Loan Facility, or before or after the commencement of an insolvency proceeding. |
| **Security and Priority:** | The obligations of the Loan Parties under the New FILO Term Loan Facility Documents shall at all times be secured by a perfected first priority security interest in substantially all assets of the Loan Parties (the "**Collateral**"), subordinate only to the security interest in the ABL Priority Collateral securing the obligations under |

the New ABL Facility and senior to the New ABL Facility and the New Term Loan Facility with respect to Term Priority Collateral.

"**ABL Priority Collateral**" means all accounts receivable, inventory, intellectual property, related books and records and general intangibles, cash and the proceeds thereof, subject to exclusions to be agreed that are customary and to the extent that such Collateral is subject to first priority liens that secure the obligations under the New ABL Facility.

"**Term Priority Collateral**" means all Collateral and all other assets pledged pursuant to the New FILO Term Loan Facility Documents to secure the obligations under the New FIL Term Loan Facility (in each case, other than ABL Priority Collateral).

The lien priority, relative rights and other intercreditor issues in respect of the New FILO Term Loan Facility and the New ABL Facility will be subject to a customary agreement among lenders.

| | |
|---|---|
| **Conditions Precedent to the Initial Extension of Credit:** | The initial extension of credit under the New FILO Term Loan Facility shall be subject to the satisfaction (or waiver) of the conditions precedent customary and appropriate to this type of transaction (and the conditions set forth under "*Conditions Precedent to Each Loan*" below). |
| **Conditions Precedent to Each Loan:** | On the funding date of each New FILO Term Loan (each, a "**Borrowing**"), (i) immediately prior to, and after giving effect to, such funding or issuance, there shall exist no default under the New FILO Term Loan Facility Documents, (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding or issuance, (iii) the making of such New FILO Term Loan shall not result in the Total Applicable Borrowings exceeding the amount Borrowing Base, (iv) the Confirmation Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect, and (v) the Effective Date shall have occurred. |
| **Representations and Warranties; Covenants; Events of Default:** | The New FILO Term Loan Facility Documentation shall contain representations and warranties, covenants and events of default customary and appropriate to this type of transaction. |
| **Required Lenders:** | New FILO Term Loan Lenders holding greater than 50.0% of the outstanding commitments and/or exposure under the New FILO Term Loan Facility (the "**Required Lenders**"); *provided* that the commitments and/or exposure of any defaulting Lender shall be disregarded in determining the Required Lenders at any time; *provided further* that upon the occurrence of an event of default, the Required Lenders under the applicable New FILO Term Loan Facility shall have the right to enforce remedies with respect to such New FILO Term Loan Facility, subject to certain exceptions. |

**Amendments:**       Required Lenders, except for amendments customarily requiring approval by affected New FILO Term Loan Lenders.

**Miscellaneous:**       The New FILO Term Loan Facility Documents will include customary (i) waivers of consequential damages and jury trial, (ii) indemnification and expense reimbursement provisions, and (iii) agency, set-off and sharing language.

**Governing Law and Submission to Exclusive Jurisdiction:**       State of New York.

CONFIDENTIAL

**ANNEX A**

**$55 Million Senior Secured FILO Term Loan Facility**

**Interest Rates And Certain Fees**

| | |
|---|---|
| **Interest Rates:** | Loans will bear interest, at the option of the Company, at one of the following rates: |

(a) the Applicable Rate (as defined below) <u>plus</u> the Base Rate, payable monthly in arrears; or

(b) the Applicable Rate <u>plus</u> the Eurodollar Rate as quoted by the Administrative Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of three months (the "**Adjusted Eurodollar Rate**"), payable at the end of the relevant interest period, but in any event, at least quarterly; *provided* that in no event shall the Adjusted Eurodollar Rate be less than 2.00% per annum (the "**Eurodollar Floor**").

"**Applicable Rate**" means (i) 5.50% *per annum*, in the case of Base Rate Loans and (ii) 6.50% *per annum*, in the case of Eurodollar Rate Loans; <u>provided</u> that for each succeeding six-month period starting after the first three months of the FILO Term Loan Facility, the Applicable Rate shall be subject to an increase of 0.50% *per annum* relative to the preceding period of three months or six months, as applicable, whereby the Applicable Rate may be increased to a rate not to exceed 9.75% per annum.

"**Base Rate**" means for any day, the higher of (i) the rate of interest publicly announced by The Wall Street Journal as its "prime rate," subject to each increase or decrease in such prime rate, effective as of the day any such change occurs, and (ii) the Federal Funds Effective Rate from time to time <u>plus</u> 0.50%; <u>provided</u> that in no event shall the Base Rate be less than 1.00% plus the Adjusted Eurodollar Rate applicable to three month Interest Periods on the date of determination of the Base Rate.

Interest shall be payable in immediately available funds on each interest payment date, but in any event, at least quarterly, and on the Maturity Date and shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of Base Rate Loans).

| | |
|---|---|
| **Default Interest:** | During the continuance of an event of default (as defined in the New FILO Term Loan Facility Documents), outstanding obligations under the New FILO Term Loan Facility will bear interest at an additional 2.00 % *per annum*. |
| **Upfront Fee:** | ████████████████████████████████████████ |

**Unused Commit-
ment Fee:**

**Exhibit 5 to Plan**

**Term/ROC DIP Facility Commitment Letter and Term Sheet**

EXECUTION VERSION

**CONFIDENTIAL**

March 8, 2018

FGI Operating Company, LLC
870 Remington Drive
Post Office Box 700
Madison, North Carolina 27025

<u>Commitment Letter</u>

Ladies and Gentlemen:

████████████████████████████████████████████, the "***Commitment Parties***", "***we***" or "***us***"), understand that FGI Operating Company, LLC, a Delaware limited liability company ("***you***" or the "***Company***") and certain of the Company's subsidiaries and/or other affiliates of the Company will become debtors-in-possession pursuant to voluntary cases, commenced under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as further described in the Term Sheet attached hereto (the "***Term Sheet***"). Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the Term Sheet. You have advised us that you desire to establish certain credit facilities in order to consummate the transactions described in the Term Sheet (the "***Transactions***"). This letter and the Term Sheet are collectively referred to herein as the "***Commitment Letter***." The credit facilities described in the Term Sheet are referred to herein as the "***Facilities***."

1.    <u>Commitments.</u>

In connection with the Transactions, (a) ████████ hereby commits to provide 85.63% of the aggregate principal amount of the New Money Loans under the Facilities and (b) ████ hereby commits to provide 14.37% of the aggregate principal amount of the New Money Loans under the Facilities, in each case, upon the terms set forth in this Commitment Letter and subject only to the satisfaction or waiver of the conditions expressly set forth in <u>Section 4</u> of this Commitment Letter.

2.    <u>Information.</u>

You hereby represent and warrant that (a) all written information concerning you, your subsidiaries and your and their respective businesses (other than the Projections (as defined below) and information of a general economic or industry nature) that has been or will be made available by you (or on your behalf at your request) to any Commitment Party in connection with the Transactions (the "***Information***") did not or will not when furnished, taken as a whole and as supplemented from time to time, contain any untrue statement of a material fact or omit to state a

material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made, and (b) the projections, estimates, forecasts, budgets and other forward-looking information that has been or will be made available by you to any Commitment Party in connection with the Transactions (the "*Projections*") were prepared in good faith based upon assumptions believed by you to be reasonable at the time of delivery thereof; it being understood that such Projections (i) are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized, that actual results may differ and that such differences may be material and (ii) are not a guarantee of performance. If at any time prior to the initial funding date, you become aware that any of the representations and warranties in the preceding sentence are incorrect in any material respect, you agree to promptly supplement the Information or the Projections such that the representations and warranties in the preceding sentence remain true in all material respects. The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Commitment Parties hereunder or the funding of the Facilities. Each of the Commitment Parties will be entitled to use and rely on the Information and the Projections without responsibility for independent verification thereof.

3.      Fees.

        As consideration for the Commitment Parties' commitments hereunder, you agree to pay (or to cause to be paid) the nonrefundable fees as set forth in (i) the Fee Letter, of even date herewith, among the Company and the Commitment Parties (the "*Lender Fee Letter*"), and (ii) the Fee Letter, of even date herewith, among the Company and the Administrative Agent (the "*Agent Fee Letters*" and together with the Lender Fee Letter, the "*Fee Letters*").

4.      Conditions.

        The Commitment Parties' commitments hereunder to fund the Facilities are subject solely to the conditions set forth in the Term Sheet. There are no conditions (implied or otherwise) to the commitments hereunder, other than those that are expressly stated in the Term Sheet.

5.      Indemnity.

        You agree to indemnify and hold harmless each Commitment Party, its affiliates, permitted successors and assigns and their respective officers, directors, employees, members, agents, advisors, representatives and controlling persons, in each case involved in the Transactions (each, a "*related party*") it being understood that in no event will this indemnity apply to any Commitment Party or its affiliates in their capacity as financial advisors to you or your subsidiaries (collectively, the "*Indemnified Persons*" and each individually an "*Indemnified Person*"), from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Fee Letters, the Transactions, the Facilities or the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing (any of the foregoing, a "*Proceeding*"), regardless of whether any such Indemnified Person is a party thereto or whether a Proceeding is brought by a third party or by you or any of your affiliates, and to reimburse each such Indemnified Person within 30 days after receipt of a written request (together

2

with reasonably detailed backup documentation supporting such reimbursement request) for the reasonable fees and reasonable out-of-pocket expenses of one primary counsel for all Indemnified Persons (taken as a whole) and to the extent reasonably necessary, one local counsel for all Indemnified Persons (taken as a whole) in each relevant material jurisdiction and one regulatory counsel (and, solely in the case of an actual or perceived conflict of interest, one additional counsel as necessary to the Indemnified Persons actually affected by such conflict taken as a whole in each relevant material jurisdiction and one regulatory counsel), but no other third-party advisors without your prior consent (not to be unreasonably withheld, delayed, conditioned or denied), and other reasonable out-of-pocket expenses incurred in connection with investigating, or defending any of the foregoing and in connection with enforcement of any provision of this Commitment Letter or the Fee Letters (in each case, excluding allocated costs of in-house counsel); provided that, the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent (i) they resulted from (A) the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of its controlled affiliates or related parties (as determined in a final non-appealable judgment in a court of competent jurisdiction), (B) any material breach of the obligations of such Indemnified Person or any of its controlled affiliates or related parties under this Commitment Letter or the Fee Letters (as determined in a final non-appealable judgment in a court of competent jurisdiction) or (C) arising out of, or in connection with, any Proceeding that does not involve an act or omission by you or any of your affiliates and that is brought by an Indemnified Person against any other Indemnified Person or (ii) they have resulted from any agreement governing any settlement referred to below by such Indemnified Person that is effected without your prior written consent (not to be unreasonably withheld, delayed, conditioned or denied). Each Indemnified Person agrees (by accepting the benefits hereof), severally and not jointly, to refund and return any and all amounts paid by you (or on your behalf) under this Section 5 to such Indemnified Person to the extent such Indemnified Person is not entitled to payment of such amounts in accordance with the terms hereof.

Notwithstanding any other provision of this Commitment Letter, no party hereto shall be liable for (i) any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages have resulted from the willful misconduct, bad faith, gross negligence or material breach of such party or any of its controlled affiliates or related parties of this Commitment Letter or the definitive documentation for the Facilities (the "*Facilities Documentation*"), as determined in a final, non-appealable judgment of a court of competent jurisdiction, or (ii) any special, indirect, consequential or punitive damages arising out of or in connection with this Commitment Letter or the Fee Letters (provided that the foregoing clauses (i) and (ii) shall not limit your indemnity or reimbursement obligations to the extent set forth above in the preceding paragraph in respect of any losses, claims, damages, liabilities and expenses incurred or paid by an Indemnified Person to a third party unaffiliated with the Commitment Parties that are otherwise required to be indemnified in accordance with this Section 5).

You shall not be liable for any settlement of any Proceedings (or any expenses related thereto) effected without your consent (which consent shall not be unreasonably withheld, delayed, conditioned or denied), but if settled with your written consent or if there is a final non-appealable judgment in a court of competent jurisdiction against an Indemnified Person in any such Proceedings, you agree to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement

3

or judgment in accordance with the second preceding paragraph. You shall not, without the prior written consent of the applicable Indemnified Person (which consent shall not be unreasonably withheld, delayed, conditioned or denied, it being understood that any consent withheld in connection with any settlement not effected in accordance with the succeeding clauses (a) and (b) shall be reasonable), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless (a) such settlement includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Indemnified Person.

In case any Proceeding is instituted involving any Indemnified Person for which indemnification is to be sought hereunder by such Indemnified Person, then such Indemnified Person will promptly notify you of the commencement of any Proceeding; provided, however, that the failure to so notify you will not relieve you from any liability that you may have to such Indemnified Person pursuant to this Section 5. Notwithstanding the above, following such notification, you may elect in writing to assume the defense of such Proceeding, and, upon such election, you will not be liable for any legal costs subsequently incurred by such Indemnified Person (other than reasonable costs of investigation and providing evidence) in connection therewith, unless (i) you have failed to provide counsel reasonably satisfactory to such Indemnified Person in a timely manner, (ii) counsel provided by you reasonably determines that its representation of such Indemnified Person would present it with a conflict of interest or (iii) the Indemnified Person reasonably determines that there are actual or perceived conflicts of interest between you and the Indemnified Person, including situations in which there may be legal defenses available to it which are different from or in addition to those available to you. In connection with any one Proceeding, you will not be responsible for the fees and expenses of more than one separate law firm for all Indemnified Persons except as expressly provided above.

6.    Confidentiality, etc.

You acknowledge that none of the Commitment Parties or their respective affiliates has any obligation to use, in connection with the transactions contemplated by this Commitment Letter, or to furnish to you or your subsidiaries, confidential information obtained by the Commitment Parties and their respective affiliates from other persons or entities. You also acknowledge that the Commitment Parties and their respective affiliates may be providing debt financing, equity capital or other services (including, without limitation, financial advisory services) to other companies in respect of which you or the Company may have conflicting interests. You also acknowledge that the Commitment Parties, their Representatives (as defined below) and their respective affiliates are investment managers and that the confidential information they may receive in connection with the transactions contemplated by this Commitment Letter may influence their views on other companies and nothing herein shall restrict the Commitment Parties, their Representatives or their respective affiliates' ability to transact in the loans and securities of the Company and its affiliates.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the debt transactions contemplated by this Commitment Letter, irrespective of

4

whether the Commitment Parties or their respective affiliates have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Parties, (c) you are capable of and responsible for evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties and their respective affiliates are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties and their respective affiliates have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship, (e) in connection herewith and with the process leading to the debt financing transactions contemplated hereby, the Commitment Parties and their affiliates (as the case may be) are acting solely as a principal and not as agents or fiduciaries of you, your management, stockholders, creditors, affiliates or any other persons, (f) we are not advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including, without limitation, with respect to any consents needed in connection with the transactions contemplated hereby), and you have consulted legal and financial advisors to the extent you have deemed appropriate, and (g) no Commitment Party or any of its affiliates has any obligation to you or your affiliates with respect to the debt financing transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and the Borrower. You further acknowledge and agree that you are responsible for making your own independent judgment with respect to the transactions contemplated by this Commitment Letter and the process leading thereto.

You agree that you will not disclose this Commitment Letter, the Fee Letters or the contents of any of the foregoing to any person without our prior written approval (which may include through electronic means) (not to be unreasonably withheld, delayed, conditioned or denied), except that you may disclose this Commitment Letter, the Fee Letters and the contents hereof and thereof (i) as required by applicable law, compulsory legal process, pursuant to the order of any court or administrative agency in any pending legal, judicial or administrative proceeding (including, without limitation, as may be required to obtain Bankruptcy Court (as defined below) approval; provided, that any such disclosure of the Fee Letters to obtain Bankruptcy Court approval shall be made via a filing under seal and, to the extent required, by providing an unredacted copy thereof directly to the Bankruptcy Court and the Office of the United States Trustee or to the extent required by governmental and/or regulatory authorities (in which case you agree to use commercially reasonable efforts to inform us promptly thereof to the extent lawfully permitted to do so) (ii) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants, consultants, compliance officers and advisors involved in the Transactions on a "need to know" basis and who are made aware of and have been directed to comply with the provisions of this paragraph, in each case on a confidential basis (you agree you are responsible for such persons' compliance with this Section 6) and (iii) as is necessary in protecting and enforcing the Company's rights with respect to this Commitment Letter or the Fee Letters. Notwithstanding anything to the contrary in the foregoing, you may, after consulting with the Commitment Parties, disclose to the Bankruptcy Court and the United States Trustee the fees and expenses payable under the Fee Letters on an aggregate basis with the other fees and expenses payable by you in connection with the Transactions (including legal, professional and advisory and other out of pocket fees and expenses).  The Company's obligations under this

5

paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Facilities Documentation upon the effectiveness thereof and, in any event, will terminate two years from the date hereof.

Each Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the Transactions or obtained from or on behalf of you, the Company or your respective affiliates in the course of the transactions contemplated hereby, except that the Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants, consultants, compliance officers and advisors (each, a "**Representative**") involved in the Transactions on a "need to know" basis and who are made aware of and have been directed to comply with the provisions of this paragraph, in each case on a confidential basis (with the Commitment Party responsible for such persons' compliance with this Section 6) (notwithstanding anything to the contrary in this Agreement, the term "Representative" shall only include such representatives and affiliates who in each case actually receive confidential information in the course of the transactions contemplated hereby), (b) on a confidential basis to any bona fide prospective Lender or prospective participant or swap counterparty that agrees to keep such information confidential in accordance with the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for the benefit of you, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case we agree to use commercially reasonable efforts to inform you promptly thereof to the extent lawfully permitted and practically feasible to do so (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority)), (d) to the extent requested by any regulatory authority having jurisdiction over a Commitment Party or its affiliates (including in any audit or examination conducted by accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), (e) to the extent such information:  (i) becomes publicly available other than as a result of a breach of this Commitment Letter, the Fee Letters or other confidential or fiduciary obligation owed by such Commitment Party to you or your affiliates, (ii) becomes available to the Commitment Parties or their Representatives on a non-confidential basis from a source other than you or on your behalf that, to such Commitment Party's knowledge (after due inquiry), is not in violation of any confidentiality obligation owed to you or your affiliates, (iii) was known by the Commitment Parties, their Representatives or their respective affiliates prior to its disclosure by or on behalf of the Company pursuant to the Transactions, or (iv) is obtained by the Commitment Parties or any of their Representatives through subpoena, formal legal proceedings, discovery, or other process required by law to the extent such information is obtained on a non-confidential basis, (f) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (g) as is necessary in protecting and enforcing the Commitment Parties' rights with respect to this Commitment Letter or the Fee Letters, (h) for purposes of establishing any defense available under applicable laws, including, without limitation, establishing a "due diligence" defense, (i) to the extent independently developed by such Commitment Party or its affiliates or Representatives without reliance on confidential information, (j) to the extent already in the Commitment Parties' or their Representatives' possession prior to any confidentiality obligation entered into in connection with

6

the Transactions, or (k) with respect to the existence and contents of the Term Sheet, in consultation with you, to the rating agencies.  The Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Facilities Documentation upon the effectiveness thereof and, in any event, will terminate two years from the date hereof.  The Company acknowledges that the Commitment Parties' employees or other Representatives or those of the Commitment Parties' Representatives, may serve as directors, board observers, officers or employees of the Commitment Parties' affiliates, including but not limited to the Commitment Parties' portfolio companies, and such affiliates will not be deemed to have received confidential information solely due to the dual role of such employee or other Representative, so long as such employee or other Representative does not provide any confidential information to the other directors, board observers, officers or employees of such affiliates in a manner that is inconsistent with this Commitment Letter.

Notwithstanding any provision contained herein, the Company understands that for securities law compliance purposes, an information blockage device (an "**Information Wall**") may be established between the employees and Representatives of the Commitment Parties and their affiliates that participate in the Company's activities in connection with the Transactions who may receive confidential information pursuant to this Commitment Letter (the "**Participant Group Representatives**"), and certain other employees and Representatives of the Commitment Parties and its affiliates, who shall not receive any confidential information pursuant to this Commitment Letter.  The Company acknowledges that an Information Wall may exist and agrees to adhere to such Information Wall by disclosing confidential information only to Participant Group Representatives who are identified in writing to the Company.

The terms of this Commitment Letter shall control over any additional purported confidentiality requirements imposed by any web-based database or similar repository of confidential information to which the Commitment Parties or any or their Representatives are granted access in connection with the Transactions, notwithstanding acceptance of submission of an electronic signature, "clicking" on an "I Agree" icon or other indication of assent to such additional confidentiality conditions, it being understood and agreed that the confidentiality obligations with respect to confidential information are exclusively governed by this Commitment Letter and may not be enlarged except in accordance with Section 8 hereof.

7.    Patriot Act.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***Patriot Act***")), each of us may be required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information may include its name and address and other information that will allow each of us to identify the Borrower and each other Loan Party in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective for each of us.

8.    <u>Governing Law, Etc.</u>

This Commitment Letter and the commitments hereunder shall not be assignable by any party hereto (other than by the Commitment Parties to their affiliates and related funds) without the prior written consent of each of the other parties hereto, and any attempted assignment without such consent shall be void; <u>provided</u> that the consent of the Company shall not be unreasonably withheld, conditioned, delayed or denied.   Except as set forth herein, this Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Commitment Parties and you.  This Commitment Letter may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement.   Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (*e.g.*, "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Commitment Letter.  This Commitment Letter and the Fee Letters are the only agreements that have been entered into among the parties hereto with respect to the Facilities and set forth the entire understanding of the parties hereto with respect thereto.  This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto, the Indemnified Persons and, if any of this Commitment Letter or any commitment hereunder is assigned in accordance with the first sentence of this <u>Section 8</u> above, the applicable assignee or assignees.  Subject to the limitations set forth in <u>Section 6</u> above, the Commitment Parties may perform the duties and activities described hereunder through any of their respective affiliates and the provisions of <u>Section 5</u> shall apply with equal force and effect to any of such affiliates so performing any such duties or activities.  This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York.

Each party hereto hereby irrevocably and unconditionally submits to the exclusive jurisdiction of any state or Federal court of competent jurisdiction sitting in New York County, State of New York (or, to the extent required by the Bankruptcy Court, the Bankruptcy Court), and, in each case, any appellate court thereof, over any suit, action or proceeding arising out of or relating to this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder, whether in contract, tort or otherwise, and irrevocably and unconditionally agrees that it will not commence any such suit, action or proceeding against any of the other parties hereto arising out of or in any way relating to this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder in any forum other than such courts.  Each party hereto agrees that service of any process, summons, notice or document by registered mail addressed to such party shall be effective service of process for any suit, action or proceeding brought in any such court.  Each party hereto hereby irrevocably and unconditionally waives any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum and agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other matter provided by law. EACH PARTY HERETO HEREBY IRREVOCABLY AGREES TO WAIVE (TO THE EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE FEE

LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Each of the parties hereto agrees that (a) this Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the Facilities Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the funding of the Facilities is subject to the conditions precedent set forth in Section 4 hereof and (b) each Fee Letter is a binding and enforceable agreement with respect to the subject matter contained therein. Reasonably promptly after the execution by the parties hereto of this Commitment Letter, the parties hereto shall proceed with the negotiation in good faith of the Facilities Documentation in a manner consistent with this Commitment Letter (including the Documentation Principles) for the purpose of executing and delivering the Facilities Documentation.

The information, indemnification, expense reimbursement, jurisdiction, waiver of jury trial, service of process, venue, governing law, absence of fiduciary duty and confidentiality provisions contained herein and in the Fee Letters shall remain in full force and effect regardless of whether the Facilities Documentation shall be executed and delivered and (except with respect to information) notwithstanding the termination of this Commitment Letter or the Commitment Parties' commitments hereunder.

Please indicate your acceptance of the terms hereof and of the Fee Letters by signing in the appropriate space below and in the Fee Letters and returning to the Commitment Parties, the enclosed duplicate originals (or facsimiles or electronic copies) of this Commitment Letter and the Fee Letters, in each case not later than 11:59 p.m., New York City time, two (2) business days after the date hereof, failing which the Commitment Parties' commitments hereunder will expire at such time. In the event that the initial borrowing under the Facilities does not occur on or before the date that is five (5) business days after the applicable date in which the Company must file the Cases pursuant to Section 6(a)(ii) of the RSA (as may be extended in accordance with the terms of the RSA), then this Commitment Letter and the commitments hereunder shall automatically terminate upon the occurrence of such event unless we shall, in our sole discretion, agree to an extension. The termination of any commitment shall not prejudice your rights and remedies in respect of any breach of this Commitment Letter or the Fee Letters.

[Signature Pages Follow]

**Term Sheet**

See attached.

CONFIDENTIAL
SUBJECT TO FRE 408

### $145 Million Senior Secured Debtor-In-Possession Credit Facility
### Summary of Terms and Conditions

Set forth below is a summary of certain key terms for a proposed $145 million in Loans (as defined below) under a DIP Facility (as defined below) to be made available to FGI Operating Company, LLC, a Delaware limited liability company. This summary of proposed terms and conditions (the "**Term Sheet**") does not purport to summarize all the terms, conditions, representations and other provisions with respect to the transactions referred to herein, which will be set forth in the DIP Loan Documents (as defined below). The obligation of any Lender to fund any Loans is expressly subject to the negotiation and execution of the DIP Loan Documents.

| | |
|---|---|
| **Borrower:** | FGI Operating Company, LLC, a Delaware limited liability company (the "**Company**"), as a debtor and debtor-in-possession in a prepackaged case (the "**Company's Case**") under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). |
| **Guarantors:** | The obligations of the Company under the DIP Facility and all obligations of the Company, will be guaranteed by FGI Holding Company, LLC, a Delaware limited liability company ("**Holdings**") and all of the Company's direct and indirect domestic wholly owned subsidiaries (excluding immaterial subsidiaries) (collectively, the "**Guarantors**"). Each of the Guarantors will be a debtor and a debtor-in-possession in cases (together with the Company's Case, the "**Cases**") under chapter 11 of the Bankruptcy Code filed contemporaneously and jointly administered with the Company's Case. |
| | The Company and the Guarantors are referred to herein as "**Loan Parties**" or "**Debtors**" and each, a "**Loan Party**" or "**Debtor**". |
| | The date of commencement of the Cases is referred to herein as the "**Petition Date**". |
| **Lenders:** | Certain Prepetition Term Loan Lenders (as defined below) party to the DIP Facility (as defined below) (such Prepetition Term Loan Lenders, the "**NM Prepetition Term Loan Lenders**"; the NM Prepetition Term Loan Lenders having more than 50% of the sum of outstanding commitments and/or exposure held by all of the NM Prepetition Term Loan Lenders under the DIP Facility, the "**Required Term Loan Group Lenders**"), the members of an ad hoc group of holders of the Notes (as defined below) (the "**Noteholder Group Lenders**") as set forth on Schedules 1.01(a) and 1.01(b) to the DIP Credit Agreement, and Remington Outdoor Company, Inc., as the lender of the 2018 Incremental Term Loans (as defined in the Prepetition Term Loan Credit Agreement (as defined below)) ("**ROC**" and, together with the NM Prepetition Term Loan Lenders and the Noteholder Group Lenders, the "**Lenders**"). |
| | ROC may not assign, participate or otherwise transfer any interest in the OpCo Bridge Roll-Up Loans without the consent of the Noteholder Group Lenders having more than 50% of the sum of outstanding commitments and/or exposure held by all of the Noteholder Group Lenders under the DIP Facility (the "**Required Noteholder Group Lenders**"), which consent will not be unreasonably withheld. |

The Noteholder Group Lenders shall be allocated no more than $5 million of the New Money Loans.

**Backstop Parties:** Certain funds and accounts managed by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in each case, that are Lenders (the "**Backstop Parties**").

**Certain Prepetition Debt Facilities and Instruments:**

First Lien Credit Agreement: A senior secured credit facility (the "**Prepetition Term Loan Facility**") consisting of a senior secured term loan facility, including the 2018 Incremental Term Loans, made available to the Company pursuant to that certain Credit Agreement, dated as of April 19, 2012, by and among the Company, certain of the Guarantors, the lenders from time to time party thereto (collectively, the "**Prepetition Term Loan Lenders**") and Ankura Trust Company, LLC, as successor administrative agent and collateral agent (in such capacity, the "**Prepetition Term Loan Agent**" and together with the Prepetition Term Loan Lenders, the "**Prepetition Term Loan Secured Parties**") (as amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition Term Loan Credit Agreement**").

First Lien ABL Credit Agreement: A senior secured credit facility (the "**Prepetition ABL Facility**") consisting of a senior secured asset-based loan facility and a senior secured letter of credit facility made available to the Company pursuant to that certain Loan and Security Agreement, dated as of April 19, 2012, by and among the Company, certain of the Guarantors, the lenders from time to time party thereto (collectively, the "**Prepetition ABL Lenders**"), Bank of America, N.A., as administrative agent (in such capacity, the "**Prepetition ABL Administrative Agent**") and Bank of America, N.A. and Wells Fargo Bank, National Association, as co-collateral agents (in such capacities, the "**Prepetition ABL Co-Collateral Agents**" and together with the Prepetition ABL Lenders and the Prepetition ABL Administrative Agent, the "**Prepetition ABL Secured Parties**") (as amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition ABL Credit Agreement**").

Third Lien Secured Notes: That certain Indenture (as amended, supplemented or otherwise modified prior to the date hereof, the "**Indenture**"), dated as of April 19, 2012, by and among the Company, FGI Finance, Inc., the guarantors party thereto, and Wilmington Trust, National Association, as trustee and collateral agent (together with the holders of the Notes, the "**Notes Secured Parties**" and, together with the Prepetition Term Loan Secured Parties and the Prepetition ABL Secured Parties, the "**Prepetition Secured Parties**"), pursuant to which the Company issued 7.875% Senior Secured Notes due 2020 (the "**Notes**").

The Prepetition Term Loan Facility, Prepetition ABL Facility and the Notes are collectively referred to herein as the "**Prepetition Facilities**".

**Administrative Agent:** Ankura Trust Company, LLC or another financial institution satisfactory to the Required Lenders (the "**Administrative Agent**" and, together with the Lenders, the "**DIP Secured Parties**").

**DIP Facility:**     A maximum amount of $145 million in the aggregate of Loans and other financial accommodations, as follows:

Term Loan Facility: A senior secured superpriority non-amortizing U.S. dollar denominated term loan facility in an aggregate principal amount of up to $145 million (the "**DIP Facility**"; the loans made thereunder, the "**Loans**") consisting of: (i) (A) new money commitments to be funded in cash on the Closing Date (as defined below) in the aggregate principal amount of $50 million (the "**Initial New Money Commitments**"; the Loans made under this subclause (A), the "**Initial New Money Loans**"), (B) new money commitments to be funded in cash after the Closing Date, pursuant to the draw schedule described below, in an aggregate principal amount up to $50 million (the "**Delayed Draw Commitments**" and, together with the Initial New Money Commitments, the "**New Money Commitments**"; the Loans made under this subclause (B) the "**Delayed Draw New Money Loans**", and together with the Initial New Money Loans, the "**New Money Loans**") and (C) new money commitment to be funded in cash on the Closing Date in an aggregate principal amount equal to the amount available to the Borrower under the 2018 Incremental Term Loan Commitments (as defined in the Prepetition Term Loan Credit Agreement), but not funded as of the Closing Date (the "**OpCo Bridge New Money Term Loan Commitments**"; the Loans made under this subclause (C), the "**OpCo Bridge New Money Term Loans**") and (ii) a roll-up of the 2018 Incremental Term Loans outstanding as of the Closing Date (the "**OpCo Bridge Roll-Up Loans**"). For the avoidance of doubt, the Initial New Money Loans shall be drawn on the Closing Date. The Delayed Draw New Money Loans may be drawn in multiple installments after the Closing Date, with $25 million of the Delayed Draw New Money Loans available commencing on the entry of the Final Order and another $25 million of the Delayed Draw New Money Loans available commencing April 15, 2018, in each case, subject to the conditions specified herein. The OpCo Bridge Roll-Up Loans will be deemed made on the Closing Date in an amount equal to the aggregate principal amount of the 2018 Incremental Term Loans outstanding as of the Closing Date, subject to the conditions specified herein.

"**Final Order**" means a final order of the Bankruptcy Court authorizing the DIP Facility in substantially the form of the Interim Order (as defined below), with only such modifications as are satisfactory to the Administrative Agent, the Required Lenders, Required Term Loan Group Lenders and the Required Noteholder Group Lenders (as defined below).

**Termination Date:**     The "**Termination Date**" with respect to the DIP Facility shall be the earliest of (a) the Scheduled Termination Date (as defined below), (b) the effective date of a chapter 11 plan in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (c) the consummation of a sale of all or substantially all of the assets of the Debtors and (d) the acceleration of the loans and the termination of the commitment with respect to such DIP Facility in accordance with the DIP Loan Documents.

"**Scheduled Termination Date**" means the date that is 3 months after the Petition Date, subject to up to a two month extension with the consent of the Required Term Loan Group Lenders, which consent shall not be unreasonably withheld.

**Use of Proceeds:**     For working capital and general corporate purposes of the Loan Parties and their subsidiaries consistent with the Approved Budget (as defined below), including to roll-up the outstanding 2018 Incremental Term Loans as provided under the "*DIP Facility*" section above, and to pay fees, costs and expenses incurred by the Backstop Parties and Administrative Agent in connection with the transactions contemplated hereby (including professional fees) and other administration costs incurred in connection with the Cases.

Additionally, the Company shall within one (1) business day of receipt of the Initial New Money Loans, (a) fund $4 million into a segregated deposit account (the "**Segregated Deposit Account**'") to serve as a backstop to the cash collateral provided by ROC pursuant to certain cash collateral arrangements (the "**Specified Cash Collateral Arrangements**") previously disclosed to the Required Lenders (the beneficiary of such cash collateral arrangements, the "**Segregated Deposit Account Beneficiary**") and (b) reimburse ROC for disbursements from ROC's deposit accounts of $391,695.49 made to legal advisers of ROC and the Company on March 6, 2018. Upon funding, the Segregated Deposit Account shall either (i) replace the Specified Cash Collateral Arrangements (it being understood that a replacement pursuant to this clause (i) shall include the release of any security interest in any deposit account maintained by ROC or any cash or proceeds of collateral of ROC, in each case, for the benefit of the Segregated Deposit Account Beneficiary) or (ii) reimburse ROC for any cash collateral draws by the Segregated Deposit Account Beneficiary pursuant to the Specified Cash Collateral Arrangements.

**DIP Loan Documents:**     The DIP Facility will be documented in a credit and guarantee agreement (the "**DIP Credit Agreement**") and shall be secured pursuant to a security agreement. The documents referred to in the preceding sentence are referred to as the "**DIP Loan Documents**".

The DIP Loan Documents shall reflect the terms and provisions set forth in this term sheet and shall otherwise be substantially consistent with the documentation governing the Prepetition Term Loan Facility; provided that certain provisions, including the representations and warranties, covenants and events of default, shall be modified in a manner appropriate to reflect the debtor-in-possession nature of the DIP Facility (including by tightening baskets and thresholds applicable to the covenants) (the definitive documentation for the Prepetition Term Loan Facility, as modified in the manner set forth above, is referred to herein as the "**Documentation Principles**").

**Interest Rates and Fees:**     As set forth on Annex A attached hereto.

**Optional Prepayments:**     The Company may, upon notice on the date of prepayment for Base Rate Loans and at least 3 business days' notice for Eurodollar Rate Loans and at the end of any applicable interest period (or at other times with the payment of applicable breakage costs), prepay in full or in part, without premium or penalty (other than such breakage costs), the Loans; *provided* that each such partial prepayment shall be in a minimum aggregate amount consistent with the Prepetition Term Loan Credit Agreement.

| | |
|---|---|
| **Mandatory Prepayments:** | The following: mandatory prepayments of the Loans shall be required with (a) 100% of the net cash proceeds received from the incurrence of indebtedness not permitted by the DIP Loan Documents and (b) 100% of the net cash proceeds from sales, recoveries or other dispositions (including casualty events) of any TL Priority Collateral (as defined below) (excluding sales of inventory in the ordinary course of business and subject to other exceptions to be agreed). |
| **Waterfall:** | All payments in respect of the DIP Facility, whether from optional prepayments, mandatory prepayments, upon acceleration or otherwise, and whether or not an Event of Default has occurred, will be applied as follows: |

(i) First, ratably, to payment of fees, indemnities, expenses and other amounts payable to the Administrative Agent;

(ii) Second, ratably, to payment of fees, indemnities, expenses, and other amounts (not otherwise addressed below) payable to the Lenders (other than any expenses of professionals for the Noteholder Group Lenders);

(iii) Third, ratably, to the accrued interest on the Loans;

(iv) Fourth, ratably, to the outstanding principal on the Loans;

(v) Fifth, ratably, to all other obligations outstanding in connection with the DIP Facility; and

(vi) Last, the balance, if any, after all of the obligations under the DIP Facility have been paid in full, to the Company or as otherwise required by law.

| | |
|---|---|
| **Security and Priority:** | The obligations of the Company under the DIP Facility and the obligations of each Guarantor in respect of its guarantee of all of the foregoing, shall, subject to the Carve-Out (as defined below), at all times: |

(a) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to super-priority administrative expense claim status in the Cases or any case under chapter 7 of the Bankruptcy Code upon conversion of any of the Cases (each, a "**Successor Case**") in respect of all obligations, joint and several, owing under the DIP Loan Documents to the DIP Secured Parties (the "**DIP Superpriority Claims**");

(b) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by an automatically perfected first priority security interest in and lien on all of Collateral of each Debtor, (i) to the extent such Collateral is unencumbered as of the Petition Date and (ii) excluding the Avoidance Actions (as defined below); provided that such lien shall attach to the proceeds of Avoidance Actions upon entry of the Final Order;

(c) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected security interest in and lien on the Collateral of each Debtor (including, without limitation, the Huntsville Property subject and subordinate only to (i) solely with respect to the ABL Priority Collateral, the Prepetition ABL Liens (as defined below) and the ABL Adequate Protection Liens (as defined below) on the ABL Priority Collateral; (ii) valid, perfected and unavoidable liens in favor of third

-5-

parties that were in existence and permitted under the Prepetition Term Loan Credit Agreement to be senior to the Prepetition Term Loan Liens (as defined below) immediately prior to the Petition Date and valid and unavoidable liens in favor of third parties that were in existence and permitted under the Prepetition Term Loan Credit Agreement to be senior to the Prepetition Term Loan Liens immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, in each case, other than the existing liens that secure obligations of the applicable Debtor under or governed by the Prepetition Facilities, which existing liens will be primed to the extent described in clause (d) below); and (iii) a valid, perfected and unavoidable lien in favor of the City of Huntsville, Alabama granted in connection with the mortgage on the Huntsville Property that was in existence immediately prior to the Petition Date (the liens described in the foregoing clauses (ii) and (iii), the "**Permitted Prior Liens**");

(d) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority priming security interest and lien on the Collateral of each Debtor (the "**Priming Liens**") senior to current and future liens granted on such property in favor of (i) with respect to the TL Priority Collateral, the Prepetition ABL Secured Parties, (ii) existing liens that secure the obligations of the applicable Debtor under or governed by the Prepetition Term Loan Facility, and (iii) existing liens that secure the obligations of the applicable Debtor under the Notes; and

(e) subject to entry of the Final Order, granting liens to the Administrative Agent, on behalf of the DIP Secured Parties, on the proceeds ("**Avoidance Proceeds**") of the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law, other than any such claims and causes of action held solely by ROC (each, an "**Avoidance Action**").

All of the liens described above shall be effective and perfected upon entry of the Interim Order.

"**ABL Priority Collateral**" means all accounts receivable, inventory, intellectual property, related books and records and general intangibles, cash and the proceeds thereof, subject to exclusions to be agreed that are customary and to the extent that such Collateral is subject to existing first priority liens that secure the obligations under the Prepetition ABL Facility.

"**Collateral**" means all owned or hereafter acquired assets and property of the Loan Parties (including, without limitation, inventory, accounts receivable, property, plant, equipment, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, subject to exclusions to be agreed that are customary for facilities of this type.

"**Huntsville Property**" means the real property located at 100 Electronics Boulevard, Huntsville, Alabama, together with all Fixtures (as defined in the UCC), Instruments (as defined in the UCC),  equipment (as defined in the UCC) and any

facilities (including, for the avoidance of doubt, the approximately 843,715 square foot facility (known as the "Old Chrysler Building")) located thereon.

"**Prepetition ABL Liens**" means the security interest in and liens on the "Collateral" as defined in the Prepetition ABL Credit Agreement.

"**Prepetition Term Loan Liens**" means the security interest in and liens on the "Collateral" as defined in the Prepetition Term Loan Credit Agreement.

"**TL Priority Collateral**" means all Collateral and all other assets pledged pursuant to the DIP Loan Documents to secure the obligations under the DIP Facility (in each case, other than ABL Priority Collateral).

Carve-Out:

The "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court or any claims and noticing agent retained by the Debtors with the approval of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); and (iii) (a) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or the official committee of unsecured creditors in the Cases (the "**Creditors' Committee**"), if any, whose retention is approved by the Bankruptcy Court pursuant to section 327, 328 and/or 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**") and (b) any success or transaction fees payable to Professional Persons, solely to the extent (1) such success or transaction fee is earned and payable pursuant to an engagement letter between the Debtors and the Professional Person that has been approved by the Court, and (2) any such success or transaction fees are reflected as a reserve in the most recent Borrowing Base Certificate delivered to the Administrative Agent by the Debtors prior to the delivery of a Carve Out Trigger Notice, in all cases subject to the terms of the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred or deemed earned (A) at any time before delivery by the Administrative Agent (at the direction of the Required Lenders) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (the "**Pre-Trigger Date Fees**"), subject to limits imposed by the Approved Budget and the Interim Order or Final Order (or otherwise) on Professional Fees permitted to be incurred; and (B) after the occurrence (the "**Trigger Date**") and during the continuance of an Event of Default and delivery of written notice (the "**Carve-Out Trigger Notice**") thereof (which may be by email) to the Debtors, the Debtors' counsel and other professional advisors, the United States Trustee, and lead counsel for the Creditors' Committee, if any, in an aggregate amount not to exceed $2,500,000 (the amount set forth in this clause (iii)(B) being the "**Post-EoD Carve-Out Amount**"); *provided,* that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii)(A) or (iii)(B) above, on any grounds.

Notwithstanding anything to the contrary in the immediately preceding paragraph, (i) the fact that a Carve-Out Trigger Notice has been delivered shall not be used

directly or indirectly to terminate or otherwise alter any rights under a Professional Person's engagement; and (ii) if a Success Fee has been earned by a Professional Person after a Carve Out Trigger Notice has been delivered in accordance with the terms and conditions of an engagement letter between the Debtors and such Professional Person that has been approved by the Court, such Success Fee when due shall be afforded the benefits of the Carve Out.

Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the Lenders, the Administrative Agent or the Prepetition Secured Parties (whether in such capacity or otherwise), or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Loan Documents or the obligations with respect to the Prepetition Facilities (whether in such capacity or otherwise), including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Lenders, the Administrative Agent or the Prepetition Secured Parties; (c) attempts to prevent, hinder or otherwise delay any of the Lenders' or the Administrative Agent's assertion, enforcement or realization upon any Collateral in accordance with the DIP Loan Documents, the Interim Order and the Final Order other than to seek a determination that an Event of Default has not occurred or is not continuing; (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court that constitutes an Approved Bankruptcy Court Order (as defined in the DIP Loan Documents) (subject to the Approved Budget); or (e) any action or transaction prohibited by any of the DIP Loan Documents.

For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Loan Documents, the Carve-Out shall be senior to all liens and claims securing the DIP Loan Documents, any adequate protection liens, and the related adequate protection claims described under "*Adequate Protection*, and any and all other liens or claims securing the obligations under the Prepetition ABL Credit Agreement (it being understood and agreed that the Carve-Out shall be allocated pro rata among the ABL Priority Collateral and the TL Priority Collateral).

**Adequate Protection:**  Prepetition Term Loan Secured Parties.  Until the indefeasible discharge of the Prepetition Term Loan Facility, and pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Prepetition Term Loan Lenders will be authorized to receive as adequate protection:

(i) cash payment on the effective date of the Plan of Reorganization of interest on the obligations under the Prepetition Term Loan Credit Agreement that was due on February 1, 2018, at the applicable non-default contract rate thereunder;

-8-

(ii) current cash reimbursement of actual and documented fees and expenses and other disbursements of the Prepetition Term Loan Agent and the Backstop Parties whether incurred before, on, or after the Petition Date;

(iii) to the extent of any diminution in value of their prepetition security interests, replacement or, if applicable, new liens on the Collateral that are (w) junior to the liens securing the DIP Facility (in the same relative priority as the Prepetition Term Loan Facility), (x) junior to the adequate protection liens on the ABL Priority Collateral granted to the Prepetition ABL Secured Parties, (y) senior to the adequate protection liens granted to the Notes Secured Parties and (z) senior to the adequate protection liens on the TL Priority Collateral granted to the Prepetition ABL Secured Parties (the "**ABL Adequate Protection Liens**"); and

(iv) to the extent of any diminution in value of their prepetition security interests, superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are junior to the DIP Superpriority Claims, senior to the superpriority claims granted to the Notes Secured Parties and senior to the superpriority claims granted to the Prepetition ABL Secured Parties (except to the extent payable from the proceeds of ABL Priority Collateral, in which case the claims shall be junior to the adequate protection superpriority claims granted to the Prepetition ABL Secured Parties).

Notes Secured Parties. Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Notes Secured Parties whose liens will be primed as described above, and whose cash collateral will be authorized for use by the Loan Parties, will receive as adequate protection:

(i) to the extent paid by ROC, current cash payment of actual and documented fees and expenses of the trustee for the Notes, including actual and documented fees and expenses of the trustee's professional advisors, including Willkie Farr & Gallagher LLP and Perella Weinberg Partners LP;

(ii) to the extent of any diminution in value of their prepetition security interests, replacement or, if applicable, new liens on the Collateral that are junior to the liens securing the DIP Facility (in the same relative priority as the Prepetition Term Loan Facility) and to the adequate protection liens granted to the Prepetition Term Loan Secured Parties (as described above) and the Prepetition ABL Secured Parties (as described below);

(iii) to the extent of any diminution in value of their prepetition security interests, superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are junior to the DIP Superpriority Claims and the superpriority claims granted to the Prepetition Term Loan Secured Parties (as described above) and the Prepetition ABL Secured Parties (as described below); and

(iv) reporting and information rights substantially similar to those granted pursuant to the DIP Loan Documents.

<u>Prepetition ABL Secured Parties</u>.  Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, the Prepetition ABL Secured Parties whose liens will be primed as described above, and whose cash collateral will be authorized for use by the Loan Parties, will receive as adequate protection:

(i) cash payment of post-petition interest on the obligations under the Prepetition ABL Credit Agreement at the applicable non-default contract rate thereunder;

(ii) current cash payment of actual and documented fees and expenses of the Prepetition ABL Secured Parties, including actual and documented fees and expenses of the Prepetition ABL Secured Parties' professional advisors, Skadden, Arps, Slate, Meagher & Flom LLP and FTI Consulting, Inc.;

(iii) to the extent of any diminution in value of their prepetition security interests, replacement or, if applicable, new liens on the Collateral that are (x) senior to the adequate protection liens granted to the Notes Secured Parties, (y) junior to the liens securing the DIP Facility (in the same relative priority as the Prepetition Term Loan Facility) and to the adequate protection liens granted to the Prepetition Term Loan Secured Parties (as described above), in each case, with respect to TL Priority Collateral and (z) senior to the liens securing the DIP Facility (in the same relative priority as the Prepetition Term Loan Facility) and to the adequate protection liens granted to the Prepetition Term Loan Secured Parties (as described above), in each case, with respect to ABL Priority Collateral;

(iv) to the extent of any diminution in value of their prepetition security interests, superpriority claims as provided for in section 507(b) of the Bankruptcy Code that are junior to the DIP Superpriority Claims and the superpriority claims granted to the Prepetition Term Loan Secured Parties (as described above) except to the extent payable from the proceeds of ABL Priority Collateral, in which case such claims shall be senior to the DIP Superpriority Claims and adequate protection superpriority claims granted to the Prepetition Term Loan Secured Parties; and

(v) reporting and information rights substantially similar to those granted pursuant to the DIP Loan Documents.

**Conditions Precedent to the Initial Extension of Credit:**   The initial extension of credit (the "**Closing**"; the date on which the Closing occurs, the "**Closing Date**") under the DIP Facility shall be subject to the satisfaction (or waiver) of the following conditions precedent among others (and the conditions set forth under "*Conditions Precedent to Each Loan*" below):

(i) The DIP Loan Documents (x) shall reflect the terms and provisions set forth in this term sheet and shall otherwise be consistent with the documentation

-10-

governing the Prepetition Term Loan Credit Agreement, and (y) shall have been executed and delivered by each party thereto.

(ii) The Petition Date shall have occurred no later than March 14, 2018 (or such later date as the RSA may provide), and each Loan Party shall be a debtor and a debtor-in-possession. The Interim Order and all other "first day orders" shall be in form and substance satisfactory to the Required Lenders, Required Term Loan Group Lenders, Required Noteholder Group Lenders and the Administrative Agent.

(iii) Not later than 3 business days following the Petition Date (or such later date as the Required Lenders may agree), the Bankruptcy Court shall have entered an order in form and substance satisfactory to the Administrative Agent, the Required Lenders, Required Term Loan Group Lenders and the Required Noteholder Group Lenders (the "**Interim Order**"), authorizing and approving the making of the Loans in the amounts consistent with those set forth in the "*DIP Facility*" section above, and the granting of the superpriority claims and liens and other liens referred to above under the heading "*Security and Priority*", which Interim Order shall not have been vacated, reversed, modified, amended or stayed. The Interim Order shall contain provisions granting the adequate protection liens and related adequate protection claims described under "*Adequate Protection*" above having the priority set forth therein, and provide for the use of proceeds of the DIP Facility consistent with the terms set forth in the "Use of Proceeds" section above.

(iv) The Administrative Agent shall have received a signed copy of the Interim Order.

(v) No trustee or examiner having expanded powers shall have been appointed with respect to the Loan Parties, any of their subsidiaries or their respective properties.

(vi) All reasonable and documented out-of-pocket costs, fees, expenses (including, without limitation, reasonable and documented attorneys' and financial advisors' fees and expenses) and other compensation contemplated by the DIP Loan Documents or otherwise required to be paid to the Administrative Agent and the Lenders on or before the Closing shall have been paid.

(vii) The Required Lenders and the Administrative Agent shall have received and the Required Lenders shall be reasonably satisfied with a cash flow forecast for the 13-week period commencing on the Closing Date dated as of a date not more than 3 business days prior to the Closing Date (the "**Initial Budget**"); provided that the form of 13-week cash flow forecast previously provided to the Backstop Parties shall be deemed satisfactory for such purposes.

(viii) The Required Lenders shall be reasonably satisfied with the cash management arrangements of the Loan Parties; *provided* that the Company's current cash management systems as in effect in accordance with the Prepetition

Term Loan Credit Agreement and the Segregated Deposit Account are deemed to be reasonably acceptable.

(ix) The Required Lenders shall be satisfied in their reasonable judgment that there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Loan Parties' or their respective subsidiaries' material debt instruments and other material agreements which (i) in the case of the Loan Parties' material debt instruments and other material agreements, would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis or (ii) in the case of any other subsidiary, would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (as defined below).

(x) The Administrative Agent shall have received customary closing deliverables consistent with the Prepetition Term Loan Credit Agreement, including, without limitation, written legal opinions of counsel to the Loan Parties.

(xi) There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to have a Material Adverse Effect.

(xii) All necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained (without the imposition of any adverse conditions that are not reasonably acceptable to the Required Lenders) and shall remain in effect; and no law or regulation shall be applicable in the judgment of the Required Lenders that restrains, prevents or imposes materially adverse conditions upon the DIP Facility or the transactions contemplated thereby.

(xiii) Each Lender who has requested the same at least 5 business days prior to the Closing Date shall have received "know your customer" and similar information at least 3 business days prior to the Closing Date.

(xiv) The collateral agent, for the benefit of the Lenders, shall have the valid and perfected liens on the security interests in the Collateral of the Loan Parties contemplated by the "*Security and Priority*" section above; the Loan Parties shall have delivered uniform commercial code financing statements and shall have executed and delivered intellectual property security agreements, in each case in suitable form for filing.

(xv) The Administrative Agent shall have received and reviewed lien and judgment search results for the jurisdiction of organization of each Loan Party and the jurisdiction of the chief executive office of each Loan Party, which search results shall be reasonably satisfactory to the Required Lenders.

(xvi) The Administrative Agent shall have received endorsements (to the extent such endorsements can be delivered prior to Closing after the exercise of commercially reasonable efforts) naming the Administrative Agent, on behalf of the Lenders, as an additional insured and loss payee, as applicable,

under all insurance policies required to be maintained with respect to the Collateral pursuant to the terms of the DIP Loan Documents.

(xvii) Company shall have delivered to the Administrative Agent a certificate, dated as of the Closing Date, to the effect set forth in clause (ii) of the "*Conditions Precedent to Each Loan*" section below and including other certifications reasonably requested by the Required Lenders.

(xviii)  The existing 2018 Incremental Term Loans contemplated to be paid with the OpCo Bridge Roll-Up Loans deemed made on the Closing Date shall have been repaid (or deemed repaid and terminated) substantially concurrently with the Closing Date.

(xix)   Company shall have appointed a financial monitor acceptable to the Required Lenders with responsibilities and on terms reasonably acceptable to the Required Lenders (an "**Acceptable Financial Monitor**"), it being understood that Alvarez & Marsal shall be deemed acceptable to the Required Lenders.

(xx) That certain restructuring support agreement, dated as of February 11, 2018 (as amended, supplemented or otherwise modified from time to time, the "**RSA**") shall not have been terminated according to its terms.

(xxi) On each of (i) March 9, 2018 and (ii) the Closing Date, ROC shall have delivered, in form and substance satisfactory to the Required Lenders, a certificate from an officer of ROC setting forth the cash balance of ROC (on a standalone basis) as of such applicable date.

"**Material Adverse Effect**" shall mean the effect of any event or condition which, alone or when taken together with other events or conditions occurring or existing concurrently therewith, (i) has a material adverse effect upon the business, properties, results of operations or financial condition of the Borrower or of all Loan Parties (taken as a whole) (other than as customarily occurs as a result of events leading up to and following the commencement of the Cases); (ii) has or may be reasonably expected to have any material adverse effect whatsoever upon the validity or enforceability of the DIP Loan Documents; (iii) has any material adverse effect upon the value of the Collateral taken as a whole (other than as customarily occurs as a result of events leading up to and following the commencement of the Cases), the liens of the Administrative Agent with respect to the Collateral or the priority of any such Liens; (iv) materially impairs the ability of any Loan Party to perform its obligations under any of the DIP Loan Documents, including repayment of any of the Obligations when due; or (v) materially impairs the ability of the Administrative Agent or any Lender to enforce or collect the Obligations or realize upon any of the Collateral in accordance with the DIP Loan Documents and applicable law.  The commencement of the Cases and any events or developments leading up to the commencement of the Cases or as otherwise described in the Disclosure Statement (as defined in the RSA) or any other public or bilateral disclosures made by the Debtor (as well as any defaults under prepetition agreements, so long as the exercise of remedies as a result of such defaults are stayed

under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court) shall be deemed not to have a Material Adverse Effect.

**Conditions Precedent to Each Loan:** On the funding date of each Loan (each, a "**Credit Event**"), (i) immediately prior to, and after giving effect to, such funding or issuance, there shall exist no default under the DIP Loan Documents, (ii) the representations and warranties of the Loan Parties therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding or issuance, (iii) the making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (iv) the making of such Loan shall not result in the aggregate outstandings under the DIP Facility exceeding the amount authorized by the Interim Order or the Final Order, as applicable, (v) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect, (vi) immediately before and after giving effect to the making of such Loan, the Total Applicable Borrowings shall not exceed the Total Applicable Availability Amount, (vii) the Company shall have satisfied all applicable milestones (as set forth in the "*Case Milestones*" section below) to be satisfied on or prior to the time of making such Loan and is not then aware of any event, fact or circumstance that would cause it to be unable to satisfy any future milestone, (viii) the RSA shall not have been terminated.

"**Borrowing Base**" shall have the meaning set forth in the Prepetition ABL Credit Agreement as in effect on the Closing Date.

"**Total Applicable Availability Amount**" means the Borrowing Base, as adjusted for (A) 85% advance rate on all receivables, (B) 75% advance rate on all inventory, (C) 85% of the NOLV (as shown on an acceptable appraisal) of intellectual property and (D) any other adjustments, in each case as set forth in a schedule attached to the DIP Credit Agreement (as such schedule may be adjusted from time to time with the agreement of the Borrower and the Required Lenders).

Discretionary determinations, if any, required in connection with the determination of the Total Applicable Availability Amount (other than determining the Borrowing Base) shall be made by an authorized representative designated by the Required Lenders in writing to the Administrative Agent and the Borrower.

"**Total Applicable Borrowings**" shall mean the sum of (i) the aggregate outstanding principal amount of all Loans outstanding under the DIP Facility and (ii) the aggregate outstanding principal amount of all indebtedness under the Prepetition ABL Facility.

**Representations and Warranties:** The DIP Loan Documents will contain representations and warranties substantially consistent with the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles, which shall include, but not be limited to, the following: (i) financial condition, (ii) no change, (iii) corporate existence, (iv) compliance with law, (v) power, (vi) authorization, (vii) enforceable obligations, (viii) no legal bar, (ix) litigation, (x) no default, (xi) ownership of property, (xii) liens, (xiii) insurance, (xiv) intellectual property, (xv) taxes, (xvi) federal regulations, (xvii) labor matters, (xviii) ERISA, (xix) Investment Company Act, (xx) other

-14-

regulations, (xxi) subsidiaries and affiliates, (xxii) use of proceeds, (xxiii) environmental matters, (xxiv) security documents, (xxv) senior indebtedness, (xxvi) anti-terrorism law, (xxvii) Foreign Corrupt Practices Act and (xxiii) material contracts.

**Affirmative Covenants:** The DIP Loan Documents will contain affirmative covenants substantially consistent with the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles (subject to certain other exceptions, qualifications and carveouts to be agreed), which shall include, but not be limited to, the following: (i) financial statements, (ii) certificates; other information, (iii) payment of obligations, (iv) maintenance of existence; compliance, (v) maintenance of property; insurance, (vi) inspection of property; books and records; discussion, (vii) notices, (viii) environmental laws, (ix) additional collateral, etc., (x) security interests; further assurances, (xi) ERISA, (xii) use of proceeds, (xiii) maintenance of ratings; lender meetings, (xiv) certain bankruptcy matters, (xv) retention of an Acceptable Financial Monitor, (xvi) payment of taxes and claims, (xvii) foreign assets control regulations, etc., (xviii) mortgages, (xix) monthly delivery of 13-week cash flow forecasts, (xx) weekly delivery of variance reports, (xxi) achievement of milestones as set forth in the "*Case Milestones*" section below and (xxii) if requested by the Required Lenders, retention of a strategic advisor acceptable to the Required Lenders.

**Case Milestones:** The DIP Loan Documents shall require compliance with the following milestones in accordance with the applicable timing referred to below (or such later dates as approved by the Required Lenders):

(i)   Not later than the date that is 18 days following the Petition Date, the applicable Loan Parties shall have taken such action (including the recording of a second mortgage) as may be necessary or advisable in the reasonable opinion of the Administrative Agent (including through means of perfection available under the Interim Order) to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) a valid, perfected and enforceable lien on the Huntsville Property junior to the existing mortgage thereon in favor of the City of Huntsville, for the benefit of the Lenders.

(ii)  Plan milestones as set forth in the RSA, but in each case subject to each relevant date being extended by 5 days.

**Negative Covenants:** The DIP Loan Documents will contain negative covenants consistent with the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles (subject to certain other exceptions, qualifications and carveouts to be agreed) (*provided*, that the negative covenants shall be tightened in a manner customary for facilities of this type), which include, but not be limited to, the following: (i) limitations on indebtedness, (ii) limitations on liens, (iii) limitations on fundamental changes, (iv) limitations on dispositions of property, (v) limitations on restricted payments, (vi) limitations on investments, (vii) limitations on prepayments and modifications of certain debt instruments or organization documents, (viii) limitations on transactions with affiliates, (ix) limitations on changes in fiscal periods and accounting changes, (x) limitations on negative pledge clauses, (xi) limitations on clauses restricting subsidiary distributions, (xii) limitations on lines

-15-

of business, (xiii) limitations on material agreements, (xiv) holding company status, (xv) limitations on sale and leaseback transactions, (xvi) certain bankruptcy matters and (xvii) certain limitations on Holdings.

**Budget Compliance and Reporting:** The Initial Budget shall be approved by the Required Lenders (once so approved, and subject to any update as may be approved by the Required Lenders, the "**Approved Budget**"). Beginning on the fifth week, and every fourth week thereafter, the Approved Budget shall be redefined as the last Rolling Budget delivered to the Lenders, (as approved by the Required Lenders, and subject to any update as may be approved by the Required Lenders). The Company shall be required to comply with such Approved Budget, subject to the Permitted Variance (as defined below).

The Company shall deliver to the Administrative Agent, and the Administrative Agent shall deliver to the Lenders each of the following: (a) on the 15th calendar day of each month, the Borrowing Base as adjusted by the definition of the term "Total Applicable Availability Amount" above (the "**Adjusted Borrowing Base**") as of the last day of the prior fiscal month, (b) beginning on the fifth week, and every fourth week thereafter, on each applicable Wednesday, a 13-week cash flow forecast for the current week and the immediately following consecutive 12 weeks (each, a "**Rolling Budget**"), (c) reports of the cash balances and disbursements (including, without limitation, check and wire run reports) of ROC as of the end of the prior business day in reasonable detail and (d) other information as may be reasonably requested by the Administrative Agent or the Lenders. The Administrative Agent and the Lenders shall also be entitled to receive, concurrently with the delivery thereof to the Prepetition ABL Administrative Agent, the Borrowing Base related deliverables provided to the Prepetition ABL Administrative Agent; provided, however, that any of the Lenders that are provided with access to the foregoing information shall have become signatories to non-disclosure agreements acceptable to the Debtors.

The Company shall also provide a budget variance report/reconciliation (the "**Budget Variance Report**") by Wednesday of each week (each, a "**Testing Date**") for the most recently ended four-week period included in the previous Approved Budget (each, a "**Testing Period**") showing by line item actual cash receipts, disbursements, net cash flow, Company professional fees, capital expenditures and billings for each week, noting therein all variances, on a line-item basis, from amounts set forth for such week in the relevant Approved Budget, and shall include explanations for all material variances for such week.

The Company shall arrange for weekly (unless waived by the Required Lenders) conference calls with Lenders discussing and analyzing cash flow and related forecast for the prior week, the financial condition, liquidity and results of operations of each of the Loan Parties, status of the Cases and progress in achieving the milestones set forth in the "*Case Milestones*" section above; provided, however, that any of the Lenders that are permitted to participate in the foregoing conference calls shall have become signatories to non-disclosure agreements acceptable to the Debtors.

**Financial Covenants:**

The DIP Facility will contain only the following financial covenants (which, for the avoidance of doubt, shall only be applicable to the Loan Parties and their subsidiaries):

(i)    for the most recently ended Testing Period, actual operating expenditures by the Loan Parties (including all cash outflows and transfers to any foreign subsidiary) in the aggregate shall be not more than 120% of the amount set forth in the Approved Budget for such Testing Period (the "**Permitted Variance**"); provided that the Loan Parties may carry forward unpaid projected expenses for a limited period of time (such period of time to be no less than four weeks).

**Financial Reporting Requirements:**

The Company shall provide the Administrative Agent and the Lenders (in addition to those reports described under "*Budget Compliance and Reporting*" above):

(i) quarterly unaudited consolidated financial statements within 45 days of quarter-end for the first 3 fiscal quarters of the fiscal year, certified by the Company's chief financial officer, accompanied by a customary management's discussion and analysis; and

(ii) annual audited consolidated financial statements within 90 days of year-end, certified with respect to such consolidated statements by Grant Thornton LLP, or other independent certified public accountants reasonably acceptable to the Required Lenders, accompanied by a customary management's discussion and analysis (it being agreed that there shall be no requirement to deliver an audit opinion not subject to a 'going-concern' qualification).

**Other Reporting Requirements:**

Consistent with the Prepetition Term Loan Credit Agreement, with the addition of customary notices in respect of certain filings made in the Cases.

**Events of Default:**

The DIP Loan Documents will contain events of default with, where appropriate, grace periods and exceptions, in each case consistent with the Prepetition Term Loan Credit Agreement, subject to Documentation Principles, which events of default shall include, but not be limited to, the following: (i) failure to pay, (ii) breaches of representations and warranties, (iii) failure to comply with covenants (including achievement of milestones as set forth in the "Case Milestones" section), (iv) cross-defaults to other post-petition or unstayed indebtedness, (v) bankruptcy or insolvency of any of the Company's material subsidiaries that is not party to a Case, (vi) certain ERISA events, (vii) post-petition judgments subject to carve-outs, (viii) actual or asserted (by any Loan Party or any affiliate thereof) invalidity or impairment of any DIP Loan Document (including the failure of any lien to remain perfected), (ix) change of ownership or control, (x) failure of subordination, (xi) the entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by the Company of a motion or other pleading seeking entry of such an order, (xii) a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the Company's Case, the Company applies for, consents

-17-

to, or acquiesces in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Required Lenders in their sole discretion; (xiii) the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case in a manner adverse in any material respect to the Administrative Agent or the Lenders, or the filing by the Company of an application, motion or other pleading seeking entry of such an order, (xiv) the entry of an order in any of the Cases denying or terminating use of cash collateral by the Loan Parties and the Debtors have not otherwise obtained authorization to use cash collateral with the prior written consent of the Administrative Agent and the Required Lenders, (xv) the entry of an order in any of the Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Loan Parties in excess of an amount to be mutually agreed, (xvi) the entry of a final non-appealable order in the Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of any other actions by the Loan Parties (or any direct or indirect parent thereof) that challenges the rights and remedies of the Administrative Agent or the Lenders under the DIP Facility in any of the Cases or that is inconsistent with the DIP Loan Documents; (xvii) the entry of an order in any of the Cases seeking authority to use cash collateral (other than with the prior written consent of the Administrative Agent and the Required Lenders) or to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facility), unless such financing would repay in full in cash all obligations under the DIP Facility upon consummation thereof, (xviii) without the consent of the Administrative Agent and the Required Lenders (not to be unreasonably withheld), the entry of an order in any of the Cases granting adequate protection to any other person (which, for the avoidance of doubt, shall not apply to any payments made pursuant to "first day" or other orders reasonably acceptable to the Administrative Agent and the Required Lenders); (xix) termination or expiration of any exclusivity period for any Loan Party to file or solicit acceptances for a plan of reorganization, (xx) the filing or support of any pleading by any Loan Party (or any direct or indirect parent thereof), seeking, or otherwise consenting to, any of the matters set forth in clauses (xi) through (xix) above, (xxi) the commencement of any action, including the filing of any pleading, by any Loan Party or any direct or indirect subsidiary of any Loan Party (or by any direct or indirect parent of any Loan Party) against any of the Prepetition Secured Parties with respect to any of the obligations or liens under or with respect to the Prepetition Term Loan Credit Agreement, (xxii) the making of any payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" orders reasonably satisfactory to the Administrative Agent and the Required Lenders, (c) as permitted by any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Administrative Agent and the Required Lenders, or (d) as otherwise agreed to by the Administrative Agent and Required Lenders, (xxiii) except with the consent of the Required Lenders, an order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out or as otherwise permitted under the applicable DIP Loan Documents, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent and the Lenders under the

DIP Facility, or the filing by the Company of a motion or application seeking entry of such an order, (xxiv) other than with respect to the Carve-Out and the liens provided for in the DIP Facility, the Company shall create or incur, or the Bankruptcy Court enters an order granting, any claim which is *pari passu* with or senior to any liens under the Prepetition Term Loan Facility, the adequate protection liens and adequate protection obligations granted under the Interim Order, (xxv) noncompliance by any Loan Party or any of its subsidiaries the terms of the Interim Order or the Final Order, (xxvi) the Loan Parties or any of their subsidiaries (or any direct or indirect parent of any Loan Party), or any person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any of the Lenders regarding the DIP Facility, unless such suit or other proceeding is in connection with the enforcement of the DIP Loan Documents against the Administrative Agent or Lenders, (xxvii) a plan of reorganization shall be confirmed in any of the Cases that is not the Plan of Reorganization, or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the unused commitments under the DIP Facility and payment in full in cash of the Loan Parties' obligations under the DIP Facility and that is not otherwise reasonably satisfactory to the Administrative Agent and the Required Lenders, or any of the Loan Parties or any of their subsidiaries (or any of their direct or indirect parents) shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order, (xxviii) any Loan Party (or any direct or indirect parent thereof) shall file any motion seeking authority to consummate the sale of assets of any Loan Party (other than any such sale that is permitted under the DIP Loan Documents) pursuant to Section 363 of the Bankruptcy Code having a value in excess of an amount to be agreed, without the consent of the Administrative Agent and the Required Lenders, or the Company shall file (or fail to oppose) any motion seeking an order authorizing the sale of all or substantially all of the assets of the Loan Parties (unless such sale would result in the repayment in full in cash of all obligations under the DIP Facility upon consummation thereof), (xxix) any loss, theft, damage or destruction of any of the Collateral not fully covered (subject to such deductibles as the Required Lenders shall have permitted) by insurance in an aggregate amount in excess of an amount to be agreed, (xxx) any Loan Party which is a partnership, limited liability company, limited liability partnership or a corporation, dissolves or there is a cessation of any substantial part of any Loan Party's business for a period of time which would reasonably be expected to have a Material Adverse Effect, (xxxi) any Loan Party makes an assignment for the benefit of creditors, makes or sends notice of a bulk transfer or calls a meeting of its creditors or principal creditors in connection with a moratorium or adjustment of the indebtedness due to them, (xxxii) any order, judgment or decree shall be entered against any Loan Party decreeing the dissolution or split up of such Loan Party and such order shall remain undischarged or unstayed for a period in excess of 10 days or (xxxiii) the RSA shall be terminated.

Notwithstanding anything to the contrary contained herein, any Event of Default under the DIP Loan Documents, and any or similarly defined term under any DIP Loan Document, other than any Event of Default which cannot be waived without the written consent of each Lender or each Lender directly and adversely affected thereby, shall be deemed not to be "continuing" if the events, act or condition that

gave rise to such Event of Default have been remedied or cured (including by payment, notice, taking of any action or omitting to take any action) or have ceased to exist.

Upon the occurrence of an Event of Default, the Administrative Agent, at the direction of the Required Lenders, shall (x) declare (i) the termination, reduction or restriction of any further commitment to the extent any such commitment remains, (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the DIP Loan Documents as to any future liability or obligation of the Administrative Agent and the Lenders, but without affecting any of the DIP liens or the obligations and (y) upon the giving of 5 business days' notice to the Debtors (the "**Remedies Notice Period**"), (i) terminate the consensual use of cash collateral and (ii) exercise all other rights and remedies provided for in the DIP Loan Documents and applicable law.

Solely during the Remedies Notice Period, the Debtors may continue to use cash collateral in the ordinary course of business, consistent with past practices. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

"**Plan of Reorganization**" shall mean that certain plan of reorganization to be filed for each of the Cases in accordance with the terms of the RSA (as amended, supplemented or otherwise modified in accordance with the terms thereof or the RSA).

|  |  |
|---|---|
| **Expenses and Indemnification:** | The Company and each Guarantor shall jointly and severally pay or reimburse the Administrative Agent and the Lenders for all reasonable and documented out-of-pocket costs and expenses incurred by the Administrative Agent and the Backstop Parties (including reasonable and documented fees and expenses of O'Melveny & Myers LLP, Davis, Polk & Wardwell LLP, Richards, Layton & Finger, PA and Ducera Partners LLP) in connection with (i) the preparation, negotiation and execution of the DIP Loan Documents; (ii) the syndication and funding of the Loans; (iii) the creation, perfection or protection of the liens under the DIP Loan Documents (including all search, filing and recording fees); and (iv) the on-going administration of the DIP Loan Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Cases. |

The Company and each Guarantor further agrees to jointly and severally pay or reimburse the Administrative Agent and each of the Lenders for all actual and documented out-of-pocket costs and expenses (including actual and documented fees and expenses of professional advisors to the Backstop Parties (including O'Melveny & Myers LLP, Richards, Layton & Finger PA and Ducera Partners LLP)), incurred by the Administrative Agent or such Lenders in connection with (i) the enforcement of the DIP Loan Documents; (ii) any refinancing or restructuring of the DIP Facility in the nature of a "work-out"; and (iii) any legal

proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the DIP Loan Documents, including the Cases.

The DIP Loan Documents will contain customary indemnification provisions (including coverage of environmental liabilities) by the Company and each Guarantor (jointly and severally) in favor of the Administrative Agent, the Backstop Parties, each Lender, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them, in each case consistent with the Prepetition Term Loan Credit Agreement.

**Required Lenders:**   Lenders holding greater than 50.0% of the outstanding commitments and/or exposure under the DIP Facility (the "**Required Lenders**"); *provided* that the commitments and/or exposure of any defaulting Lender shall be disregarded in determining the Required Lenders at any time; *provided further* that upon the occurrence of an event of default, the Required Lenders under the applicable DIP Facility shall have the right to enforce remedies with respect to such DIP Facility, subject to certain exceptions.

With respect to any matter (including any amendment, modification, waiver, consent or other action ("**Amendment**")) other than those which would customarily require approval by each affected Lender, ROC (and any transferee or assignee of OpCo Bridge New Money Term Loans or OpCo Bridge Roll-Up Loans) shall be deemed to have voted its interest as a Lender without discretion in proportion as the allocation of voting with respect to such matter by the other Lenders.

Notwithstanding the foregoing, the Scheduled Termination Date may be extended by up to two months with solely the approval of the Required Term Loan Group Lenders.

**Amendments:**   Required Lenders, except for amendments customarily requiring approval by affected Lenders.

**Exit Financing:**   Upon confirmation of the Plan of Reorganization and the Company's emergence from bankruptcy, the New Money Loans will be converted into exit term loans (the "**Exit Financing**") and the OpCo Bridge New Money Term Loans and the OpCo Bridge Roll-Up Loans will be converted into equity of the reorganized Company, each in accordance with the Plan of Reorganization and the RSA and otherwise upon terms satisfactory to the Required Lenders.

**Miscellaneous:**   The DIP Loan Documents will include (i) waivers of consequential damages and jury trial, and (ii) agency, set-off and sharing language, in each case consistent with the Prepetition Term Loan Credit Agreement.

**Governing Law and Submission to Exclusive Jurisdiction:**   State of New York (and, to the extent applicable, the Bankruptcy Code).

CONFIDENTIAL
SUBJECT TO FRE 408
ANNEX A

**$145 Million Senior Secured Debtor-In-Possession Credit Facility**

**Interest Rates And Certain Fees**

| | |
|---|---|
| **Interest Rates:** | Loans will bear interest, at the option of the Company, at one of the following rates: |

(a) the Applicable Rate (as defined below) <u>plus</u> the Base Rate, payable monthly in arrears; or

(b) the Applicable Rate <u>plus</u> the Eurodollar Rate as quoted by the Administrative Agent, adjusted for reserve requirements, if any, and subject to customary change of circumstance provisions, for interest periods of one month (the "**Adjusted Eurodollar Rate**"), payable at the end of the relevant interest period, but in any event at least quarterly; *provided* that in no event shall the Adjusted Eurodollar Rate be less than 1.25% per annum (the "**Eurodollar Floor**").

"**Applicable Rate**" means (i) 5.75% *per annum*, in the case of Base Rate Loans and (ii) 6.75% *per annum*, in the case of Eurodollar Rate Loans.

"**Base Rate**" means for any day, the higher of (i) the rate of interest publicly announced by The Wall Street Journal as its "prime rate," subject to each increase or decrease in such prime rate, effective as of the day any such change occurs, and (ii) the Federal Funds Effective Rate from time to time <u>plus</u> 0.50%; <u>provided</u> that in no event shall the Base Rate be less than 1.00% plus the Adjusted Eurodollar Rate applicable to one month Interest Periods on the date of determination of the Base Rate.

Interest shall be payable in immediately available funds on the last business day of each month and on the Termination Date and shall be calculated on the basis of the actual number of days elapsed in a 360-day year (or a 365/366-day year, in the case of Base Rate Loans).

| | |
|---|---|
| **Default Interest:** | During the continuance of an event of default (as defined in the DIP Loan Documents), Loans will bear interest at an additional 2.00 % *per annum*. |
| **OpCo New Money Upfront Fee:** | |
| **Unused Commitment Fee:** | |

**Backstop Fee:** ███████████████████████████████████

**Structuring Fee** ███████████████████████████████████

<u>Exhibit 6 to Plan</u>

**Warrant Agreement**

THIS WARRANT AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY JURISDICTION. MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, ASSIGNED, ENCUMBERED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT (I) PURSUANT TO A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE ACT AND APPLICABLE STATE SECURITIES LAW, OR (II) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE ACT, OR APPLICABLE STATE SECURITIES LAW, PROVIDED THAT, AN OPINION OF COUNSEL WILL BE FURNISHED TO THE ISSUER (IF REQUESTED BY THE ISSUER), IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE ISSUER, TO THE EFFECT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE ACT AND/OR APPLICABLE STATE SECURITIES LAW.

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT ARE SUBJECT TO A STOCKHOLDERS AGREEMENT, DATED AS OF THE DATE HEREOF, BY AND AMONG REMINGTON OUTDOOR COMPANY, INC., THE STOCKHOLDERS THEREOF, AND THE HOLDER HEREOF (AS AMENDED FROM TIME TO TIME, THE "STOCKHOLDERS AGREEMENT"). NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS WARRANT AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THIS WARRANT MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT. A COPY OF THE STOCKHOLDERS AGREEMENT SHALL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON REQUEST.

REMINGTON OUTDOOR COMPANY, INC.

WARRANT TO PURCHASE COMMON STOCK

[__], 2018[1]

VOID AFTER 5:00 P.M. (NEW YORK CITY time) ON [__], 2022[2]

THIS CERTIFIES THAT, for value received, [___] (the "*Holder*"), is entitled to subscribe for and purchase from REMINGTON OUTDOOR COMPANY, INC., a Delaware corporation, with its principal office at 870 Remington Drive Madison, NC 27025 (the "*Company*"), up to all of the Exercise Shares at the Exercise Price (subject to adjustment as provided in this Warrant), all subject to the terms, conditions and adjustments set forth in this Warrant.

1.    DEFINITIONS. As used in this Warrant, the following terms have the following respective meanings:

(a)    "*Aggregate Purchase Price*" means an amount equal to the product of (i) the number of Exercise Shares in respect of which this Warrant is then being exercised pursuant to Section 2.1 hereof, *multiplied by* (ii) the Exercise Price in effect as of the date a Notice of Exercise relating to such Exercise Shares is properly delivered to the Company in accordance with the terms of this Warrant.

(b)    "*Change of Control*" means: (i) any consolidation or merger of the Company with or into any other Person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold at least a majority of the voting power of the surviving entity in substantially the same proportions (or, if the resulting entity is a wholly owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party or is otherwise

---

[1] *[NTD: To insert the issue date.]*
[2] *[NTD: To insert the date that is four years after the issue date.]*

involved or affected in which the stockholders of the Company immediately prior to such transaction(s) fail to continue to hold at least a majority of the voting power of the Company or other entity resulting from such transaction(s) in substantially the same proportions (or, if such entity is a wholly owned subsidiary, its parent) immediately after such transaction(s); or (iii) any sale, lease, exclusive license or other disposition of all or substantially all of the assets of the Company.

        (c)      "*Common Stock*" means the Company's Common Stock, par value $0.01 per share.

        (d)      "*Exercise Period*" means, subject to Section 8 below, the period commencing on and including the date hereof and ending at 5:00 p.m. (New York City time) on [__], 2022[3].

        (e)      "*Exercise Price*" means $[__] per Exercise Share, subject to adjustment pursuant to Section 6 below.

        (f)      "*Exercise Shares*" means [__][4] shares of Common Stock issuable upon exercise of this Warrant.

        (g)      "*Fair Market Value Per Share of Common Stock*" means the fair market value of one share of Common Stock as determined by the Company's Board of Directors in good faith; *provided, however*, that (i) in the event that this Warrant is exercised in connection with the Company's IPO, the Fair Market Value Per Share of Common Stock will be the per share offering price of the Common Stock to the public pursuant to the IPO, and (ii) in the event that this Warrant is exercised after an IPO, the Fair Market Value Per Share of Common Stock will be the average trading price per share of Common Stock on the stock exchange or securities market which the Common Stock trades for the ten (10) consecutive trading days immediately preceding the date of such exercise of this Warrant.

        (h)      "*IPO*" means the initial firm commitment underwritten public offering and sale of the Company's Common Stock registered under the Securities Act, or equivalent foreign securities laws (other than a registration on Form F-4, Form S-4 or Form S-8 (or any similar or successor form or equivalent foreign form)) that is listed on a national or foreign securities exchange.

        (i)      "*Person*" means any individual, partnership, limited partnership, corporation, limited liability company, association, joint stock corporation, trust, joint venture, unincorporated organization or governmental entity or department, agency or political subdivision thereof, or any other entity.

        (j)      "*Plan of Reorganization*" means the Joint Plan of Reorganization under Chapter 11 of Title 11 of the United States Bankruptcy Code of the Company and certain of its affiliates, as confirmed on [____], 2018 by the United States Bankruptcy Court for the District of Delaware.

        (k)      "*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

2.      EXERCISE OF WARRANT.

        2.1      **Exercise Procedure.** The rights represented by this Warrant may be exercised in whole or in part at any time during the Exercise Period, for all or any part of the unexercised Exercise Shares, by delivery by the Holder of the following to the Company at its address listed on the signature page to this Warrant (or at such other address as it may designate in accordance with Section 12):

        (a)      A duly completed and executed Notice of Exercise (including specifying the number of Exercise Shares to be purchased) in the form attached to this Warrant as **EXHIBIT A**;

---

[3] *[NTD: To insert the date that is four years after the issue date.]*

[4] *[NTD: Number of shares issued to Third Lien Noteholders to equal 15% of the issuer at a strike price calculated based on a $700 million enterprise value.]*

2

**(b)**    Payment to the Company of the applicable Aggregate Exercise Price for the purchase of the Exercise Shares specified in the Notice of Exercise by delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to an account designed in writing by the Company;

**(c)**    This Warrant; and

**(d)**    A duly completed and executed Joinder to the Stockholder Agreement for the Person that will hold the Common Stock issued pursuant to the Notice of Exercise in the form provided for in the Stockholder Agreement.

**2.2    Net Exercise.** Notwithstanding any provisions in this Warrant to the contrary, if the Fair Market Value Per Share of Common Stock is greater than the Exercise Price (at the date of calculation as set forth below), then, in lieu of making the payment required by Section 2.1(b), the Holder may instruct the Company to issue Exercise Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder will receive the number of Exercise Shares computed using the following formula:

$$X = \frac{Y(A-B)}{A}$$

Where    X =    the number of Exercise Shares to be issued to the Holder;

Y =    the number of Exercise Shares then purchasable under this Warrant or, if only a portion of this Warrant is being exercised, the number of Exercise Shares that the Holder has elected to purchase pursuant to Section 2.1(a) (at the date of such calculation);

A =    the Fair Market Value Per Share of Common Stock (at the date of such exercise of this Warrant); and

B =    the Exercise Price (in effect as of the date of such exercise of this Warrant).

**2.3    Delivery of Stock Certificates and New Warrants.** Upon the Holder's exercise of the rights represented by this Warrant, and the Holder's satisfaction of the requirements in Section 2.1 (or Section 2.2, if applicable) hereof, a certificate or certificates for the Exercise Shares for which this Warrant is being exercised and being so purchased, registered in the name of the Holder or Persons affiliated with the Holder, if the Holder so designates, will be issued and delivered by the Company to the Holder within a reasonable time (but not more than ten (10) business days) after the requirements of Section 2.1 (or Section 2.2, if applicable) have been satisfied. In the event that this Warrant is being exercised for less than all of the number of Exercise Shares purchasable or otherwise issuable under this Warrant at such time or any time thereafter, the Company will, concurrently with the issuance by the Company of the number of shares of Common Stock for which this Warrant is then being exercised, deliver to the Holder a new Warrant exercisable for the remaining number of Exercise Shares purchasable under this Warrant at such time or any time during the Exercise Period. Such new Warrant will be identical in all respects to this Warrant other than the issuance date thereof, the number of Exercise Shares covered thereby, which will be reduced by the number of Exercise Shares previously purchased. The Person in whose name any certificate or certificates for Exercise Shares are to be issued upon exercise of this Warrant will be deemed to have become the holder of record of such shares on the date on which this Warrant is exercised in accordance with Section 2.1 or 2.2, irrespective of the date of delivery of such certificate or certificates, except that, if the date of such exercise is a date when the stock transfer books of the Company are closed, such Person will be deemed to have become the holder of such shares at the close of business on the next succeeding date on which the stock transfer books are open.

3.      [WARRANT REGISTER. The Company shall appoint an agent to maintain a registry showing the name and address of the Holder as the registered holder of this Warrant and all transfers and exchanges of this Warrant (and the name and address of any subsequent holder thereof) in accordance with its terms.]

4.      COVENANTS.

4.1      **Covenants as to Exercise Shares.** The Company covenants and agrees that all Exercise Shares that may be issued upon the exercise of the rights represented by this Warrant will, upon issuance, be validly issued and outstanding, fully paid and nonassessable, and free from all taxes, liens and charges with respect to the issuance thereof. The Company further covenants and agrees that the Company will at all times during the Exercise Period, have authorized and reserved a sufficient number of shares of Common Stock comprising the Exercise Shares to provide for the exercise of the rights represented by this Warrant. The issuance of the Exercise Shares will not be subject to any preemptive rights. Without limiting, and in furtherance of, the foregoing, if at any time during the Exercise Period the number of authorized but unissued shares of Common Stock will not be sufficient to permit exercise of this Warrant, the Company will use commercially reasonable efforts to take such action as shall be necessary to increase the number of its authorized but unissued shares of Common Stock to such number of shares as will be sufficient to permit exercise of this Warrant. In connection with the exercise of this Warrant, the Company shall not be required to pay any tax or other charge imposed in respect of any transfer involved in the Company's issuance and delivery of shares of Common Stock (including certificates therefor) (or any payment of cash or other property in lieu of such shares) to any recipient other than the Holder of this Warrant, and in case of any such tax or other charge, the Company shall not be required to issue or deliver any such shares (or cash or other property in lieu of such shares) until (x) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Company or (y) it has been established to the Company's satisfaction that any such tax or other charge that is or may become due has been paid.

4.2      **Protection of Rights.** The Company shall not, by amendment of its charter or through reorganization, consolidation, merger, dissolution, sale of assets or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times. in good faith assist in carrying out all of the provisions of this Warrant.

4.3      **Notices of Record Date.** In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, the Company will mail to the Holder, at least ten (10) business days prior to such record date, a notice specifying the date on which any such record is to be taken for the purpose of such dividend or distribution.

4.4      **Irrevocability of Exercise.** Any exercise of this Warrant shall be irrevocable as of the date of delivery of the Notice of Exercise to the Company and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with the terms of this Warrant.

5.      REPRESENTATIONS OF HOLDER.

5.1      **Acquisition of Warrant for Personal Account.** The Holder represents and warrants that it is acquiring this Warrant and the Exercise Shares solely for its own account for investment, not as a nominee or agent, and not with a view to or for sale or distribution of said Warrant or Exercise Shares or any part thereof, and that the Holder has no present intention of selling, granting any participation in, or otherwise distributing the same. The Holder further represents that it does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to the Person or to any third Person with respect to this Warrant and the Exercise Shares.

5.2      **Securities Are Not Registered.**

(a)      The Holder understands that this Warrant and the Exercise Shares have not been registered under the Act. The Holder has no such present intention of acquiring the securities for a fixed or

4

determinable period in the future, selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the securities.

**(b)**    The Holder recognizes that this Warrant and the Exercise Shares must be held indefinitely unless they are subsequently registered under the Act or an exemption from such registration is available. The Holder recognizes that the Company has no obligation to register this Warrant or the Exercise Shares of the Company, or to comply with any exemption from such registration.

**(c)**    The Holder is aware that neither this Warrant nor the Exercise Shares may be sold pursuant to Rule 144 adopted under the Act unless certain conditions are met. These conditions may include, among other things, the existence of a public market for the shares, the availability of certain current public information about the Company, the resale following the required holding period under Rule 144 and the number of shares being sold during any three month period not exceeding specified limitations. Holder is aware that the conditions for resale set forth in Rule 144 have not been satisfied as of the date of this Warrant and that the Company presently has no plans to satisfy these conditions in the foreseeable future.

**5.3**    **Disposition of Warrant and Exercise Shares.**

**(a)**    [Subject to the terms and conditions of the Stockholders Agreement, the Holder further agrees not to make any disposition of all or any part of this Warrant or Exercise Shares in any event unless and until:

**(i)**    The Company will have received a letter secured by the Holder from the Securities and Exchange Commission stating that no action will be recommended to the Commission with respect to the proposed disposition; or

**(ii)**    There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with said registration statement; or

**(iii)**    The Holder will have notified the Company of the proposed disposition and will have furnished the Company with a reasonably detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, the Holder will have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, for the Holder to the effect that such disposition will not require registration of such Warrant or Exercise Shares under the Act or any applicable state securities laws and will not cause the Company to be subject to the reporting requirements under the Securities Exchange Act of 1934, as amended. The Company agrees that it will not require an opinion of counsel with respect to transactions under Rule 144 of the Securities Act of 1933, as amended, except in unusual circumstances.]

**(b)**    The Holder understands and agrees that all certificates evidencing the shares of Common Stock to be issued to the Holder may bear the following legend:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY JURISDICTION. SUCH SECURITIES MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, ASSIGNED, ENCUMBERED, HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT (I) PURSUANT TO A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE ACT AND APPLICABLE STATE SECURITIES LAW, OR (II) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE ACT, OR APPLICABLE STATE SECURITIES LAW, PROVIDED THAT, AN OPINION OF COUNSEL WILL BE FURNISHED TO THE ISSUER (IF REQUESTED BY THE ISSUER), IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE ISSUER, TO THE EFFECT THAT SUCH TRANSACTION DOES NOT REQUIRE REGISTRATION UNDER THE ACT AND/OR APPLICABLE STATE SECURITIES LAW.

IN ADDITION, THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT DATED AS OF [____], 2018 (AS THE SAME MAY BE AMENDED FROM TIME TO TIME, THE "STOCKHOLDER AGREEMENT"), A COPY OF WHICH IS ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE ISSUER. NO TRANSFER OF THE SECURITIES WILL BE MADE ON THE BOOKS OF THE ISSUER UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE TERMS OF SUCH STOCKHOLDER AGREEMENT. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO OTHER RIGHTS AND OBLIGATIONS, INCLUDING VOTING AGREEMENTS, AS SET FORTH IN THE STOCKHOLDER AGREEMENT.

**5.4    Accredited Investor Status; Other Matters.** The Holder is an "accredited investor" as defined in Regulation D promulgated under the Act. The Holder acknowledges that it can bear the economic risk and complete loss of its investment in this Warrant and the Exercise Shares and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment contemplated hereby. To the Holder's knowledge, it is not a Person identified in clause (1) of Rule 506(d) under the Securities Act that is subject to a disqualification event listed in Rule 506(d)(1)(i) through (viii) under the Securities Act, except for any such event subject to the exceptions set forth in Rule 506(d)(2) or (d)(3) under the Securities Act.

6.    **ANTI-DILUTION PROVISIONS.**

**6.1    Special Definitions.** For purposes of this Section 6, the following definitions shall apply:

(a)    "Convertible Securities" shall mean any evidence of indebtedness, shares of the Company's capital stock (other than shares of Common Stock) or other securities directly or indirectly convertible into or exchangeable for shares of Common Stock.

(b)    "Excluded Issuance" shall mean any issuance or sale (or deemed issuance or sale) by the Company after the date hereof of (a) shares of Common Stock issued directly or upon the exercise of Options to directors, officers, employees, or consultants of the Company in connection with their service as directors of the Company, their employment by the Company or their retention as consultants by the Company, in each case authorized by the Board of Directors and issued pursuant to the Company's employee benefit or incentive plans (including all such shares of Common Stock and Options outstanding prior to the date hereof) or in connection with the Plan of Reorganization; (b) shares of Common Stock issued upon the conversion or exercise of Options (other than Options covered by clause (a) above) or Convertible Securities issued on or prior to the date hereof, provided that such securities are not amended after the date hereof to increase the number of shares of Common Stock issuable thereunder or to lower the exercise or conversion price thereof or in connection with the Plan of Reorganization; or (c) shares of Common Stock issued as *bona fide* "equity kickers" following the date hereof in connection with one or more debt financings of the Company from one or more lenders that are not affiliates of the Company.

(c)    "Number of Shares of Common Stock Deemed Outstanding" at any given time shall mean the sum of (i) the number of shares of Common Stock outstanding at such time, (ii) the number of shares of Common Stock issuable upon exercise of Options outstanding at such time and (iii) the number of shares of Common Stock issuable upon conversion or exchange of Convertible Securities outstanding at such time (treating as outstanding any Convertible Securities issuable upon exercise of Options outstanding at such time), in each case, regardless of whether the Options or Convertible Securities are actually exercisable at such time; *provided*, that the Number of Shares of Common Stock Deemed Outstanding shall not include shares owned or held by or for the account of the Company or any of its wholly-owned subsidiaries.

(d)    "Options" shall mean any rights, options or warrants to subscribe for, purchase or otherwise acquire shares of Common Stock or Convertible Securities.

6

      **6.2**    **No Adjustment of Exercise Price**. No adjustment in the Exercise Price shall be made in respect of the issuance of Additional Common Shares (as defined below) unless the consideration per share (determined pursuant to Section 6.5 hereof) for an Additional Common Share issued or deemed to be issued by the Company is less than ninety percent (90%) of the Fair Market Value Per Share of Common Stock on the date of and immediately prior to such issuance.

      **6.3**    **Deemed Issue of Additional Common Shares**. In the event the Company at any time, or from time to time, during the Exercise Period shall issue any Options or Convertible Securities (excluding Options or Convertible Securities that are issued in Excluded Issuances) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares of Common Stock (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number that would result in an adjustment pursuant to clause (b) below) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities or Options, shall be deemed to be Additional Common Shares issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date, *provided* that Additional Common Shares shall not be deemed to have been issued unless the consideration per share (determined pursuant to Section 6.5 hereof) of such Additional Common Shares would be less than ninety percent (90%) of the Fair Market Value Per Share of Common Stock on the date of and immediately prior to such issuance, or such record date, as the case may be; *provided, further,* that if before the distribution to its holders of Common Stock the Company legally abandons its plan to pay or deliver such dividend, distribution, subscription or purchase rights, then thereafter no adjustment shall be required by the taking of such record and any such adjustment previously made in respect thereof shall be rescinded and annulled, and *provided, further,* that in any such case in which Additional Common Shares are deemed to be issued:

          **(a)**    no further adjustment in the Exercise Price shall be made upon the subsequent issuance of Convertible Securities or shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities;

          **(b)**    if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the Company, or increase or decrease in the number of shares of Common Stock issuable, upon the exercise, conversion or exchange thereof, the Exercise Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon any such increase or decrease becoming effective, be recomputed to equal the Exercise Price as would have been obtained had such revised terms been in effect upon the original date of issuance;

          **(c)**    upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Exercise Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon such expiration, be recomputed as if:

          **(i)**    in the case of Convertible Securities or Options for shares of Common Stock, the only Additional Common Shares issued were shares of Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities and the consideration received therefor was the consideration actually received by the Company for the issue of all such Options, whether or not exercised, plus the consideration actually received by the Company upon such exercise, or for the issue of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the Company upon such conversion or exchange, and

          **(ii)**    in the case of Options for Convertible Securities, only the Convertible Securities, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options, and the consideration received by the Company for the Additional Common Shares deemed to have been then issued was the consideration actually received by the Company for the issue of all such Options, whether or not exercised, plus the consideration deemed to have been received by the Company upon the issue of the Convertible Securities with respect to which such Options were actually exercised;

7

(d)      no readjustment pursuant to clauses (i) and (ii) above shall have the effect of increasing the Exercise Price to an amount which exceeds the lower of (A) the Exercise Price as of the date hereof, or (B) the Exercise Price that would have resulted from any issuance of Additional Common Shares between the original adjustment date and such readjustment date; and

(e)      in the case of any Options which expire by their terms not more than thirty (30) days after the date of issue thereof, no adjustment of the Exercise Price shall be made until the expiration or exercise of all such Options, whereupon such adjustment shall be made in the manner provided in clause (c) above.

6.4      **Adjustment of Exercise Price Upon Issuance of Additional Common Shares**. Except as provided in Section 6.2 or Section 6.7 and except in the case of an event described in Section 6.6 which shall be governed by Section 6.6, in the event that any time, or from time to time, during the Exercise Period, the Company issues, including any deemed issuance pursuant to Section 6.3), in a transaction other than an Excluded Issuance, any shares of Common Stock (the "Additional Common Shares") without consideration or for a consideration per share received by or payable to the Company less than ninety percent (90%) of the Fair Market Value Per Share of Common Stock on the date of issuance, then and in such event, the Exercise Price shall be reduced, concurrently with such issue, to a price per share computed using the following formula:

$$X = \frac{((A \times B) + C)}{(A + D)}$$

Where:          X = the reduced Exercise Price.

A = the Number of Shares of Common Stock Deemed Outstanding immediately prior to such issuance or sale (or deemed issuance or sale).

B = the Exercise Price then in effect immediately prior to such issuance or sale (or deemed issuance or sale).

C = the aggregate consideration, if any, received by the Company upon such issuance or sale (or deemed issuance or sale).

D = the aggregate number of shares of Common Stock issued or sold (or deemed issued or sold) by the Company in such issuance or sale (or deemed issuance or sale).

6.5      **Determination of Consideration**. The consideration received by or payable to the Company for the issue of any Additional Common Shares shall be computed as follows:

(a)      Cash and Property. Such consideration shall:

(i)      insofar as it consists of cash, be computed at the aggregate amount of cash received by or payable to the Company excluding amounts paid or payable for accrued interest or accrued dividends;

(ii)      insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined in good faith by the board of directors of the Company; provided, however, that no value shall be attributed to any services performed by any employee, officer or director of the Company or any of its subsidiaries; and

(iii)      in the event Additional Common Shares are issued together with other shares or securities or other assets of the Company for consideration which covers both, be the proportion of such consideration so received or payable with respect to such Additional Common Shares, computed as provided in clauses (A) and (B) above, as determined in good faith by the board of directors of the Company.

8

(b)    Options and Convertible Securities. The consideration per share received by or payable to the Company for Additional Common Shares deemed to have been issued relating to Options and Convertible Securities shall be determined by dividing:

(i)    the total amount, if any, received by or payable to the Company as consideration for the issuance of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities; by

(ii)    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

6.6    **Adjustments for Shares Dividends, Subdivisions, Combinations or Consolidations of Shares of Common Stock**. In the event the outstanding shares of Common Stock shall be subdivided (by share dividend, share split, or otherwise), into a greater number of shares of Common Stock, the Exercise Price then in effect shall, concurrently with the effectiveness of such subdivision, be proportionately decreased. In the event the outstanding shares of Common Stock shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of Common Stock, the Exercise Price then in effect shall, concurrently with the effectiveness of such combination or consolidation, be proportionately increased.

6.7    **Exceptions to Adjustments**. Notwithstanding anything herein to the contrary, there shall be no adjustment to the Exercise Price or the number of Exercise Shares issuance upon exercise of this Warrant with respect to any Excluded Issuance.

6.8    **Certificate as to Adjustments**. Upon the occurrence of each adjustment or readjustment of the Exercise Price pursuant to this Section 6, the Company (at its expense) shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to the Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, upon the written request at any time of the Holder, furnish or cause to be furnished to the Holder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Exercise Price at the time in effect, and (iii) the number of Shares of Common Stock which at the time would be received upon the exercise of this Warrant. The form of this Warrant need not be changed because of any adjustment in the number of Exercise Shares subject to this Warrant.

6.9    **Miscellaneous**. All calculations hereunder shall be made to the nearest cent or to the nearest one hundredth (1/100) of a share, as the case may be.

7.    **FRACTIONAL SHARES.** No fractional shares will be issued upon the exercise of this Warrant as a consequence of any adjustment pursuant to this Warrant. All Exercise Shares (including fractions) to be issued upon exercise of this Warrant will be aggregated for purposes of determining whether the exercise would result in the issuance of any fractional share. If, after aggregation, the exercise would result in the issuance of a fractional share, the Company will, in lieu of issuance of any fractional share, pay the Holder otherwise entitled to such fractional share a sum in cash equal to the product resulting from multiplying the then current Fair Market Value Per Share of Common Stock by such fraction.

8.    **IPO OR CHANGE OF CONTROL.** In the event that, at any time prior to the commencement of the Exercise Period, or at any time during the Exercise Period, with respect to any Exercise Shares an IPO or a Change of Control occurs (or the Company proposes or intends to effect an IPO or Change of Control), (a) the Company will provide written notice thereof to the Holder not less than twenty (20) days prior to the effective date of such IPO or Change of Control (as applicable) and (b) this Warrant will be deemed to have been exercised (pursuant to Section 2.1 and the net exercise provisions of Section 2.2) with respect to any and all Exercise Shares immediately prior to the consummation of such IPO or Change of Control (as applicable).

9

9. **NO STOCKHOLDER RIGHTS.** This Warrant in and of itself will not entitle the Holder to any voting rights or other rights as a stockholder of the Company. Prior to the issuance to the Holder of the Exercise Shares to which the Holder is then entitled to purchase upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporation action (whether any reorganization, issuance of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights or otherwise. Upon exercise of this Warrant, with respect to the Common Stock issued to the Holder, the Holder agrees to (a) become a party to the Stockholder Agreement and (b) enter into any other stockholders agreement, voting agreement, right of first refusal agreement, co-sale agreement or similar agreement then in effect among all of the stockholders of the Company, it being understood that the rights and obligations of the Holder under any such agreement described in (b) shall be substantially identical to those of each other stockholder of the Company that holds a similar (but not a lower) percentage of the then outstanding equity interests in the Company (on a fully diluted basis); provided, that, if at such time there is not any other such stockholder, then the rights and obligations of the Holder under any such agreement shall be substantially identical to those of the stockholder of the Company that holds next largest percentage (relative to the Holder) of the then outstanding equity interests in the Company (on a fully diluted basis).

10. **LOST, STOLEN, MUTILATED OR DESTROYED WARRANT.** If this Warrant is lost, stolen, mutilated or destroyed, the, upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, mutilation or destruction of this Warrant, the Company may, on such terms as to indemnity as it may reasonably impose (and, in the case of a mutilated Warrant, the surrender thereof), issue a new Warrant of like denomination and tenor as this Warrant so lost, stolen, mutilated or destroyed. Any such new Warrant will constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant will be at any time enforceable by anyone.

11. **AMENDMENT; WAIVER.** Any term of this Warrant may only be amended, modified or supplemented with the written consent of the Company and the Holder. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege

12. **NOTICES, ETC.** All notices, requests, consents, claims, demands, waivers and other communications required or permitted under this Warrant will be in writing and will be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by electronic transmission or facsimile (in each case, with confirmation of transmission) if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) business days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, postage prepaid, with written verification of receipt. All communications will be sent to the Company and the Holder at the respective addresses listed on the signature pages hereto, or at such other address as the Company or Holder may designate by ten (10) business days advance written notice to the other party to this Warrant.

13. **ACCEPTANCE.** Receipt of this Warrant by the Holder will constitute acceptance of and agreement to all of the terms and conditions contained in this Warrant.

14. **ENTIRE AGREEMENT.** This Warrant, together with the Stockholders Agreement, constitutes the entire agreement, and supersedes any and all prior agreements or understandings (written or oral), among the Company and the Holder with respect to the subject matter of this Warrant.

15. **GOVERNING LAW.** This Warrant and all rights, obligations and liabilities under this Warrant will be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware

residents, made and to be performed entirely within the State of Delaware without giving effect to conflicts of laws principles.

16.    SUCCESSOR AND ASSIGNS. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

17.    NO THIRD-PARTY BENEFICIARIES. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Warrant.

18.    HEADINGS. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

19.    SEVERABILITY. The determination by a court of competent jurisdiction that any particular provision of this Warrant is unenforceable or invalid will not affect the enforceability of or invalidate the other provisions hereof, and this Warrant will be construed in all respects as if such invalid or unenforceable provisions had never been part hereof and were omitted here from. Upon such a determination, the parties will negotiate in good faith to modify this Warrant so as to effect the original intent of the parties as closely as possible so that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

20.    COUNTERPARTS. This Warrant may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Warrant delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant.

21.    SUBMISSION TO JURISDICTION. The parties hereto hereby irrevocably submit to the jurisdiction of the Court of Chancery of the State of Delaware if it has subject matter jurisdiction, and otherwise to the courts of the State of Delaware sitting in New Castle County over any action or proceeding arising out of or relating to this Agreement, and each party hereto hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such courts. Each of the parties hereto irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Warrant or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described in this Agreement for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Each of the parties hereto agrees not to commence any action, suit or proceeding relating thereto except in the courts described above in the State of Delaware, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in the State of Delaware as described in this Warrant. Each of the parties hereto hereby irrevocably consents to process being served by any party to this Warrant in any action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12</u> and waives any argument that such services is insufficient.

22.    WAIVER OF JURY TRIAL. EACH OF THE PARTIES TO THIS WARRANT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS WARRANT OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS WARRANT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS <u>SECTION 22</u> HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH

PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

**[SIGNATURE PAGE FOLLOWS]**

12

The Company has caused this Warrant to be executed by its duly authorized officer as of the date first written above.

REMINGTON OUTDOOR COMPANY, INC.

By: _____
     Name:
     Title:

Address:

870 Remington Drive
Madison, NC 27025
Attention: [__]
Email: [__]

Accepted and agreed,

[HOLDER NAME]

By: _____
    Name:
    Title:

Address:

[_____]
[_____]
Attention: [_____]
Email: [_____]

**EXHIBIT A**

**NOTICE OF EXERCISE**

**TO: REMINGTON OUTDOOR COMPANY, INC.**

    **(1)**   ☐   The undersigned hereby elects to purchase _____ shares of common stock, par value $0.01 per share (the "***Exercise Shares***") of Remington Outdoor Company, Inc. (the "***Company***") pursuant to the terms of <u>Section 2.1</u> of the attached Warrant, and tenders herewith payment to the Company of the applicable exercise price therefor in full.

        ☐   The undersigned hereby elects to purchase _____ shares of common stock, par value $0.01 per share (the "***Exercise Shares***") of Remington Outdoor Company, Inc. (the "***Company***") pursuant to the terms <u>Section 2.1</u> and the net exercise provisions set forth in Section 2.2 of the attached Warrant.

    **(2)**   Please issue a certificate or certificates representing said Exercise Shares in the name of the Holder and be delivered to the address indicated below:

_____

_____

(Address)

    **(3)**   If said number of Exercise Shares shall not be all the Exercise Shares issuable upon exercise of this Warrant, the undersigned requests that a new Warrant representing the balance of such Warrant shall be issued in the name of the undersigned Holder and be delivered to the address indicated below:

_____

_____

(Address)

    **(4)**   The undersigned represents, as of the date hereof, that each of the representations in Section 5 of the attached Warrant are true and correct.

    **(5)**   Concurrently with the exercise of the attached Warrant, the Holder agrees to become a party to, and to enter into, any stockholders agreement, voting agreement, right of first refusal agreement, co-sale agreement or similar agreement among all of the stockholders of the Company in accordance with Section 9 of the attached Warrant.

_____      _____
(Date)                                     (Signature)

                                                     _____
                                                     (Print name)