THIS SOLICITATION IS BEING CONDUCTED BY REMINGTON OUTDOOR COMPANY, INC. AND ITS SUBSIDIARIES FGI HOLDING COMPANY, LLC, FGI OPERATING COMPANY, LLC, REMINGTON ARMS COMPANY, LLC, BARNES BULLETS, LLC, TMRI, INC., RA BRANDS, L.L.C., FGI FINANCE INC., REMINGTON ARMS DISTRIBUTION COMPANY, LLC, HUNTSVILLE HOLDINGS LLC, 32E PRODUCTIONS, LLC, GREAT OUTDOORS HOLDCO, LLC, AND OUTDOOR SERVICES, LLC (COLLECTIVELY, "REMINGTON") TO OBTAIN SUFFICIENT ACCEPTANCES OF A JOINT PREPACKAGED CHAPTER 11 PLAN *PRIOR TO* THE FILING OF VOLUNTARY PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE U.S. BANKRUPTCY CODE.[1] BECAUSE NO CHAPTER 11 CASES HAVE BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS BEEN NEITHER FILED WITH ANY BANKRUPTCY COURT NOR APPROVED BY ANY BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF CHAPTER 11 CASES, REMINGTON EXPECTS TO PROMPTLY SEEK ENTRY OF AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (II) APPROVING THE SOLICITATION OF VOTES ON THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(B) OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PLAN.

## DISCLOSURE STATEMENT FOR JOINT PREPACKAGED CHAPTER 11 PLAN OF REMINGTON OUTDOOR COMPANY, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION

### March 22, 2018

Solicitation of votes from the holders of outstanding

### Term Loan Claims
### Third Lien Notes Claims

EXCEPT AS OTHERWISE SPECIFIED HEREIN OR AS MAY BE COMMUNICATED BY REMINGTON, THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE CLASS 4 AND CLASS 5 CLAIMS IS BEING MADE PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), INCLUDING SECTION 4(A)(2) THEREOF, AND APPLICABLE U.S. STATE SECURITIES LAWS, AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE "ACCREDITED INVESTORS" AS DEFINED IN RULE 501 OF THE SECURITIES ACT ("ACCREDITED INVESTORS"). IF YOU ARE NOT AN ACCREDITED

---

[1] The anticipated debtors in these chapter 11 cases, along with the last four digits of each anticipated debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings, LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The principal offices of Remington Outdoor Company Inc., the top-level holding company, are located at 870 Remington Drive, Madison, NC 27025.

INVESTOR, YOUR VOTE WILL NOT BE COUNTED AND YOU SHOULD <u>NOT</u> COMPLETE OR RETURN YOUR BALLOT, UNLESS YOU ARE OTHERWISE NOTIFIED TO THE CONTRARY BY REMINGTON.

FOLLOWING THE FILING OF THE PLAN WITH THE BANKRUPTCY COURT, REMINGTON INTENDS TO REQUEST THE BANKRUPTCY COURT'S APPROVAL TO SOLICIT VOTES ON THE PLAN FROM THE HOLDERS OF CLASS 4 CLAIMS AND CLASS 5 CLAIMS WHO ARE NOT ACCREDITED INVESTORS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE.  TO THE EXTENT THE BANKRUPTCY COURT APPROVES SUCH REQUEST, REMINGTON WILL PROMPTLY NOTIFY THE HOLDERS OF CLASS 4 CLAIMS AND CLASS 5 CLAIMS OF SUCH APPROVAL, AND THAT ALL SUCH HOLDERS, INCLUDING THOSE WHO ARE NOT ACCREDITED INVESTORS, ARE ENTITLED TO VOTE ON THE PLAN AND COMPLETE THE APPLICABLE BALLOT.

UNLESS NON-ACCREDITED INVESTORS ARE INSTRUCTED BY REMINGTON TO SUBMIT THEIR BALLOTS, ALL BALLOTS RECEIVED FROM NON-ACCREDITED INVESTORS WILL BE DISREGARDED.

---

**DELIVERY OF BALLOTS**

For your vote to be counted, Ballots reflecting your vote must be actually received by the Voting Agent before **4:00 p.m. (prevailing Eastern Time), on April 26, 2018** (the "<u>Voting Deadline</u>") unless extended by Remington.  You should refer to the enclosed ballot(s) for instructions on how to vote on the plan.

---

PLEASE NOTE THAT THE DESCRIPTION OF THE PLAN PROVIDED THROUGHOUT THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY PROVIDED FOR CONVENIENCE PURPOSES. IN THE CASE OF ANY INCONSISTENCY BETWEEN THE SUMMARY IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF, THE PLAN WILL GOVERN.

A COPY OF THE PLAN TO WHICH THIS DISCLOSURE STATEMENT RELATES IS ATTACHED HERETO AS <u>EXHIBIT A</u>.

## IMPORTANT INFORMATION FOR YOU TO READ

**REMINGTON HAS NOT YET COMMENCED ANY CASES UNDER CHAPTER 11 OF THE U.S. BANKRUPTCY CODE, AND NO BANKRUPTCY COURT HAS APPROVED THE ADEQUACY OF THE DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. REMINGTON EXPECTS TO COMMENCE CHAPTER 11 CASES WHILE THE SOLICITATION OF VOTES ON THE PLAN IS PENDING.**

UNDER THE PLAN, HOLDERS OF "GENERAL UNSECURED CLAIMS" (EACH AS DEFINED IN THE PLAN) ARE ANTICIPATED TO BE PAID IN FULL, SUBJECT TO BANKRUPTCY COURT APPROVAL, IN THE ORDINARY COURSE OF BUSINESS DURING THE PENDENCY OF THE CASES OR THEREAFTER IN ACCORDANCE WITH THEIR TERMS, OR TO RECEIVE SUCH OTHER TREATMENT TO RENDER HOLDERS OF SUCH CLAIMS UNIMPAIRED UNDER THE BANKRUPTCY CODE.

Remington has prepared this disclosure statement (this "Disclosure Statement") for use in connection with the solicitation of votes on, and confirmation of, the *Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession,* as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan"),[2] and the information set forth herein may not be relied upon for any other purpose. Remington has not authorized any entity to provide any information about, or concerning, the Plan, other than the information contained in this Disclosure Statement. In addition, Remington has not authorized any entity to make any representations concerning Remington or the value of its property, other than as set forth in this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding Remington's operations, its financial history and forecasts, the need to seek chapter 11 protection, significant events that are expected to occur during its chapter 11 cases, and the anticipated organization, operations, and liquidity of Remington upon its successful emergence from chapter 11. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims or interests entitled to vote under the Plan must follow in order for their votes to be counted.

Remington does not presently have the resources to pay all of its existing long-term debt obligations. However, Remington has entered into a Restructuring Support Agreement (attached hereto as **Exhibit B**) with the Consenting Creditors in order to effectuate a balance sheet recapitalization of Remington pursuant to the terms of the Plan. The proposed restructuring will eliminate approximately $620 million in debt from Remington's balance sheet and thereby improve Remington's financial condition and overall creditworthiness and help ensure Remington's continued operations. Remington is commencing solicitation of the Plan *prior* to the commencement of "prepackaged" chapter 11 cases, which Remington believes will minimize

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

disruption to its day-to-day operations, reduce the cost of the proposed restructuring, and ultimately be in the best interests of all of its stakeholders.

**Remington therefore recommends, with the support of the Consenting Creditors, that all holders of Claims or Interests who are entitled to vote on the Plan, after having reviewed all of the information contained in this Disclosure Statement, Plan, and other documents incorporated by reference thereto, vote to accept the Plan.**

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE, AND REMINGTON URGES ANY HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN TO CONSULT WITH ITS OWN ADVISORS FOR ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE ON THE PLAN IS ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS.

UNLESS OTHERWISE STATED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT OR ACCURATE AT ANY TIME AFTER THAT DATE.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE, REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COMPLETE COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

EXCEPT WHERE SPECIFICALLY NOTED HEREIN, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

REMINGTON'S MANAGEMENT, IN CONSULTATION WITH REMINGTON'S PROFESSIONAL FINANCIAL ADVISORS, PREPARED THE PROJECTIONS PROVIDED IN THIS DISCLOSURE STATEMENT. WHILE REMINGTON HAS PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, IT HAS NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH

CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND REORGANIZED REMINGTON'S CONTROL. REMINGTON CAUTIONS THAT IT CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO REORGANIZED REMINGTON'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED AND, THUS, MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO DESCRIPTIONS OF LITIGATION OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE, OR BE CONSTRUED AS, AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER REMINGTON OR REORGANIZED REMINGTON.

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "SEC") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b). The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act, or any securities regulatory authority of any state under the applicable state securities law (collectively, "Blue Sky Laws"). Remington intends to rely on section 1145(a) of the Bankruptcy Code and equivalent state law registration exemptions to exempt the issuance of new securities of Remington in connection with the Plan from registration under the Securities Act and Blue Sky Laws. The prepetition solicitation of votes on the Plan is being made in reliance on the exemption from the registration requirements of the Securities Act provided by section 4(a)(2) thereof. Following the filing of the Plan with the Bankruptcy Court, Remington intends to request the Bankruptcy Court's approval to solicit votes on the Plan from holders of Class 4 Claims and Class 5 Claims who are not Accredited Investors pursuant to section 1145 of the Bankruptcy Code.

Neither the solicitation of votes on the Plan nor this Disclosure Statement constitutes an offer to sell or a solicitation of an offer to acquire securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology, such as "may," "expect," "anticipate," "estimate," "continue," or the negatives thereof, as well as any similar or comparable language. You are cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. The liquidation analysis, financial projections, and other projections and forward-looking information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to holders of allowed claims and interests, among other things, may be affected by many factors that cannot be predicted. Any analyses, estimates, or recovery projections may or may not turn out to be accurate.

Each recipient of this Disclosure Statement, by its acceptance hereof, acknowledges that (i) it is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities, and (ii) it is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act"), and the rules and regulations promulgated thereunder, and agrees that it will not use, or communicate to any person under circumstances where it is reasonably likely that such person is likely to use or cause any person to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

Subject to the terms hereof, this Disclosure Statement is submitted by the Remington Entities on a confidential basis to the holders of Class 4 and Class 5 Claims who are Accredited Investors for informational use solely in connection with the consideration of the proposed restructuring and the Plan. Its use for any other purpose is not authorized. Distribution of this Disclosure Statement by the recipient thereof to any person other than a holder of Class 4 or Class 5 Claims who is an Accredited Investor and any person retained to advise such person with respect to its participation in the restructuring is unauthorized and, until such time, if any, as the Plan is publicly filed with the Bankruptcy Court, any disclosure of its contents without Remington's prior written consent is prohibited. Each holder of Class 4 and Class 5 Claims who is an Accredited Investor, by accepting delivery of this Disclosure Statement, agrees to the foregoing and agrees to make no copies or reproductions of this Disclosure Statement or any documents referred to in this Disclosure Statement in whole or in part (other than publicly available documents).

# TABLE OF CONTENTS

SECTION I. INTRODUCTION AND OVERVIEW ................................................................ 1

    A.    Overview of Proposed Restructuring ........................................................ 2
    B.    Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan ........................................................................................ 5
    C.    Plan Solicitation ...................................................................................... 6
        1.    Parties Entitled to Vote on Plan ................................................... 6
        2.    Voting Procedures, Ballots, and Voting Deadline ....................... 7
    D.    Anticipated Restructuring Timetable ........................................................ 8

SECTION II. HISTORICAL INFORMATION ................................................................ 9

    A.    Remington's Businesses and Operations ................................................ 9
    B.    Selected Financial Information ................................................................ 9
    C.    Corporate History and Organizational Structure .................................... 9
    D.    Prepetition Indebtedness and Capital Structure ...................................... 10
        1.    ABL Facility .................................................................................. 11
        2.    Term Loan Facility ........................................................................ 12
        3.    Senior Third Lien Notes ................................................................ 12
        4.    Intercompany Note Purchase Agreement / ROC Financing ......... 13
        5.    Huntsville Third Lien Note ............................................................ 14
        6.    Certain Other Liabilities ................................................................ 14
        7.    ROC Common Stock and Ownership ............................................ 14
    E.    Events Leading up to Chapter 11 ............................................................ 14
        1.    Concerns Stemming from Industry-Specific Events and Company-Specific Events ............................................................................... 14
        2.    Negotiation and Entry into Restructuring Support Agreement .... 15

SECTION III. ANTICIPATED EVENTS DURING CHAPTER 11 CASES ........................... 20

    A.    Overview of Chapter 11 .......................................................................... 20
    B.    First-Day Relief ...................................................................................... 21
    C.    DIP Facilities .......................................................................................... 24
        1.    Term/ROC DIP Facility ................................................................ 24
        2.    ABL DIP Facility .......................................................................... 25
    D.    Disclosure Statement Approval and Confirmation ................................. 26

SECTION IV. JOINT PREPACKAGED CHAPTER 11 PLAN ........................................... 26

    A.    Summary of Plan ..................................................................................... 26
        1.    Administrative Expenses and Other Unclassified Claims ........... 26
        2.    Classification and Treatment of Claims and Interests ................. 29
        3.    Acceptance or Rejection of Plan ................................................... 34
        4.    Means for Implementation of Plan ................................................ 35
        5.    The Litigation Trust ...................................................................... 45
        6.    Treatment of Executory Contracts and Unexpired Leases .......... 53

          7.      Provisions Governing Distributions............................................................. 55
          8.      Settlement, Release, Injunction, and Related Provisions......................... 60
          9.      Conditions to Confirmation and Effective Date .................................... 65
          10.     Modification, Revocation or Withdrawal of Plan.................................... 68
          11.     Retention of Jurisdiction ........................................................................ 69
   B.     Summary of Capitalization of Reorganized Remington ...................................... 71
          1.      Description of New Common Units and New Warrants ......................... 71
          2.      Description of New ABL Facility ........................................................... 72
          3.      Description of New Term Loan Facility.................................................. 72

SECTION V. VOTING PROCEDURES AND REQUIREMENTS ........................................... 72

   A.     Voting Deadline .................................................................................................... 73
   B.     Voting Record Date ............................................................................................. 73
   C.     Parties Entitled to Vote ....................................................................................... 73
   D.     Ballots .................................................................................................................. 74
   E.     Agreements upon Furnishing Ballots.................................................................. 75
   F.     Withdrawal or Change of Votes on Plan ............................................................ 76
   G.     Fiduciaries and Other Representatives................................................................ 76
   H.     Waivers of Defects, Irregularities, etc. .............................................................. 76
   I.     Further Information, Additional Copies .............................................................. 77
   J.     Requirements for Acceptance by Impaired Class of Claims ............................... 77

SECTION VI. CONFIRMATION OF PLAN .......................................................................... 77

   A.     Combined Hearing ............................................................................................... 77
   B.     Requirements for Confirmation of Plan – Consensual Confirmation.................. 78
          1.      Feasibility............................................................................................... 78
          2.      Best Interests Test .................................................................................. 78
   C.     Requirements for Confirmation of Plan – Non-Consensual Confirmation ......... 80
          1.      Unfair Discrimination ............................................................................ 80
          2.      Fair and Equitable Test .......................................................................... 80

SECTION VII. PROJECTED FINANCIAL INFORMATION AND VALUATION
          ANALYSIS.............................................................................................................. 81

   A.     Estimated Valuation............................................................................................. 81
   B.     Valuation Methodology ....................................................................................... 82
          1.      Discounted Cash Flow Analysis: ........................................................... 82
          2.      Comparable Public Company Analysis: ................................................. 83

SECTION VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN... 85

   A.     Certain U.S. Federal Income Tax Consequences to Remington........................... 86
          1.      Cancellation of Debt and Reduction of Tax Attributes ........................... 86
          2.      Limitation of NOL Carry Forwards and Other Tax Attributes................. 87
   B.     Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed
          Term Loan Claims and Allowed Third Lien Notes Claims................................. 88

|   |   |   |   |
|---|---|---|---|
|   | 1. | Consequences to U.S. Holders of Allowed Term Loan Claims | 88 |
|   | 2. | Consequences to U.S. Holders of Allowed Third Lien Notes Claims | 91 |
|   | 3. | Accrued Interest | 93 |
|   | 4. | Market Discount | 94 |
|   | 5. | Tax Consequences of Owning New Common Units | 94 |
|   | 6. | Tax Consequences of Owning New Warrants | 95 |
|   | 7. | Ownership of the Litigation Trust Interests | 95 |
|   | 8. | Limitation on Use of Capital Losses | 97 |
| C. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Term Loan Claims and Allowed Third Lien Notes Claims | | 97 |
|   | 1. | Gain Recognition | 97 |
|   | 2. | Accrued Interest | 98 |
|   | 3. | Distributions on New Common Units | 99 |
|   | 4. | Sale, Redemption, or Repurchase of New Common Units or New Warrants | 100 |
|   | 5. | Ownership of the Litigation Trust Interests | 100 |
| D. | FATCA | | 100 |
| E. | Information Reporting and Backup Withholding | | 101 |

SECTION IX. CERTAIN FEDERAL AND STATE SECURITIES LAW CONSIDERATIONS ................................................................................. 102

| A. | Exemption from Registration Requirements | 102 |
| B. | Subsequent Transfers of Securities | 103 |

SECTION X. RISK FACTORS ................................................................................ 104

| A. | Certain Bankruptcy Law Considerations | 105 |
| B. | Business-Related Risks | 108 |
| C. | Regulatory Risks | 121 |
| D. | Risks Related to New Common Units, New Warrants, and Litigation Trust Interests | 124 |
| E. | Other Risks | 128 |

SECTION XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN .............................................................................................. 130

| A. | Liquidation Under Chapter 7 or Chapter 11 | 130 |
| B. | Alternative Plans of Reorganization | 131 |

SECTION XII. CONCLUSION AND RECOMMENDATION ................................ 131


EXHIBIT A          Joint Prepackaged Chapter 11 Plan

EXHIBIT B          Restructuring Support Agreement **(with redactions)**

EXHIBIT C          Projections

EXHIBIT D          Liquidation Analysis

EXHIBIT E          Consolidated Financial Statements / 2017 Flash Results

EXHIBIT E-1        Annual Report of Remington Outdoor Company, Inc. for Fiscal Year-
                   Ended December 31, 2016

EXHIBIT E-2        Quarterly Report of Remington Outdoor Company, Inc. for the Nine
                   Month Period Ended October 1, 2017

EXHIBIT E-3        December Year-to-Date 2017 Flash Results (Unaudited Preliminary)[3]

---

[3] Certain of the exhibits to the Disclosure Statement and the Plan have been redacted for confidential information.

# SECTION I.
## INTRODUCTION AND OVERVIEW

Remington Outdoor Company, Inc. ("ROC") and its subsidiaries FGI Holding Company, LLC ("FGI Holding"), FGI Operating Company, LLC ("OpCo"), Remington Arms Company, LLC, Barnes Bullets, LLC, TMRI, Inc., RA Brands, L.L.C., FGI Finance Inc., Remington Arms Distribution Company, LLC, Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC, and Outdoor Services, LLC, as anticipated debtors and debtors in possession (each a "Remington Entity" and, collectively, the "Remington Entities" or "Remington") submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") for use in the solicitation of votes on the *Joint Prepackaged Chapter 11 Plan of Remington Outdoor Company, Inc. and Its Affiliated Debtors and Debtors in Possession*, dated as of March 22, 2018, as it may be amended, supplemented, restated, or modified from time to time (together with the Plan Supplement, the "Plan").[4]  A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.  In the event of any inconsistency between the terms of the Plan and the description of such terms in this Disclosure Statement, the terms of the Plan shall control.

This Disclosure Statement is part of the "Solicitation Package" distributed to all holders of Claims in the voting Classes, regardless of whether such holder is an Accredited Investor (provided that, except as otherwise specified herein or as otherwise may be communicated by Remington, only Accredited Investors may vote to accept or reject the Plan), and contains the following:

- the transmittal letter

- this Disclosure Statement,

- the Plan (as Exhibit A to this Disclosure Statement),

- the Restructuring Support Agreement (redacted for certain confidential information) (as Exhibit B to this Disclosure Statement),[5]

- the Projections (as Exhibit C to this Disclosure Statement),

- the Liquidation Analysis (as Exhibit D to this Disclosure Statement),

- the Consolidated Financial Statements / 2017 Flash Results (as Exhibit E to this Disclosure Statement),

- if you are entitled to vote to accept or reject the Plan, one or more ballots, as applicable, which shall include instructions describing the two acceptable methods to submit your ballot (via Prime Clerk's online "E-Ballot" portal or via first class mail, overnight courier, or hand delivery) along with a postage-paid, pre-addressed

---

[4] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

[5] The signature pages to the Restructuring Support Agreement have been redacted in accordance with the terms and conditions thereof.

1

return envelope to be used by voters who opt to submit their ballot to Prime Clerk by mail.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot, or lost your ballot, please contact Prime Clerk LLC ("Prime Clerk" or the "Voting Agent") by e-mail at remingtonballots@primeclerk.com or by phone at (877) 755-3450 (toll free) or (347) 338-6538 (international).

For your vote to be counted, your ballot(s) reflecting your vote must be **actually received** by the Voting Agent no later than 4:00 p.m., prevailing Eastern Time, on April 26, 2018 (the "Voting Deadline"). To be counted as votes to accept or reject the Plan, each ballot (each, a "Ballot") must be properly executed, completed, and delivered to the Voting Agent in accordance with the instructions set forth on the applicable ballot such that it is actually received by the Voting Agent before the Voting Deadline. As of the date hereof, only Accredited Investors are entitled to vote to accept or reject the Plan. However, following the filing of the Plan with the Bankruptcy Court, Remington intends to request the Bankruptcy Court's approval to solicit votes on the Plan from the holders of Class 4 Claims and Class 5 Claims who are not Accredited Investors. To the extent the Bankruptcy Court approves such request, Remington will promptly notify the holders of Class 4 Claims and Class 5 Claims of such approval, and that all such holders, including those who are not Accredited Investors, are entitled to vote on the Plan

To ensure that the prepetition solicitation is exempt from the registration requirements of the Securities Act, the Ballots include a certification that the voting holder of such Claims is an "accredited investor." Unless the Bankruptcy Court has approved the solicitation of votes from holders who are not Accredited Investors, any ballots received from a holder of a Claim that does not certify that it is an Accredited Investor will not be counted.

Copies, faxes, and e-mails will not be accepted or counted as votes. Each ballot has been coded to reflect the Class of the Claim(s) it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot(s) sent to you with this Disclosure Statement.

While the solicitation of votes with respect to the Plan is ongoing, Remington anticipates commencing a case under chapter 11 of the Bankruptcy Code for each Remington Entity to be jointly administered under the Bankruptcy Code (collectively, the "Chapter 11 Cases") and seeking confirmation of the Plan by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

A.    *Overview of Proposed Restructuring*

Remington is pleased to announce that the Plan provides for a restructuring of Remington (the "Restructuring") that will eliminate approximately $620 million in debt from its balance sheet. As a result, Remington will emerge from the Chapter 11 Cases (as "Reorganized Remington") a stronger company, with a sustainable capital structure that is better aligned with Remington's present and future operating prospects.

Remington is commencing this solicitation on the Plan following extensive discussions with certain of its key stakeholders. The discussions have resulted in majorities of its stakeholders agreeing to support the Restructuring and vote to accept the Plan pursuant to a Restructuring

2

Support Agreement, dated as of February 11, 2018 (as it may be amended from time to time, the "Restructuring Support Agreement"), among Remington and:

- holders of, or an investment advisor or an investment manager to a holder or holders of a majority of the Term Loan Claims (the "Consenting Term Loan Creditors"); and

- holders of, or an investment advisor or an investment manager to a holder or holders of a majority of the Third Lien Notes Claims (the "Consenting Third Lien Creditors" and, together with the Consenting Term Loan Creditors, the "Consenting Creditors").

**For additional information regarding the Restructuring Support Agreement, please refer to the discussion in Section II.E.2 herein entitled, "Negotiation and Entry into Restructuring Support Agreement."** A redacted copy of the Restructuring Support Agreement is attached hereto as Exhibit B and incorporated herein by reference. In the event of any inconsistency between the terms of the Restructuring Support Agreement and the description of such terms in this Disclosure Statement, the terms of the Restructuring Support Agreement shall control.

As a result of the Restructuring provided in the Plan:

- the ABL Facility Claims, in the aggregate principal amount of approximately $114,500,000, will receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, consideration equal to the amount of such Claim, in Cash, on the Effective Date, except to the extent a holder of such Claims has agreed to an alternative treatment (which may include participation in an exit asset-based lending facility);

- the Allowed Term Loan Claims, in the aggregate principal amount of approximately $550,475,000, will be exchanged on a Pro Rata basis for (i) 82.5% of the New Common Units, (ii) to the extent such holder is an Electing Term Loan Lender, its Pro Rata Class 4 Shares of either (a) the Litigation Trust Class A Interests, or (b) any amounts allocated for distribution to the Electing Term Loan Lenders under a Litigation Settlement, and (iii) to the extent not previously paid to the Term Loan Lenders in accordance with the terms of the Interim DIP Order, Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018;

- the Allowed Third Lien Notes Claims, in the aggregate principal amount of approximately $226,012,000, will be exchanged on a Pro Rata basis for (i) the ROC DIP Distribution, (ii) the Third Lien Noteholder Cash Distribution, (iii) the New Warrants, and (iv) to the extent such holder is an Electing Third Lien Noteholder, its Pro Rata Class 5 Shares of either (a) the Litigation Trust Class B Interests, or (b) any amounts allocated for distribution to the Electing Third Lien Noteholders under a Litigation Settlement. To the extent not previously paid by OpCo to ROC in accordance with the terms of the Interim DIP Order, on the Effective Date, OpCo

3

shall transfer Cash to ROC in an amount equal to $924,375.61 for reimbursement of fees and costs previously paid by ROC between January 30, 2018 and March 16, 2018;

- the Interests in Remington Outdoor Company, Inc. will be extinguished; and

- all other Claims, including all General Unsecured Claims and all Other Secured Claims, will be paid in full or otherwise rendered Unimpaired; *provided*, that any Allowed General Unsecured Claim against ROC shall be assumed by OpCo in accordance with the Plan.

In order to fund the above-described distributions, in connection with consummation of the Plan, (1) ROC will make certain distributions in Cash from its Cash on hand, (2) Reorganized Remington will enter into a new $193 million asset based loan facility comprising a revolving credit facility (the "New ABL Facility"), (3) Reorganized Remington will enter into a new term loan facility with the Term DIP Lenders (the "New Term Loan Lender"), comprising a term loan in the approximate amount of $100 million (the "New Term Loan Facility"), (4) Reorganized Remington shall enter into a $55 million senior secured first in, last out asset based term loan facility (the "New FILO Term Loan Facility"); and (5) Reorganized ROC will issue common units/shares representing 100% of the common equity interests therein (the "New Common Units") and the New Warrants. **For additional information on Remington's post-Restructuring capitalization, please refer to the discussion in Section IV.B herein entitled, "Summary of Capitalization of Reorganized Remington."**

Remington, with the support of the Consenting Creditors, believes that consummation of the proposed Restructuring under the Plan will provide Remington with the capital structure and liquidity to continue operating as a going concern. Remington currently is significantly overleveraged and facing severe liquidity constraints. The proposed Restructuring solves these problems by eliminating more than $620 million of the Remington's funded debt obligations, thereby reducing debt service expenses and providing access to necessary working capital upon Remington's emergence from the Chapter 11 Cases. Not only will this help stabilize Remington's business in the near-term, but it also positions Remington to operate successfully for years to come and be competitively positioned within the firearms and ammunition markets

In connection with developing the Plan, Remington conducted a careful review of its current business operations and compared its projected value as an ongoing business enterprise with its potential value in a liquidation scenario, as well as the estimated recoveries to holders of Allowed Claims and Interests thereunder. Remington concluded that the potential recoveries to holders of Allowed Claims and Interests would be maximized by continuing to operate as a going concern. Remington believes that its businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the liquidation analysis described herein and other analyses prepared by Remington and its advisors, Remington believes the value of its assets is considerably greater when Remington operates as a going concern and continues to generate revenues by selling firearms and ammunition. **For additional information on estimated recoveries under the Plan as compared to estimated recoveries in liquidation, please refer to the discussion in Section VI.B.2 herein entitled, "Best Interests Test."** Moreover, Remington believes that any alternative to the Restructuring contemplated by

the Plan, such as an out-of-court restructuring, an asset sale or liquidation, or attempts by another party-in-interest to file an alternative plan of reorganization, could result in significant delay, litigation, execution risk, and/or additional costs and, ultimately, could lower the recoveries to holders of Allowed Claims and Interests. Accordingly, Remington, with the support of the Consenting Creditors, strongly recommends that you vote to **accept** the Plan, if you are entitled to vote.

B.    *Summary of Classification and Estimated Recoveries of Claims and Interests Under Plan*

The following table summarizes the classification and estimated recoveries to holders of Allowed Claims and Interests under the Plan. Although every reasonable effort was made to be accurate, the projections of recoveries are only estimates. The final amounts of Claims or Interests allowed by the Bankruptcy Court may vary from the estimates in this Disclosure Statement. As a result of the foregoing and other uncertainties inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries realized. In addition, the ability to receive distributions under the Plan depends upon, among other things, the ability of Remington to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. **For additional explanation regarding the terms of the Plan and treatment of Allowed Claims and Interests thereunder, please refer to the discussion in Section IV.A herein entitled, "Summary of Plan," as well as the Plan itself, attached hereto as Exhibit A.**

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Amount[6] | Estimated Recovery[7] |
|-------|---------------------|--------|---------------|------------------------------|------------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept | $0 | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept | $12,500,000 | 100% |
| 3 | ABL Facility Claims | Unimpaired | Deemed to accept | $114,500,000 | 100% |
| 4 | Term Loan Claims | Impaired | Entitled to vote | $550,475,000 | 40.3% |
| 5 | Third Lien Notes Claims | Impaired | Entitled to vote | $226,012,000 | 44.6% |
| 6 | General Unsecured Claims | Unimpaired | Deemed to accept | $163,000,000 | 100% |

[6] Amounts listed are in approximate principal amount only and estimated as of March 22, 2018.

[7] The estimated recoveries set forth in this chart are estimated in relation to the approximate principal amount of Claims in each Class (not including any outstanding fees, interest, etc. to which a creditor may be entitled). The estimated recoveries set forth in this chart assume that holders of Class 5 Claims entitled to participate in the Litigation Trust will receive approximately $5,000,000 in recoveries from the Litigation Trust Assets. In light of the inherent uncertainty around any litigation involving the Litigation Claims, however, the Remington Entities cannot, and do not, guarantee that any such recoveries will be realized, and the actual recoveries received by holders of Class 5 Claims from the Litigation Trust Assets could be higher or lower than the estimates used for purposes of this chart.

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Amount[6] | Estimated Recovery[7] |
|-------|---------------------|--------|---------------|----------------------------|------------------------|
| 7 | Intercompany Claims | Unimpaired | Deemed to accept | $0 | 100% |
| 8 | Settled Intercompany Claims | Impaired | Deemed to reject | Unliquidated | 0% |
| 9 | Interests in ROC | Impaired | Deemed to reject | N/A | 0% |
| 10 | Intercompany Interests | Unimpaired | Deemed to accept | N/A | 100% |

C.    *Plan Solicitation*

As indicated above, Remington intends to implement the Restructuring through the Chapter 11 Cases and confirmation of the Plan by the Bankruptcy Court. The solicitation is being conducted at this time in order to obtain sufficient votes accepting the Plan to permit the Plan to be confirmed by the Bankruptcy Court. **For further information and instructions on voting on the Plan, please refer to Section V herein entitled, "Voting Procedures and Requirements."**

    1.    Parties Entitled to Vote on Plan

Under the Bankruptcy Code, only holders of Claims or Interests that are "Impaired" under the Plan are entitled to vote to accept or reject the Plan. Holders of Claims or Interests that are not Impaired under the Plan (i.e., "Unimpaired") are, in accordance with section 1126(f) of the Bankruptcy Code, conclusively presumed to accept the Plan, and the solicitation with respect to such holders is not required. Remington is therefore soliciting votes only from holders of Impaired Claims or Interests (to the extent eligible to vote, as described below) and not from any holders of Unimpaired Claims or Interests.

Holders of Claims in Class 4 (Term Loan Claims) and Class 5 (Third Lien Notes Claims) are Impaired under the Plan; therefore, holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan. However, unless the Bankruptcy Court has approved the solicitation of votes from holders who are not Accredited Investors, Remington will not solicit acceptances of the Plan from any holder of a Claim otherwise entitled to vote to accept or reject the Plan if such holder is not an Accredited Investor. Each holder of Claims that may be entitled to vote to accept the Plan will be required to certify on its ballot whether it is an Accredited Investor. As of the date hereof, only Accredited Investors are entitled to vote to accept or reject the Plan, and any ballots received from a non-Accredited Investor will not be counted. To the extent the Bankruptcy Court approves Remington's request to solicit votes from all holders of Class 4 Claims and Class 5 Claims, Remington will promptly notify all such holders of such approval, and that all such holders, including those who are not Accredited Investors, will be entitled to vote on the Plan.

Holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 3 (ABL Facility Claims), Class 6 (General Unsecured Claims), Class 7

(Intercompany Claims), and Class 10 (Intercompany Interests) are Unimpaired under the Plan and therefore not entitled to vote to accept or reject the Plan. Class 8 (Settled Holding Intercompany Claims) and Class 9 (Interests in ROC) are Impaired and will not receive a distribution under the Plan. Accordingly, Classes 8 and 9 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

    2.    Voting Procedures, Ballots, and Voting Deadline

If you have received a ballot and are entitled to vote on the Plan, you should read the materials supplied to you in the Solicitation Package in their entirety, including the instructions set forth in the ballot(s). These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. After carefully reviewing the Solicitation Package, please indicate your acceptance or rejection of the Plan on the ballot by voting for or against the Plan. Remington will not count any executed ballot that (a) does not indicate either acceptance or rejection of the Plan, or (b) indicates both acceptance and rejection of the Plan. The ballots being sent to the Classes entitled to vote explicitly provide holders who vote to reject the Plan or who do not cast a vote to accept or reject the Plan with the ability to (x) opt-out of the third-party releases set forth in the Plan and/or (y) opt-in to have their Causes of Action treated as Litigation Claims (as set forth herein and in the Plan).

For your vote to be counted, your ballot(s) must be **actually received** by the Voting Agent no later than the Voting Deadline. Any ballot received after the Voting Deadline will be counted only in the discretion of Remington. To be counted as votes to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered in accordance with the instructions set forth on the applicable ballot, along with a postage-paid, pre-addressed return envelope to be used by voters who opt to submit their ballot to Prime Clerk by mail, such that it is actually received before the Voting Deadline by the Voting Agent. Copies, faxes, and e-mails will not be accepted or counted as votes. Each ballot has been coded to reflect the Class of the Claim(s) it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot(s) sent to you with this Disclosure Statement and follow the instructions included on the applicable ballot. Do not return any debt instruments or equity securities with your ballot(s).

In order for a holder of Class 5 Claims to cast its vote through its Ballot, such holder will be required to complete its Ballot and return it to its broker, bank, or other nominee, or the agent of such broker, bank, or other nominee (each of the foregoing, a "Nominee") in accordance with the instructions provided by such Nominee, who will then complete a "Nominee Certification" to the Ballot and return such compiled Ballot to the Voting Agent on behalf of such holder. In order for the vote of a holder of Class 5 Claims to count, such holder's Ballot (including the Nominee Certification) must be completed and returned in accordance with the instructions set forth in the Ballot. Holders of Class 5 Claims should allow sufficient time for their Nominee to receive their completed Ballot, complete the Nominee Certification, and return both such Ballot and the related Nominee Certification to the Voting Agent before the Voting Deadline. You should refer to the enclosed ballot(s) for instructions on how to vote on the plan. If you have any questions on the procedures for voting on the Plan, please call the Voting Agent at either of the following telephone numbers:

877-755-3450 (domestic / toll free)

347-338-6538 (international)

If you have any questions about the procedure for voting your Claim(s), the packet of materials that you have received, or the amount of your Claim(s), or if you wish to obtain, at your own expense, an additional copy of this Disclosure Statement and its exhibits, please contact the Voting Agent, by e-mail at remingtonballots@primeclerk.com or by phone at (877) 755-3450 (toll free) or (347) 338-6538 (international).

Each holder of Claims in Class 4 (Term Loan Claims) and Class 5 (Third Lien Notes Claims) will receive distributions under the Plan irrespective of whether such holder is an Accredited Investor. However, unless the Bankruptcy Court has approved the solicitation of votes from holders who are not Accredited Investors, Remington will not solicit acceptances of the Plan from any holder of a Claim otherwise entitled to vote to accept or reject the Plan if such holder is not an Accredited Investor. Each holder of Claims that may be entitled to vote to accept the Plan will be required to certify on its ballot that it is an Accredited Investor.  To the extent the Bankruptcy Court approves Remington's request to solicit votes from all holders of Class 4 Claims and Class 5 Claims, Remington will promptly notify all such holders of such approval, and that all such holders, including those who are not Accredited Investors, will be entitled to vote on the Plan

D.    *Anticipated Restructuring Timetable*

Remington anticipates commencing the Chapter 11 Cases (such commencement date, the "Petition Date") on or before March 25, 2018 and, as soon as practicable thereafter, seeking entry of an order of the Bankruptcy Court scheduling the Combined Hearing to consider (1) the adequacy of this Disclosure Statement and solicitation of votes in connection therewith and (2) confirmation of the Plan.  Remington expects that notice of the Combined Hearing will be published in *USA Today National Edition* or another nationally-circulated newspaper and will be mailed to all known holders of Claims and Interests approximately twenty-eight (28) days before the date by which objections to confirmation must be filed with the Bankruptcy Court.  **For additional information regarding the Combined Hearing, please refer to Section VI.A herein entitled, "Combined Hearing."**

Assuming the Bankruptcy Court approves Remington's scheduling request, Remington anticipates that the Combined Hearing will be held within approximately forty (40) to fifty (50) days after the Petition Date.  Remington does not currently anticipate any significant objections to confirmation of the Plan.  However, if any such objections are raised, the expected timing for confirmation may be significantly delayed.  To the extent the Plan is confirmed within the expected timeframe, Remington currently intends to consummate the Plan as soon as practicable thereafter.  **For additional information regarding the anticipated Chapter 11 Cases, please refer to Section III herein entitled, "Anticipated Events During Chapter 11 Cases."**

8

## SECTION II.
## HISTORICAL INFORMATION

A.    *Remington's Businesses and Operations*

Headquartered in Madison, North Carolina, Remington is one of America's oldest and largest manufacturers of firearms, ammunition and related products for commercial, military, and law enforcement customers throughout the world.    Remington holds a diverse portfolio of category-defining brands, including Remington, Marlin, Bushmaster, Barnes Bullets, Advanced Armament Corp., and DPMS, among others.

Since 2008, Remington has held leading market positions in the United States in a variety of firearms and ammunition categories, including certain sales to the military and law enforcement agencies.  Remington has several key strengths that provide them with a significant competitive advantage in the firearm and ammunition markets, including, among other things, (i) category defining brands, (ii) a broad product portfolio, (iii) multiple distribution channels designed to reach diverse end markets, and (iv) a differentiated, customer-focused management, sales, and marketing approach.  In addition, Remington is one of only two major U.S. companies that manufacture both firearms and ammunition, which provides them with a unique servicing edge, supports their market leading positions, and adds a recurring revenue component to sales.

Remington currently manufactures their products in seven different facilities located across the United States with an aggregate 2.5 million square feet of manufacturing space, enabling them to deliver products throughout the United States and globally to approximately 52 countries.  The majority of Remington's revenue is derived from two key firearms facilities in Ilion, New York and Huntsville, Alabama and a primary ammunition plant in Lonoke, Arkansas.  Remington's principal customers are various mass market retail chains (e.g., Wal-Mart and Dick's Sporting Goods) and specialty retail stores (e.g., Bass Pro Shops and Cabela's) and wholesale distributors (e.g., Sports South).  As of the date hereof, Remington employed approximately 2,700 full-time employees, with an additional work force of temporary employees engaged during peak production schedules at certain of their manufacturing facilities.

B.    *Selected Financial Information*

As of December 31, 2016, Remington generated approximately $865 million in net sales for the prior 12-month period, resulting in a net income of approximately $19 million.  Its unaudited balance sheet reflected assets of approximately $954 million and liabilities of approximately $1.3 billion as of October 1, 2017.  Additional financial information regarding Remington can be found in the audited consolidated financial statements for Remington as of December 31, 2016, attached hereto as Exhibit E.

C.    *Corporate History and Organizational Structure*

Formed in 2007, ROC is a holding company that is currently majority owned by R2 Holdings, LLC ("R2H").  ROC was previously known as Freedom Group, Inc. ("FGI"), which was formed principally for the purpose of acquiring Remington Arms Company, LLC[8] ("RAC").

---

[8] Formerly known as Remington Arms Company, Inc.

On December 12, 2007, through a series of transactions, Bushmaster Firearms International, LLC and RAC became wholly owned subsidiaries of FGI.

ROC, FGI Holding, and OpCo principally serve as holding companies. ROC owns 100% of the equity interests in FGI Holding, which in turn owns 100% of the equity interests in OpCo.

OpCo owns 100% of the equity interests in RAC, Barnes Bullets, LLC ("Barnes"), RA Brands, L.L.C. ("RA Brands"), FGI Finance, Inc. ("FGI Finance"), and Outdoor Services, LLC. RAC, in turn, owns 100% of the equity interests in Remington Arms Distribution Company, LLC ("RAD"), TMRI, Inc. ("TMRI"), Huntsville Holdings LLC, 32E Productions, LLC and Great Outdoors Holdco, LLC.

RAC, Barnes, TMRI and RAD are the principal operating companies within Remington's corporate enterprise and the owner of Remington's principal manufacturing plants. Brief descriptions of certain of the operating entities' functions are outlined below:

- RAC – manufacturer of firearms, ammunition, and related products;

- Barnes – manufacturer of ammunition and ammunition components;

- RA Brands – owns Remington's core brand trademarks and charges a royalty to other Remington Entities for use of those brands;

- TMRI – manufacturer of barrel components with certain Remington Entities as primary customers;

- FGI Finance – inactive entity that is the co-issuer of the Senior Third Lien Notes (described below) with OpCo;

- RAD – distributes Remington products to retail chains/dealers.

Huntsville Holdings LLC, 32E Productions, LLC, Great Outdoors Holdco, LLC and Outdoor Services, LLC are inactive shell entities that do not have any material assets or liabilities.

Remington's principal offices and main corporate headquarters are located at 870 Remington Drive, Madison, North Carolina 27025. In addition, certain corporate administrative functions are handled in offices adjacent to Remington's Huntsville, Alabama plant.

D.    *Prepetition Indebtedness and Capital Structure*[9]

Remington has incurred and/or issued debt through five primary debt vehicles, consisting of (i) an asset-based lending ("ABL") facility, (ii) a term loan facility, (iii) third lien notes, (iv) an intercompany note purchase agreement, and (v) a secured promissory note. A summary of these

---

[9] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

debt facilities, as well as the issued and outstanding common stock of ROC and certain other ownership details, is provided below.

    1.    ABL Facility

OpCo, RAC, Barnes, and RAD[10] are the borrowers under an asset-based revolving credit facility (the "ABL Facility"), in an original amount of $225 million,[11] which is memorialized pursuant to that certain Loan and Security Agreement, dated as of April 19, 2012 (as amended, modified, supplemented or restated from time to time, the "ABL Facility Loan Agreement"), by and among FGI Holdings, OpCo and certain of OpCo's subsidiaries including Barnes and RAC, Bank of America, N.A., as Administrative Agent (the "ABL Agent") and co-collateral agent with Wells Fargo Bank, National Association ("Wells"), and the lenders from time to time party thereto (the "ABL Facility Lenders"). The maturity date for the ABL Facility is June 27, 2019, provided that, if the Term Loan Facility is not refinanced by January 18, 2019, the ABL Facility will mature on such date.

FGI Holding, RA Brands, TMRI,[12] and FGI Finance are guarantors of the ABL Facility (together with OpCo, Barnes and RAC, the "ABL Loan Parties"). ROC is not a borrower under or guarantor of the ABL Facility. As is typical in a ABL and term loan structure, the ABL Loan Parties' obligations under the ABL Facility are secured by (i) first priority liens on certain of the ABL Loan Parties' collateral, including but not limited to accounts receivable, intellectual property, inventory, and proceeds thereof and (ii) a second priority lien on substantially all other assets of the ABL Loan Parties. As of the Petition Date, the Debtors, the ABL Agent, the Term Loan Agent (as defined below) and the Third Lien Notes Indenture Trustee were party to that certain Intercreditor Agreement, dated as of April 19, 2012.

As of the date of this Disclosure Statement, the aggregate outstanding principal balance under the ABL Facility was approximately $114,500,000, plus any accrued and unpaid fees, expenses, and other amounts due and owing pursuant to the terms of the ABL Facility Loan Agreement and related loan documents.

As discussed below, and as set forth in the commitment letter attached as **Exhibit 1** to the Plan, the ABL Lenders have agreed to provide Remington with postpetition financing during the Chapter 11 Cases in the form of a debtor-in-possession superpriority senior secured asset-based revolving credit facility of up to $193 million in the aggregate (including a $15 million letter of credit subfacility and a $25 million swingline subfacility), which Remington intends to use to fund its working capital needs and satisfy certain prepetition obligations under the ABL Facility during the Chapter 11 Cases. **For additional information regarding the debtor-in-possession asset-based revolving credit facility, please refer to Section III.C herein entitled, "DIP Facility."**

---

[10] RAD was not a Borrower on the closing date, but was added as a Borrower by way of joinder subsequently.

[11] Pursuant to certain amendments entered into prior to the Petition Date, the maximum availability under the ABL Facility has fluctuated from time to time. As of the date hereof, the facility size is $193 million.

[12] TMRI was not a Guarantor on the closing date, but was added as a Guarantor by way of joinder subsequently.

2.    Term Loan Facility

OpCo is the borrower under that certain Term Loan Agreement, dated as of April 19, 2012 (as amended, modified, supplemented or restated from time to time, the "Term Loan Agreement")[13] by and between FGI Holdings, OpCo and certain of OpCo's subsidiaries, Ankura Trust Company, LLC, as successor agent[14] (the "Term Loan Agent"), and the lenders from time to time party thereto (the "Term Loan Lenders").

FGI Holding, RA Brands, TMRI, RAD, Barnes, RAC, and FGI Finance are guarantors under the Term Loan Facility (together with OpCo, the "Term Loan Parties").[15]  ROC is not a guarantor under the Term Loan Facility.  As is typical in a ABL and term loan structure, the Term Loan Parties' obligations under the Term Loan Facility are secured by (i) second priority liens, junior to the ABL Facility liens, on certain of the Term Loan Parties' collateral, including but not limited to accounts payable, inventory, and proceeds thereof and (ii) first priority liens on substantially all of the Term Loan Parties' other assets.  The maturity date for the Term Loan Facility is April 12, 2019.

On February 12, 2018, ROC, FGI Holding, OpCo, the other Term Loan Parties and the Term Loan Agent, entered into an incremental amendment to Term Loan Agreement (the "Term Loan Amendment"), pursuant to which ROC agreed to loan an aggregate of up to $45 million to OpCo for general corporate and working capital purposes and to pay fees and expenses related to the foregoing.

As of the date of this Disclosure Statement, the aggregate outstanding principal balance under the Term Loan Facility was approximately $550,475,000.

As discussed below, ROC and certain of the Consenting Creditors have agreed to provide Remington with postpetition financing during the Chapter 11 Cases in the form of a superpriority debtor-in-possession credit facility of up to $145 million in the aggregate, which Remington intends to use to fund its costs during the Chapter 11 Cases and for working capital needs.  **For additional information regarding the debtor-in-possession term loan credit facility, please refer to Section III.C herein entitled, "DIP Facility."**

3.    Senior Third Lien Notes

OpCo and FGI Finance are issuers of those certain 7.875% Senior Secured Notes due 2020 (the "Third Lien Notes") pursuant to that certain Indenture, dated as of April 19, 2012, by and among, OpCo and FGI Finance, and Wilmington Trust, National Association, as indenture trustee.

---

[13] The credit facility memorialized by the Term Loan Agreement and the various related agreements and documents is referred to herein as the "Term Loan Facility."

[14] Ankura Trust Company, LLC was not the administrative agent on the closing date, but succeeded Bank of America as administrative agent subsequently.

[15] RAD and TMRI were not Guarantors on the closing date, but were added as Guarantors by way of joinder subsequently.

ROC, FGI Holding, RAC, RA Brands, Barnes, TMRI, and RAD[16] are guarantors of the Third Lien Notes. The Third Lien Notes are secured by third priority liens and security interests (junior to the respective liens and security interests of the ABL Agent and the Term Loan Agent) on substantially all of the assets of RAC, RA Brands, Barnes, TMRI, and RAD.

In addition, in connection with the execution of the Restructuring Support Agreement, on February 12, 2018, ROC, FGI Holding, OpCo, FGI Finance, RAC, Barnes, Remington Arms Distribution, RA Brands and TMRI entered into a letter agreement with the Consenting Third Lien Creditors (the "Letter Agreement"). Pursuant to the Letter Agreement, the Consenting Third Lien Creditors consented to ROC's, OpCo's and FGI Holding's entry into the Term Loan Amendment and the consummation of the transactions contemplated thereby (including, but not limited to, the provision of the ROC Financing). Additionally, pursuant to the Letter Agreement, ROC granted the Third Lien Notes Indenture Trustee, for the benefit of the Third Lien Noteholders, a security interest in and lien on substantially all of ROC's assets, including ROC's bank accounts and cash. On February 12, 2018, the Third Lien Notes Indenture Trustee filed a UCC-1 financing statement identifying all assets of ROC as collateral.

The Third Lien Notes mature on May 1, 2020. As of the date of this Disclosure Statement, the aggregate outstanding principal amount of the Third Lien Notes was approximately $226,012,000.[17]

FGI Holding, OpCo, RAC, RA Brands, Barnes, FGI Finance, TMRI, and RAD,[18] the ABL Agent, the Term Loan Agent, and the Third Lien Notes Indenture Trustee are party to that certain Intercreditor Agreement dated as of April 19, 2012 that, among other things, sets forth the relationship in terms of claims, priority, rights and remedies between and among the parties. As of the date of this Disclosure Statement, the Remington Entities are unaware of any equity holder of ROC that holds any Third Lien Notes.

    4.    Intercompany Note Purchase Agreement / ROC Financing

On May 11, 2017, OpCo and ROC entered into that certain Note Purchase Agreement ("Intercompany NPA"). Pursuant to the Intercompany NPA, OpCo agreed to issue, and ROC agreed to purchase, up to $100 million of senior unsecured notes to ROC up to and through July 19, 2019 for the purposes of obtaining additional cash to fund OpCo's and its various subsidiaries' working capital needs. As of the date of this Disclosure Statement, $20 million in notes are outstanding under Intercompany NPA.

Furthermore, pursuant to the Term Loan Amendment discussed above, in connection with the Remington Entities' entry into the Restructuring Support Agreement, ROC made a series of advances totaling $45 million from its cash on hand to its subsidiary OpCo for the purpose of

---

[16] TMRI and RAD were not Guarantors on the closing date, but were added as Guarantors by way of joinder subsequently.

[17] In late 2017, FGI Holding repurchased approximately $24 million of the then-outstanding Third Lien Notes and, prior to the Petition Date, cancelled all of the repurchased Third Lien Notes.

[18] RAD and TMRI were not parties to the Intercreditor Agreement on the closing date thereof, but were added as grantors by way of joinder subsequently.

funding the operating Remington Entities' working capital needs. Additional details regarding this prepetition financing are set forth below.

5.    Huntsville Third Lien Note

In February 2014, RAC obtained a $12.5 million loan from the City of Huntsville, Alabama (the "City of Huntsville") in order to improve its manufacturing facility there. The loan is evidenced by a promissory note executed by RAC in favor of the City of Huntsville (the "Huntsville Note") and secured by a first priority mortgage on Remington's firearm facilities in Huntsville. The Promissory Note has an eleven-year term with annual amortization payments due each year beginning on the second anniversary of the issuance equal to 10% of the original principal balance, provided that if RAC meets certain employment goals for the year preceding the principal and interest payment dates, the annual principal and related interest for that payment period will be forgiven. As of the date of this Disclosure Statement, the aggregate outstanding balance under the Huntsville Note was approximately $12.5 million; *provided however*, that Remington's obligations payable in connection with the Huntsville Note may increase to the extent RAC has not satisfied the criteria for the year ended December 31, 2017 and has not received from the City of Huntsville a waiver or reduction of any such additional obligations.

6.    Certain Other Liabilities

As of the date of this Disclosure Statement, Remington has approximately $54 million in outstanding claims owed to its various vendors, suppliers, and service providers, including claims reflected in Remington's current accounts payable or otherwise accrued and/or attributable to the period prior to the Petition Date. Additionally, as described further in Section X herein, Remington is party to various litigation matters, including products liability actions. The claims associated with such litigation matters are disputed, contingent, and/or unliquidated as of the date of this Disclosure Statement.

7.    ROC Common Stock and Ownership

ROC has approximately 351,000 shares of common stock (including restricted stock units) issued and outstanding. As of December 31, 2017, approximately 93.5% of ROC's outstanding common stock is held by R2H. The balance of ROC's common stock is held primarily by certain past and present directors, officers, and employees of Remington acquired primarily pursuant to various stock-based incentive plans. In addition, certain past and present directors, officers and employees hold options to purchase, in the aggregate, less than 10% of ROC's common stock.

E.    *Events Leading up to Chapter 11*

1.    Concerns Stemming from Industry-Specific Events and Company-Specific Events

Despite the historical strength of Remington's various brands, Remington has experienced a significant decline in sales and revenues in the approximately one-year period preceding the Petition Date. As a result, Remington has faced increasing difficulty in meeting certain benchmarks in order to maintain borrowing capacity under its ABL Facility. Although Remington negotiated for minor relief with respect to the borrowing capacity, the overall business and industry environments continue to cause significant financial hardship to Remington.

14

More specifically, throughout 2016, Remington was increasing production rates based on inputs from its key markets to meet expected demand for its products in 2017. Those demands, however, ultimately did not materialize. Due to the resulting elevated level of their inventory, Remington initiated certain production reductions, as well as various cost cutting measures and liquidity management initiatives. At the same time, however, the firearms and ammunition markets experienced significant competitive market pricing pressures from the higher inventory levels industry-wide and the accelerating reduction in demand. Based on the foregoing, Remington's financial performance began experiencing significant year-over-year deterioration since the beginning of 2017.

Furthermore, Remington's early 2017 plans and historical seasonality needs required additional working capital, and thus Remington increased its borrowings under the ABL Facility. At that time, Remington expected that the additional borrowings would be repaid from the collection of receivables on sales of the Remington's inventory. Those expectations, however, did not materialize, and Remington therefore was left with continued high inventory balances, an increased debt load, and a continuing market environment experiencing significant pressures on pricing, in large part due to Remington's principal competitors engaging in unusually heavy discounting and promotions to reduce their own excess inventory.

To address these issues, in late 2017, Remington embarked on a number of different initiatives, both from an operational and financial perspective to improve sales and obtain relief and flexibility under its various debt instruments. With respect to its operations, Remington broadened and restructured its sales force and reorganized their marketing organization, which in turn helped expand their customer base. Remington also reset its pricing strategy in the hopes that it would avoid the need to engage in additional discounting. In addition, Remington entered into a number of amendments of the ABL Facility which were principally designed to increase borrowing capacity under the ABL Facility to facilitate smoother operational reductions in their production facilities.

Despite these efforts, Remington's financial performance continued to deteriorate, owing in large part to higher costs. At the conclusion of 2017, Remington had realized approximately $603.4 million in sales and an adjusted EBITDA of $33.6 million. In comparison, in 2015 and 2016, Remington had achieved approximately $808.9 million and $865.1 million in sales and $64 million and $119.8 million in adjusted EBITDA, respectively.

2.     Negotiation and Entry into Restructuring Support Agreement

Given the continued strain the decreasing revenues were placing on their liquidity, in early 2018, Remington, together with various holders of Remington's funded debt obligations, began exploring even broader solutions to Remington's financial problems. Among the options discussed by the parties were (i) a recapitalization of Remington through a traditional chapter 11 plan of reorganization and (ii) a potential sale of Remington's assets pursuant to section 363 of the Bankruptcy Code. At the same time, Remington considered various financing alternatives to address its immediate working capital needs, including obtaining additional access under its ABL Facility, financing from the Term Lenders and/or the Third Lien Noteholders, or advances from ROC to its operating subsidiaries.

Based on extensive, good faith efforts of Remington and certain of the Term Loan Lenders and Third Lien Noteholders, the parties ultimately were able to negotiate a comprehensive restructuring (the "Restructuring") that not only would address Remington's overleveraged balance sheet and a global settlement of various intercompany claims, but also leaves general unsecured claims unimpaired and provides a path to the short-term and long-term financing that will allow Remington to operate its business successfully. The terms and conditions of the Restructuring were set forth in the Restructuring Support Agreement, described further below.[19]

On February 11, 2018, each of Remington, the Consenting Term Loan Creditors, and the Consenting Third Lien Creditors entered into the Restructuring Support Agreement, pursuant to which the Consenting Creditors agreed, subject to the terms and conditions set forth therein, to support the Restructuring and vote to accept the Plan. **A redacted copy of the Restructuring Support Agreement is attached hereto as <u>Exhibit B</u>.**

Pursuant to the Restructuring Support Agreement, each Consenting Creditor agreed, among other things, to:

- support and take all commercially reasonable actions necessary or reasonably requested by Remington to facilitate entry of the DIP Orders, the Disclosure Statement Order, and the Confirmation Order (each as defined in the Restructuring Support Agreement);

- support the Restructuring and vote in favor of the Plan, provided that the obligations of the Consenting Creditors have not been terminated in accordance with the terms of the Restructuring Support Agreement, and not withdraw or revoke its vote with respect to the Plan; and

- not take any action materially inconsistent with the transactions expressly contemplated by the Restructuring Support Agreement, or that would materially delay or obstruct the consummation of the Restructuring, including, without limitation, commencing, or joining with any Person in commencing, any litigation or involuntary case for relief under the Bankruptcy Code against Remington.

Pursuant to the Restructuring Support Agreement, Remington agreed, among other things, to:

- support and, subject to all necessary Bankruptcy Court approvals, consummate the Restructuring and all transactions contemplated under the Restructuring Support Agreement;

---

[19] The following summary of the Restructuring is qualified in its entirety by reference to the Restructuring Support Agreement and the Plan. In the event of any conflict between the Restructuring Support Agreement or Plan, on the one hand, and the following summary, on the other hand, the terms of the Restructuring Support Agreement or Plan, as applicable, shall control.

- negotiate in good faith all definitive documentation contemplated by the Restructuring Support Agreement and use its best efforts to obtain all necessary regulatory and/or third-party approvals;

- operate in the ordinary course consistent with industry practice and the operations contemplated pursuant to Remington's business plan;

- complete the Restructuring and all transactions set forth in accordance with each of the following milestones, among others:

  - obtain entry of the Interim DIP Order within three (3) days of the Petition Date;

  - obtain entry of the Final DIP Order within thirty-five (35) days of the Petition Date;

  - obtain entry of the Confirmation Order within fifty (50) days of the Petition Date; and

  - have the Effective Date occur within fifteen (15) days after entry of the Confirmation Order.

The Restructuring Support Agreement includes two principal components. First, it addressed Remington's immediate liquidity needs by allowing its operating subsidiaries to borrow up to $45 million from ROC in order to satisfy the subsidiaries' various obligations, including the claims of other Remington entities' various vendors and suppliers (the "ROC Financing"). ROC would provide the funds for the ROC Financing from its existing cash on hand.

The primary purpose of the ROC Financing was to provide a bridge that would allow Remington to operate until the commencement of these Chapter 11 Cases, as well as provide additional liquidity postpetition. As of the date of this Disclosure Statement, ROC had advanced $45 million dollars under the ROC Financing, and Remington expects that the remaining available funds under the ROC Financing will be funded to Remington upon approval of the motion to approve the Term/ROC DIP Facility. The amounts advanced prepetition under the ROC Financing, together with the amounts outstanding under the ROC Financing funded upon approval of the Term/ROC DIP Facility, will be fully converted and rolled up into a postpetition DIP facility (the "ROC DIP Facility").

In addition to the ROC Financing, Remington and the ABL Lenders also entered into a number of amendments to the ABL Facility which provided additional access to funds under the ABL Facility to support Remington's ongoing business operations during the immediate prepetition period. Remington expects to request for the balance of the ABL Facility on the Petition Date be paid in full immediately following entry of an interim debtor-in-possession financing order. Remington and certain of its affiliates expect to immediately enter into a replacement superiority senior secured debtor-in-possession asset-based revolving credit facility (the "ABL DIP Facility") as described in further detail below.

The Restructuring Support Agreement also contemplates that, upon the commencement of the Remington Entities' chapter 11 cases, a subset of the Term Loan Lenders and the Third Lien Noteholders would provide up to an additional $100 million in postpetition financing to Remington in order to fund the administration of these Chapter 11 Cases and other working capital needs (the "Term DIP Facility"). The Term DIP Facility is described in greater detail below. Collectively, the total postpetition financing will be $338 million consisting of the $193 million ABL DIP Facility, the $100 million Term DIP Facility, and the $45 million ROC DIP Facility (the Term DIP Facility and the ROC DIP Facility together, the "Term/ROC DIP Facility", and the Term/ROC DIP Facility together with the ABL DIP Facility, the "DIP Facilities").

In addition to the financing aspects, the Restructuring Support Agreement sets forth the terms and conditions for the comprehensive Restructuring of Remington's balance sheet and the path to resolve certain prepetition intercompany and third party claims, all of which would be implemented through the Plan. The principal terms of the Restructuring, which are set forth in greater detail in the Restructuring Support Agreement and the Plan, are summarized below:

- On the effective date of the Plan (the "Effective Date"), ROC will receive and immediately distribute to the Third Lien Noteholders, in full and final satisfaction of the ROC DIP Facility and the settlement of any intercompany claims of ROC against its subsidiaries, 17.5% of the new common units of Reorganized ROC, plus Cash in an amount equal to all accrued and unpaid postpetition interest on the ROC DIP Facility (collectively, the "ROC DIP Distribution");

- On the Effective Date, the outstanding Term DIP Facility Claims will be replaced with obligations under a new $100 million exit term loan facility made available to Reorganized Remington;

- On the Effective Date, the claims under the ABL DIP Facility and the ABL Facility will be repaid in full in Cash, unless each holder of such claims agrees to an alternative treatment, which may include participation in an exit asset-based lending facility;

- On the Effective Date, the Term Loan Lenders will receive: (i) 82.5% of the New Common Units, (ii) to the extent such holder is an Electing Term Loan Lender, its Pro Rata Class 4 Shares of either (a) the Litigation Trust Class A Interests, or (b) any amounts allocated for distribution to the Electing Term Loan Lenders under a Litigation Settlement, and (iii) to the extent not previously paid to the Term Loan Lenders in accordance with the terms of the Interim DIP Order, Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018;

- On the Effective Date, the Third Lien Noteholders will receive: (i) the ROC DIP Distribution, (ii) the Third Lien Noteholder Cash Distribution, (iii) the New Warrants, and (iv) to the extent such holder is an Electing Third Lien Noteholder, its Pro Rata Class 5 Shares of either (a) the Litigation Trust

18

Class B Interests, or (b) any amounts allocated for distribution to the Electing Third Lien Noteholders under a Litigation Settlement;

- Substantially all other Claims against Remington, including all General Unsecured Claims, will either be paid in full in cash in the ordinary course after the Effective Date or otherwise be Unimpaired; *provided*, that any Allowed General Unsecured Claim against ROC shall be assumed by OpCo in accordance with the Plan;

- Existing equity interests in ROC would be canceled on the Effective Date; and

In light of the foregoing, the Plan contemplates that only two Impaired Classes of claims would be entitled to vote on the Plan:  the Term Loan Claims and the Third Lien Notes Claims.

In connection with the Plan, Remington also anticipates entering into certain exit credit facilities that will provide Remington with the necessary liquidity to operate its business into the future, including but not limited to the New ABL Exit Facility, the New Term Loan Facility, and the New FILO Term Loan Facility.  Together with the implementation of the Restructuring Transaction, these exit facilities are expected to provide Reorganized Remington with at least $50 million in liquidity at emergence. Additional details regarding those facilities is set forth below in Section IV.A.4.

The Restructuring Support Agreement and Plan provide that, on the Effective Date, a litigation trust (the "Litigation Trust") will be established and will acquire Litigation Claims held by the Remington Entities' estates as of the Effective Date, as well as any claims held by any of the Term Lenders and Third Lien Noteholders voting to accept the Plan. The Litigation Trust will be funded with $5.0 million in cash in order to investigate and, potentially, prosecute Litigation Claims.

The Litigation Trustee shall make distributions on account of Litigation Trust Interests in accordance with the terms of the Litigation Trust Agreement.  The first $5,000,000 of any aggregate net proceeds of the Litigation Claims shall be allocated on a pro rata basis to the holders of Litigation Trust Class B Interests, and any recoveries in excess of $5,000,000 obtained by the Litigation Trust shall be shared equally among the holders of Litigation Trust Class A Interests and holders of the Litigation Trust Class B Interests, if applicable.  The Litigation Trustee shall classify and allocate recoveries from Litigation Claims in good faith and consistent with its fiduciary obligations to all Litigation Trust Beneficiaries under Section 3.2 of the Litigation Trust Agreement. Notwithstanding the foregoing, the holders of Litigation Trust Class B Interests shall receive all recovery amounts from any Litigation Claims that (i) are exclusively related to amounts transferred within applicable statutes of limitations from ROC to any transferee, or (ii) belong solely to ROC or any of its stakeholders; *provided, however*, for the avoidance of doubt, that any Litigation Claim based on mismanagement or a fiduciary-duty breach in connection with any potential merger, acquisition or similar change in control transaction of the Remington Entities, or against any third party in connection with the same; or based on mismanagement or a fiduciary-duty breach that had a material adverse effect on the value of any of the non-ROC Remington Entities (excluding claims related to amounts transferred within applicable statutes of limitations

from ROC to any transferee, as set forth in (i) above), shall in each case not be deemed to belong solely to ROC.

Remington believes that the Restructuring as set forth in the Plan represents the best outcome for Remington and all of its stakeholders. The Plan limits the impairment of third party claims only to the Term Loan and Third Lien Notes Classes. Importantly, the Plan provides that all general unsecured claims against Remington will be paid in full in cash in the normal course or otherwise be rendered Unimpaired. Additionally, Remington's plans and funding obligations in respect thereof will remain in place under, and left Unimpaired by, the Plan. Thus, the Plan will have little to no impact on most creditors of Remington, and in fact will better position Remington to satisfy those creditors' Claims as they come due.

Furthermore, by agreeing to implement the Restructuring through a prepackaged Plan, the creditor parties to the Restructuring Support Agreement have elected not to pursue a sale of Remington's assets pursuant to section 363 of the Bankruptcy Code. The ABL Lenders, the Consenting Term Loan Creditors, and the Consenting Third Lien Creditors, of course, could have insisted on a sale process as a condition to the Restructuring or providing the DIP Facilities. And, had they done so, it likely would have meant that many unsecured creditors' claims would not be assumed by the eventual purchaser (whether Remington's prepetition secured creditors or a third party) or otherwise paid in full. In addition, a sale process would likely engender costly litigation amongst the various creditor constituencies and would create uncertainty among Remington's various trade vendors, suppliers, customers, and employees, all of which likely would disrupt business operations and cause a deterioration in value to the detriment of all stakeholders. In light of the foregoing, Remington believes that entry into the Restructuring Support Agreement and promptly pursuing the Plan is in the best interests of all parties.

## SECTION III.
## ANTICIPATED EVENTS DURING CHAPTER 11 CASES

A.    *Overview of Chapter 11*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and estates. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly-situated creditors and equity interest holders with respect to the distribution of a debtor's assets. In furtherance of these two goals, section 362 of the Bankruptcy Code generally provides for, upon the filing of a petition for relief under chapter 11, an automatic stay of substantially all acts and proceedings against a debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the debtor's chapter 11 case.

The commencement of a case under chapter 11 creates an estate comprising all of the debtor's legal and equitable interests as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against and interests in the debtor. Confirmation of a plan by the bankruptcy court makes the plan binding, subject to the occurrence of an effective date, upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions and the terms of the plan, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

The Bankruptcy Code expressly authorizes a debtor to solicit votes for the acceptance of a plan prior to the filing by the debtor of a chapter 11 case. Certain holders of claims against, or interests in, a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, sections 1125(a) and 1126(b) of the Bankruptcy Code require a plan proponent to prepare and distribute a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment whether to accept or reject the plan.

Because no chapter 11 cases have yet been commenced, this Disclosure Statement has not yet been approved by any bankruptcy court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code. If the Chapter 11 Cases are subsequently commenced as currently contemplated, Remington expects to promptly seek entry of an order of the Bankruptcy Court approving this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and determining that the solicitation of votes on the Plan by means of this Disclosure Statement was in compliance with section 1125(a) of the Bankruptcy Code.

B.    *First-Day Relief*

Remington intends to continue to operate its businesses throughout the Chapter 11 Cases in the ordinary course, as it had prior to the commencement thereof, and expects to seek certain "first-day" relief from the Bankruptcy Court for authority to do so. The following are descriptions of the "first-day" motions that Remington currently expects to file upon commencement of the Chapter 11 Cases. As a result of further consideration, however, Remington may, subject to its obligations under the Restructuring Support Agreement, determine to file other motions, omit certain motions, or file motions at a time other than the first day of the Chapter 11 Cases. The following list should therefore not be considered final or exhaustive.

**Motion for Entry of an Order Authorizing Joint Administration of the Chapter 11 Cases**

Upon commencement of the Chapter 11 Cases, Remington expects to seek entry of an order authorizing procedural consolidation and joint administration of the Chapter 11 Cases. Joint administration will provide significant administrative convenience without harming the rights of any party in interest.

***Motion for Entry of Order Authorizing Remington to File Consolidated List of Creditors in Lieu of Submitting Separate Mailing Matrix***

Remington expects to seek entry of an order granting authority to maintain a single consolidated list of creditors, instead of filing a separate matrix for each Remington Entity. Remington believes that preparing separate lists of creditors in an entity-specific matrix format would be unnecessarily burdensome and result in duplicate mailings.

***Application to Appoint Prime Clerk LLC as Claims and Noticing Agent***

Remington expects to seek entry of an order authorizing it to appoint and retain Prime Clerk LLC as the Claims and Noticing Agent in its Chapter 11 Cases. Remington also seeks to retain Prime Clerk as the Voting Agent for the solicitation of the Plan, as further described herein.

***Motion for Entry of Order Authorizing Remington's Continued Use of Its Existing Cash Management Systems***

Remington expects to seek entry of an order authorizing it, subject to the requirements of the DIP Order, to continue using its existing cash management system, bank accounts, business forms, and to continue conducting intercompany transactions in the ordinary course. Absent the Bankruptcy Court's authorization of the continued use of its prepetition cash management system, Remington would face unnecessary difficulty in managing its cash flow and operations during the course of the Chapter 11 Cases, potentially to the detriment of its estates.

***Motion for Entry of an Order Authorizing Remington to Pay Wages and Benefits to Employees and Continue Existing Employee Benefit Plans***

Remington employs approximately 2,700 employees spread across eight locations. In the ordinary course of business, Remington compensates its employees by, among other things, wages and salaries, vacation, business expense allowances and reimbursements, bonuses, retention awards, supplemental retirement, severance, pension plan contributions, medical and dental plans, worker's compensation, and life insurance. Without continuing these wages and benefits, Remington believes that its employees may seek alternative employment opportunities. Accordingly, Remington expects to seek entry of an order authorizing it to continue to pay wages, salaries, and benefits to its employees.[20]

***Motion for Entry of Order Authorizing Remington to Continue Insurance Policies and Pay Certain Obligations in Respect Thereof***

Remington maintains various insurance policies, essential to its ability to conduct its operations and to preserve the value of its business, properties, and assets. Maintenance of insurance is also required under the laws of the various states in which Remington operates and pursuant to the terms of material agreements to which the Remington Entities are parties. Accordingly, Remington expects to seek entry of an order authorizing it to continue to honor

---

[20] To the extent that Remington does not seek first day relief to honor or pay any prepetition benefits, Remington expects to honor those obligations in the normal course upon the Effective Date of the Plan.

22

obligations under and related to its insurance policies, and to renew, replace, extend, supplement, modify, or obtain its insurance coverage.

### Motion for Entry of Order Authorizing Payment and Adequate Assurance to Utilities and Prohibit Alterations or Discontinuance of Utility Services to Remington

Remington expects to seek entry of an order (i) approving, as adequate assurance of payment for the utility companies, a cash deposit equal to approximately half of Remington's average aggregate monthly cost for utility services, and (ii) prohibiting utility companies from altering, refusing, or discontinuing services to Remington.

### Motion for Entry of Order Authorizing Payment of Taxes and Regulatory Expenses in Ordinary Course of Business

Although Remington expects to pay all taxes and regulatory obligations in full pursuant to the Plan, in order to minimize the potential disruption to its businesses during the Chapter 11 Cases, Remington expects to seek entry of an order authorizing it to pay prepetition sales taxes, use taxes, and property taxes, regardless of when incurred, to the appropriate taxing, licensing, and other governmental authorities and to continue to honor related obligations (including the posting of additional collateral, if necessary) in the ordinary course of Remington's businesses and consistent with its past practices.

### Motion for Entry of an Order Authorizing Remington to Continue its Customer and Consumer Programs

In order to develop and sustain positive reputations in the marketplace for their products and maximize the loyalty of, and goodwill with, their customers, Remington historically has engaged in certain practices and programs designed to provide certain incentives and services to its various customers as well as the consumer end users of Remington products. Much of the success and viability of Remington's business is dependent upon the loyalty and confidence of their customers and the end consumers of their products. Accordingly, Remington expects to seek entry of an order authorizing it to continue its customer and consumer programs.

### Motion for Entry of an Order Authorizing Remington to Pay Certain Prepetition Claims in the Ordinary Course of Business

In the ordinary course of its business, Remington incurs numerous obligations to various creditors that provide Remington with a variety of resources and services that are necessary for the continued operation of Remington's firearms, ammunition and accessories business. These payable claims are owed to third-party creditors who will be treated as unimpaired for purposes of the Plan, including, without limitation, trade vendors, suppliers, common carriers, and service providers. Given the highly competitive industry in which Remington operates its business, it is essential that Remington maintains and develops relationships with certain of these creditors that supply unique or essential resources and services to Remington. Accordingly, Remington expects to seek entry of an order authorizing it to pay certain prepetition claims of third-party creditors in the ordinary course of business.

C.    *DIP Facilities*[21]

1.    Term/ROC DIP Facility

In connection with the Restructuring Support Agreement and after arms' length negotiations, Remington expects to request authority to enter into a $145,000,000 debtor-in-possession postpetition term credit facility and to use cash collateral, and to grant liens and superpriority administrative claims in connection therewith. The Term/ROC DIP Facility will be provided in two tranches: (i) the Term DIP Facility consisting of (A) initial new money loans in the aggregate principal amount of $50 million; and (B) delayed draw new money loans ("Delayed Draw New Money Loans") in an aggregate principal amount equal to $50 million; and (ii) the ROC DIP Facility in an aggregate principal amount equal to $50 million,[22] comprised of both new money loans and a roll-up of already existing debt. The Delayed Draw New Money Loans may be drawn in multiple installments, with (i) $25 million available to be funded commencing on the date of entry of the Final DIP Order; and (ii) the remaining $25 million available to be funded commencing on or after April 15, 2018, in each case subject to the conditions specified the Term/ROC DIP Credit Agreement, related transaction documents, and the DIP Orders. Each of the ABL Agent, the Term Loan Agent, and the agents in respect of the DIP Facilities will consent to the use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases, subject to certain terms and conditions specified in the applicable DIP facility agreement, related transaction documents, and the DIP Orders.

The Term/ROC DIP Facility will be provided by (i) certain of the prepetition Term Loan Lenders,[23] (ii) certain of the prepetition and Third Lien Noteholders, and (iii) ROC, and will be backstopped by certain of the Term/ROC DIP Lenders. OpCo will be the borrower under the Term/ROC DIP Facility, which will be guaranteed by FGI Holding and all of OpCo's direct and indirect wholly owned subsidiaries. The Term/ROC DIP Facility is expected to contain covenants that are customary for such debtor-in-possession financings, and will be secured by substantially all of the assets of OpCo, FGI Holding, and the other guarantors.

Subject to approval by the Bankruptcy Court, the proceeds of the Term/ROC DIP Facility will be used for, among other things, (i) the ongoing working capital and general corporate purposes of Remington to the extent set forth in an approved budget, including the roll-up of the prepetition loans outstanding under the ROC Financing as provided in the Term/ROC DIP Credit Agreement, (ii) to pay fees, costs and expenses incurred by the Term/ROC DIP Agent and the Term/ROC DIP Lenders in connection with the transactions related to the Term/ROC DIP Facility and other administration costs incurred in connection with the Chapter 11 Cases (including all fees, charges and disbursements of all advisors to the Term/ROC DIP Agent and the Term/ROC

---

[21] The following summary is qualified in its entirety by reference to the motion to approve the Term/ROC DIP Facility and, if applicable, the ABL DIP Facility, and the relevant operative documents, agreements, schedules, and exhibits.

[22] Only $45 million of the $50 million available under the ROC DIP Facility will be used to fund the Restructuring Support Agreement/Plan process. The remaining $5 million will be used either (i) to fund the Litigation Trust Fund, or (ii) if there is a Complete Litigation Settlement, to fund the Third Lien Noteholder Cash Distribution.

[23] Subject to the terms and conditions of the Term/ROC DIP Credit Agreement, other Term Loan Lenders may participate in the Term DIP Facility after the Petition Date.

DIP Lenders); and (iii) to deposit $4,000,000 into a segregated deposit account to serve as cash collateral.

As the Term/ROC DIP Facility has been agreed in connection with the Restructuring, a failure to meet certain milestones under the Restructuring Support Agreement, among other things, could trigger an event of default and the payment of default interest as specified under the terms of the Term/ROC DIP Facility. Consistent with the terms of the Restructuring Support Agreement, Remington expects to file a motion on the Petition Date seeking entry of the DIP Orders approving, on an interim basis and a final basis, respectively, (i) Remington's entry into the Term/ROC DIP Facility, and (ii) Remington's use of the cash collateral of the Term Loan Lenders and Third Lien Noteholders during the pendency of the Chapter 11 Cases, and (iii) Remington's entry into the exit financing commitment letters.

In addition, by this motion, (and any motion to approve the ABL DIP Facility),[24] Remington will seek approval of certain superpriority liens and claims to be granted to the Term/ROC DIP Agent and the ABL DIP Agent, as applicable (the "DIP Agents") pursuant to the DIP Orders, as well as certain adequate protection liens and claims for the benefit of the ABL Facility Lenders, Term Loan Lenders and Third Lien Noteholders, whose prepetition liens will be "primed" by those granted to the DIP Agents in connection with the DIP Facilities. Under the terms of the Term/ROC DIP Facility, the Term/ROC DIP Agent will receive, for the benefit of the Term DIP Lenders, junior liens on Remington's Huntsville, Alabama facility.[25] The motion will also seek the scheduling of a hearing to consider approval of the Term/ROC DIP Facility (and/or the ABL DIP Facility, as applicable) on a final basis. The terms and conditions of the Term/ROC DIP Facility are more specifically set forth in **Exhibit 5** to the Plan.

2.     ABL DIP Facility

In connection with the Restructuring Support Agreement and after arms' length negotiations, Remington expects to request authority to enter into a debtor-in-possession postpetition superpriority senior secured asset-based revolving credit facility with an aggregate principal amount of up to $193 million (including a $15 million letter of credit subfacility and a $25 million swingline subfacility). Each of the ABL Agent, the Term Loan Agent, and the agents in respect of the DIP Facilities will consent to the use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases, subject to certain terms and conditions specified in the applicable DIP facility agreement, related transaction documents, and the DIP Orders.

The ABL DIP Facility will be provided by the prepetition ABL Lenders. OpCo, RAC, RAD, and Barnes will be the borrowers under the ABL DIP Facility, which will be guaranteed by FGI Holding, RA Brands, TMRI, and FGI Finance.

---

[24] As of March 22, 2018, the Term/ROC DIP Credit Agreement and the ABL DIP Facility Loan Agreement remain subject to negotiation and completion in accordance with the Restructuring Support Agreement. Remington expects to attach final forms of the Term/ROC DIP Credit Agreement and the ABL DIP Facility Loan Agreement to its motion(s) seeking approval of the DIP Facilities.

[25] The Term Loan Lenders, the ABL Facility Lenders and the Third Lien Noteholders do not have liens on the Huntsville facility.

Subject to approval by the Bankruptcy Court, the proceeds of the ABL DIP Facility, if any, will be used for, among other things, (i) the ongoing working capital and general corporate purposes of Remington to the extent set forth in an approved budget, (ii) to pay fees, costs and expenses incurred by the ABL DIP Agent and the ABL DIP Lenders in connection with the transactions related to the ABL DIP Facility and other administration costs incurred in connection with the Chapter 11 Cases (including all fees, charges and disbursements of all advisors to the ABL DIP Agent and the ABL DIP Lenders), and (iii) the refinance and discharge of all amounts outstanding under the ABL Facility in full as provided in the ABL DIP Facility Loan Agreement, and to obtain letters of credit under the ABL DIP Facility (or to roll over the outstanding letters of credit under the ABL Facility).  If any such ABL DIP Facility is entered into, the treatment of the ABL DIP Claims will be governed by the terms of the Plan.

D.    *Disclosure Statement Approval and Confirmation*

As discussed above, Remington intends to effectuate the Restructuring through the Plan. Furthermore, pursuant to the Restructuring Support Agreement, Remington is bound by certain milestones, including but not limited to deadlines to commence solicitation of the Plan, obtain entry of a confirmation order, and to consummate the Restructuring. In light of those milestones and the prepackaged nature of these cases, Remington expects to file, on or about the Petition Date, a motion for entry of an order scheduling a combined hearing on the adequacy of this Disclosure Statement, approval of the prepetition solicitation procedures and related notices and objection deadlines, as well as confirmation of the Plan.  Remington believes the relief requested in the scheduling motion is appropriate in that it will best position to satisfy the Restructuring Support Agreement milestones, thereby maximizing Remington's ability to consummate the Restructuring for the benefit of all stakeholders.  **For additional information regarding the confirmation process and requirements, please refer to the discussion in Section VI herein entitled, "Confirmation of Plan."**

**SECTION IV.**
**JOINT PREPACKAGED CHAPTER 11 PLAN**

A.    *Summary of Plan*

    1.    Administrative Expenses and Other Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, ABL DIP Claims, Term DIP Claims, ROC DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

    a.    General Administrative Expenses

Each holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, then in the applicable Remington

26

Entity's ordinary course of business), unless otherwise agreed by the holder of such General Administrative Expense and the applicable Remington Entity.

      b.     Restructuring Expenses

Except as otherwise specifically provided in the Plan, Reorganized OpCo shall, without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash all reasonable and documented accrued and unpaid (i) Creditor Fees and Expenses (as defined in the Restructuring Support Agreement) in accordance with the terms of the Restructuring Support Agreement and the Bankruptcy Code, and (ii) subject to and in accordance with the ABL Loan Facility Agreement, the fees, expenses and other disbursements of the ABL Parties, whether incurred before or after the Petition Date, including without limitation, the reasonable and documented fees and expenses of the ABL Parties' professional advisors. Reorganized OpCo shall, without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash all reasonable and documented accrued and unpaid fees and expenses of the Term Loan Agent in accordance with that certain Successor Agent Fee Letter, dated March 2, 2018. Notwithstanding anything to the contrary herein, Cash associated with the Third Lien Noteholder Cash Distribution on the Effective Date shall only be used to satisfy the Third Lien Noteholder Cash Distribution and to fund payment of fees and expenses incurred by Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP, and Perella Weinberg Partners on behalf of the Consenting Third Lien Creditors; provided that documentation of such fees and expenses shall be summary in nature and shall not include billing detail.

      c.     Professional Fees

      *(i)*     Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on Reorganized Remington no later than forty-five (45) days after the Effective Date, unless Reorganized Remington agrees otherwise in writing. Objections to Professional Fees must be filed with the Bankruptcy Court and served on Reorganized Remington and the applicable Professional no later than seventy-five (75) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of such Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be promptly paid in full in Cash from the Professional Fees Escrow Account; provided, however, that if the funds in the Professional Fees Escrow Amount are insufficient to pay the full Allowed amounts of the Professional Fees, Reorganized Remington shall promptly pay any remaining Allowed amounts from its Cash on hand. For the avoidance of doubt, in no circumstance shall ROC funds be contributed to the Professional Fees Escrow Account or used to pay any Professional Fees except as otherwise provided pursuant to the Plan.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that is permitted to receive, and the Remington Entities are permitted to pay without seeking further authority from the Bankruptcy Court, compensation for services and reimbursement of expenses in the ordinary course of the Remington Entities' businesses (and

in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation.

*(ii)*      Professional Fees Escrow Account

On the Effective Date, Reorganized Remington shall establish the Professional Fees Escrow Account in an amount equal to all asserted Claims for Professional Fees outstanding as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts payable by the Remington Entities or Reorganized Remington). Amounts held in the Professional Fees Escrow Account shall not constitute property of Reorganized Remington. The Professional Fees Escrow Account may be an interest-bearing account. In the event there is a remaining balance in the Professional Fees Escrow Account following payment to all holders of Claims for Professional Fees under the Plan, any such amounts shall be returned to Reorganized Remington.

Professionals shall estimate their unpaid Claims for Professional Fees incurred in rendering services to the Remington Entities or their Estates before and as of the Effective Date and shall deliver such estimate to counsel for the Remington Entities no later than ten (10) Business Days before the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of filed Professional Fees Claims. If a Professional does not provide an estimate, the Remington Entities shall estimate the unpaid and unbilled fees and expenses of such Professional in order for such Professional to be entitled to payment from the Professional Fees Escrow Account. The total amount proposed to be allocated to the Professional Fees Escrow Account pursuant to this Section shall be provided to the attorneys for the Remington Entities no later than three (3) Business Days before the Effective Date.

*(iii)*      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, Reorganized OpCo shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by Reorganized Remington on and after the Effective Date. On the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Reorganized Remington may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

d.      Term DIP Claims

On the Effective Date, each holder of an Allowed Term DIP Claim shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Term DIP Claim, have such Allowed Term DIP Claim replaced with obligations in an amount equal to such Allowed Term DIP Claim under the RSA Term Loan Facility or repaid in full in cash with the proceeds of an Alternative New Term Loan Facility. Pursuant to the Restructuring Support Agreement, each holder of an Allowed Term DIP Claim shall be deemed to have consented to

receive such treatment for such Allowed Term DIP Claim. The specific terms and conditions of the New Term Loan Facility will be subject to and may require material modifications depending on the terms and conditions of the New ABL Facility, the New FILO Term Loan Facility, or such other exit asset-based lending facility that Remington enters into on the Effective Date. For the avoidance of doubt, the obligations under the New FILO Term Loan Facility shall not replace the Allowed Term DIP Claims and no portion of the proceeds of the New FILO Term Loan Facility shall be used in any part to satisfy the Allowed Term DIP Claims.

     e.    ROC DIP Claims

On the Effective Date, ROC, as the holder of the Allowed ROC DIP Claims, shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed ROC DIP Claims, (i) receive the ROC DIP Distribution, and (ii) be deemed to automatically, and without need for any further action or notice, distribute such ROC DIP Distribution on a Pro Rata basis to the holders of Third Lien Notes Claims, consistent with the distributions described in Article III.B.5 of the Plan.

     f.    ABL DIP Claims

On the Effective Date, except to the extent such holder has agreed to an alternative treatment (which may include participation in an exit asset-based lending facility), each holder of any Allowed ABL DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, consideration equal to the Allowed amount of such Claim, in Cash, on the Effective Date.

     g.    Priority Tax Claims

Except to the extent that a holder of a Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim also is secured, such Claim shall, to the extent it is Allowed, be treated as an Allowed Other Secured Claim if such Claim is not otherwise paid or satisfied in full.

    2.    Classification and Treatment of Claims and Interests

     a.    Classification of Claims and Interests

Claims and Interests, except for Administrative Expenses, ABL DIP Claims, ROC DIP Claims, Term DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

To the extent that a particular Claim does not qualify within the description of any Class and the Plan otherwise fails to classify such Claim or specify its treatment, then such Claim shall be deemed to be part of Class 6; *provided, however*, that all rights of the holder(s) of such Claim(s), including the right to object to such classification, and the Remington Entities' and Reorganized Remington's rights and defenses thereto, are reserved.

The Plan constitutes a separate chapter 11 plan of reorganization for each Remington Entity.  Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept |
| 3 | ABL Facility Claims | Unimpaired | Deemed to accept |
| 4 | Term Loan Claims | Impaired | Entitled to vote |
| 5 | Third Lien Notes Claims | Impaired | Entitled to vote |
| 6 | General Unsecured Claims | Unimpaired | Deemed to accept |
| 7 | Intercompany Claims | Unimpaired | Deemed to accept |
| 8 | Settled Intercompany Claims | Impaired | Deemed to reject |
| 9 | Interests in ROC | Impaired | Deemed to reject |
| 10 | Intercompany Interests | Unimpaired | Deemed to accept |

     b.     Treatment of Claims and Interests

     *(i)*     Class 1 – Priority Non-Tax Claims

*Classification*:  Class 1 consists of all Allowed Priority Non-Tax Claims.  Although all Priority Non-Tax Claims have been placed in one Class for the purposes of nomenclature, the Priority Non-Tax Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 1 Claim shall (i) receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the later of the Effective Date and the date such Claim becomes due and payable in the ordinary course of business or (ii) be otherwise rendered Unimpaired.

*Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(ii)    Class 2 – Other Secured Claims

*Classification*: Class 2 consists of all Allowed Other Secured Claims. Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, the Other Secured Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 2 Claim (i) have its Claim be reinstated or receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, payment equal to the Allowed amount of such Claim, in Cash, on the Effective Date or (ii) be otherwise rendered Unimpaired.

*Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(iii)    Class 3 – ABL Facility Claims

*Classification*: Class 3 consists of all Allowed ABL Facility Claims. Although all ABL Facility Claims have been placed in one Class for the purposes of nomenclature, the ABL Facility Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*Allowance*: Except to the extent previously indefeasibly paid during the Chapter 11 Cases, Class 3 Claims are deemed Allowed in the aggregate principal amount of $114,500,000, plus any pre-petition and post-petition interest, fees, expenses, and other amounts due and owing pursuant to or secured by the terms of the ABL Facility Loan Documents as of the Effective Date.

*Treatment*: Except to the extent each holder has agreed to an alternative treatment (which may include participation in an exit asset based lending facility), each holder of an Allowed Class 3 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, consideration equal to the Allowed amount of such Claim, in Cash, on the Effective Date.

*Voting*: Class 3 is Unimpaired under the Plan. Therefore, holders of Allowed Class 3 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

(iv)    Class 4 – Term Loan Claims

*Classification*: Class 4 consists of all Allowed Term Loan Claims. Although all Allowed Term Loan Claims have been placed in one Class for the purposes of nomenclature, the Allowed

Term Loan Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*Allowance*: Class 4 Claims are deemed Allowed in the aggregate principal amount of $550,475,000, plus any interest, fees, and expenses due and owing pursuant to the terms of the Term Loan Agreement as of the Effective Date.

*Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 4 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, its Pro Rata share of (i) 82.5% of the New Common Units, (ii) to the extent such holder is an Electing Term Loan Lender, its Pro Rata Class 4 Shares of either (a) the Litigation Trust Class A Interests, or (b) any amounts allocated for distribution to the Electing Term Loan Lenders under a Litigation Settlement, and (iii) to the extent not previously paid to the Term Loan Lenders in accordance with the terms of the Interim DIP Order, Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018.

*Voting*: Class 4 is Impaired under the Plan. Therefore, holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

(v)    Class 5 – Third Lien Notes Claims

*Classification*: Class 5 consists of all Allowed Third Lien Notes Claims. Although all Allowed Third Lien Notes Claims have been placed in one Class for the purposes of nomenclature, the Allowed Third Lien Notes Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*Allowance*: Class 5 Claims are deemed Allowed in the aggregate amount of $226,012,000, plus any interest, fees, and expenses due and owing pursuant to the terms of the Third Lien Notes Indenture as of the Effective Date.

*Treatment*: Except to the extent such holder agrees to less favorable treatment, each holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, its Pro Rata share of (i) the ROC DIP Distribution, (ii) the Third Lien Noteholder Cash Distribution, (iii) the New Warrants, and (iv) to the extent such holder is an Electing Third Lien Noteholder, its Pro Rata Class 5 Shares of either (a) the Litigation Trust Class B Interests, or (b) any amounts allocated for distribution to the Electing Third Lien Noteholders under a Litigation Settlement. To the extent not previously paid by OpCo to ROC in accordance with the terms of the Interim DIP Order, on the Effective Date, OpCo shall transfer Cash to ROC in an amount equal to $924,375.61 for reimbursement of fees and costs previously paid by ROC between January 30, 2018 and March 16, 2018.

*Voting*: Class 5 is Impaired under the Plan. Therefore, holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.

*(vi)*     Class 6 – General Unsecured Claims

*Classification*:  Class 6 consists of all Allowed General Unsecured Claims.  Although all General Unsecured Claims have been placed in one Class for the purposes of nomenclature, the General Unsecured Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed Class 6 Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each such Claim, (i) payment equal to the Allowed amount of such Claim, in Cash, as an when such Claim becomes due and payable in the ordinary course of the applicable Remington Entity's business or in accordance with applicable court order (plus any interest accrued after the Petition Date with respect to such Claim as may be required by law to render such Claim Unimpaired, as determined by the Remington Entities or ordered by the Bankruptcy Court), or (ii) such other treatment that renders such holder Unimpaired; *provided, that* any Allowed General Unsecured Claim against ROC shall be assumed by Reorganized OpCo in accordance with the foregoing terms.

*Voting*:  Class 6 is Unimpaired under the Plan.  Holders of Allowed Class 6 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

*(vii)*     Class 7 – Intercompany Claims

*Classification*:  Class 7 consists of all Allowed Intercompany Claims.  Although all Allowed Intercompany Claims have been placed in one Class for the purposes of nomenclature, the Intercompany Claims against each applicable Remington Entity shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

*Treatment*:  Each holder of an Allowed Class 7 Claim shall (i) have its Claim be paid, reinstated, or cancelled, to the extent determined appropriate by the Remington Entities, or (ii) receive such other treatment that renders such holder Unimpaired.

*Voting*:  Class 7 is Unimpaired under the Plan.  Holders of Allowed Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

*(viii)*     Class 8 – Settled Intercompany Claims

*Classification*:  Class 8 consists of all Settled Intercompany Claims.

*Treatment*:  No holder of a Class 8 Claim shall receive a distribution under the Plan.

*Voting*:  Class 8 is Impaired under the Plan.  Each holder of a Claim in Class 8 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote.

*(ix)*     Class 9 – Interests in ROC

*Classification*:  Class 9 consists of all Interests in ROC.

*Treatment*:  No holder of a Class 9 Interest shall receive a distribution under the Plan.

*Voting*:  Class 9 is Impaired under the Plan. Each holder of a Claim in Class 9 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote.

*(x)*     Class 10 – Intercompany Interests

*Classification*:  Class 10 consist of all Allowed Interests in the Remington Entities other than in ROC, separately classified by Remington Entity.

*Treatment*:  Each holder of an Allowed Interest in Class 10 shall (i) have its Interest be reinstated or (ii) receive such other treatment that renders such holder Unimpaired.

*Voting*:  Class 10 is Unimpaired under the Plan.  Holders of Allowed Interests in Class 10 is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

    c.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Remington Entities' rights and defenses in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupment against, any such Unimpaired Claims.

3.     Acceptance or Rejection of Plan

a.     Voting Classes

Classes 4 and 5 are Impaired under the Plan; therefore, holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

An Impaired Class of Claims shall be deemed to have accepted the Plan if, not counting any holder designated pursuant to section 1126(e) of the Bankruptcy Code, (i) holders of at least two-thirds in amount of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan, and (ii) holders of more than one-half in number of the Allowed Claims held by holders who actually voted in such Class have voted to accept the Plan.

b.     Presumed Acceptance of the Plan

Classes 1, 2, 3, 6, 7, and 10 are Unimpaired under the Plan.  Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

c.  Non-Consensual Confirmation

Class 8 and Class 9 are Impaired and will not receive a distribution under the Plan. Accordingly, Class 8 and Class 9 are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Because Class 8 and Class 9 are deemed to reject the Plan, and to the extent that any other Impaired Class rejects the Plan, the Remington Entities will request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. The Remington Entities reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, subject in each instance to the Restructuring Support Agreement.

d.  Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, Reorganized Remington reserves the right to re-classify, with the consent of the Requisite Consenting Creditors, any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4.  Means for Implementation of Plan

a.  General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims in any Class and Interests in accordance with the Plan are intended to be and, shall be, final.

Several compromises are embodied in the Plan in light of, among other things, potentially avoidable transfers made by the Remington Entities, including the Settled Intercompany Claims, and the Remington Entities' liquidity crisis immediately prior to the commencement of the Chapter 11 Cases. The Remington Entities, the ABL Parties, and the Consenting Creditors negotiated in good faith and at arm's length to reach the consensual resolution embodied in the Plan and the Restructuring Support Agreement.

Although the Plan does not provide for substantive consolidation of the Estates, it also does not contemplate individual recoveries on a debtor-by-debtor basis. Rather, it represents a global and integrated series of compromises and settlements of all Allowed Claims and Interests against the Remington Entities, including, but not limited to, the settlement of all Allowed Claims held by the Consenting Creditors. The treatment of the Consenting Creditors' Claims and the ABL Parties' Claims set forth in the Plan supports maximum recoveries for all other creditors, including the unimpairment of holders of Claims in Class 6 (General Unsecured Claims).

    b.    Restructuring Transactions

On the Confirmation Date, subject to and consistent with the terms of its obligations under the Plan, the New ABL Facility Documents, the New Term Loan Facility Documents, the New FILO Term Loan Facility Documents, and the Restructuring Support Agreement, and subject to the rights of the Consenting Creditors under the Restructuring Support Agreement, the Remington Entities shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate and other Entity restructuring of their businesses, to otherwise simplify the overall corporate and other Entity structure of the Remington Entities, or to reincorporate or reorganize certain of the Remington Entities under the laws of jurisdictions other than the laws under which such Remington Entities currently are incorporated or formed, which restructuring may include one or more mergers, consolidations, dispositions, liquidations or dissolutions, as may be determined by the Remington Entities to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Remington Entities vesting in one or more surviving, resulting or acquiring entities (collectively, the "Restructuring Transactions"). Subject to the terms of the Plan, in each case in which the surviving, resulting or acquiring Entity in any such transaction is a successor to a Remington Entity, such surviving, resulting or acquiring Entity will perform the obligations of such Remington Entity pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Remington Entity, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Entity, which may provide that another Remington Entity will perform such obligations.

In effecting the Restructuring Transactions, the Remington Entities shall be permitted to: (1) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree; (2) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree; (3) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law; and (4) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. The terms of the Restructuring Transactions shall be structured to preserve favorable tax attributes, if any, of the Remington Entities.

    c.    Sources of Consideration for Plan Distributions

    *(i)*    Issuance of New Common Units and New Warrants

On the Effective Date, Reorganized ROC shall issue the New Common Units and the New Warrants. All of the securities issued pursuant to the Plan shall be duly authorized, validly issued, and fully paid, and non-assessable. Each distribution and issuance referred to in Article VIII of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, and by the terms and conditions of the instruments evidencing or relating

to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

On the Effective Date, ROC, as the holder of the Allowed ROC DIP Claims, shall, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed ROC DIP Claims, (i) receive the ROC DIP Distribution, and (ii) be deemed to automatically and without need for any further action or notice distribute such ROC DIP Distribution on a Pro Rata basis to the holders of Third Lien Notes Claims, consistent with the distributions described in Article III.B.5 of the Plan.

        *(ii)*    Cash

Other than the Third Lien Noteholder Cash Distribution, Reorganized OpCo shall fund distributions under the Plan required to be paid in Cash with Cash on hand, including Cash from operations and any Cash received on the Effective Date, and borrowings under the Term/ROC DIP Facility, the ABL DIP Facility, the New ABL Facility, and the New Term Loan Facility, as applicable.

        *(iii)*    New ABL Facility

On the Effective Date, Reorganized Remington shall enter into the $193 million New ABL Facility. The ABL DIP Lenders will commit to provide an exit facility upon Remington's emergence from bankruptcy, subject to the terms and conditions set forth in its commitment letter and the term sheet attached as **Exhibit 1** to the Plan. The borrowers and guarantors under the New ABL Facility will be the same as the existing ABL Facility, and additionally, ROC will become a guarantor after the Third Lien Noteholder Cash Distribution. The New ABL Facility is expected to contain affirmative and negative covenants that are customary for similar facilities, and will be secured by the same assets as the existing ABL Facility.

Confirmation shall be deemed approval of the New ABL Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New ABL Facility, including the New ABL Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, and the New ABL Agent may mutually agree to be necessary to consummate the New ABL Facility. The terms and conditions of the New ABL Facility are more specifically set forth in the commitment letter attached as **Exhibit 1** to the Plan.

        *(iv)*    New Term Loan Facility

As of the Petition Date, the Term DIP Lenders have committed to provide the RSA Term Loan Facility (in an amount equal to the Term DIP Facility Claims outstanding as of the Effective Date), which shall refinance the outstanding Term DIP Facility Claims. In the event that the Debtors' board of directors, in its good faith judgment, determines, prior to the Effective Date, and consistent with the milestone dates set forth in the Restructuring Support Agreement, that one or

more alternative commitments for financing (such facility, an "Alternative New Term Loan Facility") with the same or longer maturity and weighted average maturity, the same collateral priority and ranking and the same aggregate principal amount as the RSA Term Loan Facility is available at a lower effective yield (taking into account interest margins, minimum LIBOR rates, original issue discount, upfront fees and other fees, costs and expenses) than the RSA Term Loan Facility or otherwise on terms no less favorable, taken as a whole, to Reorganized Remington than the RSA Term Loan Facility, the Debtors may accept such commitment and consummate the transactions contemplated thereby without any liability in respect of the RSA Term Loan Facility, including any fees, costs or expenses thereunder; provided that (i) the Alternative New Term Loan Facility shall not include any commitment replacing, repaying or refinancing the New FILO Term Loan Facility, and (ii) the Debtors' acceptance of any Alternative New Term Loan Facility shall not release the Debtors or Reorganized Remington (after the Effective Date) from liability in respect of the New FILO Term Loan Facility, including any fees, costs or expenses thereunder.

On the Effective Date, Reorganized Remington shall enter into the New Term Loan Facility (in an amount equal to the Term DIP Facility Claims outstanding as of the Effective Date), and the outstanding Term DIP Facility Claims shall be replaced with, or repaid in full in cash with the proceeds of, the obligations under the New Term Loan Facility. Confirmation shall be deemed approval of the New Term Loan, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain and/or effectuate the New Term Loan Facility without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, the New ABL Agent, the New Term Loan Agent, and the New FILO Term Loan Agent (solely to the extent such modification materially affects the New ABL Agent, the New Term Loan Agent or the New FILO Term Loan Agent, as applicable) may mutually agree to be necessary to consummate the New Term Loan Facility. The specific terms and conditions of the New Term Loan Facility will be subject to and may require material modifications depending on the terms and conditions of the New ABL Facility, the New FILO Term Loan Facility, or such other exit asset-based lending facility that Remington enters into on the Effective Date.

*(v)*     New FILO Term Loan Facility

On the Effective Date, Reorganized Remington shall enter into the New FILO Term Loan Facility. Confirmation shall be deemed approval of the New FILO Term Loan Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized Remington in connection therewith and subject to the terms of conditions of the New FILO Term Loan Facility Documents) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New FILO Term Loan Facility, including the New FILO Term Loan Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, and the New

FILO Term Loan Agent may mutually agree to be necessary to consummate the New FILO Term Loan Facility. For the avoidance of doubt, the Remington Entities shall not solicit alternative financing commitments for financing in place of the New FILO Term Loan Facility.

        d.      Corporate Existence

Except as otherwise provided in the Plan, each of Reorganized ROC and its direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Remington Entity is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable law).

        e.      Vesting of Assets in Reorganized Remington

Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, and any property acquired by the Remington Entities pursuant to the Plan shall vest in Reorganized Remington, free and clear of all Liens, Claims, charges, or other encumbrances; provided, however, that (i) each Litigation Claim shall either (a) be treated pursuant to the terms of a Litigation Settlement, or (b) if no such Litigation Settlement occurs with respect to such Litigation Claim, shall be transferred to the Litigation Trust, and (ii) all unsecured claims against ROC as of the Effective Date shall be assumed by Reorganized OpCo on the Effective Date. On and after the Effective Date, except as otherwise provided in the Plan, Reorganized Remington may operate its businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or causes of action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

        f.      Cancellation of Loans, Securities, and Agreements

Except as otherwise provided in the Plan, on the Effective Date: (1) the Term/ROC DIP Credit Agreement, the ABL DIP Facility Loan Agreement, the ABL Facility, the Term Loan Agreement, the Third Lien Notes Indenture, the Interests in ROC, its intercompany notes, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Remington Entities giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, the Remington Entities that are reinstated pursuant to the Plan), shall be deemed cancelled, surrendered, and discharged as to the Remington Entities without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, and Reorganized Remington shall not have any continuing obligations thereunder or in any way related thereto; and (2) the obligations of the Remington Entities pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or

articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Remington Entities (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Remington Entities that are specifically reinstated pursuant to the Plan) shall be deemed satisfied in full, released, and discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity; provided, however, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions under the Plan, (b) with respect to the ABL Facility, as necessary to enforce the terms of the ABL Payoff Letter, including but not limited to the Surviving Obligations (as defined in the ABL Payoff Letter), and (c) solely with respect to the Term Loan Agreement, as necessary to (i) enforce the rights, Claims and interests of the Term Loan Agent and any predecessor thereof vis-a-vis the Secured Parties (as defined in the Term Loan Agreement) and any parties other than Remington or Reorganized Remington, (ii) preserve any rights of the Term Loan Agent and any predecessor thereof as against any money or property distributable to holders of Term Loan Claims, including any priority in respect of payment and the right to exercise any charging lien, and (iii) enforce the terms of the OpCo Bridge Payoff Letter, including but not limited to the Surviving Obligations (as defined in the OpCo Bridge Payoff Letter); provided further, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to Reorganized Remington. Except for the foregoing, the Term Loan Agent and its respective agents shall be relieved of all further duties and responsibilities related to the Financing Agreements (as defined in the Term Loan Agreement) and the Plan, except with respect to such other rights of the Term Loan Agent that, pursuant to the Term Loan Agreement, survive the termination of the Financing Agreements. Subsequent to the performance by the Term Loan Agent of its obligations pursuant to the Plan, the Term Loan Agent and its agents shall be relieved of all further duties and responsibilities related to the Financing Agreements.

g.    Corporate and Other Entity Action

On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including: (1) appointment of the New Boards pursuant to Article V.I of the Plan and any other managers, directors, or officers for Reorganized Remington identified in the Plan Supplement; (2) the issuance and distribution of the New Common Units by Reorganized ROC; (3) entry into the New Organizational Documents; (4) entry into the New ABL Facility Documents; (5) entry into the New Term Loan Facility Documents and the New FILO Term Loan Facility Documents; (6) entry into the Warrant Agreement and the issuance and distribution of the New Warrants by Reorganized ROC pursuant thereto; (7) implementation of the Restructuring Transactions; (8) the establishment of the Litigation Trust and the issuance of the Litigation Trust Interests, in each case, if applicable; and (9) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate or other Entity structure of the Remington Entities or Reorganized Remington, and any corporate or other Entity action required by the Remington Entities or Reorganized Remington in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, or officers of the Remington Entities or Reorganized

40

Remington. On or before the Effective Date, the appropriate officers of the Remington Entities or Reorganized Remington, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of Reorganized Remington, including any and all agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article V.G of the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

> h.    New Organizational Documents

On or immediately prior to the Effective Date or as soon thereafter as is practicable, Reorganized Remington shall, to the extent such New Organizational Documents were included in the Plan Supplement, file their New Organizational Documents (if so required under applicable state law) with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, Reorganized Remington may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the Plan, the laws of their respective states, provinces, or countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court.

> i.    Directors and Officers of Reorganized Remington and its Subsidiaries

As of the Effective Date, the terms of the current members of the boards of directors or managers (as applicable) of the Remington Entities shall expire, such directors shall be deemed to have resigned, and the initial boards of directors or managers (as applicable), including the New Boards, and the officers of each Reorganized Remington entity shall be appointed in accordance with the respective New Organizational Documents. The members of the New Boards will be identified in the Plan Supplement, together with biographical information. If any such director, manager, or officer of Reorganized Remington is an "insider" under the Bankruptcy Code, the Remington Entities also will disclose the nature of any compensation to be paid to such director or officer. Each such director, manager, and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized Remington.

> (i)    Reorganized ROC Board

The Reorganized ROC Board shall consist of seven (7) initial Directors appointed as follows on the Effective Date: (i) four (4) Directors appointed by the Requisite Consenting Term Loan Creditors (each, a "Term Loan Director"); (ii) two (2) Directors appointed by the Requisite Consenting Third Lien Creditors (the "Third Lien Notes Director"); and (iii) the CEO Director.

Thereafter, for so long as they own certain amounts of Reorganized ROC equity, certain stockholders of Reorganized ROC will have the right to appoint one or more directors to the

Reorganized ROC Board, subject to the terms and conditions of the New Organizational Documents. Except as provided below, in the event that any Designated Director for any reason ceases to serve as a member of the Reorganized ROC Board, the resulting vacancy on the Reorganized ROC Board shall be filled by a person designated by the party who designated such Designated Director. In the event that the CEO Director for any reason ceases to serve as a member of the Reorganized ROC Board (including as a result of ceasing to be Reorganized Remington's chief executive officer), the CEO Director board seat shall remain vacant until Reorganized Remington's chief executive officer is next appointed by the Reorganized ROC Board. Following the loss of any party's right to appoint a Designated Director, such party will cause its Designated Director to promptly resign, and the board seat formerly occupied by such Designated Director will thereafter be subject to a one-year term, with the vacancy resulting from such loss of designation rights initially filled by a vote of the holders of the New Common Units (determined by plurality) at a special meeting called for such purposes and, thereafter, shall be elected annually by the holders of the New Common Units.

*(ii)* New Subsidiary Boards

On the Effective Date, the New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

*(iii)* Certain Personnel

On and after the Effective Date until June 30, 2018, COAC shall continue to make available to Reorganized Remington each of Jim Geisler, John Kwapis, Jason Bixby, and Jed Dunbar, and COAC in accordance with past practice under the prepetition agreement between COAC and ROC (the "Existing COAC Agreement"); *provided, however,* that on and prior to the Effective Date, the Existing COAC Agreement shall be deemed to be amended (the "COAC Amendment") to provide that COAC shall pay for the foregoing personnel without any cost to the Remington Entities or Reorganized Remington.

j.    Effectuating Documents; Further Transactions

On and after the Effective Date, Reorganized Remington and the officers and members of the boards of directors thereof are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of Reorganized Remington, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

k.    Section 1146 Exemption

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents and any third party shall forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation any of

the foregoing instruments or other documents without the payment of any such tax, recordation fee, or assessment.

l.   Litigation Trust

Pursuant to Article VI hereof, a Litigation Trust shall be established in the event that Litigation Claims are not settled or otherwise resolved through a Litigation Settlement prior to the Effective Date. For the avoidance of doubt, if a Litigation Settlement occurs, the Litigation Trust will not be established.

m.   Preservation of Litigation Claims

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VI and Article IX of the Plan, each Remington Entity shall retain all rights to commence and pursue, as appropriate, any and all Litigation Claims that such Remington Entity or its Estate may hold whether arising before or after the Petition Date, including any actions specifically identified in the Plan Supplement, and such rights to commence, prosecute, settle, or assert as a defense such Litigation Claims shall be preserved notwithstanding the occurrence of the Effective Date. No Litigation Claim belonging to any of the Remington Entities prior to the occurrence of the Effective Date shall be settled without the consent of the Requisite Consenting Creditors. Unless any Litigation Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, each Remington Entity and its Estate expressly reserve any and all Litigation Claims that such Remington Entity or its Estate may hold.

If a Litigation Trust is established, any and all Litigation Claims that constitute Litigation Trust Assets shall be transferred to the Litigation Trust on the Effective Date, and the Litigation Trustee shall be entitled to enforce all rights to commence and pursue any such Litigation Claims at the Direction of the Litigation Trust Advisory Board in accordance with the terms of the Litigation Trust Agreement. If a Litigation Trust is established, the Litigation Trust expressly reserves any and all Litigation Claims that constitute Litigation Trust Assets for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Litigation Claims upon, after, or as a consequence of, the Confirmation or Consummation.

If the Litigation Trust is established, the Litigation Trustee, at the Direction of the Litigation Trust Advisory Board and in accordance with the terms of the Litigation Trust Agreement, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Litigation Claims and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Litigation Claim against it as any indication that Reorganized Remington or the Litigation Trust, as applicable, will not, or may not, pursue any and all available Litigation Claims against it.

n.    Management Incentive Plan

Following the Effective Date, the Reorganized ROC Board shall reserve a customary amount of the New Common Units for distribution to certain employees of Reorganized Remington pursuant to the Management Incentive Plan. The terms of the Management Incentive Plan and any awards thereunder shall be determined by the Reorganized ROC Board.

o.    Procedures for Treating Disputed Claims and Interests Under the Plan

*(i)*    Disputed Claims and Interests Process

Except as otherwise specified in the Plan or required by an order of the Bankruptcy Court, holders of Claims or Interests need not file proofs of claim or interest with the Bankruptcy Court and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan. If a proof of claim or interest is filed, and if Remington or Reorganized Remington dispute any such Claim or Interest, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; provided, however, that Remington or Reorganized Remington may elect to object to any proof of claim or interest, and to have the validity or amount of any Claim or Interest adjudicated by, the Bankruptcy Court; provided further, that holders of Claims or Interests may elect to resolve the validity or amount of any Claim or Interest in the Bankruptcy Court. If a holder makes such an election, the Bankruptcy Court shall apply applicable bankruptcy law and the law that would have governed the dispute if the Chapter 11 Cases had not been filed.. Notwithstanding anything to the contrary herein, (1) Reorganized Remington shall retain all defenses to Claims and Interests under applicable law and (2) notwithstanding anything to the contrary herein, on the Effective Date, any proof of claim or interest filed by an Entity whose Allowed Claim or Allowed Interest is otherwise addressed, resolved, paid, or satisfied by the Plan shall be automatically expunged without further notice to or action, order, or approval of the Bankruptcy Court. To the extent any holder of a Claim or Interest files a proof of claim or interest with the Bankruptcy Court, any objections to any such proof of claim or interest must be filed by no later than (i) ninety (90) days after the Effective Date if such proof of claim or interest is filed prior to the Effective Date or (ii) ninety (90) days after the date of the filing of such proof of claim or interest if such proof of claim or interest was filed after the Effective Date.

*(ii)*    No Distributions Pending Allowance

Notwithstanding anything to the contrary herein, if any portion of a Claim or Interest is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Disputed Interest becomes Allowed.

*(iii)*    Distributions after Allowance

To the extent that a Disputed Claim or Disputed Interest ultimately becomes Allowed, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment finding or deeming any Disputed Claim or Disputed Interest to be Allowed has become

a Final Order, the Disbursing Agent shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest

5.    The Litigation Trust

a.    Establishment of Litigation Trust

The parties shall execute the Litigation Trust Agreement on or before the Effective Date if no Litigation Settlement has occurred. In the event that a Litigation Settlement does not occur on or before the Effective Date, then on the Effective Date, the Litigation Trust Agreement shall be effective and the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purposes of, among other things, (i) administering the Litigation Trust Assets, (ii) prosecuting, settling, adjusting, retaining, and enforcing any Litigation Claims, (iii) making any distributions as provided for under the Plan and the Litigation Trust Agreement, and (iv) liquidating the Litigation Trust Assets. Each Electing Term Loan Lender and Electing Third Lien Noteholder has consented to treating its Litigation Claims as Litigation Trust Assets subject to the Litigation Trust Agreement by voting in favor of the Plan or otherwise checking the appropriate box on its ballot to "opt in" to such treatment. Accordingly, pursuant to the Plan, the Litigation Trust Beneficiaries shall be deemed parties to the Litigation Trust Agreement, and the Litigation Trust Agreement shall be binding upon all of the Litigation Trust Beneficiaries, without the need for any Litigation Trust Beneficiary to execute the Litigation Trust Agreement. The Litigation Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and shall take no action inconsistent with such qualification. The Litigation Trust will be initially funded by the Litigation Trust Fund.

For the avoidance of doubt, if a Litigation Settlement occurs, then no Litigation Trust shall be established and the remaining provisions of Article VI of the Plan shall be of no force or effect.

b.    Vesting of Assets

On the Effective Date, provided that a Litigation Settlement does not occur, then the Remington Entities and the Litigation Trust Beneficiaries shall be deemed to transfer all of the Litigation Trust Assets (and, in the case of (x) the Remington Entities, the rights and powers of the Remington Entities' Estates applicable to the Litigation Trust Assets in accordance with section 1141 of the Bankruptcy Code, and (y) the Consenting Third Lien Creditors, the Litigation Trust Fund) to the Litigation Trust, including all information necessary to investigate, prosecute, protect, and conserve all Litigation Claims, free and clear of all liens, Claims, encumbrances, and Interests (legal, beneficial, or otherwise) for the benefit of the Litigation Trust Beneficiaries. For the avoidance of doubt, upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the Remington Entities' rights, title, and interest in the Litigation Trust Assets, and the Remington Entities shall have no further interest in or with respect to the Litigation Trust. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. In connection with the vesting and transfer of the Litigation Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral and including, electronic information)

45

relating to the Litigation Trust Assets (collectively, the "Privileges") shall vest in the Litigation Trust. The Remington Entities, Reorganized Remington, the Consenting Creditors, and the Litigation Trustee shall take all necessary actions to effectuate the transfer of such privileges, protections, and immunities. The Litigation Trust's, Litigation Trustee's, and the Litigation Trust Advisory Board's receipt of the Privileges shall be without waiver in recognition of the joint/successorship interest in prosecuting claims on behalf of the applicable stakeholders of the Remington Entities' Estates.

The transfer of the Litigation Trust Assets to the Litigation Trust shall be made for the benefit and on behalf of the Litigation Trust Beneficiaries. The assets comprising the Litigation Trust Assets will be treated for tax purposes as being transferred by the Remington Entities to the Litigation Trust Beneficiaries pursuant to the Plan in exchange for a portion of their Allowed Claims and then by the Litigation Trust Beneficiaries to the Litigation Trust in exchange for the Litigation Trust Interests in the Litigation Trust. Article VII of the Litigation Trust Agreement ("Tax Matters") is incorporated by reference as if set forth fully herein. The Litigation Trust Beneficiaries shall be treated as the grantors and owners of their respective share of the Litigation Trust Assets. Upon the transfer of the Litigation Trust Assets, the Litigation Trust shall succeed to all of the Remington Entities' rights, title and interest in the Litigation Trust Assets, and the Remington Entities will have no further interest in or with respect to the Litigation Trust.

Except as provided in, and unless expressly released, compromised, or settled in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, the Litigation Trustee, upon the Direction (as defined in the Litigation Trust Agreement) of the Litigation Trust Advisory Board, shall enforce the Litigation Claims, in accordance with sections 1123(a)(5)(A) and 1123(b)(3) of the Bankruptcy Code. For the avoidance of doubt, any Direction of the Litigation Trust Advisory Board to release, compromise, or settle a Litigation Claim must be consistent with the Advisory Board's fiduciary obligations to the Litigation Trust Beneficiaries pursuant to Section 5.3 of the Litigation Trust Agreement. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel, (judicial, equitable, or otherwise), or laches shall apply to the Litigation Trust, the Litigation Trustee, or the Litigation Trust Advisory Board by virtue of or in connection with the confirmation, consummation, or effectiveness of the Plan. No Person or entity may rely on the absence of a specific reference in the Plan to any claim against them as any indication that the Litigation Trustee will not pursue any and all available Litigation Claims against them. Unless any Causes of Action against a Person or Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Litigation Trustee expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation Order.

In accordance with the Litigation Trust Agreement, the Litigation Trustee will prepare and make available to Litigation Trust Beneficiaries, on an annual basis, a written report detailing, among other things, the litigation status of the Litigation Claims, any settlements entered into by the Litigation Trust, the proceeds recovered to date from the Litigation Trust Assets, and the

46

distributions made by the Litigation Trust. Such report shall be posted on a website maintained by the Litigation Trustee. In addition, the Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article VI.B and Section 7.2 of the Litigation Trust Agreement.

c.    The Litigation Trustee

(i)    Appointment

The Litigation Trustee shall be selected no later than thirty (30) days after the Effective Date or as soon as practicable thereafter by the Requisite Third Lien Creditors in consultation with the Requisite Consenting Term Loan Creditors. The Litigation Trustee may be named in the Confirmation Order if selected prior to the Combined Hearing, or in the Litigation Trust Agreement if selected prior to the deadline for filing the Plan Supplement. Prior to the appointment of the Litigation Trustee, a majority of the Members may exercise all powers otherwise belonging to the Litigation Trustee, in addition to the powers provided to the Litigation Trust Advisory Board, pursuant to the Litigation Trust Agreement.

(ii)    Powers

The powers and responsibilities of the Litigation Trustee shall include, but shall not be limited to, those responsibilities vested in the Litigation Trustee pursuant to the Litigation Trust Agreement, the Confirmation Order, or as may be necessary and proper to carry out the provisions of the Plan relating to the Litigation Trust. The Litigation Trustee shall maintain good and sufficient books and records of account relating to the Litigation Trust Assets, the management thereof, all transactions undertaken by the Litigation Trustee, all expenses incurred by or on behalf of the Litigation Trustee, and all distributions to Litigation Trust Beneficiaries contemplated or effectuated under the Plan. In connection with the administration of the Litigation Trust, the Litigation Trustee shall have all powers necessary to implement the provisions of the Plan relating to the Litigation Trust, within the bounds of the Plan, the Litigation Trust Agreement, and applicable law.

(iii)    Litigation; Responsibilities of Litigation Trustee

The Litigation Trustee shall, upon the Direction of the Litigation Trust Advisory Board, in an expeditious but orderly manner, and subject to the other provisions of the Plan, the Confirmation Order, and the Litigation Trust Agreement, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions, and not unduly prolong the duration of the Litigation Trust. The Litigation Trust Advisory Board shall take into consideration the Members' fiduciary obligations pursuant to Section 5.3 of the Litigation Trust Agreement and the risks, timing, and costs of potential actions, in exercising its reasonable business judgment to maximize net recoveries to the Litigation Trust Beneficiaries. Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment, or dismissal of any or all claims, rights, or causes of action of the Litigation Claims or otherwise or through the sale or other disposition of the Litigation Trust Assets (in whole or in combination). Consistent with an agreed-upon budget in accordance with Section 3.12(b) of the Litigation Trust Agreement, if any, the Litigation Trustee may incur

47

any reasonable and necessary expenses in connection with liquidating and converting the Litigation Trust Assets to Cash and distribution of the proceeds thereof.

The Litigation Trust Advisory Board shall have the absolute right to provide Direction to the Litigation Trustee to prosecute, pursue, commence, object to, seek to estimate, seek to subordinate, compromise, settle, or take any other action concerning any and all Litigation Claims as it determines in good faith to be in the best interests of the Litigation Trust Beneficiaries, and consistent with (i) the Members' fiduciary obligations to the Litigation Trust Beneficiaries pursuant to Section 5.3 of the Litigation Trust Agreement; and (ii) the purposes of the Litigation Trust; provided, that neither the Litigation Trustee nor the Litigation Trust Advisory Board Members, and their representatives, shall have any liability for any actions or omissions in accordance with the Litigation Trust Agreement or with respect to the Litigation Trust unless arising out of such Person's own fraud, self-dealing, intentional misrepresentation, willful misconduct, breach of the fiduciary duty of loyalty, or gross negligence. The Litigation Trustee may incur any reasonable and necessary expenses in liquidating and converting the Litigation Trust Assets to Cash and shall be reimbursed in accordance with the provisions of the Litigation Trust Agreement. Any and all proceeds generated from the Litigation Trust Assets shall be the property of the Litigation Trust.

### (iv)    Employment of Professionals

The Litigation Trustee may, without further order of the Bankruptcy Court, but subject to the terms of the Litigation Trust Agreement, employ various professionals, including, but not limited to, counsel, experts, consultants, and financial advisors, as needed to assist the Litigation Trustee in fulfilling its obligations under the Plan. Such employment agreements shall be acceptable to the Litigation Trust Advisory Board. Professionals engaged by the Litigation Trustee shall not be required to file applications in order to receive compensation for services rendered and reimbursement of actual out-of-pocket expenses incurred. For the avoidance of doubt, unless an alternative fee arrangement has been agreed to (either by order of the Bankruptcy Court, at the Direction of the Litigation Trust Advisory Board, or the Litigation Trustee, as applicable), professionals retained by the Litigation Trustee shall be compensated solely by the Litigation Trust Fund. Any and all proceeds generated from the Litigation Trust Assets shall be the property of the Litigation Trust.

### (v)    Value of Litigation Trust Assets

As soon as reasonably practicable following the Effective Date, but in no event later than sixty (60) days thereafter, the Litigation Trustee shall inform, in writing, the Litigation Trust Advisory Board and the Litigation Trust Beneficiaries of the value of the Litigation Trust Assets, based on the good-faith determination of the Litigation Trustee. The valuation of the Litigation Trust Assets prepared pursuant to this Article VI.C.5 and Section 1.8 of the Litigation Trust Agreement shall be used consistently by all parties (including the Litigation Trust) for all federal income tax purposes. The Litigation Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit.

d.    Litigation Trust Advisory Board

(i)    Appointment

On or prior to the Confirmation Date, a three-member Litigation Trust Advisory Board shall be appointed as follows: (i) two Members to be appointed by the holders of Litigation Trust Class B Interests; and (ii) one Member to be appointed by the holders of Litigation Trust Class A Interests. The Litigation Trustee shall not be a Member. Each Member shall designate an alternate representative to attend meetings and participate in other activities of the Litigation Trust Advisory Board when the corresponding Member is unavailable to participate in such meetings and activities. With the express written consent of a majority in number of the Members, the Litigation Trust Advisory Board may appoint *ex officio* members. Such ex officio members shall not be entitled to vote.

(ii)    Authority and Responsibilities

The Litigation Trust Advisory Board shall, as and when requested by the Litigation Trustee, or when the Members otherwise deem it to be appropriate or as is otherwise required under the Plan, the Confirmation Order, or the Litigation Trust Agreement, consult with and advise the Litigation Trustee as to the administration and management of the Litigation Trust in accordance with the Plan, the Confirmation Order, or the Litigation Trust Agreement, and the Litigation Trustee's and the Litigation Trust Advisory Board's fiduciary duties and shall have the other responsibilities and powers as set forth herein. The Litigation Trust Advisory Board shall have the authority and responsibility to provide Direction with respect to the activities of the Litigation Trust and the performance of the Litigation Trustee and shall have the authority to remove the Litigation Trustee in accordance with Section 4.4 of the Litigation Trust Agreement *provided, however*, that the Litigation Trust Advisory Board may not provide Direction to the Litigation Trustee or the Members to act inconsistently with their duties under the Plan, the Confirmation Order, or the Litigation Trust Agreement, or their fiduciary obligations to the Litigation Trust Beneficiaries; *provided, further*, that the Litigation Trust Class A Trust Representative shall not have the authority to provide Direction to the Litigation Trustee with respect to any Litigation Claims to which only holders of Litigation Trust Class B Interests are entitled to proceeds, as set forth in Section 3.5(a) of the Litigation Trust Agreement. Notwithstanding anything to the contrary herein, the Litigation Trust Class A Trust Representative shall receive notice of and a reasonable opportunity to attend all meetings of the Litigation Trust Advisory Board.

The Litigation Trustee shall consult with and provide information to the Litigation Trust Advisory Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order, or the Litigation Trust Agreement to enable the Litigation Trust Advisory Board to meet its obligations hereunder.

Notwithstanding any provision of Litigation Trust Agreement to the contrary, the Litigation Trustee shall not be required to (i) obtain the Direction of the Litigation Trust Advisory Board to the extent that the Litigation Trust Advisory Board has not provided Direction to the Litigation Trustee to take any action that the Litigation Trustee, in good faith, reasonably determines, based on the advice of legal counsel, is required to be taken by applicable law; or (ii)

49

follow the Direction of the Litigation Trust Advisory Board to the extent that the Litigation Trust Advisory Board provides Direction to the Litigation Trustee to take action that the Litigation Trustee, in good faith, reasonably determines, based on the advice of legal counsel, is prohibited by applicable law or by the Litigation Trustee's fiduciary obligations.

e.    Expense Reserve and Litigation Trust Expenses

The Litigation Trustee shall establish a segregated account, maintained by the Litigation Trustee, to be funded initially by the Litigation Trust Fund and thereafter by such amounts as reasonably estimated from time to time by the Litigation Trustee as being necessary to assure payment when due of all expenses that the Litigation Trustee anticipates will be incurred in connection with carrying out the provisions of the Plan, the Litigation Trust Agreement, and applicable law, which amounts are to be reserved from distributions to Litigation Trust Beneficiaries.

Except as otherwise ordered by the Bankruptcy Court, the Litigation Trust Expenses, on or after the Effective Date, shall be paid in accordance with the Litigation Trust Agreement without further order of the Bankruptcy Court. For the avoidance of doubt, (i) the Litigation Trust Assets may not be used to pay professional fees and expenses other than those of the Litigation Trustee and professionals or vendors retained by the Litigation Trustee or his/her counsel, and (ii) the Remington Entities shall not have any obligation, or be required, to pay any of the Litigation Trust Expenses, other than the Litigation Trust Fund.

f.    Compensation of the Litigation Trustee

In addition to reimbursement for the Litigation Trust Expenses, the Litigation Trustee shall, upon the Direction of the Litigation Trust Advisory Board without necessity for review or approval by the Bankruptcy Court or any other Person, shall be paid reasonable compensation as provided by the Litigation Trust Agreement. The reasonable costs and expenses incurred by the Litigation Trustee in performing the duties set forth in the Plan shall be paid by the Litigation Trust from the Litigation Trust Fund. All costs, expenses, and obligations incurred by the Litigation Trustee in administering the Plan, or in any manner connected, incidental, or related thereto, including those of attorneys, accountants, and other persons employed to assist in the administration and distribution of the Litigation Trust Assets, shall be a charge against such assets.

g.    Litigation Trust Interests

Each Litigation Trust Interest will entitle its holder to distributions from the Litigation Trust in accordance with the terms of the Litigation Trust Agreement. The Litigation Trust Interests will be uncertificated; thus, distributions of Litigation Trust Interests will be accomplished solely by the entry of the names of the holders and their respective Litigation Trust Interests in the books and records of the Litigation Trust. Each holder of a Litigation Trust Interest shall take and hold its uncertificated beneficial interest subject to all of the terms and provisions of the Plan, the Confirmation Order, and the Litigation Trust Agreement.

The Litigation Trust Interests shall not be registered pursuant to the Securities Act of 1933, as amended, or any state securities law and shall be exempt from registration thereunder pursuant

to section 1145 of the Bankruptcy Code. For additional information on section 1145 of the Bankruptcy Code, see "*IX. Certain Federal and State Securities Law Considerations.*" The Litigation Trust Interests shall be freely transferable; *provided, however*, that the transfer of the Litigation Trust Interests will be prohibited to the extent such transfer would subject the Remington Entities to the registration and reporting requirements of the Securities Act and the Securities Exchange Act.

      h.    Distributions by Litigation Trustee

     The Litigation Trustee shall make distributions on account of Litigation Trust Interests in accordance with the terms of the Litigation Trust Agreement. The first $5,000,000 of any aggregate net proceeds of the Litigation Claims shall be allocated on a pro rata basis to the holders of Litigation Trust Class B Interests (the "Initial Distribution"), and any recoveries in excess of $5,000,000 obtained by the Litigation Trust shall be shared equally among the holders of Litigation Trust Class A Interests and holders of the Litigation Trust Class B Interests, if applicable. The Litigation Trustee shall classify and allocate recoveries from Litigation Claims in good faith and consistent with its fiduciary obligations to all Litigation Trust Beneficiaries under Section 3.2 of the Litigation Trust Agreement. Notwithstanding the foregoing, the holders of Litigation Trust Class B Interests shall receive all recovery amounts from any Litigation Claims that (i) are exclusively related to amounts transferred within applicable statutes of limitations from ROC to any transferee, or (ii) belong solely to ROC or any of its stakeholders; *provided, however*, for the avoidance of doubt, that any Litigation Claim based on mismanagement or a fiduciary-duty breach in connection with any potential merger, acquisition or similar change in control transaction of the Remington Entities, or against any third party in connection with the same; or based on mismanagement or a fiduciary-duty breach that had a material adverse effect on the value of any of the non-ROC Remington Entities (excluding claims related to amounts transferred within applicable statutes of limitations from ROC to any transferee, as set forth in (i) above), shall in each case not be deemed to belong solely to ROC.

     The identities and entitlements of the Litigation Trust Beneficiaries shall be maintained in a registry of the Litigation Trust, based on the ballots received from holders of Class 4 Claims and Class 5 Claims and using the Voting Record Date (as defined below) as the determinative date for such determination.

     The Litigation Trustee shall distribute or cause to be distributed to each Litigation Trust Beneficiary its share of any proceeds of the Litigation Trust Assets semi-annually, or more frequently as otherwise determined upon the Direction of the Litigation Trust Advisory Board, until such time as there are no longer any proceeds to distribute; provided, however, that the Litigation Trust may retain such amounts (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during liquidation; (ii) to pay or reserve for reasonable administrative expenses (including the costs and expenses of the Litigation Trust and the Litigation Trustee and the fees, costs, and expenses of all professionals retained by the Litigation Trustee, and any taxes imposed on the Litigation Trust or in respect of the assets of the Litigation Trust); and (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Litigation Trust Agreement. All reasonable and documented fees and expenses of the Term Loan Agent or any successor agent designated by the holders of Litigation Trust Class A Interests or the Litigation

Trust, as applicable, to receive distributions pursuant to the terms of the Litigation Trust Agreement (including the reasonable and documented fees and expenses of its counsel and agents) incurred in connection with such distributions shall be paid by Reorganized OpCo.

No Cash distributions shall be required to be made to any Litigation Trust Beneficiary in an amount less than $100.00. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions. Notwithstanding the foregoing, all cash shall be distributed in the final distribution of the Litigation Trust.

Notwithstanding the foregoing and the terms of the Litigation Trust Agreement, upon a motion by the Litigation Trustee (filed upon the Direction of the Litigation Trust Advisory Board) asserting reasonable grounds therefor, the Bankruptcy Court shall have the authority to enter an order directing that distributions to be made on account of Litigation Trust Interests issued to the Third Lien Notes Indenture Trustee or the Term Loan Agent instead be made to the beneficial and/or record Third Lien Noteholders and/or Term Loan Lenders. Reasonable grounds shall include, without limitation, an insolvency proceeding relating to the Third Lien Notes Indenture Trustee or Term Loan Agent, or any other circumstance in which the distributions being made on account of Litigation Trust Interests would not or cannot promptly be made to the beneficial Third Lien Noteholders or the Term Loan Lenders.

      i.     Termination

The Litigation Trust Advisory Board and the Litigation Trust shall be dissolved no later than five years from the Effective Date unless the Litigation Trust Advisory Board determines that a fixed period extension (not to exceed three years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Trust Advisory Board that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Litigation Trust Assets.

Notwithstanding the foregoing, multiple extensions can be effectuated as long as the Litigation Trust Advisory Board determines that each such extension is necessary at least ninety (90) days prior to the expiration of each extended term; *provided*, *however*, that in no event shall the term of the Litigation Trust extend past ten years from the Effective Date. In the event a Cash balance exists in the Litigation Trust Fund upon termination of the Litigation Trust, (i) if holders of the Litigation Trust Class B Interests have not received, or have only received a portion of, the Initial Distribution contemplated by Article VI.H of the Plan, the difference between $5,000,000 and the portion of the Initial Distribution the holders of Litigation Trust Class B Interests have received shall be distributed to holders of the Litigation Trust Class B Interests, and (ii) any remaining balance shall be shared equally by holders of the Litigation Trust Class A Interests and Litigation Trust Class B Interests.

6.    Treatment of Executory Contracts and Unexpired Leases

a.    Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise ordered by the Bankruptcy Court or provided herein, all Executory Contracts and Unexpired Leases of the Remington Entities, including the Existing Employment Agreements, shall be deemed assumed by the applicable Remington Entity counterparty in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, on the Effective Date, all Executory Contracts and Unexpired Leases to which ROC or FGI Holding is a party shall be deemed assumed by Reorganized OpCo; *provided, that* all federal, state, or local government licenses, permits, and similar rights or privileges held by ROC shall be deemed assumed on the Effective Date by Reorganized ROC. All indemnification contracts and employment contracts to which one or more Remington Entities is a party shall be rejected to the extent permitted by law unless expressly assumed prior to the Effective Date or pursuant to the terms of the Plan.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, and assumptions and assignments, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to Article VII.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in, and be fully enforceable by, Reorganized OpCo in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Remington Entity that is party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

b.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of Reorganized OpCo or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption and shall not prevent or delay implementation of the Plan or the occurrence of the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of the applicable cure amount, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any proof of claim filed with respect to an Executory Contract or Unexpired Lease that is assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

      c.     Insurance Policies

Each of the insurance policies of the Remington Entities, including all director and officer insurance policies in place as of the Petition Date are deemed to be and treated as Executory Contracts under the Plan. On the Effective Date, the Remington Entities shall be deemed to have assumed all insurance policies, including all director and officer insurance policies in place as of the Petition Date.

      d.     Employment Agreements

On the Effective Date, Reorganized OpCo shall be deemed to have assumed that certain Employment Agreement dated as of August 15, 2015, by and between Remington Outdoor Company, Inc. and Stephen P. Jackson, Jr., and that certain Employment Agreement dated as of October 19, 2017, by and between Remington Outdoor Company, Inc. and Anthony A. Acitelli (collectively, the "Existing Employment Agreements"). The Existing Employment Agreements are the only two employment contracts of which the Remington Entities are aware.

      e.     Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed and, if applicable, assigned to OpCo, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts or Unexpired Leases that have been executed by the Remington Entities during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith; provided, that the Remington Entities shall not execute any material modification, amendment, supplement, and/or restatement on or after the Confirmation Date and prior to the Effective Date without the consent of the Requisite Consenting Creditors, which consent shall not be unreasonably withheld, and upon notice to the ABL DIP Agent.

f.      Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Remington Entities that any Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease or that the Remington Entities or Reorganized Remington has any liability thereunder.

g.      Non-Occurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

h.      Contracts and Leases Entered into after Petition Date

Contracts and leases entered into after the Petition Date by any Remington Entity, including any Executory Contracts and Unexpired Leases assumed by a Remington Entity, will be performed by the applicable Remington Entity or Reorganized OpCo, as the case may be, liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

i.      Rejection Damages Claims

If the rejection of an executory contract or unexpired lease by the Remington Entities results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be classified and treated in Class 6 (General Unsecured Claims).

7.      Provisions Governing Distributions

a.      Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, on the Effective Date (or if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class; provided however, that holders of Third Lien Notes Claims will receive their distribution (other than any such distributions of Litigation Trust Interests) on, or as soon as practicable after, the Effective Date via customary methods to make distributions through DTC, including via a mandatory exchange upon surrender of the Third Lien Notes Claims. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

b.      Application of Distributions

Any distribution made under the Plan on account of an Allowed Claim shall be allocated first to the principal amount of such Claim (as determined for U.S. federal income tax purposes)

and then, to the extent the consideration exceeds the principal amount of the Claim, to any portion of such Claim for accrued but unpaid interest.

     c.     Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date. If the Disbursing Agent is one or more of Reorganized Remington, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized OpCo.

     d.     Rights and Powers of Disbursing Agent

     *(i)*     Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

     *(ii)*     Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent on and after, or in contemplation of, the Effective Date (including taxes) and any reasonable compensation and documented expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by Reorganized OpCo.

     e.     Delivery of Distributions and Undeliverable or Unclaimed Distributions

     *(i)*     Delivery of Distributions to Term Loan Agent and Third Lien Notes Indenture Trustee

No later than two (2) Business Days after the Distribution Record Date, the Term Loan Agent shall provide to counsel to the Remington Entities a list of all holders of Term Loan Claims as of such date and such additional information as reasonably requested by counsel to the Remington Entities or the Disbursing Agent required to make distributions under the Plan. The Term Loan Agent may, in its sole discretion, limit the further assignment of Term Loan Claims to allow for the accurate recording of the holders of Term Loan Claims as of the Distribution Record Date with respect to the Term Loan Claims. All distributions of Cash on account of Term Loan Claims shall be deposited with the Term Loan Agent for distribution to holders of Term Loan Claims in accordance with terms of the Plan and the Term Loan Agreement. All distributions other than Cash on account of Term Loan Claims shall be made by the Disbursing Agent directly to holders of Term Loan Claims or such holder's authorized designee in accordance with terms of

the Plan and the Term Loan Agreement. All reasonable and documented fees and expenses of the Term Loan Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the Chapter 11 Cases or the implementation of the Plan, including but not limited to as part of Article VIII.E.1 of the Plan, shall be paid by Reorganized OpCo.

All distributions to holders of Allowed Third Lien Notes Claims shall be governed by the Third Lien Notes Indenture and shall be made to each holder of an Allowed Third Lien Notes Claim, or such holder's authorized designee, for purposes of distributions to be made hereunder. Notwithstanding the foregoing, except as otherwise provided in the Plan or reasonably requested by the Third Lien Notes Indenture Trustee, all distributions to holders of Allowed Third Lien Notes Claims shall be deemed completed when made to the Third Lien Notes Indenture Trustee, which shall be deemed to be the holder of all Allowed Third Lien Notes Claims for purposes of distributions to be made hereunder. The Third Lien Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Third Lien Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article VIII, the Third Lien Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders. If the Third Lien Notes Indenture Trustee is unable to make, or consents to Reorganized Remington or the Disbursing Agent making, such distributions, Reorganized Remington or the Disbursing Agent, as applicable, with such Third Lien Notes Indenture Trustee's cooperation, shall make such distributions to the extent reasonably practicable to do so. As to any holder of an Allowed Third Lien Notes Claims that is held in the name of, or by a nominee of, DTC, Reorganized Remington, or the Disbursing Agent, as applicable, shall seek the cooperation of DTC so that such distribution shall be made through the facilities of DTC on or as soon as practicable on or after the Effective Date. All reasonable and documented fees and expenses of the Third Lien Notes Indenture Trustee incurred after the Effective Date as part of Article VIII.E.1 of the Plan shall be paid by Reorganized OpCo.

*(ii)*    Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date (provided that the foregoing shall not apply to publicly held securities, including, without limitation, the Third Lien Notes), at the address for each such holder as indicated on the Remington Entities' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of Reorganized Remington. Notwithstanding any of the foregoing, and for the avoidance of doubt, the Distribution Record Date for purposes of making any determinations with respect to qualification of any holder of a Class 4 Claim or Class 5 Claim as an Electing Term Loan Lender, Electing Third Lien Noteholder, or a Litigation Trust Beneficiary, and with respect to receiving any distributions of Litigation Trust Interests under the Plan, shall be made by reference to the Voting Record Date.

*(iii)*    Minimum Distributions

No fractional New Common Units, New Warrants, or Litigation Trust Interests shall be distributed, and no Cash shall be distributed with respect to such fractional amounts. When any distribution pursuant to the Plan would otherwise result in the issuance of a number of New

Common Units, New Warrants, or Litigation Trust Interests that is not a whole number, the actual distribution of New Common Units New Warrants, or Litigation Trust Interests, as applicable, shall be rounded as follows: (a) fractions of greater than one-half (½) shall be rounded to the next higher whole number, and (b) fractions of one-half (½) or less shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized New Common Units, New Warrants, or Litigation Trust Interests, as applicable, to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding. DTC is considered a single holder for rounding and distribution purposes and no additional cash or securities will be distributed to DTC on account of rounding at the DTC participant or beneficial holder level.

*(iv)*      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date; provided further, that the Remington Entities or Reorganized Remington, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to Reorganized Remington automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred; provided; that all distributions of (i) the ROC DIP Distribution, (ii) the Third Lien Noteholder Cash Distribution, (iii) New Warrants, (iv) Cash, and (v) New Common Units that are unclaimed by a holder of Allowed Class 4 Claims or Allowed Class 5 Claims, as applicable, shall be distributed on a Pro Rata basis to the holders of Allowed Class 4 Claims or Allowed Class 5 Claims, as applicable, whose distributions of the preceding items (i)-(v) on the Effective Date were not returned as undeliverable; provided further, that no unclaimed distributions on account of an Allowed Class 4 Claim shall be distributed to the holders of Allowed Class 5 Claims, and no unclaimed distributions on account of an Allowed Class 5 Claim shall be distributed to the holders of Allowed Class 4 Claims; provided further, that if a Litigation Trust is established pursuant to Article VI of the Plan, each Electing Term Loan Lender whose distributions of the preceding items (i)-(v) were not returned as undeliverable shall receive their Pro Rata Class 4 Share of all unclaimed distributions of Litigation Trust Class A Interests, and each Electing Third Lien Noteholder whose distributions of the preceding items (i)-(v) were not returned as undeliverable shall receive their Pro Rata Class 5 Share of all unclaimed distributions of Litigation Trust Class B Interests.

f.      Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the issuance and distribution of the New Common Units, the New Warrants (and the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests as contemplated by the Plan shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration thereunder. In addition, under section 1145 of the Bankruptcy

Code, the New Common Units, the New Warrants (and the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments and subject to any restrictions in the New Organizational Documents, the Warrant Agreement, and the Litigation Trust Agreement, as applicable.  Notwithstanding anything to the contrary herein, the transfer of the New Common Units, the New Warrants, and the Litigation Trust Interests will be prohibited to the extent such transfer would subject the Remington Entities to the registration and reporting requirements of the Securities Act and the Securities Exchange Act.  For additional information on section 1145 of the Bankruptcy Code, see "*IX. Certain Federal and State Securities Law Considerations*."

      g.     Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, Reorganized Remington shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, Reorganized Remington and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  Reorganized Remington reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

      h.     No Postpetition Interest on Claims and Interests

Unless otherwise specifically provided for in the Restructuring Support Agreement, Plan, Confirmation Order, or other Bankruptcy Court order or otherwise required by applicable law, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

      i.     Setoffs and Recoupment

The Remington Entities and Reorganized Remington are authorized to set off against or recoup from any Claims (to the extent not released pursuant to the Plan) of any nature whatsoever that the Remington Entities or Reorganized Remington may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Remington Entities or Reorganized Remington of any such claim they may have against the holder of such Claim.

> j.    Claims Paid or Payable by Third Parties

> > (i)    Claims Paid by Third Parties

The Remington Entities or Reorganized Remington, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that is not a Remington Entity or Reorganized Remington entity.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Remington Entity or Reorganized Remington entity on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Remington Entity or Reorganized Remington entity, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Remington Entity annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.  Notwithstanding the foregoing, if a Litigation Trust is established, nothing in this Section VIII(J) shall apply to any treatment or recoveries on account of being a Litigation Trust Beneficiary.

> > (ii)    Claims Payable by Third Parties

To the extent that one or more of the Remington Entities' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

> > (iii)    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Remington Entities or any Entity, including the Litigation Trustee, may hold against any other Entity under any insurance policies, including against insurers or any insured, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

> 8.    Settlement, Release, Injunction, and Related Provisions

> a.    Compromise and Settlement

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Remington Entities, their Estates, and all holders of Claims or Interests, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9019.  In addition,

the allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Remington Entities and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan. The Confirmation Order shall authorize and approve the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto. Nothing in Article IX.A. of the Plan shall compromise or settle, in any way whatsoever, any Causes of Action that the Remington Entities or Reorganized Remington, as applicable, may have against any Entity that is not a Released Party.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, but subject in all respects to Article VI, after the Effective Date, except with respect to the Litigation Trust Assets, Reorganized Remington may, in its sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in the Remington Entities (if any), and (2) claims (including Causes of Action) against other Entities.

      b.     Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Plan Supplement), the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by Reorganized Remington), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Remington Entities or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose prior to the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), (h), or (i) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests as set forth above subject to the occurrence of the Effective Date. The discharge of all Claims and Interests as set forth above shall not apply to any Litigation Claim unless such Litigation Claim is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Litigation Settlement, or a Bankruptcy Court order. Notwithstanding the foregoing or anything to the contrary in the Plan or in the Confirmation Order, (a) each Administrative Expense and any Claim or Interest arising prior to the Effective Date in Classes 1, 2, 3, 6, 7, or 10 (including Claims for rejection damages pursuant to section 365 of the Bankruptcy Code) of the Plan shall not be deemed settled, satisfied, resolved, released, discharged, barred or enjoined by any provision of the Plan, and (b) Remington and Reorganized Remington shall retain all defenses, counterclaims, rights to setoff, and rights to recoupment, if any, as to the foregoing Claims.

c.    Release of Liens

Except as otherwise expressly provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the New ABL Facility Documents, New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the New ABL Facility Documents, New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to Reorganized Remington and each of their successors and assigns.

d.    Releases of Released Parties

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article IX.D of the Plan and shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by Article IX.D of the Plan; (3) in the best interests of the Remington Entities and all holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity (including the Remington Entities) asserting any claim or Cause of Action released pursuant to Article IX.D of the Plan.

*(i)*    Releases by the Remington Entities

Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including without limitation the efforts of the Released Parties to facilitate the reorganization of the Remington Entities and the implementation of the restructuring contemplated by the Restructuring Support Agreement, on and after the Effective Date, the Remington Entities, and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions and Settled Intercompany Claims), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Remington Entity, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereinafter arising, in law, equity, or otherwise, that the Remington Entities, or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Remington Entity), based on or relating to, or in any manner arising from, in whole or in part, the Remington Entities, the Chapter 11 Cases, the ABL DIP Claims, the Term DIP Claims, the ROC DIP Claims, the ABL Facility Claims, the Term Loan Claims, the Third Lien Notes Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Remington Entities or Reorganized Remington, the subject matter of, or the transactions

62

or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Remington Entity and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New Term Loan Facility, (iii) the New FILO Term Loan Facility, (iv) the New ABL Facility, (v) the Disclosure Statement, (vi) the Restructuring Support Agreement, or (vii) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.  For the avoidance of doubt, the releases described in Article IX.D.1 of the Plan do not release any Litigation Claim asserted or that could be asserted against any Unreleased Debtor Parties or any Independent Directors and Officers. However, such Litigation Claims may be released pursuant to a Litigation Settlement. Any recovery on account of any potential and/or actual claims against the Independent Directors and Officers of the Remington Entities shall be within and to the extent of the limits of liability and the scope of coverage afforded by the insurance held by the Remington Entities.

    *(ii)*    Third-Party Releases by Holders of Claims or Interests

Except as otherwise expressly provided in the Plan, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Remington Entity, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Remington Entity), based on or relating to, or in any manner arising from, in whole or in part, the Remington Entities, the Chapter 11 Cases, the ABL DIP Claims, the Term DIP Claims, the ROC DIP Claims, the ABL Facility Claims, the Term Loan Claims, the Third Lien Notes Claims, the purchase, sale, or rescission of the purchase or sale of any security of the Remington Entities or Reorganized Remington, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Remington Entity and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, consummation, or dissemination of: (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the New Term Loan Facility, (iii) the New ABL Facility, (iv) the Disclosure Statement, (v) the Restructuring Support Agreement, or (vi) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence.  For the

avoidance of doubt, the releases described in this Article IX.D.2 do not release any Litigation Claim asserted or that could be asserted against any Unreleased Debtor Parties or any Independent Directors and Officers. However, such Litigation Claims may be released pursuant to a Litigation Settlement. Any recovery on account of any potential and/or actual claims against the Independent Directors and Officers of the Remington Entities shall be within and to the extent of the limits of liability and the scope of coverage afforded by the insurance held by the Remington Entities.

e.      Exculpation

Except as otherwise expressly provided in the Plan, and to the extent permitted under Section 1125(e) of the Bankruptcy Code, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claims (including any Cause of Action), whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereinafter arising, in law, equity, or otherwise, related to or arising out of any act taken or omitted to be taken in connection with, or relating to, negotiation of and entry into the Restructuring Support Agreement, the ABL DIP Facility Loan Agreement, the Term/ROC DIP Credit Agreement, the New ABL Facility Documents, the New Term Loan Facility Documents, the New FILO Term Loan Facility Documents, the issuance of the New Common Units and the New Warrants pursuant to the Plan, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the preparation or filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the Restructuring Transactions, and the administration and implementation of the Plan, including the issuance of any securities or the distribution of property under the Plan or any other agreement or any obligation, cause of action, or liability for any such Claim; provided, however, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, fraud, or gross negligence; provided, further, that in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan; provided, further that the exculpations set forth herein shall not be deemed a release of any claims or Causes of Action that are otherwise expressly preserved by the Plan.   The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

f.      Injunction

Except as otherwise expressly provided in the Plan and, if applicable, the Litigation Trust Agreement, and except for obligations issued pursuant to the Plan, including with respect to the New ABL Facility, the New Term Loan Facility, and the New FILO Term Loan

Facility, all Entities (along with their respective current or former employees, agents, officers, directors, principals, and affiliates) who have held, hold, or may hold claims, Causes of Action, or interests that have been released pursuant to Article IX.D of the Plan (the "<u>Released Claims</u>") or discharged pursuant to Article IX.B of the Plan (the "<u>Discharge</u>"), or that are subject to exculpation pursuant to Article IX.E of the Plan (the "<u>Exculpation</u>") are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties or the Exculpated Parties:    (1) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; (2) enforcing, attaching, collecting, or recovering, by any manner or means any judgment, award, decree or order against the Released Parties or the Exculpated Parties, as applicable, on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Released Parties or the Exculpated Parties, as applicable, or their property or assets on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation; and (4) asserting any right of subrogation, setoff, or recoupment of any kind against any obligation due from the Released Parties or the Exculpated Parties, as applicable, or against their property or assets on account of, in connection with, or with respect to, any Released Claims or any Claim, Cause of Action, or Interest that is the subject of the Discharge or Exculpation. Pursuant to sections 1142 and 105 of the Bankruptcy Code, from and after the Effective Date, all holders of Claims and Interests and other parties in interest, along with their respective current or former employees, agents, officers, directors, principals and affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; provided, that if a Litigation Trust is established, this Section F shall not apply to the Litigation Trustee, the Litigation Trust Advisory Board, or any Litigation Trust Beneficiary, each, solely in its capacity as such, and shall not enjoin such parties with respect to the Litigation Trust or any of the Litigation Trust Assets (including the Litigation Claims).

      9.     Conditions to Confirmation and Effective Date

         a.     Conditions to Confirmation

The following are conditions to Confirmation that shall have been satisfied or waived in accordance with Article X.C of the Plan:

     1.     no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred in accordance with the terms of the Restructuring Support Agreement, and no Termination Event shall have occurred and not been waived;

     2.     the Confirmation Order shall approve all provisions, terms, and conditions hereof and be in form and substance (i) acceptable to the Remington Entities, the Requisite Consenting Creditors, the ABL DIP Agent, the New ABL Agent, and New FILO Term Loan Lenders, and the ABL Required Lenders, each in its sole

and absolute discretion, and (ii) to the extent any provision of such order materially affects the New Term Loan Agent, acceptable to the New Term Loan Agent in its sole and absolute discretion; and

3.    the Plan Supplement shall have been filed at least fourteen (14) days prior to the Combined Hearing, and shall be (i) in form and substance reasonably acceptable to the Remington Entities and the Requisite Consenting Creditors, and (ii) to the extent ABL Parties are materially affected, in form and substance acceptable to the ABL DIP Agent in its sole and absolute discretion, and any additional documents or amendments to previously-filed documents shall have been filed as amendments to the Plan Supplement prior to Confirmation.

     b.    Conditions to Effective Date

The following are conditions to the Effective Date that shall have been satisfied or waived in accordance with Article X.C of the Plan:

1.    no valid termination of the Restructuring Support Agreement with respect to the obligations of all parties thereto shall have occurred in accordance with the terms of the Restructuring Support Agreement, and no Termination Event shall have occurred and not been waived;

2.    the Bankruptcy Court shall have entered the Final DIP Order in such form and substance as is (i) consented to by each of the Remington Entities and to the Requisite Consenting Creditors, (ii) acceptable to the ABL DIP Agent in its sole and absolute discretion, and (iii) and otherwise consistent with the Restructuring Support Agreement;

3.    Confirmation shall have occurred, the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation shall not be subject to any stay, modification or reversal;

4.    all authorizations, consents, regulatory approvals, rulings, or documents required by applicable law to implement and effectuate the Plan, including any approvals required in connection with the transfer, change of control, or assignment of the Remington Entities' permits and licenses, shall have been obtained from any appropriate regulatory agencies and not subject to any appeal;

5.    except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with Consummation shall have been executed, delivered, assumed, or performed, as the case may be, and any conditions contained therein (other than Consummation or notice of Consummation) shall have been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement, which are in form and substance (i) reasonably acceptable to the Remington Entities and the Requisite Consenting Creditors, and otherwise consistent with the Restructuring Support Agreement, and (ii) reasonably acceptable to the ABL DIP Agent, Term/ROC DIP Agent, and the New FILO Term Loan Lenders (provided, however, that to

the extent the ABL Parties, Term DIP Lenders, ROC DIP Lender, or the New FILO Term Loan Lenders are materially affected, acceptable to the ABL DIP Agent, Term/ROC DIP Agent, or the New FILO Term Loan Lenders, respectively, in their sole and absolute discretion);

6.      all other actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered, as the case may be, to the appropriate parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable law;

7.      there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

8.      the conditions to the effectiveness of each of the New ABL Facility, the New Term Loan Facility, and the New FILO Term Loan Facility shall have been satisfied or waived in accordance with the terms of the New ABL Facility Documents, the New Term Loan Facility Documents, and the New FILO Term Loan Facility Documents (as applicable) on or prior to the Effective Date;

9.      the Third Lien Noteholder Cash Distribution shall be $39.3 million in Cash at ROC, *less* all fees and expenses incurred by Willkie Farr & Gallagher LLP, Young Conaway Stargatt & Taylor, LLP, and Perella Weinberg Partners on behalf of the Consenting Third Lien Creditors; *plus* $5.0 million to be distributed on the Effective Date in the event of a Litigation Settlement;

10.     the Professional Fees Escrow Account shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan;

11.     on the date of the initial extension of credit pursuant to the terms of the Term/ROC DIP Credit Agreement, (a) OpCo shall have paid ROC in Cash an amount equal to $924,375.61 for reimbursement of fees and costs previously paid by ROC between January 30, 2018 and March 16, 2018, and (b) the Term Loan Lenders shall have received Cash in an amount equal to the approximately $2.67 million interest payment that was due to the Term Loan Lenders on February 1, 2018; and

12.     the New FILO Term Loan Facility, in the form of the term sheet attached to the Plan as **Exhibit 4**, shall have been consummated in accordance with such term sheet and is otherwise reasonably acceptable to the Requisite Consenting Creditors.

c.     Waiver of Conditions

The conditions to Confirmation and the Effective Date set forth in Article X of the Plan may be waived only by the Remington Entities, with the consent of the Requisite Consenting Creditors and the ABL DIP Agent, which consents may be withheld in their sole and absolute

discretion, in whole or in part, without notice, leave, or order of the Bankruptcy Court. Notwithstanding the foregoing, the condition set forth in Article X.B.9 of the Plan may be waived only by the Requisite Consenting Third Lien Creditors.

        d.     Effect of Non-Occurrence of Effective Date

If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity; (2) prejudice in any manner the rights of the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Remington Entities, any holders of Claims or Interests (including the Consenting Creditors), or any other Entity, in any respect. For the avoidance of doubt, except as provided in the Restructuring Support Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Restructuring Support Agreement upon non-occurrence of the Effective Date (subject, in all respects, to any consent, termination, or other rights of the Consenting Creditors under the Restructuring Support Agreement) or as otherwise preventing the Restructuring Support Agreement from being effective in accordance with its terms.

       10.     Modification, Revocation or Withdrawal of Plan

        a.     Modification and Amendments

Except as otherwise specifically provided in the Plan, and subject to the terms of the Restructuring Support Agreement, the Remington Entities reserve the right to modify the Plan, with the consent of the Requisite Consenting Creditors, the Term Loan Agent, the Term/ROC DIP Agent, the ABL DIP Agent, the New FILO Term Lenders, and the New ABL Required Lenders, which consent may be withheld in their sole and absolute discretion, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the terms of the Restructuring Support Agreement, and subject to the consent of the Requisite Consenting Creditors, the ABL DIP Agent, the New FILO Term Lenders, and the New ABL Required Lenders, which consent may be withheld in their sole and absolute discretion, each Remington Entity expressly reserves its respective rights to revoke, withdraw, alter, amend, or modify the Plan with respect to such Remington Entity, one or more times, after Confirmation, to the extent necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement, including by structuring the Plan, the Restructuring, and the Restructuring Transaction in a manner that preserves favorable tax attributes. Each Remington Entity may, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan and the Restructuring Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

b.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

c.    Revocation or Withdrawal of Plan

The Remington Entities reserve the right to revoke or withdraw the Plan with respect to any or all of the Remington Entities prior to the Confirmation Date and to file subsequent plans of reorganization, subject in each instance to the Restructuring Support Agreement. If the Remington Entities revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Remington Entity or any other Entity (including the Consenting Creditors and the ABL Parties); or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Remington Entity or any other Entity (including the Consenting Creditors and the ABL Parties).

11.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest that is not a Litigation Trust Asset, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Remington Entities are party or with respect to which the Remington Entities may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or cure amounts pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned;

and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Remington Entities that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.      enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VIII.J.1 of the Plan;

13.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14.    determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    enter an order or final decree concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX of the Plan, regardless of whether such termination occurred before or after the Effective Date;

22.    hear and determine all disputes that arise out of the formation or initial implementation of the Litigation Trust Agreement or the transfer of the Litigation Trust Assets to the Litigation Trust on the Effective Date;

23.    determine whether a Claim is Allowed or Disallowed;

24.    enforce all orders previously entered by the Bankruptcy Court; and

25.    hear any other matter not inconsistent with the Bankruptcy Code.

*provided*, however, that the Bankruptcy Court shall not retain exclusive jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

B.    *Summary of Capitalization of Reorganized Remington*

1.    Description of New Common Units and New Warrants

As set forth in the Plan, on the Effective Date, Reorganized ROC shall issue the New Common Units and the New Warrants. All of the securities issued pursuant to the Plan shall be duly authorized, validly issued, and fully paid, and non-assessable, as applicable. Each distribution

71

and issuance referred to in Article VIII of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance, and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

2.    Description of New ABL Facility

On the Effective Date, Reorganized Remington shall enter into the New ABL Facility. Confirmation shall be deemed approval of the New ABL Facility, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized OpCo in connection therewith) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain the New ABL Facility, including the New ABL Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, and the New ABL Agent may mutually agree to be necessary to consummate the New ABL Facility.

3.    Description of New Term Loan Facility

On the Effective Date, Reorganized Remington shall enter into a New Term Loan Facility (in an amount equal to the Term DIP Facility Claims outstanding as of the Effective Date), and the outstanding Term DIP Facility Claims shall be replaced with obligations under the New Term Loan Facility. Confirmation shall be deemed approval of the New Term Loan, to the extent not approved by the Bankruptcy Court previously (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Remington Entities or Reorganized OpCo in connection therewith) and Reorganized Remington shall be authorized to execute and deliver those documents necessary or appropriate to obtain and/or effectuate the New Term Loan Facility without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval, subject to such modifications as Reorganized Remington, the Requisite Consenting Creditors, and the New Term Loan Agent (solely to the extent such modification materially affects the New Term Loan Agent) may mutually agree to be necessary to consummate the New Term Loan Facility. The specific terms and conditions of the New Term Loan Facility will be subject to and may require material modifications depending on the terms and conditions of the New ABL Facility, or such other exit asset-based lending facility that Remington enters into on the Effective Date.

## SECTION V.
## VOTING PROCEDURES AND REQUIREMENTS

This Section describes in summary fashion the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you should receive a ballot for the purpose of voting on the Plan. If you are not an Accredited Investor, you are not entitled to vote to accept or reject the Plan and your vote will not be counted, unless the Bankruptcy Court has approved the solicitation of votes from holders who are not Accredited

Investors. If you hold Claims or Interests in more than one Class and you are entitled to vote such Claims or Interests in more than one Class, you will receive separate ballots, which must be used for each separate Class of Claims or Interests. If you are entitled to vote and did not receive a ballot, received a damaged ballot, or lost your ballot please contact the Voting Agent by e-mail at remingtonballots@primeclerk.com or by phone at (877) 755-3450 (toll free) or (347) 338-6538 (international).

**Before voting to accept or reject the Plan, each eligible holder of a Claim or Interest should carefully review the Plan attached hereto as <u>Exhibit A</u> and described in Section IV herein entitled, "Joint Prepackaged Chapter 11 Plan."**

A.    *Voting Deadline*

To be considered for purposes of accepting or rejecting the Plan, all ballots must be **actually received** by the Voting Agent no later than the Voting Deadline of **4:00 p.m., prevailing Eastern Time, on April 26, 2018**, unless Remington extends the Voting Deadline. **Remington expressly reserves the absolute right to extend, by oral or written notice to the Voting Agent, the period of time (on a daily basis, if necessary) during which ballots will be accepted for any reason, until the necessary ballots have been received. Remington will not have any obligation to publish, advertise, or otherwise communicate any such extension, other than by filing a notice of such extension with the Bankruptcy Court docket and posting a notice on the website of the Remington Entities' notice and voting agent at http://cases.primeclerk.com/remington. There can be no assurance that Remington will exercise any right to extend the solicitation period and deadline for the receipt of ballots.**

Except to the extent requested by Remington, in its sole discretion, or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018, ballots received by the Voting Agent after the Voting Deadline will not be counted or otherwise used in connection with Remington's request for confirmation of the Plan (or any permitted modification thereof).

You must complete and return your ballot(s) in accordance with the instructions set forth on your applicable ballot(s). Votes may not be transmitted orally, by facsimile, or by electronic mail. Accordingly, you are urged to return your signed and completed ballot(s) promptly.

B.    *Voting Record Date*

Consistent with the provisions of Bankruptcy Rule 3018(b), Remington has fixed March 19, 2018 as the "<u>Voting Record Date</u>" for the determination of holders of record of Claims or Interests entitled to vote to accept or reject the Plan. Only holders of record are entitled to vote to accept or reject the Plan.

C.    *Parties Entitled to Vote*

Under the provisions of the Bankruptcy Code, not all parties-in-interest are entitled to vote on a chapter 11 plan. Creditors or equity interest holders whose claims or interests are not Impaired by a plan are deemed to accept the plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "Impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable,

and contractual rights to which such claim or interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Creditors and equity interest holders whose claims or interests are Impaired by a plan, but who will receive no distribution under a plan, are also not entitled to vote because they are deemed to have rejected the plan pursuant to section 1126(g) of the Bankruptcy Code.

As mentioned above, this Disclosure Statement and other Solicitation Package materials are being furnished prior to the commencement of the Chapter 11 Cases, and Remington is soliciting votes on the Plan from the holders of Allowed Claims in Class 4 (Term Loan Claims) and Class 5 (Third Lien Notes Claims), which Classes are deemed to be Impaired, as follows:

- Holders of Class 4 Term Loan Claims whose names appear as of the Voting Record Date in the list of lenders maintained by the Term Loan Agent; and

- Holders of Class 5 Third Lien Notes Claims holding a beneficial interest in such Claims directly on the records maintained by DTC or holding a beneficial interest in such Claims that is registered or held of record on their behalf through Nominees whose names appear on the records maintained by DTC, in each case as of the Voting Record Date.

Holders of Claims and Interests that are entitled to vote should receive ballots with their Solicitation Package, which ballots should be used to submit their vote. Unless the Bankruptcy Court has approved the solicitation of votes from holders who are not Accredited Investors, Remington will not solicit acceptances of the Plan from any holder of a Claim otherwise entitled to vote to accept or reject the Plan if such holder is not an Accredited Investor. Each holder of Claims that may be entitled to vote to accept the Plan will be required to certify on its ballot whether it is an Accredited Investor. As of the date hereof, any ballots received from a holder of a Claim that does not certify that it is an Accredited Investor will not be counted. To the extent the Bankruptcy Court approves Remington's request to solicit votes from all holders of Class 4 Claims and Class 5 Claims, Remington will promptly notify all such holders of such approval, and that all such holders, including those who are not Accredited Investors, will be entitled to vote on the Plan.

D.    *Ballots*

Each ballot enclosed with this Disclosure Statement is marked with the Class into which the Claim or Interest has been placed under the Plan. All votes to accept or reject the Plan with respect to any Class of Claims or Interests must be cast by properly submitting the duly completed and executed ballot designated for such Class in accordance with the instructions set forth on the applicable ballot. Holders of Claims or Interests voting on the Plan should complete and sign their ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "ACCEPT (VOTE FOR) THE PLAN" or "REJECT (VOTE AGAINST) THE PLAN." Any executed ballot that does not indicate either acceptance or rejection of the Plan, or that indicates both acceptance and rejection of the Plan, will not be counted.

74

Any Holder of a Class 4 Claim or Class 5 Claim that checks the box entitled "ACCEPT (vote FOR) the Plan" elects to have its Causes of Action be included among the Litigation Claims or settled pursuant to a Litigation Settlement. Any Holder of a Class 4 or Class 5 Claim that checks the box entitled "REJECT (vote AGAINST) the Plan" or abstains from voting to accept or reject the Plan may nonetheless check the appropriate box entitled "Opt In to the Litigation Trust or Litigation Settlement" to elect to have its Causes of Action be included among the Litigation Claims or settled pursuant to a Litigation Settlement, and to be treated as an Electing Term Loan Lender or Electing Third Lien Noteholder in accordance with the Plan.

To the extent a holder of Claims or Interests holds multiple Claims or Interests within a particular Class, Remington may, in its discretion, instruct the Voting Agent to aggregate, to the extent possible, such holder's Claims or Interests (as applicable) for purposes of counting votes.

Ballots must be delivered to the Voting Agent in accordance with the instructions set forth on the applicable ballot and **actually received** by the Voting Deadline. In order for a holder of Class 5 Claims to cast its vote through its Ballot, such holder will be required to complete its Ballot and return it to its Nominee in accordance with the instructions provided by such Nominee, who will then complete a "Nominee Certification" to the Ballot and return such compiled Ballot to the Voting Agent on behalf of such holder. In order for the vote of a holder of Class 5 Claims to count, such holder's Ballot (including the Nominee Certification) must be completed and returned in accordance with the instructions set forth in the Ballot. Holders of Class 5 Claims should allow sufficient time for their Nominee to receive their completed Ballot, complete the Nominee Certification, and return both such Ballot and the related Nominee Certification to the Voting Agent before the Voting Deadline.

THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER. If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery.

If you are entitled to vote and you did not receive a ballot, received a damaged ballot, or lost your ballot, please contact the Voting Agent by e-mail at remingtonballots@primeclerk.com or by phone at (877) 755-3450 (toll free) or (347) 338-6538 (international), or, if you hold your Claim through a Nominee, your Nominee.

E.      *Agreements upon Furnishing Ballots*

The delivery of a ballot to the Voting Agent by a holder of a Claim or an Interest voting to accept the Plan will constitute the agreement of such holder to accept (1) all of the terms of, and conditions to, the solicitation and (2) the terms of the Plan; provided, however, that all parties-in-interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code in accordance with any applicable order of the Bankruptcy Court.

In addition, a vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

F.    *Withdrawal or Change of Votes on Plan*

Except as may be provided in the Restructuring Support Agreement with respect to the votes of the Consenting Creditors, after the Voting Deadline, no vote may be withdrawn without the prior consent of Remington, which consent shall be provided in Remington's sole discretion.

Any holder who has submitted a properly completed ballot to the Voting Agent prior to the Voting Deadline may change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly-completed ballot for acceptance or rejection of the Plan. If more than one timely, properly-completed ballot is received with respect to the same Claim or Interest, the ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the ballot that the Voting Agent determines in its sole discretion was the last to be received.

G.    *Fiduciaries and Other Representatives*

If a ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other Entity acting in a fiduciary or representative capacity, such Entity should indicate such capacity when signing and, if requested by Remington, will be required to submit proper evidence satisfactory to Remington of authority to so act. Authorized signatories should submit the separate ballot of each holder for whom they are voting.

UNLESS THE BALLOT BEING FURNISHED IS **ACTUALLY RECEIVED** BY THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT REMINGTON RESERVES THE RIGHT, IN ITS SOLE DISCRETION, TO ACCEPT AND COUNT ANY SUCH LATE BALLOT. IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE VOTING AGENT.

IF YOU ARE SUBMITTING YOUR BALLOT TO A NOMINEE, YOU MUST SUBMIT YOUR BALLOT TO YOUR NOMINEE WITH SUFFICIENT TIME FOR YOUR NOMINEE TO COMPLETE THE "NOMINEE CERTIFICATION", AND RETURN BOTH SUCH BALLOT AND THE RELATED NOMINEE CERTIFICATION TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.

H.    *Waivers of Defects, Irregularities, etc.*

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by Remington in its sole discretion, which determination will be final and binding. As indicated above, effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. Remington reserves the absolute right to contest the validity of any such withdrawal. Remington also reserves the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of Remington or its counsel, be unlawful. Remington further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular ballot. The interpretation (including the ballot and the applicable instructions thereto) by Remington, unless otherwise directed by the Bankruptcy Court, will be final and binding on all

parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as Remington (or the Bankruptcy Court) determines. Neither Remington nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots, nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

I.  *Further Information, Additional Copies*

If you have any questions or require further information about the voting procedure for voting your Claim or Interest or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by of Bankruptcy Rule 3017(d)), please contact the Voting Agent by e-mail at remingtonballots@primeclerk.com or by phone at (877) 755-3450 (toll free) or (347) 338-6538 (international).

J.  *Requirements for Acceptance by Impaired Class of Claims*

An Impaired Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan.

## SECTION VI.
## CONFIRMATION OF PLAN

A.  *Combined Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Combined Hearing. On, or as promptly as practicable after commencement of the Chapter 11 Cases, Remington will request that the Bankruptcy Court schedule the Combined Hearing. Notice of the Combined Hearing will be provided to all known creditors and equity interest holders or their representatives. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Combined Hearing or any subsequent adjourned Combined Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must (1) be in writing, (2) conform to the Bankruptcy Rules, (3) set forth the name of the objecting party, the nature of Claims or Interests held or asserted by the objecting party, and (4) state with particularity the legal and factual basis for the objection, and (5) be filed with the Bankruptcy Court, together with proof of service thereof, and served so as to be received no later than the date and time designated in the notice of the Combined Hearing.

The procedures for filing objections to confirmation of the Plan shall be determined by the Bankruptcy Court after the Chapter 11 Cases are commenced.

B.    *Requirements for Confirmation of Plan – Consensual Confirmation*

At the Combined Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. If the Plan is accepted by all Impaired Classes of Claims and Interests (i.e., a consensual confirmation), among the requirements for confirmation are that the Plan is (1) feasible and (2) in the "best interests" of holders of Claims and Interests Impaired under the Plan.

1.    Feasibility

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of Remington or any successors to Remington under the Plan. This condition is often referred to as the "feasibility" of the Plan. Remington believes that the Plan satisfies this requirement.

For purposes of determining whether the Plan meets this requirement, Remington, in consultation with its financial and market advisors, has analyzed its ability to meet its obligations under the Plan. As part of that analysis, Remington, with the assistance of its financial advisor, Alvarez & Marsal, LLC ("A&M"), and investment banker, Lazard Frères & Co. LLC ("Lazard"), has prepared consolidated projected financial results (the "Projections") for each of the fiscal years through 2022. These Projections, and the assumptions on which they are based, are attached hereto as Exhibit C.

Remington, A&M, and Lazard prepared the Projections based upon certain assumptions and upon the assessments of certain market experts that it believes to be reasonable at the time of preparation. Those assumptions Remington considered to be significant are described in the Projections. The Projections have not been examined or compiled by independent accountants. Many of the assumptions on which the Projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period covered by the Projections may vary from the projected results, and the variations may be material. All holders of Claims and Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projections are based in evaluating the feasibility of the Plan.

2.    Best Interests Test

Unless each Impaired Class of Claims or Interests under the Plan unanimously accepts the Plan, section 1129 of the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan is in the best interests of all holders of Claims and Interests in such Classes. This "best interests" test must show that each holder of Impaired Claims or Interests receive property with a value not less than the amount such holder would receive if Remington were liquidated under chapter 7 of the Bankruptcy Code. Remington believes that under the Plan, holders of Impaired Claims or Interests will receive property with a value equal to or in excess of the value such holders would receive in a chapter 7 liquidation.

To estimate the potential recoveries to holders of Claims and Interests in a Chapter 7 liquidation, Remington determined, as might a Bankruptcy Court conducting such an analysis, the amount of liquidation proceeds that might be available for distribution (net of liquidation-related costs) and the allocation of such proceeds among the Classes of Claims and Interests based on their relative priority as set forth in the Bankruptcy Code.

The amount of liquidation value available to holders of unsecured Claims against Remington would be reduced by, first, the Claims of secured creditors to the extent of the value of their collateral and, second, the administrative expenses and priority claims allowed in chapter 7, including the costs and expenses of liquidation. Costs and other administrative expenses of a chapter 7 liquidation would include the compensation of a trustee, as well as counsel and other professionals retained by the trustee, asset disposition expenses, applicable taxes, litigation costs, all unpaid administrative expenses incurred by Remington in the Chapter 11 Cases that are allowed in the chapter 7 cases, such as compensation of counsel and other professionals retained by Remington and Claims arising from Remington's operations during the pendency of the Chapter 11 Cases. The liquidation itself would trigger certain priority payments that otherwise would be due in the original course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured Claims.

In a chapter 7 liquidation, no junior Class of Claims or Interests may be paid unless all Classes of Claims or Interests senior to such junior Class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination agreements are enforceable under applicable non-bankruptcy law. Therefore, no Class of Claims or Interests that is contractually subordinated to another Class would receive any payment on account of its Claims or Interests, unless and until such senior Class was paid in full.

Once the Bankruptcy Court ascertains the liquidation recoveries to Remington's secured and priority creditors in chapter 7, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court. Remington believes that the Liquidation Analysis attached hereto as Exhibit D demonstrates that each holder in a Class of Impaired Claims or Interests will receive at least as much, if not more, under the Plan as such holder would receive if Remington were liquidated pursuant to chapter 7. Therefore, Remington believes that the Plan satisfies the requirements of the "best interests" test.

C.     *Requirements for Confirmation of Plan – Non-Consensual Confirmation*

As set forth above, Classes 8 and 9 are deemed to reject the Plan. Accordingly, Remington will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code (i.e., a non-consensual confirmation).[26]

The Bankruptcy Code permits the Bankruptcy Court to confirm the Plan over the dissent of any Impaired Class of Claims or Interests as long as the standards in section 1129(b) are met. This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the chapter 11 process. It assures that no single group (or multiple groups) of claims or interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in the case.

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection by any Impaired Class of Claims or Interests if, among other requirements, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Class. While these requirements will not apply if the Plan is accepted by all Impaired Classes of Claims and Interests, Remington believes that the Plan nonetheless satisfies the requirements for a non-consensual confirmation and may be confirmed over the dissent of any Impaired Class of Claims or Interests.

1.     Unfair Discrimination

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, the Plan could treat two Classes of unsecured creditors differently without unfairly discriminating against either Class. This test only applies to Classes that reject or are deemed to reject the Plan.

2.     Fair and Equitable Test

A chapter 11 plan is only fair and equitable with respect to a dissenting class if no class senior to such dissenting class receives more than it is entitled to on account of such senior claims or interests. The "fair and equitable" test also imposes certain requirements that depend on the type of claims or interests in the dissenting class.

To be fair and equitable with respect to a dissenting class of Impaired secured creditors, a chapter 11 plan must provide that each holder in such class either (a) retains its liens on the property subject to such liens (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of consummation of the chapter 11 plan, of at least such allowed amount or (b) receives the "indubitable equivalent" of its secured claim.

---

[26] To the extent there is any other Impaired Class of Claims that votes to reject the Plan, Remington will seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to that Class as well.

To be fair and equitable with respect to a dissenting class of Impaired unsecured creditors, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the allowed amount of its unsecured claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the chapter 11 plan.

To be fair and equitable with respect to a dissenting class of Impaired equity interest holders, a chapter 11 plan must provide that either (a) each holder in such class receives or retains property having a value, as of consummation of the chapter 11 plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference or fixed redemption price of its interest and (ii) the value of its interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the chapter 11 plan.

Remington believes that the Plan does not permit holders of any Class to receive more than they are entitled to on account their Claims or Interests and that the Plan satisfies each other requirement of the "fair and equitable" test with respect to each Impaired Class.

## SECTION VII.
## PROJECTED FINANCIAL INFORMATION AND
## VALUATION ANALYSIS

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE REMINGTON ENTITIES OR ANY OF THEIR AFFILIATES.

A.   *Estimated Valuation*

Solely for the purposes of the Plan and the Disclosure Statement, Lazard, as investment banker to the Remington Entities, has estimated a range of total Enterprise Value (defined below) for Reorganized Remington on a consolidated going-concern basis and pro forma for the transactions contemplated by the Plan (the "Valuation Analysis"). The Valuation Analysis is based on financial information and projections provided by Remington's management, including the Projections attached to the Disclosure Statement as Exhibit C, and information provided by other sources. The Valuation Analysis assumes an Effective Date of May 17, 2018, and values the operating assets as of the end of the financial quarter in which the Effective Date occurs (June 30th, 2018, or the "Valuation Date"). The valuation estimates set forth herein represent valuation analyses of Reorganized Remington generally based on the application of customary valuation techniques deemed appropriate by Lazard.

Based on the Projections and solely for the purposes of the Plan, the estimated potential range of Reorganized Remington's operations on a going concern basis (the "Enterprise Value") is approximately $470 million to $615 million, with a midpoint of approximately $543 million. Based on the potential range of Enterprise Value and assumed pension obligation of approximately $50 million and net debt of approximately $227 million as of the Valuation Date, the imputed range of potential equity value is approximately $193 million to $338 million, with a midpoint of approximately $266 million. For purposes of the Valuation Analysis, it is assumed that, between the date of filing of the Disclosure Statement and the assumed Valuation Date, no material changes that would affect estimated valuation will occur. Reorganized Remington's assumed net debt of approximately $227 million consists of approximately $72 million on account of the New ABL Facility, $55 million on account of the New FILO Term Loan Facility, and $100 million on account of the New Term Loan Facility that are estimated to be outstanding as of the Valuation Date.

The value of the New Warrants has been estimated using a Black-Scholes valuation model and reflects the estimated range of Reorganized Remington's equity value above. Based on that analysis, the value of the New Warrants is estimated at approximately $2.4 million to $17.5 million, with an average of approximately $10.0 million.

Note that the valuation analysis does not include any estimates of value for the Litigation Trust that is contemplated to be established.

The Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

B.    *Valuation Methodology*

The consolidated value of Reorganized Remington was estimated by primarily relying on two generally accepted valuation techniques: (i) Discounted Cash Flow ("DCF") Analysis and (ii) Comparable Company Analysis. While the precedent transaction methodology is sometimes used, it was believed that this methodology has less relevance when assessing the Enterprise Value of Reorganized Remington due to the lack of recent comparable transactions, among other factors.

1.    Discounted Cash Flow Analysis

DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The Enterprise Value of the firm is determined by calculating the present value of the unlevered after-tax free cash flows based on the Projections provided by management plus an estimate for the value of the firm beyond the Projection Period, known as the terminal value. The range of potential terminal values was calculated by applying a multiple to earnings before interest, taxes, depreciation and amortization ("EBITDA") for the final year of the Projection Period and for the five-year average EBITDA through 2022, inclusive of forecasted years. The terminal value was then discounted back to the assumed Effective Date.

82

2.    Comparable Public Company Analysis

A "Comparable Public Company Analysis" estimates the value of a company relative to other publicly traded companies with similar operating and financial characteristics. A set of publicly traded companies was selected based on similar business and financial characteristics to Reorganized Remington. Criteria for the selected reference group included, among other relevant characteristics, similarity in business, business risks, growth prospects, product mix, customer base, margins, market presence, size and scale of operations. The selected reference group may not be comparable to Reorganized Remington in all aspects, and may differ materially in others.

In deriving Enterprise Value ranges under the Comparable Public Company Analysis methodology, EBITDA multiples were the primary valuation metric. Based on 2019 multiples of this reference group as well as historical average multiples and certain qualitative judgments based on differences between the characteristics of Reorganized Remington and the selected reference group, a range of multiples was then applied to each of Reorganized Remington's implied 2019, as well as Remington's implied five- and ten-year average EBITDA through 2022, inclusive of forecasted years.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE REMINGTON ENTITIES AVAILABLE TO LAZARD AS OF MARCH 22, 2018. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

LAZARD DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS OR OTHER INFORMATION THAT LAZARD USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE REMINGTON ENTITIES WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH. THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES,

NEITHER THE REMINGTON ENTITIES, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL AND COMMODITY MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE COMPENSATION PLAN, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Lazard assumed that the Projections were reasonably prepared in good faith and on a basis reflecting the Remington Entities' best estimates and judgments as to the future operating and financial performance of Reorganized Remington. The Valuation Analysis assumes that the actual performance of Reorganized Remington will correspond to the Projections in all material respects. If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis and estimated potential ranges of Enterprise Value therein.

In preparing the Valuation Analysis, Lazard: (a) reviewed certain historical financial information of the Remington Entities for recent years and interim periods; (b) reviewed certain financial and operating data of the Remington Entities, including the Projections; (c) discussed the Remington Entities' operations and future prospects with the Remington Entities' senior management team and third-party advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the value of Reorganized Remington; (e) considered certain economic and industry information that Lazard deemed generally relevant to Reorganized Remington; and (f) conducted such other studies, analyses, inquiries, and investigations as deemed appropriate. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Remington Entities' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any holder of Allowed Claims or any other person as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been requested to, and does not express any view as to, the potential value of Reorganized Remington's securities on issuance or at any other time.

Lazard did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income on Reorganized Remington's Projections. Such matters are subject to many uncertainties and contingencies that are difficult to predict. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Remington's Projections could materially impact Lazard's valuation analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY LAZARD IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE REMINGTON ENTITIES, AND HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

## SECTION VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a general discussion based upon present law of certain U.S. federal income tax considerations relevant to the implementation of the Plan to Remington, Reorganized Remington, holders of Allowed Term Loan Claims and holders of Allowed Third Lien Notes Claims. This summary is limited to holders of the Allowed Term Loan Claims and the Allowed Third Lien Notes Claims who hold their Claims as capital assets for purposes of the Internal Revenue Code of 1986, as amended (the "Code"). This discussion does not address rules relating to Allowed Term Loan Claims and Allowed Third Lien Notes Claims held by special categories of holders, including financial institutions, insurance companies, regulated investment companies, real estate investment trusts, broker dealers, tax exempt organizations, traders in securities that elect to mark to market, investors liable for the alternative minimum tax, U.S. expatriates, investors that hold such claims as part of a straddle, hedging, constructive sale or conversion transaction, and U.S. Holders (as defined below) whose functional currency is not the U.S. dollar. The discussion does not address any state, local or foreign taxes, the Medicare tax on net investment income, the federal alternative minimum tax, or any other federal tax other than the federal income tax.   Holders should note that no rulings have been, or are expected to be, sought from the U.S. Internal Revenue Service (the "IRS") with respect to any of the U.S. federal income tax consequences discussed below, and no assurance can be given that the IRS or a court will not take contrary positions.  This discussion does not address the federal income tax consequences to holders of Claims or Interests who are Unimpaired, or holders who are not entitled to vote because they are deemed to accept or reject the Plan.

This summary is not a comprehensive description of all of the U.S. federal tax consequences that may be relevant with respect to the Plan. We urge you to consult your own tax advisor regarding your particular circumstances and the U.S. federal tax consequences to you with respect to the Plan, as well as any tax consequences arising under the laws of any state, local or foreign tax jurisdiction and the possible effects of changes in U.S. federal or other tax laws.

As used herein, the term "U.S. Holder" means a beneficial owner of Allowed Term Loan Claims or Allowed Third Lien Notes Claims (other than a partnership) that for U.S. federal income tax purposes is any of the following:

- an individual citizen or resident of the U.S.;

- a corporation or any other entity treated as a corporation for U.S. federal income tax purposes created or organized in or under the laws of the U.S., any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the U.S. and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under to be treated as a U.S. person.

A "Non-U.S. Holder" means a person that is a beneficial owner of Allowed Term Loan Claims or Allowed Third Lien Notes Claims, other than a U.S. Holder or an entity or arrangement treated as a partnership for U.S. federal income tax purposes.

If an entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Allowed Term Loan Claims or Allowed Third Lien Notes Claims being exchanged in the Plan, the U.S. federal income tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership and accordingly, this summary does not apply to partnerships. A partner of a partnership exchanging Allowed Term Loan Claims or Allowed Third Lien Notes Claims should consult its own tax advisor regarding the U.S. federal income tax consequences to the partner of exchanging Allowed Term Loan Claims or Allowed Third Lien Notes Claims pursuant to the Plan.

A.    *Certain U.S. Federal Income Tax Consequences to Remington*

ROC is the parent of a consolidated federal income tax group and also owns the equity in several wholly owned companies that are disregarded for U.S. federal income tax purposes (the "Tax Group"). The entities that are obligors for tax purposes under the Term Loans and the Third Lien Notes are disregarded entities wholly owned by ROC. The Tax Group has significant net operating loss ("NOL") carryforwards as of December 31, 2017 and expects to generate additional NOLs in 2018. The Tax Group's NOLs are expected to be eliminated upon implementation of the Plan as more fully described below.

1.    Cancellation of Debt and Reduction of Tax Attributes

Because the obligors under the Term Loans and Third Lien Notes are disregarded entities wholly owned by ROC, the cancellation of Claims pursuant to the Plan will give rise to a significant amount of cancellation of indebtedness income ("CODI") for ROC. The amount of CODI, in general, will equal the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, and (ii) the fair market value of the other consideration transferred to the holders for their Claims determined at the time of the exchange.

Under section 108 of the Code, ROC is not, however, required to include any amount of CODI in gross income because the CODI will be recognized while ROC and its subsidiaries are debtors under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code. Instead, as a consequence of such exclusion, ROC must reduce its tax attributes by the amount of CODI that it excluded from gross income pursuant to section 108 of the Code. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. As noted above, in connection with the Restructuring Transactions, ROC expects to realize significant CODI. The exact amount of any CODI that will be realized by ROC will not be determinable until the consummation of the Plan, however, Remington expects that the amount of such CODI will be sufficient to eliminate all of its NOLs. In addition, depending on the structure of the transactions undertaken, some of Remington's asset tax basis may be reduced by CODI.

2.     Limitation of NOL Carry Forwards and Other Tax Attributes

Under sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the amount of any NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the corporation allocable to periods prior to the ownership change (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. The implementation of the Plan will result in an "ownership change" of the Tax Group for these purposes. As a result, Reorganized Remington's use of its Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Code applies. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. It is unclear whether Remington will have a net unrealized built-in loss at the time the Plan goes effective.

a.     General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (2.18 percent for March 2018). The section 382 limitation may be increased to the extent that the company recognizes certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing

87

built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

      b.      Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the ownership change, and during the part of the taxable year prior to and including the ownership change, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the company undergoes another "ownership change" within two years after the first change, then the company's Pre-Change Losses thereafter would be effectively eliminated in their entirety. Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce their NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes. As discussed above, Remington expects that all of the Tax Group's NOLs will be eliminated and hence will not be subject to the section 382 limitation with respect to its NOLs following the year in which the Plan goes effective. The availability to Remington of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions and whether the restructuring is implemented pursuant to the Plan.

B.     *Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Term Loan Claims and Allowed Third Lien Notes Claims*

     1.     Consequences to U.S. Holders of Allowed Term Loan Claims

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of, and in exchange for the Allowed Term Loan Claims, each holder thereof will receive its Pro Rata share, relative to all Allowed Claims, of (a) 82.5% of the New Common Units, (b) to the extent such holder is an Electing Term Loan Lender, its Pro Rata Class 4 Shares of either (i)

the Litigation Trust Class A Shares, or (ii) any amounts allocated for distribution to the Electing Term Loan Lenders under a Litigation Settlement, and (c) Cash.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed Term Loan Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute a "reorganization" within the meaning of Section 368 of the tax law (a "Reorganization"). Whether the transactions undertaken pursuant to the Plan constitute a Reorganization will depend, in part, on whether the Allowed Term Loan Claims are "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. The Allowed Term Loan Claims had a term to maturity of over six (6) years when issued. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor at the time of issuance, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. A U.S. Holder of Allowed Term Loan Claims should consult their own tax advisor to determine whether the Allowed Term Loan Claims should be treated as securities for U.S. federal income tax purposes.

a.    Reorganization

If the Allowed Term Loan Claims are treated as "securities" for U.S. federal income tax purposes, the transactions contemplated by the Plan are expected to constitute a Reorganization unless the transactions are structured in a manner that prevents them from qualifying as a Reorganization. The classification of an exchange as a Reorganization generally serves to defer the recognition of any gain or loss by the U.S. Holder. However, a U.S. Holder generally is still required to recognize any gain (but not loss) to the extent the holder receives "boot" in the reorganization exchange, i.e., consideration other than stock or "securities" of the exchanging company. Accordingly, assuming the transactions undertaken pursuant to the Plan qualify as a Reorganization with respect to Allowed Term Loan Claims, a U.S. Holder of Allowed Term Loan Claims generally will not recognize any loss upon the exchange. A U.S. Holder will, however, recognize any realized gain (calculated as described below in "—Taxable Transaction") to the extent of the Cash received pursuant to the Plan and the Cash and/or the fair market value of any other property received pursuant to a Litigation Settlement, or the fair market value of the Litigation Claims underlying the holder's Litigation Trust Interests received in the exchange in respect of its Allowed Term Loan Claims.

If the exchange of Allowed Term Loan Claims for the consideration provided for in the Plan is a Reorganization, a U.S. Holder's tax basis in the New Common Units received in respect of its Allowed Term Loan Claims should be equal to the U.S. Holder's tax basis in their Allowed

Term Loan Claims, increased by any gain recognized and decreased by the amount of Cash received pursuant to the Plan and the Cash and/or the fair market value of any other property received pursuant to a Litigation Settlement or the fair market value of the Litigation Trust Interests received in the exchange in respect of its Allowed Term Loan Claims. In that case, a U.S. Holder's holding period for their New Common Units will include their holding period for their Allowed Term Loan Claims.

In addition, even though the exchange may otherwise be a Reorganization, a U.S. Holder will have taxable interest income to the extent of any consideration allocable to accrued but unpaid interest or OID not previously included in income as more fully described below under "—Accrued Interest," which amounts will not be included in the amount realized with respect to a U.S. Holder's Claim.

       b.     Taxable Transaction

If the transactions undertaken pursuant to the Plan do not constitute a Reorganization with respect to a U.S. Holder of an Allowed Term Loan Claim, a U.S. Holder of an Allowed Term Loan Claim would be treated as exchanging such Claims for Cash, New Common Units, and to the extent such holder is an Electing Term Loan Lender, its Pro Rata Class 4 Shares of either (a) the Litigation Trust Class A Interests, or (b) any amounts allocated for distribution to the Electing Term Loan Lenders under a Litigation Settlement in a fully taxable transaction.

A U.S. Holder of an Allowed Term Loan Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of (a) the Cash received, (b) the fair market value of the New Common Units received in exchange for its Allowed Term Loan, and (c) if there is a Litigation Settlement, the Cash and/or the fair market value of any other property received pursuant to the Litigation Settlement, or if there is no Litigation Settlement and the Litigation Trust is a "liquidating trust" (as discussed below), the fair market value of the Litigation Claims underlying the holder's Litigation Trust Class A Interests received in the exchange in respect of its Claims (in the case of clauses (a), (b), and (c), other than any consideration received in respect of accrued but unpaid interest or accrued but unpaid OID, if any), and (ii) the U.S. Holder's adjusted tax basis in its Allowed Term Loan Claim immediately prior to the exchange. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Claim in such U.S. Holder's hands, whether the Allowed Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Allowed Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Term Loan Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for its Allowed Term Loan Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See "—Accrued Interest" and "—Market Discount", below.

If the exchange is a taxable transaction, a U.S. Holder's tax basis in the New Common Units received in respect of its Allowed Term Loan Claims should be equal to the fair market value of the New Common Units. If, as intended, the Litigation Trust is a "liquidating trust" (as discussed below), then a U.S. Holder will not have a tax basis in any Litigation Trust Interests

received in respect of its Allowed Term Loan Claims, but rather will have an initial tax basis in the portion of the Litigation Claims underlying such interests that equals that portion's fair market value. A U.S. Holder's holding period for each item of consideration received on the Effective Date should begin on the day following the Effective Date.

    2.      Consequences to U.S. Holders of Allowed Third Lien Notes Claims

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of, and in exchange for an Allowed Third Lien Notes Claims, each holder thereof will receive its Pro Rata share, relative to all Allowed Third Lien Notes Claims, of (i) the Cash and New Common Units relating to the ROC DIP Distribution, (ii) Cash relating to the Third Lien Noteholder Cash Distribution, (iii) the New Warrants, and (iv) to the extent such holder is an Electing Third Lien Noteholder, its Pro Rata Class 5 Shares of either (a) the Litigation Trust Class B Interests, or (b) any amounts allocated for distribution to the Electing Third Lien Noteholders under a Litigation Settlement.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed Third Lien Notes Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute a Reorganization (defined above). Whether the transactions undertaken pursuant to the Plan constitute a Reorganization will depend, in part, on whether the Allowed Third Lien Notes Claims are "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. The Allowed Third Lien Notes Claims had a term to maturity of approximately eight (8) years when issued. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. A U.S. Holder of Allowed Third Lien Notes Claims should consult their own tax advisor to determine whether the Allowed Third Lien Notes Claims should be treated as securities for U.S. federal income tax purposes.

    a.      Reorganization

If the Allowed Third Lien Notes Claims are treated as "securities" for U.S. federal income tax purposes, the transactions contemplated by the Plan are expected to constitute a Reorganization unless the transactions are structured in a manner that prevents them from qualifying as a Reorganization. The classification of an exchange as a Reorganization generally serves to defer the recognition of any gain or loss by the U.S. Holder. However, a U.S. Holder generally is still required to recognize any gain (but not loss) to the extent the holder receives "boot" in the reorganization exchange, i.e., consideration other than stock or "securities" of the exchanging

91

company. For this purpose, warrants to acquire stock of a corporation are generally considered securities. Accordingly, assuming the transactions undertaken pursuant to the Plan qualify as a Reorganization with respect to Allowed Third Lien Notes Claims, a U.S. Holder of Allowed Third Lien Notes Claims generally will not recognize any loss upon the exchange. A U.S. Holder will, however, recognize any realized gain (calculated as described below in "—Taxable Transaction") to the extent of the sum of the amount of Cash received pursuant to the Plan, the amount of Cash received and/or the fair market value of any other property received in connection with a Litigation Settlement, and the fair market value of the Litigation Claims underlying the holder's Litigation Trust Interests received in the exchange in respect of its Allowed Third Lien Notes Claims.

If the exchange of Allowed Third Lien Notes Claims for the consideration provided for in the Plan is a Reorganization, a U.S. Holder's tax basis in the New Common Units and New Warrants received in respect of its Allowed Third Lien Notes Claims should be equal to the U.S. Holder's tax basis in their Allowed Third Lien Notes Claims, increased by any gain recognized and decreased by the Cash received pursuant to the Plan, the Cash and/or the fair market value of any other property received in connection with a Litigation Settlement, and the fair market value of the Litigation Trust Interests received in the exchange in respect of its Allowed Third Lien Notes Claims. Such basis should generally be allocated between the New Common Units and the New Warrants based on their relative fair market values. In that case, a U.S. Holder's holding period for their New Common Units and New Warrants will include their holding period for their Allowed Third Lien Notes Claims.

In addition, even though the exchange may otherwise be a Reorganization, a U.S. Holder will have taxable interest income to the extent of any consideration allocable to accrued but unpaid interest or OID not previously included in income as more fully described below under "— Accrued Interest," which amounts will not be included in the amount realized with respect to a U.S. Holder's Claim.

    b.     Taxable Transaction

To the extent that the transactions undertaken pursuant to the Plan do not constitute a Reorganization, a U.S. Holder of an Allowed Third Lien Notes Claim would be treated as exchanging its Allowed Third Lien Notes Claims for Cash, New Common Units, New Warrants, and to the extent such holder is an Electing Third Lien Noteholder, its Pro Rata Class 5 Shares of either (a) the Litigation Trust Class B Interests or (b) any amounts allocated for distribution to such holder under a Litigation Settlement in a fully taxable transaction.

A U.S. Holder of an Allowed Third Lien Notes Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of (a) the Cash, (b) the fair market value of the New Common Units and New Warrants received in exchange for its Allowed Third Lien Notes Claim, and (c) if there is a Litigation Settlement, the Cash and/or the fair market value of any other property received pursuant to the Litigation Settlement, or if there is no Litigation Settlement and the Litigation Trust is a "liquidating trust" (as discussed below), the Cash and the fair market value of the Litigation Claims underlying the holder's Litigation Trust Class B Interests received in the exchange in respect of its Claims (in the case of clauses (a), (b) and (c), other than any consideration received in respect of accrued but unpaid interest or accrued but unpaid OID, if any), and (ii) the U.S. Holder's adjusted tax basis in its Allowed Third Lien

Notes Claim immediately prior to the exchange. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Claim in such U.S. Holder's hands, whether the Allowed Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Allowed Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Third Lien Notes Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for its Allowed Third Lien Notes Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See "—Accrued Interest" and "—Market Discount", below.

If the exchange is a taxable transaction, a U.S. Holder's tax basis in the New Common Units and New Warrants received in respect of its Allowed Third Lien Notes Claim should be equal to the fair market value of the New Common Units and New Warrants. If, as intended, the Litigation Trust is a "liquidating trust" (as discussed below), then a U.S. Holder will not have a tax basis in the Litigation Trust Interests received in respect of its Allowed Third Lien Notes Claims on the Effective Date, but rather will have an initial tax basis in the portion of the assets of the Litigation Trust underlying such interests that equals that portion's fair market value. A U.S. Holder's holding period for each item of consideration received on the Effective Date should begin on the day following the Effective Date.

3.    Accrued Interest

To the extent that any amount received by a U.S. Holder of a surrendered Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

93

4.   Market Discount

Under the "market discount" provisions of the Code, some or all of any gain realized by a U.S. Holder of an Allowed Claim who receives consideration pursuant to the Plan in satisfaction of their Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the Allowed Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Claim acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.

5.   Tax Consequences of Owning New Common Units

a.   Distributions on New Common Units

Any distributions made on account of New Common Units will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized ROC, as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

      b.     Sale, Redemption, or Repurchase of New Common Units

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Units. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Units for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below. In certain circumstances, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Units as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claims or recognized an ordinary loss on the exchange of its Allowed Claims for New Common Units.

      6.     Tax Consequences of Owning New Warrants

A U.S. Holder of New Warrants generally will not recognize any gain or loss upon the exercise of such New Warrants and a U.S. Holder's aggregate tax basis in the New Common Units received upon exercise of a New Warrant should be equal to the sum of (i) the amount paid for the New Common Units and (ii) the holder's tax basis, in the New Warrants. A U.S. Holder's holding period in the New Common Units received upon exercise of a New Warrant generally should commence the day following the exercise date.

Upon the lapse of a New Warrant, a U.S. Holder generally will recognize loss equal to its tax basis in the New Warrant. In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (taking into account that the receipt of the New Warrant in partial satisfaction of a Allowed Third Lien Notes Claims could be part of a Reorganization, such that the U.S. Holder may carry over the holding period in its Allowed Third Lien Notes Claim).

Section 305 of the Code could apply to a U.S. Holders of the New Warrants in certain transactions and such application will depend on the terms of the New Warrants. U.S. Holders of the New Warrants are urged to consult their own tax advisors regarding the U.S. federal income tax consequences of the acquisition, ownership, and disposition of the New Warrants.

Unless a nonrecognition provision applies and subject to the discussion above with respect to market discount, U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Warrants in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Warrants held and (ii) the sum of the cash and the fair market value of any other property received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the holder's holding period for such New Warrants is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate holders. The deductibility of capital loss is subject to significant limitations.

      7.     Ownership of the Litigation Trust Interests

The Litigation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in

Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Litigation Trust will be structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Remington Entities, the Litigation Trustee, and the holders of Litigation Trust Interests) will treat the transfer of the Cash and Litigation Claims underlying the holder's Litigation Trust Class A Interests and Litigation Trust Class B Interests received in the exchange in respect of its Litigation Claims to the Litigation Trust as (1) a transfer of the Cash and Litigation Claims underlying the holder's Litigation Trust Class A Interests and Litigation Trust Class B Interests received in in the exchange directly to the holders of Allowed Term Loan Claims and Allowed Third Lien Notes Claims in respect of such claims, followed by (2) the transfer by such holders to the Litigation Trust (as a "liquidating trust") of such assets in exchange for their respective Litigation Trust Interests. Accordingly, except in the event of contrary definitive guidance, the holders of Litigation Trust Interests will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the assets of the Litigation Trust.

While this discussion assumes that the Litigation Trust would be treated as a liquidating trust for U.S. federal income tax purposes, it is not currently contemplated that a ruling will be requested from the IRS concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Litigation Trust and the holders of Litigation Trust Interests could vary from those discussed herein.

As soon as reasonably practicable after the transfer of the Litigation Claims to the Litigation Trust, the Litigation Trustee will make a good faith valuation of the assets of the Litigation Trust. All parties to the Litigation Trust (including, without limitation, the Remington Entities, the Litigation Trustee and the Litigation Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes (including for purposes of determining gain or loss recognized by the U.S. Holders of Allowed Term Loan Claims or Allowed Senior Notes Claims as a result of the Plan as discussed above in the tax treatment sections for such Claims). The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a U.S. Holder of Litigation Trust Interests will be treated as income or loss with respect to such U.S. Holder's undivided interest in the underlying assets of the Litigation Trust, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the U.S. Holder.

Allocations of taxable income of the Litigation Trust among the Litigation Trust Beneficiaries should generally be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed. Similarly, taxable loss of the Litigation Trust should generally be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Litigation Trust.

The U.S. federal income tax obligations of a U.S. Holder with respect to its Litigation Trust Interests are not dependent on the Litigation Trust distributing any cash or other proceeds. Thus, a

U.S. Holder may incur a U.S. federal income tax liability with respect to its allocable share of Litigation Trust income even if the Litigation Trust does not make a concurrent distribution to the U.S. Holder. In general, a distribution of cash by the Litigation Trust will not be separately taxable to a U.S. Holder of Litigation Trust Interests since the U.S. Holder is already regarded for U.S. federal income tax purposes as owning the underlying assets. Furthermore, a sale or other disposition of Litigation Trust Interests by a holder thereof generally will be taxed just as if the holder had owned and sold the underlying Litigation Trust assets. A holder of Litigation Trust Interests should consult with their own tax advisor regarding the tax consequences of holding such interests.

8.      Limitation on Use of Capital Losses

U.S. Holders who recognize capital losses will be subject to limits on their use of capital losses. For U.S. Holders other than corporations, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns), or (ii) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income. For corporate U.S. Holders, capital losses may only be used to offset capital gains. U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. For corporate U.S. Holders, unused capital losses may be carried forward for the five years following the capital loss year or carried back to the three years preceding the capital loss year. Noncorporate U.S. Holders may carry over unused capital losses for an unlimited number of years.

C.      *Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Term Loan Claims and Allowed Third Lien Notes Claims*

The following discussion assumes that Remington will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders. The discussion does not include any non-U.S. federal income tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holders.

1.      Gain Recognition

Whether the satisfaction of an Allowed Term Loan Claim or Allowed Third Lien Notes Claim is a taxable event or not will be determined as noted above under the discussion relevant to U.S. Holders. To the extent that the Restructuring Transactions are treated as a taxable exchange or otherwise result in the recognition of taxable gain for U.S. federal income tax purposes, any gain realized by a Non-U.S. Holder on the exchange of its Allowed Claims generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an

97

income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or applicable successor form). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.    Accrued Interest

Subject to the discussion below under "—Information Reporting and Backup Withholding," payments to a Non-U.S. Holder that are attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of Remington's stock entitled to vote;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to Remington (each, within the meaning of the Code);

- the Non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Code; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but unpaid interest on the Allowed Claims that is not effectively connected

income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but unpaid interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail, the Plan provides that the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Allowed Claims, if any. The IRS could take the position that the consideration received by a Non-U.S. Holder should be allocated in some way other than as provided in the Plan. Non-U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

    3.    Distributions on New Common Units

Any distributions made with respect to New Common Units will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized ROC's current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that a Non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Non-U.S. Holder's basis in its shares. Any such distributions in excess of a Non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange as described below; see "—Sale, Redemption, or Repurchase of New Common Units", below).

Except as described below, dividends paid with respect to New Common Units held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a Non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Units held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

4.     Sale, Redemption, or Repurchase of New Common Units or New Warrants

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Common Units or New Warrants unless:

(i)     such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

(ii)    such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

(iii)   Reorganized ROC is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Units or New Warrants, as applicable. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). Remington considers it unlikely, based on the current business plans and operations, that Reorganized ROC will become a "U.S. real property holding corporation" in the future.

5.     Ownership of the Litigation Trust Interests

The Litigation Trustee will be required to comply with all applicable governmental withholding requirements. Thus, in the case of any holders of Litigation Trust Interests that are not U.S. persons, the Litigation Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). Non-U.S. Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of owning an interest in the Litigation Trust.

D.     *FATCA*

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common

Units), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Units and New Warrants). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules currently apply to U.S.-source payments of fixed or determinable, annual or periodic income, and will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's ownership of New Common Units and New Warrants.

E.    *Information Reporting and Backup Withholding*

Remington and Reorganized Remington will withhold all amounts required by law to be withheld. Remington and Reorganized Remington will comply with all applicable reporting requirements of the Code. In general, information reporting requirements may apply to distributions or payments made to a holder under the Plan. Additionally, under the backup withholding rules, a holder or may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption), Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Restructuring would be subject to these regulations and require disclosure on the holders' tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE RESTRUCTURING TRANSACTIONS ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE RESTRUCTURING TRANSACTIONS, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

## SECTION IX.
## CERTAIN FEDERAL AND STATE SECURITIES LAW
## CONSIDERATIONS

A.    *Exemption from Registration Requirements*

Remington believes that each of the New Common Units, the New Warrants and the Litigation Trust Interests may constitute a "security" as defined in Section 2(a)(1) of the Securities Act.

Remington is relying on exemptions from the registration requirements of the Securities Act, including Section 4(a)(2) thereof, and applicable state securities laws, to exempt the offer of the New Common Units, the New Warrants, and the Litigation Trust Interests that may be deemed to be made pursuant to the prepetition solicitation of votes on the Plan. To ensure that the prepetition solicitation is exempt from the registration requirements of the Securities Act, the ballots include a certification that the voting holder of the related Claims is an "accredited investor." As of the date of this Disclosure Statement, if the voting holder fails to make such certification, its vote will not be counted. Following the filing of the Plan with the Bankruptcy Court, Remington intends to request the Bankruptcy Court's approval to solicit votes on the Plan from holders of Class 4 Claims and Class 5 Claims who are not Accredited Investors pursuant to section 1145 of the Bankruptcy Code. If the Bankruptcy Court does not grant Remington's request, Remington will use reasonable efforts to propose an alternative mechanism to allow holders of Class 4 Claims and Class 5 Claims who are not Accredited Investors to participate in the Litigation Trust.

Upon consummation of the Plan, Remington will rely on section 1145 of the Bankruptcy Code, to the extent permitted, to exempt the issuance of the New Common Units, the New Warrants (including the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests from the registration requirements of the Securities Act and of any state securities or "blue sky" laws. Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any similar applicable state securities laws) do not apply to the offer or sale of securities under a chapter 11 plan of a debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to a debtor under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or interest in, or a claim for an administrative expense in a case concerning, the debtor or such affiliate under the Plan. Remington believes that Reorganized ROC is a successor to Remington Outdoor Company, Inc. under the Plan for purposes of section 1145 of the Bankruptcy Code and that the issuance of the New Common Units, the New Warrants (including the New Common Units issuable upon the exercise thereof), and the Litigation Trust Interests under the Plan satisfy the requirements of section 1145 and are therefore exempt from the registration requirements of the Securities Act and state securities laws, unless the holder of the Claim in respect of which such securities are issued is an "underwriter" (as discussed below) with respect to such securities, as that term is defined under section 1145 of the Bankruptcy Code. If section 1145(a) of the Bankruptcy Code is unavailable because the recipient of the New Common Units, New Warrants or Litigation Trust Interests, as applicable, is an "underwriter" as defined under section 1145(b)(1) of the Bankruptcy Code, such securities will be issued pursuant to Section 4(a)(2) of the Securities Act. As discussed below, securities issued pursuant to Section 4(a)(2) of the Securities Act may not generally be

resold absent an exemption from the registration requirements of the Securities Act, and applicable state securities laws. The Remington Entities will seek to obtain, as part of the Confirmation Order, a provision confirming such exemptions. Notwithstanding the foregoing, securities issued under the Management Incentive Plan will be issued in accordance with an applicable exemption from registration under the Securities Act and other applicable law.

B.    *Subsequent Transfers of Securities*

In general, recipients of New Common Units, New Warrants and Litigation Trust Interests will be able to resell such New Common Units, New Warrants (including the New Common Units issuable upon the exercise thereof), and Litigation Trust Interests without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder of such securities is an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Subject to certain limited exceptions, section 1145(b) of the Bankruptcy Code defines "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer", (1) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the relevant debtor, with a view to distribution of any security to be received in exchange for such claim or interest, (2) offers to sell securities offered or sold under a chapter 11 plan for the holders of such securities, (3) offers to buy securities offered or sold under a chapter 11 plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities and under an agreement made in connection with the chapter 11 plan, with the consummation of the chapter 11 plan, or with the offer or sale of securities under the chapter 11 plan, or (4) is an "issuer" with respect to such security, as such term is used in section 2(a)(11) of the Securities Act. Under section 2(a)(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any person directly or indirectly through one or more intermediaries controlling, controlled by, or under common control with the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

To the extent recipients of New Common Units, New Warrants, or Litigation Trust Interests are deemed to be "underwriters," the resale of such securities by such persons would not be exempted from registration by section 4(a)(1) of the Securities Act. Securities issued pursuant

to section 4(a)(2) of the Securities Act will be "restricted securities" within the meaning of Rule 144 under the Securities Act. Such "restricted securities" may not generally be resold absent an exemption from the registration requirements of the Securities Act. Under certain circumstances, such securities deemed to be "restricted securities" may be resold pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of such securities after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if the seller of such securities is an affiliate of the issuer, if certain volume limitations, notice, and manner of sale requirements and other conditions are met.

Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by rule 144 under the Securities Act.

GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN "UNDERWRITER" WITH RESPECT TO NEW COMMON UNITS, NEW WARRANTS, OR THE LITIGATION TRUST INTERESTS, REMINGTON MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE SUCH SECURITIES UNDER THE PLAN. REMINGTON RECOMMENDS THAT HOLDERS OF CLAIMS AND INTERESTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS.

Notwithstanding the foregoing, the New Common Units, New Warrants, or Litigation Trust Interests may be subject to transfer restrictions set forth in the New Organizational Documents, the Warrant Agreement, and/or the Litigation Trust Agreement, as applicable.

## SECTION X.
## RISK FACTORS

The implementation of the Plan and the issuance of the New Common Units are subject to a number of material risks, including those summarized below. However, this summary of risks and considerations is not exhaustive. Prior to deciding whether and how to vote on the Plan, holders of Claims or Interests entitled to vote should read and consider carefully all of the information in the Plan and this Disclosure Statement, as well as all other information referenced or incorporated by reference into this Disclosure Statement.

These risk factors contain certain statements that are "forward-looking statements." These statements are subject to a number of assumptions, risks, and uncertainties, many of which are beyond the control of Remington, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, the effect of the reorganization on customers, suppliers, and vendors, fluctuations in raw material prices and other costs, the American political climate, the consumption of durable and nondurable goods, the degree and nature of competition, increases in insurance costs, changes in government regulations, changes in the application or interpretation of those regulations, changes in the systems, personnel, technologies, or other resources Remington devotes to compliance with regulations, Remington's

ability to complete acquisitions and successfully integrate the operations of acquired businesses, terrorist actions or acts of war, operating efficiencies, labor relations, property tax assessments, and other market and competitive conditions. Holders of Claims and Interests are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements. No party, including, without limitation, Remington or Reorganized Remington, undertakes an obligation to update any such statements.

A.    *Certain Bankruptcy Law Considerations*

***Remington cannot predict the amount of time needed in chapter 11 to implement the Plan, and lengthy chapter 11 cases could disrupt its businesses, as well as impair prospects for reorganization on terms contained in the Plan and possibly provide an opportunity for other plans to be proposed.***

Remington cannot be certain that the Chapter 11 Cases, commenced solely for the purpose of implementing the Plan, would be of relatively short duration (e.g., 45 to 65 days) and would not unduly disrupt its businesses. It is impossible to predict with certainty the amount of time needed in bankruptcy, and Remington cannot be certain that the Plan would be confirmed. Moreover, the Bankruptcy Code limits the time during which a debtor has an exclusive right to file a plan before other proponents can propose and file their own plan.

Lengthy chapter 11 cases would also involve additional expenses and divert the attention of management from operation of the businesses, as well as create concerns for personnel, vendors, suppliers, service providers, and customers. The disruption that lengthy chapter 11 cases would inflict upon Remington's businesses would increase with the length of time needed to complete the Restructuring, and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties, including suppliers, service providers, vendors, personnel, and customers. Significant delay may result in the termination of the Restructuring Support Agreement or the DIP Facilities due to missed milestones, other termination events, or other applicable events of default, to the extent Remington is unable to obtain waivers or amendments from the relevant Consenting Creditors, ABL DIP Facility Lenders, or Term DIP Lenders, as applicable.

If Remington is unable to obtain confirmation of the Plan on a timely basis for any reason, Remington may be forced to operate in chapter 11 for an extended period while trying to develop a different chapter 11 plan that can be confirmed. Protracted chapter 11 cases would increase both the probability and the magnitude of the adverse effects described above.

***Remington may be unable to obtain confirmation of the Plan.***

Although Remington believes that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the re-solicitation of votes on the Plan.

The Plan provides that Remington reserves the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent necessary. In the event that Classes 4 and 5 fail to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, Remington reserves the right to: (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code; and/or (b) modify the Plan in accordance with Article X of the Plan. While Remington believes that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay Remington's emergence from chapter 11 or prevent confirmation of the Plan.

If the Plan is not confirmed, there can be no assurance the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative chapter 11 plan or plans would be on terms as favorable to the holders of Claims and Interests as the terms of the Plan. If a liquidation or protracted reorganization of Remington's bankruptcy estates were to occur, there is a substantial risk that Remington's going-concern value would be substantially eroded to the detriment of all stakeholders.

### The Effective Date may not occur.

Although Remington believes the Effective Date may occur shortly after the Confirmation Date, there can be no assurance as to such timing. The occurrence of the Effective Date is also subject to certain conditions precedent as set forth in Article IX of the Plan. Failure to meet any of these conditions could result in the Plan not being consummated.

If the Effective Date does not occur, the Plan shall be null and void in all respects; and nothing contained in the Plan or this Disclosure Statement shall: (a) constitute a waiver or release of any claims by Remington, any holders of Claims or Interests (including the Consenting Creditors and the ABL Parties), or any other Entity; (b) prejudice in any manner the rights of Remington, any holders of Claims or Interests (including the Consenting Creditors and the ABL Parties), or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by Remington, any holders of Claims or Interests (including the Consenting Creditors and the ABL Parties), or any other Entity, in any respect.

If the Effective Date of the Plan does not occur, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative chapter 11 plan or plans would be on terms as favorable to the holders of Claims and Interests as the terms of the Plan. If a liquidation or protracted reorganization of Remington's Estates were to occur, there is a substantial risk that Remington's going-concern value would be eroded to the detriment of all stakeholders.

### Remington may be unsuccessful in obtaining first-day orders to authorize certain requested relief.

There can be no guaranty that Remington will be successful in obtaining the necessary approvals of the Bankruptcy Court to authorize certain requested "first day" relief, including but

not limited to, payment of accounts payable to certain creditors in the ordinary course of business, payment of employees and employee benefits, and authorization to use existing cash management systems. As a result, Remington may be unable to make certain prepetition payments to customers, vendors, suppliers, service providers, other creditors, and various employees, in which case Remington's businesses may suffer.

### *Projections, Estimates, and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.*

Certain of the information contained in this Disclosure Statement contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, including but not limited to (i) the aggregate amounts of Claims in the various Classes (which may increase substantially as a result of, for example, any rejection damages claims in Class 6), and (ii) the estimated recoveries by holders of Allowed or Unimpaired Claims, and such projections and estimates should not be considered assurances or guarantees of the amount of assets that will ultimately be available for distribution on the Effective Date or the amount of Claims in the various Classes that might be Allowed or Unimpaired. In addition, if the actual amount of Allowed Claims are greater than the Remington's estimates, Remington may be unable to pay or otherwise satisfy those Claims and other Claims in accordance with the terms of the Plan.

### *COAC Agreement*

The Restructuring Support Agreement provides in pertinent part that, "Cerberus Operations & Advisory Company, LLC ("COAC") will continue to make available to the Company the personnel identified below and will maintain and pay for those personnel at the Company through June 30, 2018, unless otherwise agreed by COAC, the Company, the First Lien Term Loan Lenders and the Third Lien Noteholders. The COAC personnel are: Jim Geisler; John Kwapis; Jason Bixby; and Jed Dunbar." Section V.I.3. of the Plan provides "[o]n and after the Effective Date until June 30, 2018, COAC shall continue to make available to Reorganized Remington each of Jim Geisler, John Kwapis, Jason Bixby, and Jed Dunbar, and COAC in accordance with past practice under the prepetition agreement between COAC and ROC (the "Existing COAC Agreement"); *provided, however,* that on and prior to the Effective Date, the Existing COAC Agreement shall be deemed to be amended (the "COAC Amendment") to provide that COAC shall pay for the foregoing personnel without any cost to the Remington Entities or Reorganized Remington." On March 20, 2018, counsel to the Cerberus Entities sent a letter to counsel to the Remington Entities to reserve its rights with respect to the Plan. That letter stated in part that Cerberus was "unwilling to unconditionally maintain its personnel at the Company," and that "Cerberus has no current intention of removing its COAC personnel from the Company." In the event Cerberus declines to maintain its personnel at the Remington Entities in accordance with the COAC Amendment, the Remington Entities would either need to seek and obtain approval to amend the Plan from the Requisite Consenting Creditors, the ABL DIP Agent, the New FILO Term Lenders, and the New ABL Required Lenders, or the Plan would not be able to be confirmed.

B.    *Business-Related Risks*

***The announcement of the Restructuring could adversely affect the value of Remington's businesses.***

It is possible that announcement of the Restructuring or the filing of the Chapter 11 Cases could adversely affect Remington's operations and relationships with third parties.    Due to uncertainties, many risks exist, including the following:

- customers could switch to competitors;

- personnel may be distracted from performance of their duties or more easily attracted to other employment opportunities, including with their competitors;

- customers may delay making payments;

- although the Plans provides for payment in full of General Unsecured Claims, general unsecured creditors may suspend or terminate their relationship with Remington, exercise rights of set-off or similar remedies, further restrict ordinary credit terms, or require guarantee of payment;

- vendors and customers could terminate their relationship or require financial assurances or enhanced performance;

- trade creditors could require payment in advance or cash on delivery;

- the ability to renew existing contracts and compete for new business may be adversely affected;

- competitors may take business away from Remington; and

- insurance policies may be more difficult or expensive to obtain.

A delay in completing the Restructuring may result in the same adverse consequences.  The occurrence of one or more of these events could have a material and adverse effect on the financial condition, operations, and prospects of Remington and the value of its existing interests and debt.

***Because of the nature of potential injuries relating to the manufacture and/or sale of firearms and ammunition, certain negative public perceptions of Remington's products or the firearms industry generally, recent efforts to expand liability of manufacturers of firearms and ammunition, product liability and class action cases and claims, and insurance costs associated with such cases and claims, may cause Remington to incur significant costs.***

Remington is currently defending product liability litigation involving Remington brand firearms (including firearms manufactured under the Marlin, Bushmaster and H&R names) and its ammunition products (including ammunition manufactured under the UMC and Peters names). As of the Petition Date, Remington had a number of individual bodily injury cases and pre-litigation claims in various stages pending, primarily alleging defective product design, defective

manufacture and/or failure to provide adequate warnings. Some of these cases seek punitive as well as compensatory damages. Remington also has two class action cases pending relating to breach of warranty claims concerning certain of its firearms products where economic damages are sought. In December 2014, Remington reached a settlement with respect to one such class action suit, which requires Remington to offer to replace the triggers on certain of its model rifles. The replacement of the triggers is not a result of a recall or an admission of liability regarding the functioning of the current models, but such measures may cause Remington to incur significant costs. To the extent Remington's products are the subject of negative publicity related to alleged defects, including by way of news stories, news articles or other forms of public or social media, related product liability claims could increase. In December 2014, Remington was named as a defendant in a wrongful death litigation case related to the use of one of its Bushmaster firearms in the 2012 shootings in Newtown, Connecticut. In addition, Remington is currently defending claims including, among other things, product liability claims and certain class actions pleading economic damages resulting from the use of its products. Remington is also currently defending numerous lawsuits, claims, investigations and proceedings, including commercial, environmental, trade mark, trade dress and employment matters that arise in the ordinary course of business. Remington is vigorously defending ourselves in the lawsuits to which Remington is subject. There can be no assurance, however, that Remington will not have to pay significant damages or amounts in settlement above its insurance coverage. Litigation of this nature is expensive and time consuming and may divert the time and attention of Remington's management.

The nature and extent of any liability for the cases and claims to which Remington is subject is uncertain. Remington's resources may not be adequate to cover any current, pending or future claims related to product liability and product related occurrences, cases or claims, in the aggregate, and such cases and claims could have a material adverse effect upon Remington's business, financial condition or results of operations. In addition, insurance coverage for these risks is expensive and relatively difficult to obtain. Remington's insurance costs were approximately $3.1 million, $2.1 million, and $2.4 million for the years ended December 31, 2017, 2016, and 2015, respectively. Any inability to obtain insurance, any significant increases in the cost of insurance Remington obtains, or any losses in excess of Remington's insurance coverage could have a material adverse effect on Remington's business, financial condition or results of operations. Remington has received, and in the future expects to continue to receive, negative media attention associated with gun-related incidents and subsequent litigation to which Remington is a party or which is associated with the gun industry in general. Such negative attention will likely have a negative influence on public opinion of Remington's company and the firearms industry and may impact the long-run demand for Remington's products. Any unfavorable outcome or prolonged litigation, and any negative publicity or negative public opinion stemming therefrom, could have a material adverse effect on Remington's business, financial condition, results of operations and cash flows.

### *Significant risks are inherent in the day-to-day operations in Remington's business.*

The day-to-day activities of Remington's business involve the operation of machinery and other operating hazards, including worker exposure to lead and other hazardous substances. As a result, Remington's operations can cause personal injury or loss of life or severe damage to and destruction of property and equipment, which may interrupt Remington's business. Many of Remington's products are of the type that can cause accidental damage, injury or death or can

potentially be used in incidents of workplace violence. Remington could be named as a defendant in a lawsuit asserting substantial claims upon the occurrence of any of these events. Although Remington maintains insurance protection in amounts Remington considers to be adequate, this insurance could be insufficient in coverage and may not be effective under all circumstances or against all hazards to which Remington may be subject. If Remington is not fully insured against a successful claim, any such claim could have a material adverse effect on Remington's financial condition and results of operations.

***Unfavorable market trends and environmental concerns could adversely affect demand for Remington's products and business.***

Remington believes that a number of trends that currently exist may affect hunting and shooting sports, including the development of rural property, which in many locations has curtailed or eliminated access to private and public lands previously available for hunting, and the release of lead into the environment, which is a component in Remington's products. These trends, or other trends that affect sales of sporting rifles, may have a material adverse effect on Remington's business by reducing industry sales of firearms, ammunition and other shooting-related products.

***Government changes in allocation of defense spending may have an adverse impact on Remington's business.***

For the year ended December 31, 2016, Remington's net sales to law enforcement, government and the military, both in the U.S. and internationally, represented approximately 5% of Remington's total net sales. Remington cannot at this time predict or provide any assurances as to whether or not the spending cuts will remain in effect and, if they do, how they will affect Remington's business. To the extent the spending cuts remain in place, Remington's sales to the U.S. law enforcement, government and military communities could be adversely affected, which in turn could have a material adverse impact on Remington's business, financial condition, results of operations and cash flows.

Some of Remington's contracts with foreign governments are or will be subject to the fulfillment of offset commitment or industrial cooperation agreements that could impose additional costs on Remington that it might not be able to timely satisfy, possibly resulting in the assessment of penalties or even debarment from doing further business with that government.

Some countries with which Remington currently or may in the future do business with may impose offset purchase commitments, also known as industrial cooperation commitments, in return for purchasing Remington's products and services. These commitments vary from country to country and generally require Remington to commit to make direct or indirect purchases or investments in the local economy. The gross amount of the offset purchase commitment arising from a sales contract is typically a function of the value of the contract. Failure to satisfy offset purchase commitments can result in penalties or blacklisting against awards of future contracts. If Remington is unable to fulfill those commitments, Remington may be subject to future penalties or transaction costs or even disbarment from doing business with a government.

***Remington's business is subject to economic and market factors beyond Remington's control or ability to predict.***

110

The sale of Remington's products depends upon a number of factors related to the level of consumer spending, including the general state of the economy and the willingness of consumers to spend on discretionary items. Historically, the general level of economic activity has significantly affected the demand for sporting goods products in hunting and shooting sports and related categories. As economic activity slows, consumer confidence and discretionary spending by consumers declines. Lower consumer spending and other competitive pressures arising from any significant or prolonged economic downturn could have a material adverse impact on Remington's financial condition and results of operations, and such impact could be intensified by the amount of debt Remington has outstanding.

***Significant increases in commodity and energy prices, or the loss of any key supplier, could have a material impact on Remington's financial condition, results of operations and cash flows.***

The manufacturing of Remington's products is dependent upon the availability of raw materials such as lead, copper, zinc, steel and brass. Increases in the prices of any of these raw materials or an increase in energy prices could have a material impact on Remington's financial condition. Remington can provide no assurance as to the future trends of these conditions or to what extent future increases could be offset through customer price increases. In addition, any extended interruption in the supply of these or other raw materials or in the supply of suitable substitute materials would disrupt Remington's operations, and Remington may incur additional costs in sourcing raw materials from alternative producers.

For a number of Remington's raw materials, Remington relies on just a few suppliers and, in some instances, Remington has sole supplier relationships. Alternative sources, many of which are foreign, exist for each of these materials. Remington does not, however, currently have significant supply relationships with any of these alternative sources and, therefore, the materials may be more expensive. Remington cannot estimate with any certainty the length of time that would be required to establish alternative supply relationships, or whether the quantity or quality of materials that could be so obtained would be sufficient.

In addition, Remington relies on a limited number of vendors to perform machining processes on key rifle components. Any disruption of the operations of one of Remington's key vendors could materially impact Remington's ability to obtain certain rifle components. In the event that Remington loses one of its principal vendors, Remington may not be able to find an alternative vendor in a timely manner and, as a result, Remington's ability to produce rifles could be materially and adversely affected.

***A substantial amount of Remington's business comes from one "national account" customer. Loss of business from this customer could adversely affect Remington's financial condition, results of operations and cash flows.***

Remington's dedicated sales force and key account managers market Remington's products directly to national accounts (consisting primarily of mass merchandisers) and to federal, state and local government agencies. Approximately 11%, 9%, and 13% of Remington's total net sales for the years ended December 31, 2017, 2016, and 2015, respectively, were attributable to one national account, Wal-Mart. Remington's sales to Wal-Mart are generally not governed by a written long-term agreement. In the event that Wal-Mart incurs financial difficulty or significantly

reduces or terminates its purchases of firearms and/or ammunition from us, Remington's financial condition, results of operations and cash flows could be adversely affected.

***Remington may not be able to compete successfully within its highly competitive industry.***

The industry in which Remington operates is highly competitive. Product image, performance, quality, price and innovation are the primary competitive factors in the firearms industry. Product differentiation exists to a much lesser extent in the ammunition industry, where price is the primary competitive factor. For example, Remington's ammunition product line faces significant price competition from foreign manufacturers and importers who may have lower production costs. In addition, in many of Remington's product lines, including ammunition and firearms, many of Remington's competitors are experiencing increased inventory levels due to declining sales, and, as a result, have engaged in unusually heavy discounting which has resulted in even greater price competition. The foregoing, as well as any future reductions in price by Remington's competitors, could make Remington's products less competitive, reduce Remington's sales, or cause Remington to further reduce prices or otherwise alter terms of sale as a competitive measure, which could adversely affect Remington's business, financial condition, results of operations or cash flows.

Remington's competitors vary by product line. Some of Remington's competitors are subsidiaries of large corporations with substantially greater financial resources than Remington. Although Remington believes that it competes effectively with all of its present competitors, it may not continue to do so, and Remington's ability to compete could be adversely affected by its significant amount of debt.

***If Remington is unable to reduce or offset its increased manufacturing costs, it may face lower margins which may have an adverse effect on its results of operation, liquidity and cash flows.***

Remington's has experienced an increase in both fixed costs as well as expenses in recent years as a result of increases in the cost of raw materials and personnel costs, among others, and such increased costs are likely to persist in the near term. If Remington is unable to reduce costs, or increase its sales volumes to reduce average production costs, its margins may continue to suffer, and Remington may have to increase prices. Remington cannot assure you that it will be able to increase its sales volumes in the current market climate without further reducing its price, or that it can increase its prices without affecting sales volumes. Accordingly, if costs continue at current levels or increase from current levels, Remington's results of operation, liquidity and cash flows may be adversely affected.

***Continued customer consolidation could have a material adverse effect on Remington's business.***

A significant portion of Remington's products are sold through sporting goods stores and mass merchandisers. For example, approximately 11%, 9% and 13% of Remington's total net sales for the years ended December 31, 2017, 2016 and 2015, respectively, were attributable to one mass merchandiser, Wal-Mart. These segments of the retail market have recently experienced increased consolidation, with such consolidation of retailers resulting in larger and more price conscious customers, with greater negotiating power. This has resulted in a retail environment with greater

112

downward pressure on prices and volumes, and in more sophisticated customers demanding better contract terms. To the extent these segments of the retail market continue to experience consolidation, the resulting impact on pricing, sales and contract terms will exacerbate the competitive risks noted earlier, and may have a material adverse effect on Remington's business, results of operations and financial condition.

### Certain of Remington's large customers have recently adopted sales policies which could adversely affect sales.

In February of 2018, Walmart and Dick's Sporting Goods both adopted new internal sales policies relating to the sale of firearms and ammunition, which prohibited their sale to anyone under the age of 21. In addition, Dick's Sporting Goods enacted measures to end the sale of any modern sporting rifles in its stores. Sales policies designed to prohibit sales to specific groups or the sale of specific products at major retailers may adversely affect the demand for Remington's products by limiting their availability to consumers and changing consumer perception. Remington is currently unable to ascertain the impact of these policies on future sales.

To the extent these policies are further expanded, or other retailers adopt similar or broader policies in the future, Remington's sales, results of operations and cash flows may be adversely affected.

### Remington's success depends on sustaining the strength of its brands.

The willingness of consumers to purchase Remington's products depends in part upon Remington's ability to offer attractive brand value propositions. This in turn depends in part on consumers attributing a higher value to Remington's products than alternatives. If the difference in the value attributed to Remington's products as compared to those of Remington's competitors narrows, or if there is a perception of such a narrowing, consumers may choose not to buy Remington's products. If Remington fails to promote and maintain the brand equity of its products, consumer perception of Remington's products' quality may be diminished and Remington's financial condition, results of operations or cash flows could be materially adversely affected. Remington may also, from time to time, be the subject of new articles or stories that portray Remington's brands in a negative light, or may face other types of negative publicity related to Remington's brands and products. Any type of adverse publicity related to Remington's brands may negatively affect Remington's brand equity, regardless of whether the characterizations are accurate.

### Remington's results of operations are affected by fluctuations in its sales and its customers' inventory management practices.

Many of Remington's firearms products are purchased in anticipation of use during the fall hunting season. As a result of the seasonal nature of Remington's sales, Remington's historical working capital financing needs generally have exceeded cash provided by operations during certain parts of the year. Remington's working capital financing needs tend to be higher during the spring and summer months, decreasing during the fall and reaching their lowest points during the winter.

In the past, deteriorations in economic conditions have caused customers, including wholesalers, dealers and chains, to defer purchases of Remington's products until later in the core fall hunting seasons (September through December) and to utilize lower inventory levels than during prior periods. This overall trend to defer purchases continues to date, and there can be no assurance that such trends will not continue.

Remington's results of operations are also affected by fluctuations due to the timing of the manufacture and delivery of large domestic and international governmental orders, which tend to be disproportionately large in value. This may extend the period of time during which Remington carries inventory and may result in an uneven distribution of net sales from these contracts between periods.

As a result of these fluctuations in Remington's sales and Remington's customers' inventory management practices, Remington's working capital financing needs may significantly exceed cash provided by operations during certain periods during the year, and therefore Remington may be required to rely on cash on hand and borrowings for working capital needs.

***Acquisition protocol and contract negotiations with government, law enforcement and military channels could result in increased volatility and uncertainty to the timing of Remington's sales revenues.***

Government, law enforcement and military sales channels are typically in the form of contractual arrangements pursuant to Federal Acquisition Regulations (FAR)/Defense Federal Acquisition Regulation Supplement (DFARS), laws of international military buyers or law enforcement distributor agreements. Remington sells certain firearms, accessories and ammunition products to these channels. A percentage of Remington's sales revenues could therefore be subject to customer acquisition protocol and contract negotiations. This could cause sales revenue from these channels to be increasingly volatile and uncertain with respect to the timing of orders and may have an impact on delivery schedules. For instance, Remington's law enforcement sales are achieved by way of designated law enforcement distributors. While Remington generally is not a party to agreements directly with a U.S. state or local police agency, the acquisition methods and laws of a particular state or local agency may impact procurement from a law enforcement distributor. In turn, sales revenue opportunities from distributors may be adversely impacted.

A significant number of U.S. government and other government contracts are obtained through competitive bidding. Remington will not win all of the contracts for which it competes and, even when it does, contracts awarded to Remington may not result in a profit. The bidding process requires substantial expense, time and effort. Further, to the extent Remington wins a bid, Remington's customers may require that it reduce price or provide more favorable terms if Remington provides a better price or terms under any other contract for the same product. Such "most favored nation" clauses could restrict Remington's ability to competitively bid for government and other contracts.

Remington is also subject to business risks specific to companies engaged in supplying defense-related equipment and services to the U.S. government and other governments. Its contracts with the U.S. government may be indefinite delivery, indefinite quantity ("IDIQ") contracts under which the customer places orders at its discretion. Although these contracts

generally have a three to five year term, they are funded only when orders are placed and, as a result, sales to the U.S. government could vary significantly from year to year. Furthermore, IDIQ contracts permit the government to order up to a maximum quantity specified in the contract, but the government is only obligated to order a minimum quantity. Remington may therefore incur capital or other expenses in order to be prepared to manufacture the maximum quantity that may not be fully recouped if the U.S. government orders a smaller amount.

The U.S. government and other government counterparties may suspend or permanently prevent Remington from receiving new contracts or from extending existing contracts based on violations or suspected violations of procurement laws or regulations or terminate Remington's existing contracts. Remington's failure to realize anticipated revenues from any government or law enforcement contracts could negatively affect Remington's results of operations.

Although Remington's agreements with the U.S. and foreign governments typically include firm quantities and delivery schedules, such parties generally have the ability to terminate for convenience, and they also generally have standard acquisition protocols that impact the timing and execution of contract awards. Accordingly, Remington's net sales from year to year with respect to such customers are dependent on government appropriations, federal law and acquisition guidelines and are subject to uncertainty. The U.S. government or any allied foreign government may decide to reduce government defense spending in the programs in which Remington participates. Sovereign budget deficits are likely to put long term pressure on defense budgets in countries to which Remington may sell its products. There can be no assurances that the amount spent on defense by countries to which Remington sells its products will be maintained or that individual defense agencies will allocate a percentage of their budget for the purchase of small arms. The loss of, or a significant reduction in, government funding for any program in which Remington participates could have a material adverse effect on Remington's sales and thus negatively affect Remington's business, financial condition, results of operations or cash flows.

***In order for Remington to sell products overseas, it is required to obtain certain licenses or authorizations, which it may not be able to receive or retain.***

Export licenses are required for Remington to export its products and services from the U.S. and issuance of an export license lies within the discretion of the issuing government. In the U.S., substantially all of Remington's export licenses are processed and issued by the Directorate of Defense Trade Controls ("DDTC") within the U.S. Department of State. In the case of large transactions, DDTC is required to notify Congress before it issues an export license. Congress may take action to block the proposed sale. As a result, Remington may not be able to obtain export licenses or to complete profitable contracts due to domestic political or other reasons that are outside Remington's control. Remington cannot, therefore, be sure of its ability to obtain the governmental authorizations required to export its products. Furthermore, Remington's export licenses, once obtained, may be terminated or suspended by the U.S. government at any time. Failure to receive required licenses or authorizations or any termination or suspension of Remington's export privileges could have a material adverse effect on its business, financial condition, results of operations and cash flow.

***Remington is subject to U.S. and other anti-corruption laws, trade controls, economic sanctions and similar laws and regulations in the jurisdictions in which it operates. Its failure to comply***

*with these laws and regulations could subject it to civil, criminal and administrative penalties and harm its reputation.*

As a result of doing business in foreign countries and with foreign partners, Remington is exposed to the risk of violating anti-corruption and trade control laws and sanctions regulations to which Remington is subject. In particular, Remington's operations are subject to the U.S. Foreign Corrupt Practices Act of 1977 (the "FCPA") and export controls and economic sanctions programs, including those administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). These laws and regulations place restrictions on Remington's operations, trade practices, partners and investment decisions.

The FCPA prohibits Remington from providing anything of value to foreign officials for the purposes of obtaining or retaining business or securing any improper business advantage. Economic sanctions programs restrict Remington's business dealings with certain sanctioned countries, persons and entities. In addition, because Remington acts through dealers and distributors, it faces the risk that its dealers, distributors or consumers might further distribute its products to a sanctioned person or entity, or an ultimate end-user in a sanctioned country, which might subject Remington to an investigation concerning compliance with OFAC or other sanctions regulations.

Violations of anti-corruption and trade control laws and sanctions regulations are punishable by civil penalties, including fines, denial of export privileges, injunctions, asset seizures, debarment from government contracts and revocations or restrictions of licenses, as well as criminal fines and imprisonment. Remington cannot assure you that all of its local, strategic or joint partners will comply with these laws and regulations, in which case Remington could be held liable for actions taken inside or outside of the U.S., even though its partners may not be subject to these laws. Such a violation could materially and adversely affect Remington's reputation, business, results of operations and financial condition. Any continued international expansion, including in developing countries, and any development of new partnerships and joint venture relationships worldwide, could increase the risk of FCPA or OFAC violations in the future.

***Environmental litigation and regulations may restrict or increase the cost of Remington's operations and/or impair its financial condition.***

Remington is subject to a variety of federal, state and local environmental laws and regulations that govern, among other things, the discharge of hazardous materials into the air and water, the handling, treatment, storage and disposal of such materials and the remediation of contaminated soil and groundwater. While Remington monitors these requirements and believe Remington is in material compliance with them, Remington is subject to governmental proceedings and orders pertaining to waste disposal, air emissions and water discharges in the normal course of its manufacturing operations.

Based on information known to Remington, it does not expect current environmental regulations or environmental proceedings and claims to have a material adverse effect on its financial condition, results of operations or cash flows. However, it is not possible to predict the impact on Remington of future environmental compliance requirements or of the cost of resolution of future environmental proceedings and claims, in part because the scope of the remedies that

may be required is not certain, liability under federal environmental laws is, in some cases, joint and several in nature, and environmental laws and regulations are subject to modifications and changes in interpretation. Environmental regulations may become more burdensome in the future and any such development, or discovery of unknown conditions, may require Remington to make material expenditures or otherwise materially adversely affect the way Remington operates its business, as well as have a material adverse effect on its financial condition, results of operations or cash flows.

***Remington depends on others to indemnify it for certain losses related to environmental liabilities, but Remington has no assurance that they will meet their obligations.***

Under the terms of a legacy asset purchase agreement from 1993 with DuPont related to the Remington business, DuPont has agreed to indemnify Remington for certain environmental liabilities. However, Remington cannot assure you that DuPont will continue to honor their obligations and Remington may be subject to substantial liabilities if DuPont does not fulfill its obligations, which could have a material adverse effect on its business, financial condition, results of operations or cash flows.

In addition, under the agreements pursuant to which Remington acquired certain of its other properties, Remington is entitled to indemnification from the seller for certain environmental liabilities. However, the ability to collect on any of these indemnification claims is subject to the financial condition of the seller of the property at the time a claim arises. The seller might also dispute its obligation to indemnify Remington. Failure to collect on any such indemnification claim for any reason could have a material impact on Remington's business, financial condition, results of operations or cash flows.

***Remington may not be able to retain or attract key management or qualified employees.***

Remington's ability to operate its business is dependent on its ability to hire and retain qualified senior management. Remington's senior management is intimately familiar with its products and those offered by its competitors, as well as the situations in which its products are utilized in combat and law enforcement activities. Remington's senior management also brings an array of other important talents and experience, including strategy, managerial, financial, supply chain, governmental contracts, sales, legal and compliance. Remington believes their backgrounds, experience and knowledge gives Remington expertise that is important to its success. Losing the services of these or other members of Remington's management team, particularly if they leave it to join a competitor's business, could harm Remington's business and expansion efforts. Remington's success also is dependent on its ability to hire and retain technically skilled workers. Competition for some qualified employees, such as engineering professionals, is intense and may become even more competitive in the future. If Remington is unable to attract and retain qualified employees, its operating results, growth and ability to obtain future contracts could suffer.

***Remington's required level of future pension contributions could be unfavorably impacted by changes in actuarial assumptions and future market performance.***

117

Remington has defined benefit pension obligations. The funding position of its pension plans is impacted by the performance of the financial markets, particularly the equity markets, and the discount rates used to calculate its pension obligations for funding and expense purposes. Historical fluctuations in the financial markets have negatively impacted the value of the assets in Remington's pension plans. In addition, lower bond yields may reduce its discount rates resulting in increased pension contributions and expense.

Funding obligations are determined under government regulations and are measured each year based on the value of assets and liabilities on a specific date. If the financial markets do not provide the long-term returns that are expected under the governmental funding calculations, Remington could be required to make larger contributions. The equity markets can be very volatile, and therefore Remington's estimate of future contribution requirements can change dramatically in relatively short periods of time. Similarly, changes in interest rates can impact its contribution requirements. In a low interest rate environment, the likelihood of higher contributions in the future increases. Under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Pension Benefit Guaranty Corporation ("PBGC") has the authority to petition a court to terminate an underfunded tax-qualified defined benefit pension plan under limited circumstances. In the event Remington's tax-qualified defined benefit pension plans were terminated by the PBGC, or if Remington decides to terminates such pension plans, Remington could be liable to the PBGC for the entire amount of the underfunding, as calculated by the PBGC based on its own assumptions (which might result in a larger obligation than that based on the assumptions Remington has used to fund such plans). Finally, to the extent that any of Remington's facilities' closures results in a cessation of operations event under ERISA, Remington may be required to post collateral or security in respect of its associated or attributable unfunded liabilities.

In addition, the measurement of Remington's obligations, costs and liabilities associated with its pension and posttreatment health plans require that Remington estimate the present values of projected future payments to all participants. Remington uses many assumptions in calculating these estimates, including discount rates, investment returns on designated plan assets, health care cost trends, and demographic experience (e.g., mortality and retirement rates). To the extent that actual results are less favorable than its assumptions, it could have be a substantial adverse impact on Remington's financial condition, results of operations or cash flows.

*A disruption to certain of Remington's production and distribution facilities and headquarters could have a material adverse effect on its financial condition, results of operation or cash flows.*

The following facilities are critical to Remington's success: Huntsville, Alabama, Ilion, New York, Lonoke, Arkansas, Southhaven, Mississippi, Mona, Utah, and Madison, North Carolina. These facilities house Remington's principal production, research, development, engineering, design, shipping and general and administrative functions. Any event that causes a disruption to the operation of any of these facilities for even a relatively short period of time may have a material adverse effects on Remington's ability to produce and ship products and to provide service to its customers.

*A significant disruption in Remington's computer systems or a cyber-security breach could adversely affect its operations.*

Remington relies extensively on its computer systems to manage its ordering, pricing, inventory replenishment, and other processes. Remington's systems are subject to damage or interruption from various sources, including power outages, computer and telecommunications failures, computer viruses, cyber security breaches, vandalism, severe weather conditions, catastrophic events and human error, and its disaster recovery planning cannot account for all eventualities. If Remington's systems are damaged, fail to function properly or otherwise become unavailable, Remington may incur substantial costs to repair or replace them, and Remington may experience loss of critical data and interruptions or delays in its ability to perform critical functions, which could adversely affect its business and operating results.

Remington's information technology systems require periodic modifications, upgrades, and replacement that subject it to costs and risks, including potential disruption to its internal control structure, substantial capital expenditures, additional administration and operating expenses, retention of sufficiently skilled personnel or outside firms to implement and operate existing or new systems, and other risks and costs of delays or difficulties in transitioning to new or modified systems or of integrating new or modified systems into its current systems. In addition, challenges implementing new or modified technology systems may cause disruptions in Remington's business operations and have an adverse effect on its business operations if not anticipated and appropriately mitigated.

Further, any compromise of Remington's data security could also result in a violation of applicable privacy and other laws, significant legal and financial exposure, damage to its reputation, loss or misuse of the information, and a loss of confidence in its data security measures, which could harm its business.

***Resources devoted to research and development may not yield new products that achieve commercial success.***

Remington devotes significant resources, including cash, toward research and development. The research and development process is expensive, prolonged and entails considerable uncertainty. Development of a new firearms product typically takes between two and three years. Because of the complexities and uncertainties associated with research and development, products that Remington is currently developing may not complete the development process or obtain the regulatory approvals required for Remington to market such products successfully. In addition, the development of new products may take longer and cost more to develop and may be less successful than Remington currently anticipates. Remington cannot ensure that any of its products currently in its development pipeline will be commercially successful.

***Remington's inability to protect its intellectual property or obtain the right to use intellectual property from third parties could impair its competitive advantage, reduce its revenue, and increase its costs.***

Remington's success and ability to compete depend in part on its ability to protect its intellectual property. Remington relies on a combination of patents, copyrights, trade secrets, trademarks, confidentiality agreements and other contractual provisions to protect its intellectual property, but these measures may provide only limited protection. Remington's failure to enforce

and protect its intellectual property rights or obtain the right to use necessary intellectual property from third parties could reduce its sales and/or increase its costs. In addition, the laws of some foreign countries do not protect proprietary rights as strictly as do the laws of the U.S.

Even if Remington attempts to protect its intellectual property, patents may not be issued for the patent applications that Remington has filed or may file in the future. Remington's issued patents may be challenged, invalidated, or circumvented, and claims of its patents may not be of sufficient scope or strength, or issued in the proper geographic regions, to provide meaningful protection. Remington has registered certain of its trademarks in the U.S. and other countries. Remington may be unable to enforce existing trademarks or obtain new registrations of principle or other trademarks in key markets. Failure to obtain or enforce such registrations could compromise its ability to protect fully its trademarks and brands and could increase the risk of challenge from third parties to its use of its trademarks and brands.

***Labor disputes may cause work stoppages, strikes and disruptions.***

The workforce at Remington's Ilion, New York manufacturing facility is unionized and covered by a collective bargaining agreement, which expires in October 2022. As a result, Remington will need to enter into a new collective bargaining agreement with this union prior to or upon expiration of the current collective bargaining agreement. No assurance can be given that Remington will be able to do so on terms Remington considers favorable. Any labor disputes at this facility, including work stoppages, strikes and disruptions could have a material adverse impact on Remington's business. In addition, from time to time, Remington faces union organizing activities at its other facilities. Although none of these activities have resulted in employees at these facilities being represented by or joining unions, to the extent that were to occur, Remington's labor costs could increase significantly.

***Remington may have to repay certain incentive funds already received if it does not achieve certain targets.***

The Company has received various incentives for the development, construction and renovation of buildings and equipment in Huntsville, Alabama, Lonoke, Arkansas, and Lexington, Missouri. These incentives are subject to claw back provisions. These provisions include commitments to achieve incentive targets associated with employment, capital and payroll. The inability to achieve these targets may require the repayment of certain funds already received.

***Failure to maintain Remington's credit ratings could adversely affect its liquidity, capital position, borrowing costs and access to capital markets.***

Remington's credit risk is evaluated by major independent rating agencies. Remington cannot assure you that it will be able to maintain its current corporate or issue-level credit ratings, and any additional actual or anticipated changes or downgrades in these credit ratings, including any announcement that its ratings are under further review for a downgrade, may further impact its borrowing capabilities and may have a negative impact on its liquidity, capital position and access to capital markets.

***In connection with the restatement of Remington's previously issued financial statements for the three months ended March 27, 2016, March 29, 2015 and June 28, 2015 (the "Original***

*Reports"), management identified a material weakness in its internal controls over financial reporting.*

Effective internal controls over financial reporting are necessary for Remington to provide reliable financial reports and effectively prevent or detect fraud. In connection with the restatement of Remington's previously issued financial statements, management has concluded that as of June 26, 2016, and for the periods covered by the Original Reports, management identified a material weakness in its internal control over financial reporting. Although Remington believes that it has remediated this material weakness, should Remington identify any other material weakness, such weakness could impair its ability to accurately report its results of operations in accordance with GAAP. These effects could in turn result in a material misstatement of its financial position or results of operations and require a further restatement of Remington's financial statements.

C.    *Regulatory Risks*

**Remington's business is subject to legislation and regulation by the U.S. federal government and other foreign governments that may restrict its operations, increase its costs of operations, or adversely affect the demand for its products by limiting the availability and/or increasing the cost of its products.**

The manufacture, sale, purchase, possession, import, export and use of firearms, ammunition and certain of Remington's consumer businesses are subject to extensive federal governmental regulation. Current federal regulations include licensing requirements for the manufacture, sale, export and distribution of firearms and ammunition, both domestically and internally, and a national system of instant background checks for all purchases of firearms from federal license holders.

Remington is issued a Federal Firearms License by, and pay Special Occupational Taxes to, the Bureau of Alcohol, Tobacco, Firearms and Explosives of the U.S. Department of Justice to be able to manufacture firearms and destructive devices in the U.S. These federal agencies also require the serialization of receivers or frames of Remington's firearm products and recordkeeping of its production and sales. Remington's properties are subject to compliance inspections by these agencies. Compliance failures, which constitute violations of law and regulation, could result in the assessment of fines and penalties, including license revocation, which may disrupt Remington's business. Any curtailment of Remington's privileges to manufacture, sell, or distribute its products could have a material adverse effect on its business.

Remington is also required to submit forms to the Bureau of Alcohol, Tobacco, Firearms and Explosives and to obtain advance approval of certain transfers of firearms, including exports from the U.S. Failure to obtain approvals when required can result in a delay in shipping products to customers, which may result in the incurrence of late delivery penalties and delayed recognition of sales for financial reporting purposes.

In addition, Remington is required to comply with legislation in the foreign jurisdictions with which Remington does business. Remington believes that existing federal and foreign government legislation relating to the regulation of firearms and ammunition has not had a material adverse effect on its sales of its products, but any failure to comply with such legislation could

result in penalties or a reduction in its ability to continue certain of its operations without delay or at all, which could have a material adverse effect on its business.

***Future governmental legislation and regulation may restrict Remington's operations, increase its costs of operations, or adversely affect the demand for its products by limiting the availability and/or increasing the cost of its products.***

Future regulations, whether local, federal or international, may adversely affect Remington's operations by limiting the types of products that it can manufacture and/or sell or imposing additional costs on Remington in connection with the manufacture and/or sale of its products. Such regulations may also adversely affect demand for Remington's products by imposing limitations that increase the costs of its products. Any such cost increase may make it more difficult for its distributors or end users to transfer, purchase and own its products and may result in negative consumer perceptions with respect to Remington's products. Bills have, in the past, been introduced in Congress to establish, and to consider the feasibility of establishing, a nationwide database recording so-called "ballistic images" of ammunition fired from new guns. Should such a mandatory database be established, the cost to Remington, its distributors and its customers could be significant, depending on the type of firearms and ballistic information included in the database. Bills have also been introduced that would increase or impose new taxes on the sales of certain types of ammunition, prohibit and/or regulate the manufacture and sale of certain ammunition, including armor-piercing bullets and .25 caliber, .32 caliber and 9 mm handgun ammunition, and address the use of lead in ammunition. Though no new firearms legislation has been passed by Congress in recent years, future bills that apply to the ammunition Remington produces, if enacted, could have a material adverse effect on its business.

In September 2004, the U.S. Congress declined to renew the Federal Assault Weapons Ban of 1994 ("AWB"), which generally prohibited the manufacture of certain firearms defined under that statute as "assault weapons" and the sale or possession of "assault weapons." If a statute similar to AWB were to be re-enacted at the federal or replicated at the local level, it could have a material adverse effect on Remington's business.

In January 2016, in light of recurring high-profile crimes by individuals involving firearms, President Obama announced executive actions that serve to, among other things, enhance background checks and broaden the definition of a "dealer" under current gun laws. Other objectives of the executive actions are to reduce sales of guns that are not required to be tracked and for which the seller is not required to conduct a background check, to increase reporting by dealers of unauthorized attempts to acquire guns, to provide greater access to information for sellers about prospective buyers of guns, to include mental health treatment and reporting as part to the firearm background check system, and to fund research in gun safety technology. The 2016 executive actions are in addition to 23 executive actions announced by President Obama in 2013, which were intended to reduce violent acts by individuals and were ultimately overridden by Congress. No assurance can be given as to whether the most recent actions will again be overridden by legislative action or will ultimately be adopted, or if they are adopted, what kind of effect they may have on Remington's business, results of operations and financial condition.

Although Remington believes that existing federal legislation relating to the regulation of firearms and ammunition has not, in the past, had a material adverse effect on its sales, any future

122

legislation may be more restrictive. In addition, future incidents of violence by individuals involving guns could increase pressure to adopt some or all of the proposed regulations described above or spur additional regulatory proposals. Whatever the cause, the implementation of additional regulations may have a material adverse effect on Remington's business, financial condition, results of operations or cash flows. Remington may also become subject to additional existing regulation as it enters into new markets and develop and sell new products. Regulatory proposals, even if never enacted, may affect firearms or ammunition sales as a result of consumer perceptions. Although Remington is primarily a manufacturer of long guns and ammunition, the trends regarding firearms regulation, as well as pending industry litigation, and the consumer perception of such developments, may adversely affect sales of firearms, ammunition and other shooting-related products not applicable to long guns by increasing costs of production and/or reducing the number of distribution outlets for Remington's products, which may have a material adverse effect on its business, results of operations and financial condition.

***Remington's business is subject to legislation and regulation at the state and local level that may restrict its operations and increase its costs of operations, in ways that vary across jurisdictions.***

In addition to federal and foreign legislation, state and local laws and regulations may place additional restrictions on the ownership and transfer of firearms and ammunition and may increase Remington's compliance costs both through additional regulation and by requiring compliance with multiple regulators within the United States. For example, various states and local jurisdictions have adopted their own version of the AWB, some of which apply to Bushmaster, DPMS and certain Remington sporting firearms products. Certain regulations at the state and local level prohibit the sale of firearms unless accompanied by an internal and/or external locking device. In several states, this requirement is imposed on both handguns and long guns. Further, some states are also considering mandating the inclusion of various design features on safety grounds. Most of these regulations as currently contemplated would be applicable only to handguns. In addition, in the past, a small number of states operated registries of so-called "ballistic images" of ammunition fired from new guns. Although Maryland became the last state to repeal these measures in May 2015, these or other states may re-enact such measures in the future. These various regulations may impose additional costs and requirements while also limiting Remington's operations and sales of certain products. Compliance with requirements across different states also increases its costs by requiring Remington to meet varying standards in the different locations in which Remington sells its products.

In addition to existing regulation, there has also been an increase in activity at the state level relating to more restrictive legislation intended to reduce violent acts by individuals. Following the shooting at Sandy Hook, the Connecticut state legislature passed a comprehensive gun control package, including a ban on assault weapons and large-capacity ammunition magazines. Similarly, the state of New York enacted the NY SAFE ACT in January 2013, which expands the state's ban on assault weapons, requires current owners of assault weapons to register them with the police, requires background checks to buy ammunition, and adds measures to keep guns away from the mentally ill. There are currently 13 states, including Colorado, California and New Jersey, that have full point-of-contact background check legislation and seven states, including Maryland, New Hampshire and North Carolina, which have partial point-of-contact background check legislation. Certain other states have enacted, or are considering enacting,

legislation that restricts or prohibits the ownership, use or sale of specified categories of firearms and ammunition, and many states currently have mandatory waiting period laws in effect for the purchase of firearms, including rifles and shotguns. Newly enacted regulations such as these may continue to increase compliance costs while creating even greater regulatory differences across states.

Remington continues to monitor changes in legislation across the states in which it operates, but no assurance can be given that differences across these jurisdictions will not prove costly or have a material effect on its results of operations.

***The acquisition of New Common Units, including through the Plan, may be subject to regulatory restrictions.***

The acquisition of New Common Units or New Warrants, including through the Plan, and the ability to vote New Common Units may be subject to compliance with regulatory requirements and/or prior regulatory approvals by the holder or acquirer of New Common Units or New Warrants. Such regulatory approvals may include, without limitation, approvals from any other regulatory body or bodies, or the satisfaction of any notification and waiting period requirements, such as those of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules promulgated thereunder (the "HSR Act"). The applicability of regulatory approvals may depend on the amount of New Common Units or New Warrants to be acquired or to be voted, as applicable, or, in the case of the HSR Act, if certain size of parties and size of transaction thresholds are satisfied and no exemption is applicable. The ability to obtain regulatory approvals may depend upon the business activities of the proposed acquirers of New Common Units or New Warrants, and the affiliates of such proposed acquirers. Regulatory approvals may be denied, conditioned, or delayed and may not be available. Denial, condition or delay could prevent a proposed holder from acquiring New Common Units or New Warrants, and could prevent a holder of New Common Units from voting its New Common Units.

A holder or acquirer of New Common Units or New Warrants should consult with its own legal counsel with regard to compliance with and/or obtaining appropriate regulatory approvals. The acquisition of New Common Units or New Warrants, or voting of New Common Units prior to obtaining and/or complying with any necessary regulatory approvals, may result in liability including potentially substantial civil penalties.

D.     *Risks Related to New Common Units, New Warrants, and Litigation Trust Interests*

The ultimate recoveries under the Plan to holders of Claims in Classes 4 and 5 that receive New Common Units, Litigation Trust Interests and, with respect to claims in Class 5, New Warrants pursuant to the Plan will depend on the realizable value of such securities. The securities to be issued pursuant to the Plan are subject to a number of material risks, including, but not limited to, those specified below. Prior to voting on the Plan, each holder of Claims in Classes 4 and 5 should carefully consider the risk factors specified or referred to below, as well as all of the information contained in the Plan and this Disclosure Statement. By virtue of the New Warrants being exercisable into New Common Units, risks that relate to the New Common Units will necessarily also affect the New Warrants.

***The outcome of the Litigation Claims, including any avoidance actions, is uncertain.***

Success by the Litigation Trustee on the Litigation Claims cannot be guaranteed. Various factors exist that may significantly reduce any recovery on the Litigation Claims, or delay such recovery. To date, a complete examination and analysis of potential Litigation Claims, including any avoidance actions, that the Litigation Trust may have has not been conducted. The establishment of the Litigation Trust is not a representation that valid claims in fact exist, or that any recovery on any Litigation Claims will be material. Moreover, to the extent Litigation Claims are pursued, the outcome of any litigation is inherently speculative and uncertain. If a Litigation Claim is pursued in court, the Litigation Trust is not guaranteed to prevail and, in the event of an adverse outcome, the value of the Litigation Trust Assets may be materially reduced. There is no guarantee that the Litigation Trust Assets will generate any proceeds to distribute to any Holders of such Litigation Trust Interests. Moreover, it is not possible to predict the amount of time that will be necessary to recover on any Litigation Claims, and various factors could lead to significant delay in any recovery. Furthermore, even if successful in prosecuting the Litigation Claims, in some cases, the Litigation Trustee may encounter difficulty in collection of recoveries. Among other factors that may reduce or limit the amount of recovery to the holders of the Litigation Trust Interests is the availability of insurance proceeds that cover such claims, and the legal fees and costs associated with pursuing such claims, which will be taken from funds available in the Litigation Trust. For these and other reasons, the Litigation Trustee may not make any recoveries on the claims underlying the Litigation Claims.

***The Litigation Trust Advisory Board has the absolute right to provide Direction to the Litigation Trustee with respect to pursuing or settling Litigation Claims.***

If a Litigation Trust is established, the Litigation Trust Advisory Board shall have the absolute right to direct the Litigation Trustee to prosecute, pursue, commence, object to, seek to estimate, seek to subordinate, compromise, settle, or take any other action concerning any and all Litigation Claims as it determines in good faith to be in the best interests of the Litigation Trust Beneficiaries, and consistent with (i) the members' fiduciary obligations to the Litigation Trust Beneficiaries and (ii) the purposes of the Litigation Trust. It is possible that the Litigation Trust Advisory Board may determine in its judgment that the expected recoveries on any or all Litigation Claims do not warrant pursuing such claims, given the likelihood of success of those Litigation Claims and the cost of pursuing them. Accordingly, the establishment of the Litigation Trust is not a guarantee that any Litigation Claims will be commenced or pursued through final judgment. Neither the Electing Term Loan Lenders nor the Electing Secured Lenders will have any right to pursue, settle, or take any other action with respect to the Litigation Claims on their own behalf. The Litigation Trustee and each member of the Litigation Trust Advisory Board shall have no liability for any actions or omissions with respect to the Litigation Trust unless arising out of such person's fraud, self-dealing, intentional misrepresentation, willful misconduct, breach of fiduciary duty, gross negligence, or professional malpractice.

***Lack of established markets for the New Common Units and the New Warrants may adversely affect liquidity.***

The New Common Units and the New Warrants will be illiquid securities without an active trading market. There can be no assurance that an active trading market for the New Common

Units or the New Warrants will develop, nor can any assurance be given as to the prices at which such securities might be traded, should an active trading market develop. Remington and Reorganized Remington do not anticipate that the New Common Units or the New Warrants to be issued under the Plan will be listed on or traded on any nationally recognized market or exchange.

***The New Common Units, New Warrants, and Litigation Trusts Interest may be subject to restrictions on transferability.***

The terms of the New Organizational Documents, the Warrant Agreement and the Litigation Trust Agreement are expected to contain prohibitions on the transfer of the New Common Units, the New Warrants, and the Litigation Trust Interests, respectively, to the extent such transfer would subject the Remington Entities to the registration and reporting requirements of the Securities Act and the Securities Exchange Act of 1934, as amended. Furthermore, the terms of the New Organizational Documents, the Warrant Agreement and/or the Litigation Trust Agreement may contain additional transferability restrictions.

***Other Risk Factors Regarding Litigation Trust Interests***

There is no guarantee that the Litigation Trust Assets will generate any proceeds to distribute to any holders of such Litigation Trust Interests. The success of the Litigation Trustee in pursuing the Litigation Claims is speculative and uncertain. Litigation may be complex and involve significant delay. Furthermore, even if successful in prosecuting the Litigation Claims, in some cases, the Litigation Trustee may encounter difficulty in collection of recoveries. Recoveries by the Litigation Trustee are an important part of the consideration being distributed to the Litigation Trust Beneficiaries under the Plan, but success by the Litigation Trustee cannot be guaranteed.

***Certain holders of New Common Units, New Warrants, and/or Litigation Trust Interests issued under the Plan may be restricted in their ability to transfer or sell their securities.***

To the extent that the New Common Units, New Warrants, or the Litigation Trust Interests (as applicable) issued under the Plan are covered by section 1145(a) of the Bankruptcy Code, they may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, that such securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of Reorganized Remington as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Such affiliate holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by persons who receive New Common Units, New Warrants, or the Litigation Trust Interests (as applicable) pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. *See* Section IX herein entitled "Certain Federal and State Securities Law Considerations" for more information.

*Lack of dividends on New Common Units may adversely affect value and liquidity.*

Remington does not anticipate that cash dividends or other distributions will be made by Reorganized Remington with respect to the New Common Units in the foreseeable future. In addition, covenants in the New ABL Facility, the New Term Loan Facility, or certain other debt instruments to which Reorganized Remington may be a party may restrict the ability of Reorganized Remington to pay dividends and make certain other payments. Further, such restrictions on dividends may have an adverse impact on the market demand for New Common Units as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the securities issued pursuant to the Plan.

*Certain holders of New Common Units may hold substantial interests in Reorganized Remington.*

During the pendency of the Chapter 11 Cases, there will be no limitation on the trading of Claims or Interests, beyond any contractual, regulatory, or other limitation that may already be in place prior to commencement of the Chapter 11 Cases, including under the Restructuring Support Agreement. Accordingly, upon consummation of the Plan, certain holders of Claims and Interests may receive distributions of New Common Units representing a substantial amount of the New Common Units outstanding on the Effective Date. If holders of significant numbers of New Common units were to act as a group, such holders could be in a position to control the outcome of actions requiring member approval, including, among other things, election of managers. This concentration of ownership could also facilitate or hinder a negotiated change of control of Remington and, consequently, impact the value of the New Common Units.

Further, the possibility that one or more holders of significant numbers of shares of New Common Units may determine to sell all or a large portion of their New Common Units in a short period of time may adversely affect the market price of the New Common Units.

*The market price of the New Common Units stock could be subject to wide fluctuations as a result of many factors.*

Many factors could affect the market price of the New Common Units, including the following:

- variations in Remington's operating results;
- introductions of new products by Remington or its competitors;
- the performance of Remington's distributors;
- general economic, political, and market conditions and consumer spending patterns;
- changes in laws, regulations or policies that may affect the marketability of Remington's products;
- investor reaction to news events;
- adverse publicity surrounding Remington's industry, products, the safety of Remington's products or the use of Remington's products;
- the general performance of the markets in which Remington participates; and

- factors relating to customers, suppliers and competitors.

In addition, price and volume fluctuations in the stock market unrelated to Remington's performance could result in significant fluctuations in the market price of the New Common Units.

E.    *Other Risks*

**The Term/ROC DIP Facility, the ABL DIP Facility, the New ABL Facility, and/or the New Term Loan Facility may not become available to Remington.**

On or shortly after the Petition Date, Remington intends to ask the Bankruptcy Court to authorize the Term/ROC DIP Facility and the ABL DIP Facility, if any to provide for funding during the Chapter 11 Cases. The Term/ROC DIP Facility and the ABL DIP Facility are intended to provide liquidity to Remington during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve the Term/ROC DIP Facility or the ABL DIP Facility on the terms requested by Remington. Moreover, if the Chapter 11 Cases take longer than expected to conclude, Remington may exhaust its financing. There is no assurance that it will be able to obtain additional financing from its existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of Remington's businesses may be materially impaired.

In addition, the Term/ROC DIP Credit Agreement, the ABL DIP Facility Loan Agreement, the New ABL Facility Documents, and the New Term Loan Facility Documents include various conditions to closing. Accordingly, Remington cannot give assurances that the ABL DIP Facility, the Term/ROC DIP Facility, the New ABL Facility, or the New Term Loan Facility will be consummated. In the event any of these facilities are not consummated, and Remington is unable to promptly obtain replacement facilities, the ability of Remington to confirm the Plan will be materially and adversely affected.

Even if the Term/ROC DIP Credit Agreement, the ABL DIP Facility Loan Agreement, the New ABL Facility Documents, and the New Term Loan Facility Documents are entered into, any inability of Reorganized Remington to remain in compliance with its covenants thereunder could restrict the ability of Reorganized Remington to fully access the maximum amount that may be borrowed under the foregoing. While Remington believes these risks are mitigated in part by the fact that the ABL DIP Facility is expected to be provided by the ABL Facility Lenders, the Term DIP Facility is expected to be provided by certain of the Term Loan Lenders and the Third Lien Noteholders, the ROC DIP Facility is expected to be provided by ROC, the New ABL Facility is expected to be provided by the ABL Facility Lenders, and the New Term Loan Facility is expected to be provided by the lender participants in the Term DIP Facility, these uncertainties with respect to the ABL DIP Facility, the Term DIP Facility, the ROC DIP Facility, the New ABL Facility, and the New Term Loan Facility may nonetheless adversely affect the success of Reorganized Remington.

***The extent of leverage may limit Reorganized Remington's ability to obtain additional financing.***

Although the Plan will result in the elimination of debt, Reorganized Remington will continue to have a significant amount of indebtedness after the Effective Date.

Such levels of indebtedness may limit the ability of Reorganized Remington to obtain additional financing for working capital, capital expenditures, debt service requirements, and general corporate or other purposes. Such levels of indebtedness may also limit the ability of Reorganized Remington to adjust to changing market conditions and to withstand competitive pressures, possibly leaving Reorganized Remington vulnerable in a downturn in general economic conditions or in its business, or unable to carry out necessary maintenance or capital spending.

***Remington's Projections and other financial information are based on assumptions that may prove incorrect.***

The Projections and other financial information contained herein reflect numerous assumptions concerning the anticipated future performance of Reorganized Remington, some of which may not materialize.

The financial information contained in this Disclosure Statement, other than that in **Exhibit E-1**, has not been audited. In preparing this Disclosure Statement, Remington has relied on financial data derived from its books and records that was available at the time of such preparation. Although Remington has exercised its reasonable business judgment to ensure the accuracy of the financial information provided herein, and while Remington believes that such financial information fairly reflects its financial results, Remington is unable to warrant or represent that the financial information contained herein is without inaccuracies.

The Projections are, by their nature, forward-looking, and necessarily based on certain assumptions or estimates that are beyond Remington's control and may ultimately prove to be incorrect. The actual future financial results of Reorganized Remington may turn out to be materially different from the Projections. As discussed above, the firearms and ammunition markets are volatile and Remington's operations are subject to inherent uncertainties and risks, all of which make accurate forecasting very difficult. In preparing the Projections, Remington has relied upon the expertise of its advisors to assess and evaluate many of those uncertainties and risks on a prospective basis, and there can be no assurances that such prospective assessments will ultimately prove to be accurate.

It was assumed in the preparation of the Projections and other financial information contained herein that the historical book value of Remington's assets as of December 31, 2017 approximates those assets' fair value, except for specific adjustments.

***Historical financial information may not be comparable.***

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of Reorganized Remington from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in Remington's historical financial statements.

## SECTION XI.
## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF PLAN

If the Plan is not confirmed, the alternatives include (a) liquidation of Remington under chapter 7 or chapter 11 of the Bankruptcy Code and (b) continuation of the Chapter 11 Cases and formulation of an alternative plan or plans of reorganization. Each of these possibilities is discussed in turn below.

A.    *Liquidation Under Chapter 7 or Chapter 11*

If the Plan is not confirmed, the Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In chapter 7, a trustee would be appointed to promptly liquidate the assets of Remington.

Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective holders of Claims or Interests, Remington believes that in a chapter 7 liquidation, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured Claims that would be expected, would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors and equity interest holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of Remington's operations and the failure to realize the greater going concern value of Remington's assets.

Remington could also be liquidated pursuant to the provisions of a chapter 11 plan. In a liquidation under chapter 11, Remington's assets could be sold in a more orderly fashion over a longer period of time than in a chapter 7 liquidation. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a chapter 11 liquidation, expenses for professional fees could be lower than in a chapter 7 liquidation, in which a trustee must be appointed. However, the drafting and pursuit of a liquidation plan and its balloting and tabulation would result in additional administrative costs. Any distributions to the holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

It is highly unlikely that Interest holders would receive any distribution in a liquidation under either chapter 7 or chapter 11.

Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, Remington believes that any liquidation is a much less attractive alternative for creditors and equity interest holders than the Plan because of the greater recoveries Remington anticipates will be provided by the Plan. REMINGTON BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF CLAIMS AND INTERESTS THAN WOULD LIQUIDATION UNDER ANY CHAPTER OF THE BANKRUPTCY CODE.

The Liquidation Analysis, prepared by Remington with its financial advisors, is premised upon a chapter 7 liquidation and is attached hereto as Exhibit D. In the Liquidation Analysis, Remington has taken into account the nature, status, and underlying value of the assets of Remington, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests. Based on this analysis, it is likely that a liquidation of Remington's assets would produce less value for distribution to creditors and equity interest holders than that recoverable in each instance under the Plan.

B.    *Alternative Plans of Reorganization*

If Remington remained in chapter 11, Remington could continue to operate its businesses and manage its properties as debtors-in-possession, but it would remain subject to the restrictions imposed by the Bankruptcy Code. It is not clear whether Remington could continue as a viable going-concern in protracted Chapter 11 Cases. Remington could have difficulty operating with the high operating and financing costs and the eroding confidence of its customers and trade vendors, if Remington remained in chapter 11 for a prolonged period. It likely would be very difficult for Remington to find alternative bank financing if the Term/ROC DIP Facility were terminated. If Remington were able to obtain financing and continue as a viable going-concern, Remington (or other parties in interest) could ultimately propose another plan or attempt to liquidate Remington under chapter 7 or chapter 11. Such alternative plans might involve either a reorganization or continuation of Remington's businesses or an orderly liquidation of its assets, or a combination of both.

## SECTION XII.
## CONCLUSION AND RECOMMENDATION

Remington, with the support of the Consenting Creditors, believes that confirmation and implementation of the Plan is in the best interests of the holders of Claims and Interests because it provides the greatest distributions and opportunity for distributions to such holders. In addition, any alternative to confirmation of the Plan could result in extensive delays and substantially increased administrative expenses.

Accordingly, Remington, with the support of the Consenting Creditors, urges all holders of Claims who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be **actually received** by the Voting Agent no later than 4:00 p.m., prevailing Eastern Time, on April 26, 2018.

*[Remainder of page intentionally left blank]*

Dated:  March 22, 2018

Respectfully submitted,

REMINGTON OUTDOOR COMPANY,
INC., on its own behalf and on behalf of its
affiliated debtors and debtors in possession

By:  _____
Name: Stephen P. Jackson, Jr.
Title: Chief Financial Officer