IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
                                                                 :
In re:                                                           :   Chapter 11
                                                                 :
REMINGTON OUTDOOR COMPANY, INC., *et*                            :   Case No. 18- 10684 (__)
*al.*,[1]                                                        :
                                                                 :   (Joint Administration Requested)
                                                                 :
                         Debtors.                                :
---------------------------------------------------------------- x

**DECLARATION OF ARI N. LEFKOVITS IN SUPPORT OF
MOTION OF DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING, (II) AUTHORIZING
POSTPETITION USE OF CASH COLLATERAL, (III) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV)
SCHEDULING FINAL HEARING, AND (V) GRANTING RELATED RELIEF
WITH RESPECT TO ABL EXIT FACILITY COMMITMENT LETTER**

I, Ari N. Lefkovits, declare as follows:

1.  I am a Managing Director at Lazard Frères & Co. LLC ("Lazard"), a financial advisory services and investment banking firm which has its principal office at 30 Rockefeller Plaza, New York, New York 10112. I am authorized to make this declaration (this "Declaration") on behalf of Lazard. Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); and Remington Arms Distribution Company, LLC (4655). The principal offices of Debtor Remington Outdoor Company Inc., the top-level holding company, are located at 870 Remington Drive, Madison, NC 27025.

[2] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Lazard and are based on information provided by them.

2. I submit this Declaration in support of the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Authorizing Postpetition Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling Final Hearing, and (V) Granting Related Relief With Respect to ABL Exit Facility Commitment Letter* (the "Motion"), which seeks, *inter alia*, entry of an interim order (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders") approving the Debtors' entry into a debtor-in-possession term loan facility (the "DIP Term Facility") and a debtor-in-possession asset-based loan facility (the "DIP ABL Facility," and together with the DIP Term Facility, the "DIP Facilities").[3]

3. Except where specifically noted, all statements in this Declaration are based on: (a) my personal knowledge developed during the course of Lazard's engagement with the Debtors; (b) my discussions with the Debtors' senior management, the Debtors' other advisors and other members of the team at Lazard; and (c) my review of relevant documents and/or my opinion based upon my professional experience. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents and/or opinion.

## Qualifications

4. I am a Managing Director in the financial restructuring group at Lazard, a financial advisory services and investment banking firm which has its principal office at 30 Rockefeller Plaza, New York, New York 10112. I have worked at Lazard since 1999. Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 150 years. Lazard and its professionals, myself included, have considerable expertise and experience in providing investment banking and financial advisory services to financially

---

[3] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

distressed companies in reorganization proceedings and complex financial restructurings, both in and out of court I hold an A.B. in History from Dartmouth College, where I graduated *magna cum laude*, and a J.D. from Stanford University, where I graduated with distinction.

5. I have experience in a wide range of corporate finance transactions, including restructurings and reorganizations, mergers and acquisitions, spin-offs and split-offs, debt and equity financings, joint ventures, and other matters. I have advised numerous clients through the restructuring process across a range of industries, including: IAP Worldwide (defense); Duke Energy, Dune Energy, and Pacific Energy (energy and natural resources); FGIC, PMI, Ambac, American Home Mortgage, New Century, and GMAC ResCap (financial institutions); AAI Pharma and SkyePharma (healthcare); Collins & Aikman, GenTek, Kaiser Aluminum, Milacron, North Atlantic Trading, Rafaella Apparel, Sons of Gwalia, and the UAW VEBA Trust (multiple transactions involving Chrysler, Ford, and GM) (industrials); Crescent Resources, Extended Stay Hotels, GHG/Capita, Highland Hotels, IVG, Landsource Communities Development, and LNR (real estate); 360networks, Asia Global Crossing, Local Insight Media, Metromedia Fiber Network, Spectrasite, SunCom, and Zilog (technology, media and telecom).

### Lazard's Retention

6. The Debtors retained Lazard in November 2017, as the Debtors' senior management and boards of directors were considering how to address their overleveraged balance sheet and liquidity issues. Since Lazard's retention, its responsibilities have included, among others, identifying and initiating potential liquidity enhancing and debt restructuring transactions for the Debtors, including the potential transfer of ownership of the Debtors to its creditors. Lazard has worked, and will continue to work, closely with the Debtors' management and other professionals and has become acquainted with the Debtors' capital structure, cash flows, liquidity needs and business operations, as well as management's business plans and

financial projections.

### Debtors' Declining Liquidity and Immediate Need for Financing

7. As described in further detail in the First Day Declaration and the Motion, the Debtors have experienced severe liquidity constraints as a result of volatility in the firearm and ammunition market and the significant deterioration in the Company's financial performance. More specifically, owing to these factors, the Debtors have experienced declining revenues, compressed margins and faced increasing difficulty in meeting certain liquidity benchmarks in order to maintain sufficient borrowing capacity under their ABL Facility.

8. By January 2018, it became clear that the Debtors' operating subsidiaries would face a working capital shortfall, with cash projected by management to run out as early as late January 2018. Shortly afterward, the Debtors, with Lazard's assistance, began exploring more far-reaching solutions to their financial problems and began a dialogue with the Debtors' primary stakeholders that could include a restructuring that would transfer ownership of the Debtors to their creditors, including:

(a) Certain funds and accounts managed by Franklin Advisers, Inc., certain discretionary accounts under the control of J.P. Morgan Investment Management, Inc. and certain discretionary accounts under the control of JPMorgan Chase Bank, N.A. (the "Term Loan Representatives," and together with the other lenders under the Debtors' Term Loan Agreement dated as of April 19, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Term Loan Facility"), the "Term Loan Lenders," and together with the Term Loan Agent, the "Term Loan Secured Parties");

(b) Bank of America, N.A., as administrative agent and co-collateral agent with Wells Fargo Bank, National Association (together, in such capacities, the "ABL Agent"), under that certain ABL Credit Agreement dated as of April 19, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "ABL Credit Agreement," and the facility thereunder, the "ABL Facility), and the lenders thereunder (the "ABL Lenders," and together with the ABL Agent, the "ABL Secured Parties"); and

(c) An *ad hoc* group (the "Ad Hoc Secured Noteholder Group") of the holders from time to time of the notes ("Secured Notes," and together with the Term Loan Facility and the ABL Facility, the "Existing Facilities") issued under that certain Indenture dated April 19, 2012 (the "Secured Note Indenture") (the "Secured Noteholders," and, together with the trustee under the Secured Note Indenture (the "Secured Notes Indenture Trustee"), the "Secured Note Secured Parties," and together with Term Loan Secured Parties and the ABL Secured Parties, the "Prepetition Secured Parties").

9. At the same time, the Debtors considered various financing alternatives to address their immediate working capital needs while working on a balance sheet restructuring. These financing alternatives included obtaining additional access to borrowings under their ABL Facility, new financing from the Term Lenders and/or the Third Lien Noteholders, and intercompany advances or loans from Debtor ROC to its operating subsidiaries.

**Decision to Pursue DIP Financing**

10. In late January 2018, the Debtors' senior management and board of directors concluded that a comprehensive out-of-court balance sheet restructuring of the Debtors' financial obligations was unlikely to be achieved before the Debtors exhausted their liquidity. In addition, because the Debtors' various institutional lenders had indicated that they were unwilling to lend any further significant sums to the Debtors outside of chapter 11, the Debtors' respective boards of directors determined that it would be appropriate to explore seeking chapter 11 relief and to obtain DIP financing to help fund the contemplated restructuring process.

11. In anticipation of commencing these Chapter 11 Cases, the Debtors identified the Term Loan Lenders, the ABL Lenders, and the Secured Noteholders—all incumbent lenders to the Debtors—as the most likely sources of post-petition financing and engaged in negotiations with all three of these constituencies to raise potential post-petition financing facilities.

### Efforts to Obtain Post-Petition Financing

12. **Initial Prepetition Secured Party Discussions.** While the Term Loan Lenders initially submitted a debtor-in-possession financing proposal to the Debtors, they subsequently informed the Debtors that that proposal was no longer actionable absent entry into a broader restructuring agreement with the Term Loan Lenders and the Ad Hoc Secured Noteholder Group. As a result, the Debtors engaged in protracted and contentious negotiations with the Term Loan Lenders and the Secured Noteholders regarding such an agreement.

13. The ABL Lenders also submitted a DIP proposal, but their initial proposal (i) did not address how the proposed DIP facility would be refinanced on exit from chapter 11; (ii) had the support of the ABL Agent and some, but not yet all, of the members of the ABL Lender group; and (iii) would have provided the Debtors with only marginal incremental liquidity, with significantly higher fees and costs. After the receipt of this DIP proposal, the Debtors informed the ABL Lenders that a successful DIP proposal would need to address these issues.

14. **Third-Party DIP Financing Discussions.** While discussions with the Prepetition Secured Parties were ongoing, the Debtors, with the assistance of Lazard, solicited, on a parallel track, post-petition financing proposals from third parties, including a number of banks and distressed debt lenders. Lazard approached over thirty (30) potential funding sources to provide such financing. The vast majority of lenders contacted, however, indicated that they were reluctant to provide financing to firearms manufacturers. The Debtors ultimately entered into confidentiality agreements with, and provided data room access to, approximately eight (8) parties. While Lazard had discussions with a number of these parties, most declined to participate due to stated timing constraints, potential non-consensual priming concerns, and concerns about investing in the firearms industry. In the end, the Debtors received a DIP

financing proposal from just one of these parties (the "Third-Party Proposed DIP Lender"). Discussions with that third party ultimately yielded a DIP financing proposal (the "Third-Party DIP Proposal") that would have furnished the Debtors with a $100 million credit facility (the minimum amount the Debtors required). However, the Third-Party Proposed DIP Lender later informed the Debtors that it was no longer prepared to provide DIP financing to the Debtors.

**Prepackaged Plan and DIP Term Facility.**

15. While negotiations with the Third-Party Proposed DIP Lender were ongoing, discussions with the Term Loan Lenders and the Secured Noteholders ultimately resulted in agreement on the terms of a comprehensive restructuring of the Debtors' capital structure (the "Restructuring"), the components of which contemplated the OpCo Bridge Term Loan Facility (as defined below), the DIP Term Facility, and, ultimately, the Term Exit Facility (as defined below).

16. In order to memorialize the terms of the Restructuring, the Debtors and a majority in principal amount of each of the Term Loan Lenders and the Secured Noteholders entered into the RSA, which set forth the terms of a comprehensive balance sheet restructuring of the Debtors to be implemented through the Prepackaged Plan. The Prepackaged Plan provides for the elimination of approximately $775 million of the Debtors' prepetition funded debt obligations. In exchange, the Term Loan Lenders and the Secured Noteholders will receive ownership of the Reorganized Debtors' new equity and certain other consideration, while all general unsecured claims of the Debtors will remain unimpaired. The Prepackaged Plan, as structured, would enable the Debtors to emerge with a significantly deleveraged balance sheet and to obtain the liquidity necessary to operate the Debtors' businesses post-emergence for the

foreseeable future based upon management forecasts.[4]

### 1. Incremental Term Loan Facility

17. As part of the Restructuring, the Term Loan Lenders and the Secured Noteholders authorized ROC, the Debtors' ultimate parent company, to make available to FGI OpCo and the Debtors' other operating subsidiaries a "bridge" or "rescue" facility in the amount of $45 million.

18. In light of the Debtors' need for cash to fund the solicitation and filing timeline contemplated by the RSA—and the absence of other out-of-court restructuring alternatives—the parties to the RSA consented to ROC (in such capacity, the "Incremental Term Loan Lender") using $45 million[5] of its own funds to make a loan to FGI OpCo to bridge FGI OpCo's cash shortfall (the "OpCo Bridge Term Loan Facility"). The OpCo Bridge Term Loan Facility was made available on the understanding that, as an emergency "bridge" facility, it would be repaid out of, and "rolled up" into, the DIP Term Facility, in which ROC would participate alongside of the Term Loan Lenders and the Secured Noteholders.

19. In addition, in connection with the OpCo Bridge Term Loan Facility, on February 12, 2018, ROC, FGI Holding, OpCo, FGI Finance, RAC, Barnes, Remington Arms Distribution, RA Brands and TMRI entered into a letter agreement with certain of the Secured Noteholders. Pursuant to the Secured Note Letter Agreement, these Secured Noteholders consented to ROC's, OpCo's and FGI Holding's entry into the Term Loan Amendment and the

---

[4] The Debtors commenced solicitation of the Prepackaged Plan prior to the Petition Date on March 22, 2018, and have filed the Prepackaged Plan and accompanying disclosure statement (the "Disclosure Statement") concurrently with the commencement of these Chapter 11 Cases. Pursuant to the milestones set forth in the RSA, the Debtors are seeking a joint hearing to consider approval of the disclosure statement and confirmation of the Prepackaged Plan on or around May 2, 2018.

[5] In addition to the $45 million to be advanced under the OpCo Bridge Term Loan Facility, the RSA required ROC to contribute $5 million to be used upon consummation of the Plan of Reorganization either (i) to fund a litigation trust with respect to certain causes of action for the benefits of the Prepetition Secured Lenders; or (ii) if these causes of action are settled without the need for litigation, to fund incremental distribution to the Secured Noteholders under the Plan of Reorganization. (RSA, Term Sheet at 2.)

consummation of the transactions contemplated thereby (including, but not limited to, the provision of the OpCo Bridge Term Loan Facility). Additionally, pursuant to the Secured Note Letter Agreement, ROC granted to the Secured Notes Indenture Trustee, for the benefit of the Secured Noteholders, a security interest in and lien on substantially all of ROC's assets, including ROC's bank accounts and cash.

**2. DIP Term Facility**

20. The DIP Term Facility, as an additional component of the overall Restructuring, is to be provided by three of the signatories of the RSA—the Term Loan Lenders, the Secured Noteholders, and ROC. The Term Loan Lenders and the Secured Noteholders will provide, as the first tranche of the DIP Term Facility, $100 million of new money on terms and conditions that are less expensive than those offered by any other third party, including the Third-Party Proposed DIP Lender. ROC, as the Incremental Term Lender and the provider of the DIP Facility's second tranche, will provide, by way of a rollup of loans outstanding under the OpCo Bridge Term Loan Facility, an additional $45 million in post-petition financing.

21. **Term Lender Loans.** The first tranche of the DIP Term Facility will be comprised of the DIP term loans to be made available to the Debtors by the Term Loan Lenders and the Secured Noteholders (the "Term Lender Loans"). The Term Lender Loans will be advanced under a term loan facility in the original principal amount of $100 million—95% of which will be funded by the Term Loan Lenders and 5% of which will be funded by the Secured Noteholders.

22. Upon entry of the Interim Order, the amount available to be drawn under the Initial Commitments will be limited to $50 million. Assuming compliance with all terms of the DIP Term Facility Documents, the Delayed Draw Lenders will make available under the Delayed Draw Commitments (i) an additional advance of $25 million on April 15, 2018,

regardless of whether the Final Order has been entered as of that date; and (ii) a final advance of $25 million upon entry of the Final Order (whether entered before or after April 15, 2018).

23.     The Term Lender Loans will receive a package of superpriority claims and liens. No priming liens will be granted that are otherwise inconsistent with the priorities already in existence under the Existing Intercreditor Agreement.

24.     Under the RSA and the Prepackaged Plan, and as discussed further below, the Term Lender Loans will roll into an exit term loan facility (the "Term Exit Facility") at emergence on the terms and conditions set forth in the Term Exit Facility Term Sheet that is annexed to the Disclosure Statement (the "Term Exit Facility Term Sheet").

25.     **OpCo Bridge DIP Loans**. The second tranche of the DIP Term Facility will be advanced by ROC, in its capacity as Incremental Term Lender, and will be comprised of the OpCo Bridge Roll-Up Loans in an aggregate principal amount of $45 million, consisting of a deemed repayment of the OpCo Bridge Term Loans outstanding on the Closing Date and the deemed funding of the OpCo Bridge Roll-Up Loans in the same amount on the same date.

26.     As originally conceived in the RSA and documented in the Term Loan Amendment, the OpCo Bridge DIP Facility also contemplated the possibility of new money DIP loans being made by ROC (the "OpCo Bridge Non-Roll-Up Loans") to the extent that the full $45 million available under the OpCo Bridge Term Loan Facility had not been funded prior to the Closing Date. However, the Debtors borrowed the full $45 million available under the OpCo Bridge Term Loan Facility prior to the Petition Date. Consequently, there will be no OpCo Bridge Non-Roll-Up Loans available or funded after the Petition Date.

27.     On the effective date of the Plan of Reorganization, (a) the Term Lender Loans will be converted into or replaced with obligations under the Term Exit Facility on the terms set forth in the Term Exit Facility Term Sheet annexed to the Disclosure Statement; and

(b) the OpCo Bridge DIP Loans will receive a distribution consisting of 17.5% of the New Common Units of Reorganized ROC, New Warrants for 15% of the reorganized equity struck at a $700 million enterprise value, plus cash in an amount equal to all accrued and unpaid post-petition interest on the OpCo Bridge DIP Loans as of the emergence date.

### 3. ABL DIP/Exit Facility

28. The DIP ABL Facility augments the liquidity available to the Debtors to fund the Prepackaged Plan process. The DIP ABL Facility also addresses the principal shortcomings that the Debtors raised with the ABL Lenders related to the ABL Lenders' first DIP proposal, notably including a commitment whereby the ABL DIP Facility will roll into the ABL Exit Facility on the Debtors' emergence from chapter 11. Finally, the DIP ABL Facility also has the support of all of the existing ABL Lenders, thereby addressing certain execution risks considerations that had made the ABL Lenders' initial DIP proposal unattractive to the Debtors.

29. The DIP ABL Facility and the ABL Exit Facility collectively provide the company with additional liquidity that, depending on the applicable borrowing base and availability calculations, permit the company to borrow up to approximately $183 million. These facilities unlock suppressed borrowing base availability by counting long-term receivables and by relaxing customer concentration and inventory limits.

30. Most significantly, the DIP ABL Facility will "roll" into the ABL Exit Facility at emergence on terms acceptable to the Debtors. Access to such an exit facility is critical to the success of the Prepackaged Plan process, and the Debtors efforts to raise exit financing to date have not yielded alternative ABL exit financing proposals. Without the ABL Exit Facility, the Prepackaged Plan, along with its full recoveries for unsecured creditors and other benefits, would require a different financing source, which, based on the financing

solicitation efforts to date, would be difficult to obtain, if obtainable at all.

31. The commitment letter furnished by the Lenders under the ABL Exit Facility with respect to the ABL Exit Facility (the "DIP/ABL Exit Facilities Commitment Letter"), together with a term sheet outlining the terms of the ABL Exit Facility, is annexed, as discussed further below, to the Motion as **Exhibit C**.

### DIP Facilities Are Necessary to Fund Prepackaged Plan Process

32. The Debtors have an immediate need to obtain the DIP Facilities and use Cash Collateral, including ROC Cash Collateral, to permit them, in addition to financing the administration of these Chapter 11 Cases and proceeding toward confirmation of the Prepackaged Plan, to, among other purposes, (a) operate the businesses in the ordinary course, (b) maintain business relationships with vendors, suppliers and customers, (c) pay employee wages in the ordinary course, (d) make necessary capital expenditures, and (e) satisfy other working capital and operational needs, all of which are necessary to preserve and maximize the going-concern value of the Debtors while ownership of the Debtors' business is transferred to their creditors under the Prepackaged Plan.

33. Without the use of Cash Collateral (including ROC Cash Collateral) and access to the additional liquidity made available under the DIP Facilities, the Debtors' management projects that the Debtors will not be able to meet their day-to-day operational needs. In such a scenario, the Debtors would have to consider halting their operations, potentially drastically impairing the overall value of their business. Further, the Debtors' management believes that having access to cash collateral and access to the DIP Facilities is critical for the Debtors to demonstrate to their customers and vendors that they have sufficient working capital to operate their businesses in the ordinary course. Absent this, the Debtors' management believes that customers will stop making purchases from the Debtors and vendors

will cease providing trade terms and/or shipping goods to the Debtors. Therefore, the Debtors request for approval of the DIP Facilities on an expedited basis is critical due to the immediate and irreparable harm that could be suffered by the Debtors' estates were they unable to obtain the post-petition financing and access to cash collateral.

### DIP Facilities Are Reasonable and Adequate Under Circumstances

34. I believe that the terms of the DIP Facilities are reasonable and adequate under the circumstances because:

   a. The terms of the DIP Facilities are at least as favorable, on the whole, to the Debtors as any DIP financing proposal offered by third-parties;

   b. The limitation of the DIP Lenders' priming liens to Term Loan and Secured Note Collateral and the non-impairment of the ABL Priority Collateral, should raise fewer priming and adequate protection issues and, thereby, reduce execution risk and cost to the estates;

   c. Based upon the Debtors' management's projections, the milestones appear reasonable, capable of satisfaction, and consistent with the Debtors' desire to maximize the value of their estates and minimize the costs of administering these Chapter 11 Cases.

### DIP Facilities Are Best Option Currently Available to Debtors

35. The Debtors concluded, based on the results of the financing process conducted by Lazard, that the DIP Facilities presented the best financing option available under the circumstances. Such circumstances included, among others, (i) the reluctance of potential lenders to provide new or increased financing to firearms manufacturers, and (ii) the Prepetition Secured Parties' respective rights under the Existing Intercreditor Agreement. In the final analysis, the combination of the DIP Term Facility and the DIP ABL Facility offered the best available alternative because it (i) permits the Debtors to address both their projected immediate

cash needs and long-term operating goals, (ii) has the support of the principal constituents of each class of the Debtors' creditors, and (iii) maintains the relative priorities under the Debtors' existing capital structure.

### Adequate Protection Furnished to Prepetition Secured Parties is Appropriate

36. I believe that the adequate protection furnished to the Prepetition Secured Parties under the Interim Order is appropriate. In my experience, replacement liens and administrative claim status—which the Interim Order grants to each of the Prepetition Secured Parties—are commonly-employed forms of adequate protection. Similarly, payment of reasonable and documented out-of-pocket fees, costs and expenses—which the Interim Order grants to each of the Prepetition Secured Parties—often serves as a form of adequate protection for secured creditors.

### Roll-Up of OpCo Bridge Term Loans and ABL Debt is Necessary and Warranted Under Circumstances

37. The OpCo Bridge Roll-Up and the ABL Debt Roll-Up (together, the "Proposed Roll-Ups") are necessary components of the DIP Facilities. Approval of the Proposed Roll-Ups is a condition to borrowing under both DIP Facilities, as both the DIP Term Lenders and the DIP ABL Lenders indicated that they were not prepared to furnish the requisite post-petition financing without the roll-up of the Prepetition Debt. The Debtors do not have any other viable DIP financing options other than the DIP Facilities that include the proposed Roll-Ups. Importantly, however, the contemplated paydown of the "rolled-up" debt will not prejudice the Debtors or their estates because the Proposed Roll-Ups will remain subject to the reservation of rights set forth in paragraphs 43 and 44 of the Interim Order—which preserves any creditor challenges to the rolled-up OpCo Bridge Term Loans and ABL Debt. The Proposed Roll-Ups facilitate the benefits of the Prepackaged Plan, which has the

support of the Debtors' key creditor constituencies and should enable the Debtors to implement the Restructuring expeditiously. If implemented, the Restructuring would result in the elimination of hundreds of millions of dollars of the Debtors' prepetition funded debt obligations, while allowing all general unsecured claims of the Debtors to remain unimpaired.

### DIP/Exit ABL Facility Commitment Letter is Critical to Prepackaged Plan and Related Fees and Indemnities Should Be Approved as Reasonable and Necessary

38. The procurement of exit financing is a condition precedent to the confirmation of the Prepackaged Plan that will restructure the Debtors and transfer ownership to their creditors. Without the ABL Exit Facility, the Debtors will require alternative financing to emerge from chapter 11 as successfully reorganized entities and implement the terms of the Plan of Reorganization on the agreed timeline. To this end, the Debtors have determined that the terms of the ABL Exit Facility, as memorialized in the DIIP/Exit ABL Facilities Commitment Letters, are the most favorable identified to date and, despite the Debtors' efforts, no other exit financing alternatives are currently available.

39. A borrower's payment of fees and expenses, such as those called for under the DIP/Exit ABL Exit Facilities Commitment Letter, is customary under circumstances such as these for an exit financing commitment.

40. Indeed, in my experience, debtors in large chapter 11 cases, in this and other districts, commonly seek and obtain approval to enter into exit financing arrangements of this type.

41. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 25, 2018

/s/ Ari N. Lefkovits
Ari N. Lefkovits